IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LIPPERT COMPONENTS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.  06-762-JJF |
| | ) | |
| DEXTER CHASSIS GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF LIPPERT COMPONENTS, INC.'S**
**<u>OPENING BRIEF ON CLAIM CONSTRUCTION</u>**

<div style="margin-left:40%">

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Thomas C. Grimm (#1098)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
tgrimm@mnat.com

*Attorneys for Plaintiff Lippert Components, Inc.*

</div>

OF COUNSEL:

Dean A. Monco
Brad R. Bertoglio
WOOD PHILLIPS
500 West Madison Street
Suite 3800
Chicago, IL  60661-2562
(312) 876-1800

September 14, 2007

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ..................................................................................................1

II. THE LAW OF CLAIM CONSTRUCTION.........................................................1

    A.  The Goal Of Claim Construction Is To Determine The Claim's
        Meaning To A Person Of Ordinary Skill In The Art ............................................1

    B.  Sources of Evidence For Claim Construction.......................................................2

        1.  The Language Of The Claims Is The Starting Point
            For Claim Construction.............................................................................2

        2.  Claims Must Be Read In Light Of The Specification, But The
            Specification Does Not Establish The Boundaries Of The Claim............3

        3.  The Claims Are Also Read In Light Of The
            Prosecution History.................................................................................4

        4.  Extrinsic Evidence Can Be Used To Assist The Court............................4

    C.  Construction of Means-Plus-Function Claim Elements ........................................5

    D.  Improperly Reading Limitations Into Claims.......................................................6

III. THE '715 PATENT SLIDE-OUT MECHANISM.................................................6

    A.  Background ............................................................................................................6

    B.  The '715 Patent .....................................................................................................7

    C.  The Context and Summary Of The Dispute ..........................................................8

IV. THE PROPER CONSTRUCTION OF THE PATENT CLAIMS ..................10

    A.  The Level Of Ordinary Skill In The Art .............................................................10

    B.  Claim Term: "Slidably Mounted".......................................................................11

        1.  The Ordinary Meaning of "Slidably Mounted" ......................................11

        2.  The Intrinsic Evidence Further Supports LCI's Construction ...............14

        3.  Dexter's Own Documents Confirm The Meaning Of The Term
            "Slide" To A Person Of Ordinary Skill In The Art ................................16

C.   Claim Terms: "Slidably Advancing" and
     "Slidably [Slidingly] Advanceable" ...................................................16

D.   Claim Term: "Moveable Member" .......................................................17

     1.   The Meaning Of "Moveable Member" Is Already Plain and
          Unambiguous and Need Not Be Further Construed By The Court ........17

     2.   "Moveable Member" Describes Structure, And Should Not
          Be Construed Under Section 112, ¶ 6 ......................................17

     3.   Dexter's Fallback Position Improperly Imports Limitations
          Into The Claims.................................................................20

E.   Claim Term: "Slide Plate" ................................................................21

F.   Claim Term: "Slide-Out Room" ........................................................22

V.   CONCLUSION.....................................................................................23

## TABLE OF AUTHORITIES

Page

**CASES**

*Abtox, Inc. v. Exitron Corp.*,
    122 F.3d 1019 (Fed. Cir. 1997)..................................................................1

*Al-Site Corp. v. VSI Int'l, Inc.*,
    174 F.3d 1308 (Fed. Cir. 1999)................................................................19

*Alloc, Inc. v. ITC,*
    342 F.3d 1361, 1380 (Fed. Cir. 2003)......................................................19

*CCS Fitness, Inc. v. Brunswick Corp.*,
    288 F.3d 1359 (Fed. Cir. 2002)......................................................5, 17, 19

*Comark Commun., Inc. v. Harris Corp.*,
    156 F.3d 1182 (Fed. Cir. 1998)............................................................2, 3

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
    469 F.3d 1005 (Fed. Cir. 2006)................................................................19

*Electro Med. Sys. S.A. v. Cooper Life Sci. Inc.*,
    34 F.3d 1048 (Fed. Cir. 1994)..................................................................3

*Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.*,
    122 F.3d 1040 (Fed. Cir. 1997)................................................................2

*Golight v. Wal-Mart*,
    355 F.3d 1327 (Fed. Cir. 2004)................................................................4

*In re GPAC Inc.*,
    57 F.3d 1573 (Fed. Cir. 1995)..................................................................2

*In re Nelson*,
    280 F.2d 172, 181 (C.C.P.A. 1960) ........................................................2

*Kwik Products, Inc. v. National Express, Inc.*,
    179 Fed. Appx. 34 (Fed. Cir. 2006) ......................................................19

*Laitram Corp. v. Rexnord, Inc.*,
    939 F.2d 1533, 1536 (Fed. Cir. 1991)....................................................19

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
    382 F.3d 1354 (Fed. Cir. 2004)......................................................5, 17, 18

*Markman v. Westview Instruments, Inc.,*
    517 U.S. 370 (1996)................................................................................1

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed.Cir.1995) (en banc)..................................................3, 4, 5

*McCarty v. Lehigh Valley R.R. Co.,*
    160 U.S. 110, 16 S.Ct. 240 (1895)........................................................6

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)............................................ *passim*

*Playtex Prod., Inc. v. Proctor & Gamble* Co.,
    400 F.3d 901 (Fed. Cir. 2005)..............................................................4

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)..............................................................12

*SRI Int'l v. Matsushita Elec. Corp. of America,*
    775 F.2d 1107 (Fed. Cir. 1985)............................................................3

*Systems Div., Inc. v. Teknek LLC,*
    59 Fed. Appx. 333, 336 (Fed. Cir. 2003)..............................................19

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.,*
    442 F.3d 1322 (Fed. Cir. 2006)..........................................................1, 8

## STATUTES

35 U.S.C. § 112.................................................................................2, 5, 17

## OTHER AUTHORITIES

Moore, *Markman Eight Years Later: Is Claim Construction More Predictable?,*
    9 Lewis & Clark L. Rev. 231, 236 (2005) ............................................6

## I.    INTRODUCTION

Defendant Dexter Chassis Group, Inc. ("Dexter") has willfully infringed U.S. Patent No. 5,791,715 ("the '715 patent"), owned by Plaintiff Lippert Components, Inc. ("LCI"). The '715 patent, entitled "Extension Mechanism For Travel Trailer Slide-Out Rooms," was issued August 11, 1998, based on an application that was filed on November 22, 1991. (Ex. 1.) LCI hereby submits its opening brief addressing the proper interpretation of terms in the '715 patent claims.

## II.   THE LAW OF CLAIM CONSTRUCTION

It is a "bedrock principle" of patent law that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). The interpretation of patent claims is generally a matter of law, decided by the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). Claim construction is "the process of giving proper meaning to the claim language." *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997). The legal function of giving meaning to claim terms always takes place in the context of a specific accused infringing device or process, and therefore some knowledge of that accused product or process is necessary to provide the Court with meaningful context for claim construction, which is the first step in the infringement analysis. *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1326-27 (Fed. Cir. 2006).

### A.    The Goal Of Claim Construction Is To Determine The Claim's Meaning To A Person Of Ordinary Skill In The Art

A patent provides notice to the public of the patentee's exclusive rights, and the patent's claims define the scope of those rights. In *Phillips,* the Federal Circuit restated the basic principles of claim construction and reiterated that the goal is to determine the meaning of the claims to a person of ordinary skill in the art at the time the application for the patent was filed.

*Phillips,* 415 F.3d at 1313 ("The descriptions in patents are not addressed to the public generally, to lawyers or to judges, but . . . to those skilled in the art to which the invention pertains or with which it is most nearly connected.") (quoting *In re Nelson,* 280 F.2d 172, 181 (C.C.P.A. 1960)). The person of ordinary skill in the art is a theoretical construct who is presumed to be aware of all of the pertinent prior art and who possesses all the skills, experience and education commensurate with the sophistication of the particular technology. *Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.,* 122 F.3d 1040, 1042 (Fed. Cir. 1997) (citations omitted); *In re GPAC Inc.,* 57 F.3d 1573, 1579 (Fed. Cir. 1995).

### B.    Sources Of Evidence For Claim Construction

The four principle sources of evidence which may be used in construing claims are: (1) the language of the claims; (2) the specification; (3) the patent application's history of proceedings before the PTO; and (4) limited extrinsic evidence to assist with understanding the background technology and the state of the art.

### 1.    The Language Of The Claims Is The Starting Point For Claim Construction

The patent claims define the scope of the patentee's exclusive rights. *Phillips,* 415 F.3d at 1312 (citation omitted).

> The specification shall conclude with one or more claims particul arly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

35 U.S.C. § 112, ¶ 2.

The proper starting point, therefore, is always the language of the asserted claim itself. *Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1186 (Fed. Cir. 1998). Unless ambiguous or otherwise clearly modified by other intrinsic evidence, claim terms are given the ordinary and customary meaning that they would have to a person of ordinary skill in the

2

relevant art at the time the patent application was filed. *Phillips,* 415 F.3d at 1312-1313 ("The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation.") (citation omitted).

Additionally, there is a presumption that each claim in a patent has a different scope. *Comark Comm.,* 156 F.3d at 1187. This difference is presumed to be significant when the absence of such difference in meaning and scope would render one of the claims superfluous. *Id.* (citation omitted).

> 2. **Claims Must Be Read In Light Of The Specification, But The Specification Does Not Establish The Boundaries Of The Claim**

The first paragraph of Section 112 of the Patent Act, 35 U. S. C. § 112, states that the specification must contain a written description in sufficient detail as to enable one skilled in the art to practice the claimed invention. Thus, the claims are read in view of the specification. However, because the specification is also meant to teach how to practice the invention, including the single best mode of using the invention, the specification can not be used as a source of claim limitations that do not appear in the claims themselves. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 980 (Fed.Cir.1995) (en banc) ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims."); *SRI Int'l v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1121, n. 14 (Fed. Cir. 1985) ("Specifications teach. Claims claim.").

Claims are not restricted to the specific embodiments or examples that appear in the specification. *Phillips,* 415 F.3d at 1323. Similarly, figures or drawings in a patent which depict an embodiment of the invention do not limit the claims to that particular figure. *Electro Med. Sys. S.A. v. Cooper Life Sci. Inc.,* 34 F.3d 1048, 1054 (Fed. Cir. 1994) ("[P]articular embodiments appearing in a specification will not be read into the claims when the claim

language is broader than such embodiments."); *Playtex Prod., Inc. v. Proctor & Gamble* Co., 400 F.3d 901, 908 (Fed. Cir. 2005) ("Claims of a patent may only be limited to a preferred embodiment by the express declaration of the patentee.") (citation omitted).

### 3.    The Claims Are Also Read In Light Of The Prosecution History

Another important source of intrinsic evidence in claim construction is the patent's prosecution history, which should be consulted as needed to determine the scope of a patent claim. *Phillips,* 415 F.3d at 1317 ("Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent."). However, claim scope is restricted only when the patentee uses "words or expressions of manifest exclusion or restriction" during prosecution or in the specification, which represent "a clear disavowal of claim scope." *Golight v. Wal-Mart*, 355 F.3d 1327, 1331 (Fed. Cir. 2004). *Phillips*, 415 F.3d at 1316:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

### 4.    Extrinsic Evidence Can Be Used To Assist The Court

Extrinsic evidence is any evidence not part of the claims, specification or prosecution history of the patent at issue. Extrinsic evidence can be used to provide background and assist the Court in understanding the technology at issue, such as how the invention works, or whether a particular claim term has a specialized meaning to one having ordinary skill in the art. *Phillips,* 415 F.3d at 1318. Because patent claims are to be construed as they would be understood by one having ordinary skill in the art at the time the invention was made, extrinsic evidence may be taken to "demonstrate the state of the prior art at the time of the invention." *Markman,* 52 F.3d at 980, 981. However, where a Court accepts extrinsic evidence, it is important that it be used to

assist with the Court's understanding and not to vary or contradict the terms of the claims. *Markman,* 52 F.3d at 981.

### C.    Construction Of Means-Plus-Function Claim Elements

Under 35 U.S.C. § 112, ¶ 6, a claim limitation may be expressed as a "means or step for performing a specified function without the recital of structure, material, or acts in support thereof." 35 U.S.C. § 112, ¶ 6. So-called means-plus-function claiming "applies only to purely functional limitations that do not provide the structure that performs the recited function." *Phillips*, 415 F.3d at 1311.

In determining whether a claim element is subject to Section 112, ¶ 6, a court considers the phrasing of the element. Use of the word "means" creates a rebuttable presumption that a claim is employing means-plus-function language, such that it should be construed in accordance with Section 112, ¶ 6. Likewise, the absence of the word "means" creates a rebuttable presumption that a claim should <u>not</u> be construed under Section 112, ¶ 6. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002). "The use of the term 'means' is central to the analysis, because the term 'means,' particularly as used in the phrase 'means for,' is part of the classic template for functional claim elements, and has come to be closely associated with means-plus-function claiming." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004) (internal citations omitted).

The presumption flowing from the absence of the term "means" is a strong one that is not readily overcome. *Id.* However, a limitation lacking the word "means" may still be construed under Section 112, ¶ 6, if it fails to recite any definite structure, or else recites function without reciting structure for performing that function. *See, e.g., CCS Fitness*, 288 F.3d at 1369.

### D.    Improperly Reading Limitations Into Claims

No subject has spawned more disputes over the proper interpretation of claims than a litigant's attempt to improperly read limitations into the claims. The temptation to do so is apparent because the practice continues despite strong admonitions by both the United States Supreme Court and the Federal Circuit. *McCarty v. Lehigh Valley R.R. Co.,* 160 U.S. 110, 116, 16 S.Ct. 240, 243 (1895) ("[I]f we once begin to include elements not mentioned in the claim, in order to limit such claim..., we should never know where to stop."); *Phillips,* 415 F.3d at 1320 ("this court has termed one of the cardinal sins of patent law reading a limitation from the written description into the claims") (internal quotation omitted) (emphasis supplied). Indeed, the improper reading of limitations into claims is one of the main reasons why the Federal Circuit reversed 34.5% of the appealed claim constructions since issuing its ruling in *Markman.* Moore, *Markman Eight Years Later: Is Claim Construction More Predictable?,* 9 Lewis & Clark L. Rev. 231, 236 (2005) (Ex. 2).

### III.    THE '715 PATENT SLIDE-OUT MECHANISM

### A.    Background

One challenge facing manufacturers of travel trailers and motor homes is providing the maximum amount of interior space and utility for a given size vehicle. Slide-out rooms or compartments have become an increasingly popular option for meeting that challenge. Slide-out rooms allow for increased interior space when a vehicle is parked. A sofa or bed is commonly attached within the slide-out room or compartment, such that an expanded living room or bedroom is provided when in the extended position. However, the slide-out rooms or compartments can also be retracted to accommodate width limitations while in transit.

While slide-out rooms or compartments had been in use long before the filing of the '715 patent, many conventional slide-outs suffered from mechanical difficulties. Slide-outs were

often mounted to a slide mechanism attached only to the trailer frame, below the trailer floor. However, for various reasons, the trailer sidewalls through which slide-out rooms or compartments extend are not always perfectly square to the trailer frame. Consequently, slide-outs often did not sit or extend squarely relative to the sidewall through which they extended. Mechanical binding problems, weather sealing problems and excessive stress on vehicle components often resulted.

In response to such problems, inventor Michael Nebel developed a new type of slide mechanism. In Nebel's novel design, one end of the slide mechanism rests on the sill of the opening through which the slide-out room or compartment extends. By mounting the slide mechanism to the sill of the slide-out opening, the slide-out room or compartment is maintained in a square orientation relative to the opening – thereby greatly reducing mechanical binding and component stress, while improving the ability to maintain a consistent seal around the slide-out room.

### B.    The '715 Patent

On November 22, 1996, Michael Nebel filed U.S. Patent Application No. 754,872, entitled "Extension Mechanism For Travel Trailer Slide-Out Rooms." Less than two years later, that application issued as the '715 patent. Claim 1 of the '715 patent is illustrative of the claimed invention:

> 1. An apparatus for selectively extending and retracting a slide-out room through a slide-out room opening in a wall of a first room, a portion of the wall comprising a sill having an upper surface which defines a lower edge of the slide-out room opening, the sill extending above a floor of the first room; said apparatus comprising:
>
> (a) at least one stationary member;
>
> (b) means mounted proximate a first end of said stationary member for engaging the upper surface of the sill of the slide-out room opening and supporting said first end of said stationary member thereby; and

7

(c) a moveable member slidably mounted relative to said stationary member and adapted for securement of the slide-out room thereto such that the slide-out room may be advanced through the slide-out room opening.

Subsequent to its issuance, the '715 patent was acquired by LCI.

## C.    The Context and Summary Of The Dispute

The legal function of giving meaning to claim terms always takes place in the context of a specific accused infringing device, and therefore some knowledge of that accused product is necessary to provide the Court with meaningful context for claim construction. *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1326-27 (Fed. Cir. 2006). In this case, LCI had long been manufacturing slide mechanisms for slide-out rooms and compartments. A number of years ago, LCI introduced a sill-mount slide mechanism manufactured under the '715 patent, and the product has achieved great success.

In 2006, LCI learned that Dexter began manufacturing and selling a nearly identical slide mechanism, also adapted for mounting to the sill of a slide-out opening. The patented and accused slide products, as sold by the parties, appear as follows (the LCI product is illustrated with a silver-colored moveable member, while the Dexter component is black):







## IV.    THE PROPER CONSTRUCTION OF THE PATENT CLAIMS

### A.    The Level Of Ordinary Skill In The Art

As described above, claim terms are generally given the meaning that they would have to a person of ordinary skill in the pertinent art, at the time of the invention.  As explained in the '715 patent itself, the field pertinent to the invention is the manufacture of parts and components for travel trailers, motor homes or similar vehicles.  (Ex. 1, '715 patent, col. 1, lines 5-15[1].)  A person having ordinary skill in the art at the time of the '715 patent invention would be familiar with the design of travel trailers, motor homes or similar vehicles, and would have either (1) at least 6 years of work experience in the design and/or manufacturing of structural components for travel trailers, motor homes or similar vehicles; or (2) at least 3 years of work experience in the design and/or manufacturing of structural components for travel trailers, motor homes or similar vehicles, along with a bachelor's degree in mechanical engineering or a similar field.

---

[1]     Hereinafter, references to specific column and line numbers within published patents will be abbreviated as COLUMN : LINES, *e.g.,* 1:5-15.

B.    Claim Term: "Slidably Mounted"

1.    The Ordinary Meaning Of "Slidably Mounted"

Claim 1 includes a limitation by which a moveable member is "slidably mounted" relative to a stationary member. Thus, the term "slidably mounted" describes the way in which the moveable member moves relative to the stationary member.

To a person of ordinary skill in the art, the plain and ordinary meaning of the term "slidably mounted" is "attached in a manner that permits smooth, continuous movement of a moveable member with respect to a stationary member." At the outset, the term "mounted" clearly describes a state of being "attached." (*See, e.g.,* Ex. 11, "mounted." *WordNet® 3.0. Princeton University.* 12 Sep. 2007. <http://wordnet.princeton.edu> (defined as "assembled for use; especially by being **attached** to a support" (emphasis added)).)

The term "slidably" further describes the way in which two components are attached. The root term "slide" is well-known to persons of ordinary skill in the RV industry. The term broadly refers to smooth, continuous movement of one component relative to another component. For example, in the context of the '715 patent invention, the term "slide" is used in reference to a "slide-out room" to describe an arrangement whereby one room (*i.e.* the slide-out room) can be extended and retracted relative to a second room. Such rooms are universally referred to as "slide-out rooms," regardless of the precise mechanism by which the room is extended or retracted. For instance, one industry article explains that "slide-out rooms" can be actuated by a wide variety of mechanisms, including "rack and pinion gears, pulleys, cables, rollers, chains, hydraulic cylinders, air cylinders, screw jack mechanisms and even garage door openers on some homemade applications just to name a few. Predominantly the two most popular methods of actuation at the root level are the electric motor and accompanying gearing and the hydraulic cylinders." (Ex. 3, Gary Bunzer, "The Era Of The Slide-Out Room," http://www.rvdoctor.com/slideout.html (visited September 12, 2007).)

A number of third party patents addressing related inventions further illustrate the understanding of the term "slide" within the RV industry to refer broadly to smooth, continuous movement of one structure relative to another. The following patents illustrate the consistent common understanding of the term "slide" through both the intrinsic evidence (patents cited by the U.S. Patent Examiner and considered during the prosecution of the '715 patent), as well as extrinsic evidence[2] of the state-of-the-art that would be familiar to the hypothetical "person of ordinary skill in the art" when interpreting the '715 patent claims:

| Prior Art Patent | Use of "slidably mounted" or similar terms |
|---|---|
| Ex. 4, *Vitalini*, U.S. Patent No. 3,512,315 (1970) <br><br> *(intrinsic evidence cited during the prosecution of the '715 patent)* | Uses the term "slidably mounted" to refer broadly to smooth continuous movement, whether via roller or otherwise: <br><br> "Generally, therefore, this invention relates to a novel building construction wherein various areas thereof are arranged to slide inwardly and outwardly relative to a static supporting structure. . . ."  (1:59-62, describing a roller device); <br><br> "A movable flooring . . . can now be **slidably mounted** relative to the static supporting structure of FIG. 1 in a manner somewhat analogous to a sliding desk drawer." (5:18-21.) <br><br> "FIG. 1 shows the bearing roller means 14 extending from both sides of each beam 3, this arrangement being adapted to accommodate sliding flooring. . . ." (5:75-6:2.) |

---

[2]    A court may admit and rely on prior art proffered by one of the parties, whether or not cited in the specification or the file history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996). This prior art is often effective in demonstrating how a disputed term is used by those skilled in the art. *Id.*

| Prior Art Patent | Use of "slidably mounted" or similar terms |
|---|---|
| Ex. 5, *DiBiaggio*, U.S. Patent No. 5,620,224 (1997)<br><br>*(intrinsic evidence cited during the prosecution of the '715 patent)* | "The extensible cabin portion is typically **slidably supported** upon the floor of the main room for movement between a stored, retracted position and an extended position." (1:16-20)<br><br>"A **roller** 66, rigidly attached to the trailer frame 62, is disposed between the wall end 60w and the interior end 60i of the frame 60 **for slidably supporting** the frame 60. The frame interior end 60i has a **roller 68 for slidably engaging** the top wall of the channel 64." (2:40-45; see also, 3:53-56, 9:30-38, 10:1-3.) |
| Ex. 6, *Miller*, U.S. Patent No. 5,491,933 (1996)<br><br>*(extrinsic evidence of meaning to a person of ordinary skill in the art near the time of the '715 patent filing)* | "A free rolling wheel 62 or similar device is attached to the opposite end of tube 60 and inserted within tube 50 to serve as a **support roller** and assist in the longitudinal **sliding** of tube 60 into and out of tube 50." (4:66-5:2.)<br><br>"The interior dimensions of ramp 56 are established to permit wheel 62 to roll or slide upward to strap clement 58." (5:39-41.)<br><br>"**Roller** 45 also facilitates telescopic **sliding** of the room portions between expanded and retracted positions. . . ." (5:62-64.) |
| Ex. 7, *Eden*, U.S. Patent No. 5,333,420 (1994)<br><br>*(extrinsic evidence of meaning to a person of ordinary skill in the art near the time of the '715 patent filing)* | "Another object of the invention is to provide a rack and gear type modular room extender wherein the extender utilizes **sliding rods** supported within channel shaped guides, and the guides incorporate **rollers engaging the sliding rods** to minimize friction and reduce the power requirements for room extension and retraction." (2:3-8.)<br><br>"[E]ach guide supports a sliding rod and utilizes rollers for engaging the rod to minimize friction." (2:20-22.) |

| Prior Art Patent | Use of "slidably mounted" or similar terms |
|---|---|
| Ex. 8, *Blodgett*, U.S. Patent No. 5,332,276 (1994)<br><br>*(extrinsic evidence of meaning to a person of ordinary skill in the art near the time of the '715 patent filing)* | "Broadly, the present invention is an extension mechanism for a **trailer slide-out**, comprising a pair of parallel rails that are **slidably carried** in a pair of parallel hollow tubes . . . . [T]he rails are mounted within the channels on **roller bearings** for smoothness and reliability of operation." (2:11-14, 2:46-48.) |
| Ex. 9, *Rasmussen*, U.S. Patent No. 6,338,523 (filed Nov. 23, 1999)<br><br>*(extrinsic evidence of meaning to a person of ordinary skill in the art near the time of the '715 patent filing)* | "In use of a **slider system** 10, slider rail 110 cooperates with **roller assembly** 148 as depicted in FIG. 6." (11:5-6.) |

(all emphasis added.)

Each of the above-referenced prior art patents utilizes terms such as "slidably mounted," "slidably carried," "slidably supported" and other analogous wording to broadly describe arrangements whereby one structure is mounted for smooth, continuous movement relative to another – regardless of whether that movement is achieved through rollers, hydraulic pistons, gear drives, friction or any other structure.

### 2. The Intrinsic Evidence Further Supports LCI's Construction

The plain meaning of "slidably mounted" described above is fully supported by the intrinsic evidence. The '715 patent specification broadly describes the analogous phrase "mounted for slidable movement" as an arrangement in which one movable component is attached in a manner that permits smooth and continuous movement relative to a stationary component, regardless of the particular structures used to facilitate that movement:

> Further, it is foreseen that the slide-out mechanism 19 could comprise a wide variety of **structure [sic] in which one member is stationary and a second member, to which the slide-out room 2 is to be attached, is mounted for slidable movement relative to the stationary member**, such as a tube within a tube or other systems known in the art or which may be hereafter developed.

14

(Ex. 1, '715 patent, 8:26-32 (emphasis added).)

In another instance, the '715 patent specification describes two other components as being "secured together [*i.e.* "mounted"] for slidable movement," where those components move relative to one another through the rotation of a spur gear relative to a rack gear. Specifically, the '715 patent uses the term "slidable" to describe the relationship between bottom plates 92 and 93 and bottom plate extenders 98 and 99. (Ex. 1, '715 patent, 6:13-16 ("bottom plates 92 and 93 and the respective bottom plate extenders 98 and 99 are secured together for *slidable movement* relative to the rails 21 and 22 respectively." (emphasis added)).) Bottom plates 92 and 93 move relative to rails 21 and 22 via engagement of rack gears 96 and 97 with spur gears 102 and 103. (*See, e.g.,* Ex. 1, '715 Patent, Figures 4 and 5; 5:59-61 ("Rack gears 96 and 97 are mounted to the bottom plates 92 and 93 respectively on each side of the slide plate 23 and extend in axial alignment to the respective rail 21 and 22"); col. 6 ll. 17-19 ("First and second spur gears 102 and 103 are mounted in engaging relationship with the rack gears 96 and 97 respectively".) The '715 patent further explains that "spur gears 102 and 103 rotate to drive the slide plate 23 forward." (Ex. 1, '715 patent, 6:44-45.) Thus, the bottom plates undergo "slidable movement" relative to the rails by engaging a rotating (*i.e.* rolling) spur gear with a rack gear. The '715 patent expressly describes this <u>rolling</u> engagement of the bottom plates with the rails to be a "slidable movement."

Throughout all of the varied contexts in which "slidable" and analogous terms are used in the intrinsic record, the common thread amongst them is their reference to arrangements permitting smooth, continuous movements of one movable structure relative to another.

3.    **Dexter's Own Documents Confirm The Meaning Of The Term "Slide" To A Person Of Ordinary Skill In The Art**

The term "slide-out" is virtually universally used in the RV industry, including by Dexter itself, to describe assemblies in which one component moves relative to another in a smooth, continuous manner – regardless of the specific structures used to facilitate that movement.

For example, a CAD drawing created by Dexter of an accused product refers to the Dexter product as a "SOFA **SLIDE** ASSY" which uses a "SOFA **SLIDE** MOTOR ASSEMBLY." (*See* Ex. 10, DEXTER 01906, DEXTER 01797.) In this drawing, Dexter's own engineers use the term "slide" to describe a product in which a moveable member moves relative to a stationary member in a smooth, continuous manner. In Dexter's case, as in Lippert's commercial embodiment of the '715 patent invention, the movement happens to be facilitated by a roller assembly. Regardless, Dexter describes this assembly broadly as a "slide" assembly.

C.    **Claim Terms: "Slidably Advancing" and "Slidably [Slidingly] Advanceable"**

At various places throughout the claims, the '715 patent includes other phrases based on the root term "slide," in addition to the "slidably mounted" term discussed hereinabove. In all cases, the terms refer to smooth, continuous movement of one structure relative to another. Thus, for the reasons explained in connection with the term "slidably mounted," the remaining slide terms should be construed consistently as follows:

| Term | Proper Construction |
|------|---------------------|
| "slidably advancing" | "A moveable member moving in a smooth, continuous manner with respect to a stationary member |
| "slidably advanceable" and "slidingly advanceable" | "Capable of being moved in a smooth, continuous manner with respect to a stationary member." |

### D.     Claim Term: "Moveable Member"

Claim 1, amongst others, includes the element "a moveable member slidably mounted relative to said stationary member and adapted for securement of the slide-out room thereto such that the slide-out room may be advanced through the slide-out room opening." In this context, the parties dispute the proper construction of the term "moveable member."

#### 1.     The Meaning Of "Moveable Member" Is Already Plain and Unambiguous and Need Not Be Further Construed By The Court

LCI submits that the term "moveable member" is a simple term with a clear and unambiguous meaning, which requires no further exposition by the Court. To the extent that it is "construed" at all, the term should be construed to mean "a structural component capable of being moved."

#### 2.     "Moveable Member" Describes Structure, And Should Not Be Construed Under Section 112, ¶ 6

In a transparent effort to import unrecited limitations into the '715 patent claims, Dexter argues that the term "moveable member" should be construed as a "means-plus-function" limitation under 35 U.S.C. § 112, ¶ 6.

Because the '715 patent does not use the term "means" in its recitation of the "moveable member" limitation, the law gives rise to a presumption that the limitation should <u>not</u> be construed as a means-plus-function limitation under Section 112, ¶ 6. *CCS Fitness,* 288 F.3d at 1369; *see also, Lighting World*, 382 F.3d at 1358 ("[t]he use of the term 'means' is central to the analysis. . . ."). The presumption flowing from the absence of the term "means" is a strong one that is not readily overcome. *Lighting World*, 382 F.3d at 1358. A limitation lacking the word "means" can only be construed under Section 112, ¶ 6, when it fails to recite any definite structure, or else recites function without reciting structure for performing that function. *See, e.g., CCS Fitness*, 288 F.3d at 1369.

17

In this case, the term "member" has structural meaning to a person of ordinary skill in the pertinent art. While the term "member" may be used to describe a structural subcomponent broadly, it is by no means a pure recitation of function devoid of structural significance.[3] Rather, the term "member" is used on dozens of occasions, throughout the '715 patent specification, to describe structural subcomponents of the disclosed device.[4] These structures include: "stationary member," "retractable member," "slidable member," "support member," "slide member 23," "frame member 14," and "angle member 66." (*See, e.g.,* Ex. 1, '715 patent, at 2:32, 2:40, 2:45, 2:48, 4:10, 5:4, 5:10, 5:15, 8:28, 8:30, 8:38, 8:50-51, 8:55.) A term should not be construed as invoking Section 112, ¶ 6 where that term is used in the patent's written description as a name for structure. *Lighting World,* 382 F.3d at 1361.

The '715 patent claims also demonstrate the structural significance of the term "moveable member." For example, claim 1 describes structural aspects of the moveable member such as its location ("slidably mounted relative to said stationary member") and its inclusion of a structural attachment or connection to a slide-out room ("adapted for securement of the slide-out room thereto"). (Ex. 1, '715 patent, 9:5-7.) Being a clear recitation of structure, the "movable member" limitation should not be interpreted under Section 112, ¶ 6.

---

[3]    "What is important is whether the term is one that is understood to describe structure, as opposed to a term that is simply a nonce word or a verbal construct that is not recognized as the name of structure and is simply a substitute for the term 'means for.'" *Lighting World,* 382 F.3d at 1360.

[4]    *Cf. Lighting World,* 382 F.3d at 1359-60 (In refusing to apply Section 112 ¶ 6, the Court explained that, "[i]n considering whether a claim term recites sufficient structure to avoid application of section 112 ¶ 6, we have not required the claim term to denote a specific structure. Instead, we have held that it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function.")

Dexter's argument that the term "member" should be construed as a means-plus-function limitation has also been recently and repeatedly rejected by the Court of Appeals for the Federal Circuit. For example:

- In *CCS Fitness v. Brunswick Corp.*, the Federal Circuit refused to construe "reciprocating member" as a means-plus-function element based upon its plain meaning as a unit of structure. 288 F.3d 1359, 1367, 1369 (Fed. Cir. 2002).

- In *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, the Federal Circuit recognized the structural significance of the term "member" and refused to construe the claim term "compression member" as a means-plus-function limitation. 469 F.3d 1005 (Fed. Cir. 2006).

- In *Al-Site Corp. v. VSI Int'l, Inc.*, the Federal Circuit refused to construe "eyeglass hanger member" as a means-plus-function element. 174 F.3d 1308 (Fed. Cir. 1999).

- Numerous Federal Circuit decisions use the term "member" in their construction of true means-plus-function limitations <u>to define the corresponding structure</u>. *See, e.g., Kwik Products, Inc. v. National Express, Inc.*, 179 Fed. Appx. 34 (Fed. Cir. 2006) (defining the <u>structure</u> corresponding to "clamping means" to include a "pivotally mounted clamping member"); *Systems Div., Inc. v. Teknek LLC*, 59 Fed. Appx. 333, 336 (Fed. Cir. 2003) (identifying "a carriage member" as <u>structure</u> corresponding to a means-plus-function limitation); *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1536 (Fed. Cir. 1991) (identifying "cross members" as structure corresponding to "means for joining").

- While the majority opinion in *Alloc, Inc. v. ITC* was decided on other grounds and did not address the term "member," in dissent, Circuit Judge Schall construed the term "member" and directly held that it constitutes a recitation of structure and is not amenable to construction as a means-plus-function limitation. 342 F.3d 1361, 1380 (Fed. Cir. 2003).

Finally, Dexter's interpretation of "moveable member" under Section 112, ¶ 6, is belied by its own positions on the construction of other terms. In order for a jury to evaluate infringement of a means-plus-function element, it is necessary to specify the function and to identify the corresponding structure from the patent specification. Accordingly, the parties have addressed the construction of each term which is legitimately a means-plus-function term, including the "means mounted proximate a first end" and the "drive means." However, tellingly, Dexter has not even suggested a means-plus-function interpretation of other "member" limitations in the claims: the "stationary member" (*see, e.g.,* claim 1) and the "support member"

19

(*see, e.g.,* claim 7).   While Dexter contends that the "moveable member" limitation is purportedly "vague" as to the structure it claims, Dexter notably has no difficulty understanding the term "member" in connection with the recitations of "stationary member" and "support member," which Dexter does <u>not</u> allege to be subject to means-plus-function interpretation under Section 112, ¶ 6.  With Dexter itself conceding that the terms "stationary member" and "support member" are structural limitations, then there can be no question that "moveable member" is likewise a structural limitation.

<div align="center">

**3.    Dexter's    Fallback    Position    Improperly    Imports    Limitations Into The Claims**

</div>

Apparently recognizing the tenuous nature of its argument for means-plus-function interpretation of the term "moveable member," Dexter has set forth a fallback position: that "moveable member" must be construed to mean "a slide plate."  However, that interpretation improperly imports unrecited limitations from the '715 patent specification into the patent claims.

At the outset, there is no basis whatsoever for importing the limitation "slide plate" into claim 1.  As described above, the term "member" describes a class of structures.  "Member" is used in the specification in a variety of different contexts, including:  "stationary member," "retractable member," "slidable member," "support member," "slide member 23," "frame member 14," and "angle member 66."  (*See, e.g.,* Ex. 1, '715 patent, at 2:32, 2:40, 2:45, 2:48, 4:10, 5:4, 5:10, 5:15, 8:28, 8:30, 8:38, 8:50-51, 8:55.)  Merely adding the term "moveable" to the broad structural term "member" does not equate to recitation of a specific structure such as a "slide plate."

Dexter's proposed definition of "movable member" as a slide plate is also inconsistent with the use of the term "moveable member" within the '715 patent specification.  For example,

<div align="center">

20

</div>

the '715 patent clearly explains that a slide plate is just one potential embodiment of a "slidable member" – which itself is just one example of a "moveable member." (*See, e.g.,* Ex. 1, '715 patent, 2:45-48 ("In a preferred embodiment . . . the slidable member comprises a slide plate. . . .").) This is precisely the type of wholesale importation of limitations from the patent specification that has been described by the Federal Circuit as "one of the cardinal sins of patent law." *Phillips,* 415 F.3d at 1320.

Even worse, Dexter's proposed definition of "moveable member" <u>excludes</u> structures specifically described as moveable members in the '715 patent specification. For example, the '715 patent teaches that, "the slide-out mechanism 19 could comprise a wide variety of structures in which one member is stationary and a second member, to which the slide-out room 2 is to be attached, is mounted for slidable movement relative to the stationary member, such as a tube within a tube or other systems known in the art or which may be hereafter developed." (Col. 8 ll. 27-32.) Thus, Dexter's proposed definition of "movable member" as a slide plate contradicts the '715 patent specification, by failing to capture even the "tube within a tube" structure that is expressly described as a moveable member in the '715 patent itself.

Had the patentee intended to limit the claim 1 "movable member" to a slide plate, it would have simply claimed a "slide plate" directly -- **as it did in claims 7, 13, 21 and 22**. Independent claims 7, 13, 21 and 22 expressly recite a "slide plate" in lieu of a "moveable member." Clearly the patentee chose the term "slide plate" where it intended to so limit the claims.

### E.    Claim Term: "Slide Plate"

Claims 7, 13, 21 and 22 include a "slide plate" element. Specifically, the element is recited as being a "slide plate slidably mounted to said rail" (claims 7, 21 and 22) or a "slide plate slidably mounted to said first and second rails" (claim 13). LCI submits that "slide plate" is

a simple term having a meaning that is already clear and unambiguous. To the extent that there is any ambiguity or dispute over the meaning of the word "slide," the significance of that term has already been addressed above in connection with the interpretation of the "slidably mounted" modifier which attaches to each instance of the term "slide plate."

To the extent "slide plate" is construed at all, it should be construed to mean "a structure having a portion that is flat (*i.e.* a "plate"), which is capable of smooth, continuous movement (*i.e.* "slide"). The significance of the term "slide" as referring to smooth, continuous movement is described in detail hereinabove.

### F.    Claim Term: "Slide-Out Room"

The '715 patent claims are directed to "[a]n apparatus for selectively extending and retracting a slide-out room through a slide-out room opening." While Dexter has identified the term "slide-out room" as a term requiring construction by the Court, LCI submits that term "slide-out room" is plain and unambiguous, such that no further interpretation by the Court is required.

To the extent any construction of the term "slide-out room" is appropriate, LCI submits that the term should be defined as "a room that is capable of retractable movement through an opening in the side of another room." This definition is provided by the '715 patent specification itself, when it explains that, "FIGS. 3, 4 and 5 show the slide-out mechanism 19 with a **slide-out room** 2 and a bed or bed frame 125 secured thereto **for retractable movement** through the slide-out room opening 3." (Ex. 1, '715 patent, 6:64-7:2.)

Rather than relying on the '715 patent and the common understanding in the pertinent industry to guide its construction of the term "slide-out room," Dexter instead hangs doggedly to its artificially-constrained definition of the term "slide" in a further effort to improperly narrow the '715 patent claims. Dexter contends that the term "slide-out room" means "a room that

22

moves along relative to a stationary surface in constant contact with the stationary surface." However, nothing in the '715 patent specification contemplates "constant contact" between the slide out room (illustrated in the patent figures 1, 3, 4 and 5 as "slide out room 2") and a stationary surface. Indeed, the slide-out room is secured to a moveable member or slidable member, so that it is suspended above, and <u>not</u> directly in contact with, the stationary components during extension or retraction of the slide-out room through the slide-out room opening. (*See, e.g.,* Ex. 1, '715 patent, 2:38-40.) Further, in an exemplary embodiment, the slide-out room only has secure contact with the stationary slide-out room wall when in the fully extended or retracted positions. (Ex. 1, '715 patent, 3:4-6, 7:45-64.)

## V.    CONCLUSION

Under the Court's Markman procedures, the parties exchanged claim constructions in an effort to narrow the issues that need to be addressed by the Court and at the Markman hearing. As a result, the parties have stipulated to the proper construction of a significant number of claim elements, which are the subject of a separate stipulated motion.

As to the remaining claim elements for which construction is disputed, in view of the foregoing, LCI respectfully submits that the disputed claim elements discussed hereinabove should be construed as proposed by LCI.

OF COUNSEL:

Dean A. Monco
Brad R. Bertoglio
WOOD PHILLIPS
500 West Madison Street
Suite 3800
Chicago, IL 60661-2562
(312) 876-1800

September 14, 2007

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Thomas C. Grimm*
_____
Thomas C. Grimm (#1098)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
tgrimm@mnat.com
*Attorneys for Plaintiff Lippert Components, Inc.*

1234674

## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2007, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

> Donald J. Detweiler
> Titania R. Mack
> GREENBERG TRAURIG, LLP

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on September 14, 2007 upon the following individuals in the manner indicated:

**BY E-MAIL & HAND DELIVERY**

Donald J. Detweiler
Titania R. Mack
GREENBERG TRAURIG, LLP
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
detweilerd@gtlaw.com
mackt@gtlaw.com

**BY E-MAIL**

George G. Matava
GREENBERG TRAURIG, LLP
matavag@gtlaw.com

Brian A. Carpenter
GREENBERG TRAURIG, LLP
carpenterb@gtlaw.com

Stephen B. Perkins
GREENBERG TRAURIG, LLP
perkinsst@gtlaw.com

*/s/ Thomas C. Grimm*
_____
Thomas C. Grimm (#1098)
tgrimm@mnat.com

759738

# EXHIBIT 1

US005791715A

# United States Patent [19]

## Nebel

[11]    **Patent Number:    5,791,715**

[45]    **Date of Patent:    Aug. 11, 1998**

[54]    **EXTENSION MECHANISM FOR TRAVEL TRAILER SLIDE-OUT ROOMS**

[76]    Inventor:    **Michael W. Nebel**, Route 3, Box 6-A, Smith Center, Kans. 66967

[21]    Appl. No.: **754,872**

[22]    Filed:    **Nov. 22, 1996**

[51]    Int. Cl.[6] ............................................... **B60P 3/35**

[52]    U.S. Cl. ......................... **296/26**; 296/171; 296/175; 52/67

[58]    **Field of Search** ..................... 296/165, 170, 296/171, 172, 175, 176, 26, 27; 52/67

[56]    **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| Re. 32,262 | 10/1986 | Stewart . |
| 2,225,319 | 12/1940 | Rollo . |
| 2,606,057 | 8/1952 | Johnson . |
| 2,820,666 | 1/1958 | Grochmal . |
| 3,512,315 | 5/1970 | Vitalini ......................... 52/67 |
| 3,572,809 | 3/1971 | Buland ......................... 296/26 |
| 4,312,159 | 1/1982 | Paul . |
| 4,500,132 | 2/1985 | Yoder . |
| 5,237,782 | 8/1993 | Cooper . |
| 5,332,276 | 7/1994 | Blodgett, Jr. . |
| 5,333,420 | 8/1994 | Eden . |
| 5,491,933 | 2/1996 | Miller . |
| 5,577,351 | 11/1996 | Dewald, Jr. et al. ................... 296/171 |
| 5,620,224 | 4/1997 | DiBiagio et al. ................. 296/165 |

OTHER PUBLICATIONS

Drawings of Slideout Mechanism #1, Peterson Industries, Inc., Smith Center, Kansas, showing slide–out mechanism which was on sale and in public use more than one year prior to the filing date of this application. (No Date).

Drawings of Slideout Mechanism #2, Peterson Industries, Inc., Smith Center, Kansas, showing slide–out mechanism which was on sale and in public use more than one year prior to the filing date of this application. (No Date).

*Primary Examiner*—Dean Kramer

*Attorney, Agent, or Firm*—Litman, McMahon, & Brown, L.L.C.

[57]    **ABSTRACT**

A slide-out mechanism for selectively extending and retracting a slide-out room through a slide-out room opening in a wall which automatically levels or aligns the slide-out room relative to the slide-out room opening in the wall comprises at least one stationary member, a retractable member slidably secured to the stationary member, and a threshold bracket for securing and supporting a front end of the stationary member on an upper surface of a portion of the wall defining a lower edge of the slide-out room opening. A support leg is preferably secured to a rear end of the stationary member for supporting the rear end thereof. The support leg is preferably height adjustable to permit leveling of the rear end of the stationary member relative to the front end.

**24 Claims, 3 Drawing Sheets**









5,791,715

**1**

# EXTENSION MECHANISM FOR TRAVEL TRAILER SLIDE-OUT ROOMS

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to mechanisms for selectively extending and withdrawing slide-out portions of a travel trailer or the like.

### 2. Prior Art

Slide-out rooms or compartments in travel trailers, motor homes and the like have become increasingly popular. The slide-out rooms allow for increased useable space when the vehicle is parked and are retractable to accommodate width limitations while in transit.

A significant problem with currently available slide-out room mechanisms is that the manner of attachment of the mechanisms to the slide-out room often results in the slide-out room being mounted in a non-square orientation relative to the slide-out room hole or opening in a sidewall of the vehicle. The non-square orientation of the slide-out room relative to the slide-out room opening causes binding when the room is retracted or extended through the opening and causes problems sealing around the slide-out room.

In most travel trailers, motor homes or similar vehicles, the sidewalls of the vehicle are generally fabricated as a single piece prior to attachment to the frame of the vehicle. Because of controlled assembly conditions, the edges of the sidewalls, including the edges of a slide-out room opening formed therein, are generally square relative to one another. However, for various reasons, when the sidewalls are secured to the vehicle frame the edges of the sidewalls, and in particular the edges of the slide out room opening, may not be square with the edges of the frame or the floor supported on the frame. This is a common problem for the upper portion of the floor and frame in fifth-wheel or gooseneck type trailers.

The frames of gooseneck type trailers are rarely welded together precisely. Therefore, the frame and floor portion above the gooseneck are almost never parallel with the frame and floor portion below the gooseneck. When a sidewall is mounted to the frame, the lower edge of the portion of the sidewall below the gooseneck is generally aligned with the portion of the frame below the gooseneck such that the lower edge of the portion of the sidewall above the gooseneck is not square with the portions of the frame and floor above the gooseneck. Similarly, the edges of a slide-out room opening above the gooseneck usually are not square with the portions of the frame and floor above the gooseneck.

Most slide-out mechanisms mount directly to the frame, generally below the floor, and the slide-out room is mounted to the slide-out mechanism such that the slide-out room is generally mounted square relative to the frame and floor. When the slide-out room opening is not positioned square with the frame and the floor, the slide out room, mounted to the frame by the slide-out mechanism, does not sit or extend squarely into the slide-out room opening. The non-square orientation of the slide-out room relative to the slide-out room opening causes the slide-out room to bind relative to the slide-out room opening as the room is extended and retracted therethrough and increases the difficulty in obtaining a proper seal around the slide-out room.

Another problem associated with existing slide-out mechanisms is the stress placed on the sidewall of the vehicle through which the room is extended and retracted.

**2**

Most slide-out rooms include some form of inner sealing flange extending perpendicular to the sides and top of the slide-out room along the rear or inner end thereof. When the slide-out room is fully extended, the inner sealing flange engages and pushes against an inner surface of the sidewall of the trailer around the slide-out opening. Similarly, an outer sealing flange, present on most slide-out rooms engages and pushes against an outer surface of the sidewall of the trailer when the room is fully retracted. Over time, the repetitive exertion of these inwardly and outwardly directed forces against the sidewall results in the sidewall being pulled away from the frame.

Therefore, there is a need for a slide-out mechanism that is generally self leveling relative to the slide-out room opening and which reduces the stresses applied to the sidewall of the trailer through repeated extension and retraction of the slide-out room relative thereto.

## SUMMARY OF THE INVENTION

The present invention comprises a slide-out mechanism for selectively extending and retracting a slide-out room through a slide-out room opening in a wall which automatically levels or aligns the slide-out room relative to the slide-out room opening in the wall. A front end of the slide-out mechanism is adapted to be supported on an upper surface of a portion of the wall defining a lower edge of the slide-out room opening so as to automatically level or align the slide-out mechanism relative to the slide-out room opening. The portion of the wall defining a lower edge of the slide-out room opening may hereinafter be referred to as the sill of the slide-out room opening.

The mechanism comprises at least one stationary member, a support bracket secured to a front end of the stationary member and a slidable member slidably mounted relative to the stationary member. The front end of the stationary member is adapted to be supported on the upper surface of the sill by the support bracket. The slide-out room is securable to the slidable member for slidable advancement through the slide-out room opening. A support member is preferably secured to a rear end of the stationary member for supporting the rear end thereof. The support member is preferably height adjustable to permit leveling of the rear end of the stationary member relative to the front end.

In a preferred embodiment the stationary member comprises two rails spaced apart in parallel alignment. The support bracket is secured to and extends between the two rails and the slidable member comprises a slide plate slidably mounted to the two rails and extending therebetween. The support bracket further includes an outer lip for engaging an outer surface of the wall through which the slide-out room opening extends and inner lips for engaging an inner surface of the wall. The outer and inner lips anchor the rails to the wall.

## OBJECTS AND ADVANTAGES OF THE INVENTION

Therefore it is an object of this invention to provide a slide-out mechanism which automatically aligns a slide-out room secured thereto relative to a slide-out room opening in a wall; to provide such a mechanism which maintains the slide-out room square relative to the slide-out opening through which the slide-out room is to be advanced; to provide such a mechanism in which a front end thereof is adapted to be supported across at least a portion an upper surface of a sill of the slide-out room opening; to provide such a mechanism which is adapted to engage inner and

5,791,715

### 3

outer surfaces of the wall adjacent the slide-out room opening for anchoring the mechanism thereto; to provide such a mechanism in which a rear end of the mechanism is height adjustable; to provide such a mechanism which facilitates obtaining a weather tight seal around the slide-out room in an extended or retracted alignment; to provide such a mechanism which is sold already assembled and ready for installation; to provide such a mechanism which is easy to install; to provide such a mechanism which may be installed relatively quickly; and to provide such a mechanism which is relatively inexpensive.

Other objects and advantages of this invention will become apparent from the following description taken in conjunction with the accompanying drawings wherein are set forth, by way of illustration and example, certain embodiments of this invention.

The drawings constitute a part of this specification and include exemplary embodiments of the present invention and illustrate various objects and features thereof.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a fragmentary perspective view of a fifth wheel trailer with a slide-out room shown extended through a slide-out room opening in a sidewall thereof.

FIG. 2 is a perspective view of a slide-out mechanism of the present invention shown supported across the sill of a slide-out room opening by a threshold bracket.

FIG. 3 is an enlarged and fragmentary cross-sectional view of the trailer taken along line 3—3 of FIG. 1 showing the slide-out mechanism in phantom lines beneath a bed frame which is secured to the slide-out mechanism.

FIG. 4 is an enlarged and fragmentary cross-sectional view taken along line 4—4 of FIG. 3 with portions broken away to show detail and showing the slide-out room fully extended through the slide-out opening by the slide-out mechanism.

FIG. 5 is a view similar to FIG. 4 showing the slide-out room fully retracted through the slide-out opening by the slide-out mechanism.

FIG. 6 is an enlarged and fragmentary perspective view of an end of the threshold bracket.

FIG. 7 is an enlarged and fragmentary cross-sectional view taken along line 7—7 of FIG. 2.

FIG. 8 is an enlarged and fragmentary perspective view of an adjustable leg of the slide-out mechanism.

### DETAILED DESCRIPTION OF THE INVENTION

As required, detailed embodiments of the present invention are disclosed herein; however, it is to be understood that the disclosed embodiments are merely exemplary of the invention, which may be embodied in various forms. Therefore, specific structural and functional details disclosed herein are not to be interpreted as limiting, but merely as a basis for the claims and as a representative basis for teaching one skilled in the art to variously employ the present invention in virtually any appropriately detailed structure.

Referring to the drawings in more detail, FIG. 1 shows a portion of a fifth wheel trailer 1 having a slide-out room 2 mounted in a slide-out room opening or hole 3 in a wall 4 thereof. The slide-out room 2 is mounted relative to a portion of the wall 4 above the gooseneck 5 of the trailer 1. Referring to FIG. 4, a lower edge of the slide-out room

### 4

opening 3 is defined by an upper surface 8 of a portion of the wall 4 which may be referred to as the sill 9 of the slide-out room opening 3. The wall 4 includes inner surface 10 and outer surface 11. The slide-out room 2 is secured relative to the wall 4 above a frame 14 and floor 15 of the trailer 1.

A slide-out mechanism 19 of the present invention is shown in FIG. 2, secured within the slide-out room opening 3 of the trailer 1. The slide-out mechanism 19 includes a support bracket or threshold bracket 20, first and second rails 21 and 22, slide plate or slide member 23, and first and second support legs 24 and 25.

The rails 21 and 22 are preferably formed from square tubing secured together in parallel and spaced apart relation. First or front ends 31 and 32 of rails 21 and 22 respectively are secured together by cross-brace 34 welded to and extending therebetween. The threshold bracket 20 is secured to the front ends 31 and 32 of the rails 21 and 22 respectively by bolting the threshold bracket 20 to the front cross-brace 34. A rear cross brace 35 is welded to and extends between second or rear ends 37 and 38 of the rails 21 and 22.

The threshold bracket 20 is sized to span the entire width of the slide-out room opening 3 and is adapted for placement across the sill 9 of the slide-out room opening 3 to support the rails 21 and 22 thereby. The threshold bracket 20 includes web 43, front depending leg or outer lip 44 and rear depending leg 45 which is bolted to the front cross brace 34. The web 43, includes a front portion 46 and a rear portion 47. When the threshold bracket 20 is positioned across the sill 9, the rear portion 47 generally extends horizontally and the front portion 46 angles slightly downward from horizontal, approximately fifteen degrees toward the front thereof.

The web 43 generally engages the upper surface 8 of the sill 9 along a front edge 48 thereof. The outer lip 44 engages the outer surface 11 of the wall 4 just below the slide-out room opening 3 and preferably spans the entire length of the slide-out room opening 3.

The web 43, across the rear portion 47 and part of the front portion 46, is slightly wider than the slide-out room opening 3 and the front lip 44 so as to generally form first and second extensions 51 and 52. First and second inner lips or shoulders 53 and 54 extend downward from the first and second extensions 51 and 52 respectively. The first and second inner shoulders 53 and 54 are spaced behind the front lip 44 a distance equal to the thickness of the wall 4 such that when the threshold bracket 20 is positioned on the sill 9 the first and second inner shoulders 53 and 54 engage the inner surface 10 of the wall 4 on opposite sides of the slide-out room opening 3.

The threshold bracket 20 is preferably formed from relatively thick steel, such as ten gauge steel, with an aluminum cover. The rigidity of the steel is sufficient to support the weight of the front end of the slide-out room mechanism 19 across the front edge 48 of the threshold bracket 20 without deflection of the bracket 20 downward. First and second triangular supports 57 and 58 (only one of which is shown in FIG. 6) may be formed along the opposite ends of the web 43, extending from the front lip 44 to the first and second inner shoulders 53 and 54 respectively. The supports 57 and 58 provide extra rigidity to the threshold bracket 20 and lower edges thereof also engage the upper surface 8 of the sill 9.

The front portion 46 of the web 43 is angled downward to facilitate the draining away of any moisture blown between the slide-out room 2 and the threshold bracket 20. The threshold bracket 20 is covered with aluminum to resist

5,791,715

5

corrosion and present a more attractive finish. The depending leg 45 of the threshold bracket 20 is spaced behind the first and second inner shoulders 53 and 54 a distance to accommodate a frame member 14 which may extend above the floor 15 depending upon the manufacturer's preference.

The first and second support legs 24 and 25 are secured proximate the rear ends 31 and 32 of the first and second rails 21 and 22 respectively. Each support leg 24 and 25 comprises a slotted flange 65, secured to and depending from the rear cross brace 35 at either end thereof proximate one of the rails 21 and 22, and a slotted angle member 66 secured to a respective slotted flange 65. The angle member includes a vertical leg 67 and a horizontal leg 68. Vertical extending slots 72 and 73 are formed in the flanges 65 and the vertical leg 67 of the angle members 66. The vertical leg 67 of the angle member 66 is secured to an associated flange 65 by a carriage bolt 75 extending through aligned slots 72 and 73. The length of the legs 24 and 25 is adjustable by sliding the vertical leg 67 of the angle member 66 relative to the flange 65 and then tightening down the carriage bolt 75. The horizontal leg 68 of each angle member 66 includes a slot 76 therein for driving a screw or the like therethrough for securing the horizontal leg 68 to the floor 15 of the trailer 1.

After the threshold bracket 20 is positioned across the sill 9 of the slide-out room opening 3, so as to support the front end of the slide-out mechanism 19 thereacross, the height of the rear ends 37 and 38 of the rails 21 and 22 respectively may be adjusted to level the rails 21 and 22 relative to the front ends 31 and 32 by adjusting the length or height of the legs 24 and 25. Independent adjustment of the height of the rear ends 37 and 38 may be necessary because the floor 15 may not be square or level relative to the slide-out room opening 3. Securing the front end of the slide-out mechanism 19 across the sill 9 using the threshold bracket 20 ensures that the front end of the slide-out mechanism is square or level with the slide-out room opening 3. The independent adjustability of the height of the legs 24 and 25 allows for adjustments in the height of the rear end of the slide-out mechanism 19 to ensure that the rear end and therefore the entire slide-out mechanism 19 is square or level with the slide-out room opening 3.

The slide plate 23 includes a top plate 80 which extends across and between the first and second rails 21 and 22. The top plate 80 includes a large cutout portion 81 to reduce the amount of material necessary. Front and rear edges or strips 82 and 83 of the top plate are bent downward to provide greater rigidity to the top plate 80.

As shown in FIG. 7, with respect to the second rail 22, opposite sides of the slide plate 23 generally wrap around outer sides 86 and 87 of the rails 21 and 22 respectively and across bottoms 88 and 89 thereof to slidably secure the slide plate 23 to the rails 21 and 22. In particular, opposite sides of the slide plate 23 include side plates 90 and 91 and bottom plates 92 and 93 respectively. The side plates 90 and 91 extend across respective outer side 86 and 87 of the rails 21 and 22 and the bottom plates 92 and 93 extend across the bottoms 88 and 89 thereof.

Rack gears 96 and 97 are mounted to the bottom plates 92 and 93 respectively on each side of the slide plate 23 and extend in axial alignment to the respective rail 21 and 22. It is foreseen that a cheaper but equally effective alternative to the rack gears 96 and 97 would be to mount to the bottom plates 92 and 93 ladder gears comprising elongate rectangular plates having a succession of holes punched therein in axial alignment and spaced apart a distance corresponding to the width of the teeth of the rack gears 96 and 97.

6

Bottom plate extenders 98 and 99 are welded to the slide plate 23 on each side thereof so as extend rearwardly from the respective bottom plate 92 and 93 in axial alignment therewith. Each bottom plate extender 98 and 99 is preferably formed from angle iron including a horizontal leg 100, which extends in axial alignment with the respective bottom plate 92 and 93 and generally forms an extension thereof, and a vertical leg 101 on an outer side thereof. The rack gears 96 and 97 each preferably extend from a front end of the slide plate 23 past a rear end thereof and across a substantial portion of the respective bottom plate extender 98 and 99. The rack gears 96 and 97 are also secured to the bottom plate extenders 98 and 99. The bottom plates 92 and 93 and the respective bottom plate extenders 98 and 99 are secured together for slidable movement relative to the rails 21 and 22 respectively.

First and second spur gears 102 and 103 are mounted in engaging relationship with the rack gears 96 and 97 respectively. The spur gears 102 and 103 are connected together by drive shaft assembly 105. The drive shaft assembly 105 is driven by a reversible electric motor 106 through transmission 107. The motor 106 and transmission 107 are mounted to an inner surface 109 of the second rail 22 by motor bracket 110.

A first end of the drive shaft assembly 105 is rotatably supported, proximate the first spur gear 102, by a first bearing 115 (not shown) which is mounted to a bearing support bracket 116 mounted to an inner surface 117 of the first rail 21. A second end of the drive shaft assembly 105, is rotatably supported, proximate the second spur gear 103, by a second bearing 118 which is mounted to the motor bracket 110.

The electric motor 106, the transmission 107, the drive shaft assembly 105, spur gears 102 and 103 and the rack gears 96 and 97 generally comprise a drive assembly or means for slidably advancing the slide plate 23 relative to the rails 21 and 22 both forward and rearward. It is foreseen that a wide variety of drive means well known in the industry could be utilized for advancing the slide plate 23 or its equivalent relative to the rails 21 and 22 or their equivalent, such as hydraulic pistons, chain drives, screw gears, scissor jacks or manual means.

As the spur gears 102 and 103 rotate to drive the slide plate 23 forward the outer lip 44 of the threshold bracket pulls against the outer surface 11 of the wall 4. As the spur gears 102 and 103 rotate to drive the slide plate rearward, the inner shoulders 53 and 54 push against the inner surface 10 of the wall 4.

Extending the rack gears 96 and 97 rearward of the rear edge 83 of the slide plate 23 permits a longer effective stroke of the slide plate 23 relative to the rails 21 and 22 while minimizing the amount of material utilized in the slide plate 23. Because the support legs 24 and 25 are mounted on the rear cross brace 35 and because the sides of the slide plate 23 only wrap around the outer sides 86 and 87 and the bottoms 88 and 89 of the rails 21 and 22 respectively, and not the inner surfaces 109 and 117 thereof, at least a portion of the slide plate 23 can be advanced past the rear ends 37 and 38 of the rails 21 and 22. This feature of the slide-plate 23, which may be referred to as a bypass feature, allows for a longer stroke length of the slide-plate 23 without having to increase the length of the rails 21 and 22.

The slide-out mechanism 19, is particularly well adapted for use with slide-out rooms 2 utilized to provide expandable sleeping quarters. FIGS. 3, 4 and 5 show the slide-out mechanism 19 with a slide-out room 2 and a bed or bed

5,791,715

7

frame 125 secured thereto for retractable movement through the slide-out room opening 3. The slide-out room 2 and bed frame 125 are shown fully extended in FIG. 4 and fully retracted in FIG. 5. By utilizing the slide-out feature with respect to the sleeping quarters, a longer bed 125 can be utilized while providing for walking space at the foot of the bed 125 when the slide-out room 2 is fully extended.

The slide-out room 2 includes outer wall panel 130, side panels 131 and 132, floor panel 133, outer sealing flange 134 and inner sealing flange 135. The bed frame 125 includes side panels 141 and 142, head panel 143, foot panel 144, top panel 145 and bottom panel 146. The bottom panel 146 is adapted to be supported on and secured to the slide plate 23. The bottom panel 146 may be secured to the slide plate 23, between the rails 21 and 22, by screws or the like. A front portion of the bottom panel 146 is positioned under and secured to a rear portion of the floor panel 133 of the slide-out room 2 by screws or the like. The portions of the side panels 141 and 142 of the bed frame 125 which extend rearward of the slide-out room 2, extend below the bottom panel 146 and almost to the floor 15 of the trailer 1 when secured to the slide-out mechanism 19.

The head panel 143 of the bed frame 125 is secured to an inner surface of the outer wall panel 130 by screws or the like which ensures that the slide-out room 2 sits square relative to the bed frame 125. The bottom panel 146 of the bed frame 125 is preferably of the same width as the slide plate 23 such that inner surfaces of the side panels 141 and 142 engage the outer surfaces of the side plates 90 and 91 respectively of the slide plate 23 when the bed frame 125 is positioned on the slide-out mechanism 19, thereby ensuring that the bed frame 125 sits square relative to the slide-out mechanism 19. Assuming the relevant components of the slide-out mechanism 19, the slide-out room 2 and the bed frame 125 are all built square relative to each other, the slide-out room 2 should sit square or in alignment with the slide-out mechanism 19, assuming the sides of the opening 3 are square and regardless of whether the opening 3 sits square or level with the frame 14 or floor 15 of the trailer 1.

Access holes or openings (not shown) may be formed in the foot panel 144 of the bed frame 125 to provide access to the adjustable support legs 24 and 25 of the slide-out mechanism 19.

Weather stripping or seals 148 well known in the art may be applied to an inner surface of the outer sealing flange 134 to form a weather tight seal when the slide-out room 2 is positioned in a retracted position. Similarly, weather stripping or seals 149 may be secured to an outer surface of the inner sealing flange 135 to form a weather tight seal when the slide-out room 2 is advanced to the extended position. The inner sealing flange 135 only extends across the sides and the top of the slide-out room 2 and not across the bottom thereof. To form a seal across the bottom of the slide-out room 2, when it is advanced to the extended position, a foam strip 150 (seen in crosssection in FIG. 5) may be secured to the lower surface of the floor panel 133 of the slide-out room 2 generally in planar alignment with the inner sealing flange 135. A layer of water repellent fabric 151 (not shown) is then secured across the lower surface of the floor panel 133 with the foam strip 150 extending therebetween. When the slide-out room 2 is advanced to the extended position, the foam strip 150 engages the upper surface of the rear portion 47 of the web 43 so as to form a seal thereby.

As the slide-out room 2 is advanced to the extended position, the gravitational force exerted on the front end thereof produces a torque on the slide-plate 23. The bed

8

frame side panels 132 and 133 are preferably secured to the vertical leg 100 of the bottom plate extenders 98 and 99 respectively to resist the torque on the slide-plate 23. Once the slide-out room 2 is fully extended, engagement of the inner surface 10 of the wall 4 by the inner sealing flange 135 reduces the torque on the slide-plate 23.

In addition, engagement by the inner sealing flange 135 of the inner surface 10 of the wall 4 when the slide-out room 2 is advanced to the extended position, exerts an outwardly directed force on the wall 4. Engagement of the outer surface 11 of the wall 4 by the outer lip 44 of the threshold bracket 20 holds the wall 4 in place and resists or counteracts the outwardly directed force exerted by the inner sealing flange 135. Similarly engagement by the inner shoulders 53 and 54 of the inner surface 10 of the wall 4 counteracts the inwardly directed force exerted on the wall 4 by the outer sealing flange 134 when the slide-out room 2 is fully retracted.

It is to be understood that whilst certain forms of the present invention have been illustrated and described herein, it is not to be limited to the specific forms or arrangement of parts described and shown. By way of example and not as a further limitation it is noted that, although the preferred embodiment of the slide-out mechanism 19 utilizes a pair of rails 31 and 32 with the slide-plate 23 slidably secured thereto, it is foreseen that the mechanism could comprise a single rail or three or more rails. Further, it is foreseen that the slide-out mechanism 19 could comprise a wide variety of structure in which one member is stationary and a second member, to which the slide-out room 2 is to be attached, is mounted for slidable movement relative to the stationary member, such as a tube within a tube or other systems known in the art or which may be hereafter developed.

Although the preferred threshold bracket 20 is shown as a single bracket extending the entire width of the slide-out room opening 3, it is foreseen that the threshold bracket 20 could comprise a wide variety of forms. For example, a flange could be welded to the ends of each rail or stationary member so as to extend horizontally relative to the rail with the flange being adapted to be fastened to the upper surface 8 of the sill 9 to support the rail thereby and secure the rail to the wall 4. The bracket could also comprise an angle iron welded to the end of each rail so as to form a downwardly opening channel with the end of the rail such that when the bracket is positioned across the sill 9, a downwardly depending leg of the angel iron engages the outer surface 11 of the wall 4, a horizontally extending leg of the angle iron engages the upper surface 8 of the sill 9, and the end of the rail engages the inner surface 10 of the wall 4.

Further it is foreseen that a wide variety of support legs or members could be used for supporting the rear ends 37 and 38 of the rails 21 and 22 above the floor 15 including support means such as threaded rods with pivotal feet, the rods being threadingly secured to the rails 21 and 22 or rear cross-brace 35. It is also foreseen that in some applications it may not be necessary to utilize a support member for supporting the rear end of the rail or stationary member. It may be possible support the stationary member only at a front end thereof.

What is claimed and desired to be secured by Letters Patent is as follows:

1. An apparatus for selectively extending and retracting a slide-out room through a slide-out room opening in a wall of a first room, a portion of the wall comprising a sill having an upper surface which defines a lower edge of the slide-out room opening, the sill extending above a floor of the first room; said apparatus comprising:

(a) at least one stationary member;

5,791,715

**9**

(b) means mounted proximate a first end of said stationary member for engaging the upper surface of the sill of the slide-out room opening and supporting said first end of said stationary member thereby; and

(c) a moveable member slidably mounted relative to said stationary member and adapted for securement of the slide-out room thereto such that the slide-out room may be advanced through the slide-out room opening.

**2.** The apparatus as in claim **1** further comprising:

(a) a height adjustable support member secured to said stationary member toward a second end thereof for supporting said second end of said stationary member.

**3.** The apparatus as in claim **1** further comprising:

(a) drive means secured to said stationary member for slidably advancing said moveable member relative to said stationary member.

**4.** The apparatus as in claim **1** wherein said first end of said stationary member is supported by the upper surface of the sill of the slide-out room opening by:

(a) a support bracket secured to said first end of said stationary member, said support bracket having an outer lip for engaging an outer surface of the wall and an inner lip for engaging an inner surface of the wall.

**5.** The apparatus as in claim **4** wherein:

(a) said support bracket spans the width of the slide-out room opening.

**6.** The apparatus as in claim **5** wherein said support bracket includes:

(a) a horizontally extending rear portion; and

(b) a front portion which slopes downward toward a front end thereof.

**7.** An apparatus for selectively extending and retracting a slide-out room through a slide-out room opening in a wall of a first room, a portion of the wall comprising a sill having an upper surface which defines a lower edge of the slide-out room opening, the sill extending above a floor of the first room; said apparatus comprising:

(a) at least one rail adapted to be supported proximate a first end thereof by the upper surface of the sill of the slide-out room opening and extending perpendicular thereto;

(b) a support member secured to said rail toward a second end thereof; and

(c) a slide plate slidably mounted to said rail and adapted for securement of the slide-out room thereto such that the slide out room is slidably advanceable through the slide-out room opening.

**8.** The apparatus as in claim **7** wherein:

(a) said support member supports said second end of said rail above the floor of said first room and is height adjustable for adjusting the height of said second end of said rail above the floor.

**9.** The apparatus as in claim **7** further comprising:

(a) drive means secured to said rail for slidably advancing said slide plate relative to said rail.

**10.** The apparatus as in claim **7** wherein said first end of said rail is supported by the upper surface of the sill of the slide-out room opening by:

(a) a support bracket secured to said first end of said rail; said support bracket having an outer lip for engaging an outer surface of the wall and an inner lip for engaging an inner surface of the wall.

**11.** The apparatus as in claim **10** wherein:

(a) said support bracket spans the width of the slide-out room opening.

**10**

**12.** The apparatus as in claim **11** wherein said support bracket includes:

(a) a horizontally extending rear portion; and

(b) a front portion which slopes downward toward a front end thereof.

**13.** An apparatus for selectively extending and retracting a slide-out room through a slide-out room opening in a wall; said apparatus comprising:

(a) a first rail and a second rail each having a first end and a second end;

(b) a threshold bracket secured to said first ends of said first and second rails and extending perpendicular thereto; said threshold bracket adapted to be positioned on and supported by an upper surface of a sill of the slide-out room opening; said threshold bracket further having an outer lip for engaging an outer surface of the wall and an inner lip for engaging an inner surface of the wall;

(c) first and second support legs secured to said first and second rails respectively toward second ends thereof; and

(d) a slide plate slidably mounted to said first and second rails and adapted for securement of the slide-out room thereto such that the slide-out room is slidingly advanceable through the slide-out room opening.

**14.** The apparatus as in claim **13** wherein said slide plate includes:

(a) a top plate extending between and across said first and second rails;

(b) first and second side plates extending across outer sides of said first and second rails respectively;

(c) first and second bottom plates extending at least partially across bottoms of said first and second rails respectively; and

(d) first and second racks mounted to said first and second bottom plates respectively and engaged by first and second spur gears rotatably mounted to said first and second rails respectively and mounted in engaging relationship with said first and second racks.

**15.** The apparatus as in claim **14** wherein said slide plate further comprises:

(a) first and second bottom plate extenders secured to said first and second bottom plates respectively in axial alignment therewith and extending rearward therefrom and having portions of said first and second racks respectively secured thereto.

**16.** The apparatus as in claim **13** wherein said threshold bracket includes:

(a) a horizontally extending rear portion; and

(b) a front portion which slopes downward toward a front end thereof.

**17.** An apparatus for selectively extending and retracting a slide-out room through a slide-out room opening in a wall; said apparatus comprising:

(a) at least one stationary member;

(b) means mounted proximate a first end of said stationary member for engaging an upper surface of a sill of the slide-out room opening and supporting said first end of said stationary member thereby;

(c) a moveable member slidably mounted relative to said stationary member and adapted for securement of the slide-out room thereto such that the slide-out room may be advanced through the slide-out room opening; and

(d) a height adjustable support member secured to said stationary member toward a second end thereof for supporting said second end of said stationary member.

5,791,715

11

**18**. An apparatus for selectively extending and retracting a slide-out room through a slide-out room opening in a wall; said apparatus comprising:

(a) at least one stationary member;

(b) means mounted proximate a first end of said stationary member for engaging an upper surface of a sill of the slide-out room opening and supporting said first end of said stationary member thereby; and

(c) a moveable member slidably mounted relative to said stationary member and adapted for securement of the slide-out room thereto such that the slide-out room may be advanced through the slide-out room opening; and

(d) a support bracket secured to said first end of said stationary member; said support bracket having an outer lip for engaging an outer surface of the wall and an inner lip for engaging an inner surface of the wall.

**19**. The apparatus as in claim **18** wherein:

(a) said support bracket spans the width of the slide-out room opening.

**20**. The apparatus as in claim **19** wherein said support bracket includes:

(a) a horizontally extending rear portion; and

(b) a front portion which slopes downward toward a front end thereof.

**21**. An apparatus for selectively extending and retracting a slide-out room through a slide-out room opening in a wall; said apparatus comprising:

(a) at least one rail adapted to be supported proximate a first end thereof by an upper surface of a sill of the slide-out room opening and extending perpendicular thereto;

(b) a support member secured to said rail toward a second end thereof;

12

(c) a slide plate slidably mounted to said rail and adapted for securement of the slide-out room thereto such that the slide out room is slidably advanceable through the slide-out room opening; and

(d) said support member supports said second end of said rail above a floor of a first room relative to which said slide-out room extends and retracts; said support member is height adjustable for adjusting the height of said second end of said rail above the floor.

**22**. An apparatus for selectively extending and retracting a slide-out room through a slide-out room opening in a wall said apparatus comprising: (a) at least one rail adapted to be supported proximate a first end thereof by an upper surface of a sill of the slide-out room opening and extending perpendicular thereto;

(b) a support member secured to said rail toward a second end thereof;

(c) a slide plate slidably mounted to said rail and adapted for securement of the slide-out room thereto such that the slide out room is slidably advanceable through the slide-out room opening; and

(d) a support bracket secured to said first end of said rail; said support bracket having an outer lip for engaging an outer surface of the wall and an inner lip for engaging an inner surface of the wall.

**23**. The apparatus as in claim **22** wherein:

(a) said support bracket spans the width of the slide-out room opening.

**24**. The apparatus as in claim **23** wherein said support bracket includes:

(a) a horizontally extending rear portion; and

(b) a front portion which slopes downward toward a front end thereof.

*    *    *    *    *

EXHIBIT 2



9 Lewis & Clark L. Rev. 231                                    Page 1

Lewis & Clark Law Review
Spring 2005

Article

**\*231** MARKMAN EIGHT YEARS LATER: IS
CLAIM CONSTRUCTION MORE
PREDICTABLE?

Kimberly A. Moore [FNa1]

Copyright (c) 2005 Lewis & Clark Law Review;
Kimberly A. Moore

This Article revisits the growing criticism surrounding the lack of guidance and predictability in claim construction cases after the Markman decision. Specifically, the Article investigates the Federal Circuit's reversal rate on these cases, as a high reversal rate evidences confusion among the lower courts. In Part II, the author reviews existing empirical studies on the Federal Circuit's reversal rate in claim construction cases, arguing that many of these studies are misleading. Part III clarifies what data must be considered to adequately determine the Federal Circuit's reversal rate of appealed claim construction cases. In Part IV, the author concludes that her new analysis of the reversal rate supports the growing criticism that Markman has created confusion, not guidance, in claim construction cases, and the confusion is getting worse.

| I. | INTRODUCTION. | 231 |
| II. | Empirical Studies of Claim Construction. | 233 |
| | A. Result-Based Studies: What is the Reversal Rate?. | 234 |
| | B. Methodology-Based Studies. | 238 |

III.          The Empirical Study.                                      239

              A. Reversal Rates.                                        239

              B. Who Wins--Patentee or                                  240
              Infringer?.

              C. Means-Plus-Function Terms.                            242

              D. Claim Construction By the                             243
              Federal Circuit Judges.

IV.           The Reversal Rate is Getting                             245
              Worse Not Better.

## I. INTRODUCTION

There is concern among the bench and bar that the Federal Circuit's de novo review of district court claim construction decisions [FN1] and lack of guidance have caused considerable unpredictability. [FN2]

*232 There's a real sense of fatalism among the patent trial bar, shared by the district court judges, that no matter how careful we are in trying to apply what the court says about Markman, there's a high likelihood that on review, the [Federal Circuit] will change the construction of the claims. [FN3] Such concern prompted two prominent practitioners to coin the term "judicial hyperactivity" to describe how the Federal Circuit usurps the province *233 of the district court in, among other areas, claim construction. [FN4] The problem is so pernicious that the court itself has taken yet another claim construction case, [FN5] Phillips, [FN6] en banc in order to establish some ground rules for the claim construction process. In the Phillips case, the court invited briefing on fourteen separate questions regarding the types of sources to be consulted in construing claims and the deference to be given to the district court. [FN7]

It is always useful to quantify any problem. Just how unpredictable is the claim construction process? Existing empirical studies have asserted that the Federal Circuit reverses 25% to 50% of district court claim construction decisions. Practitioners then choose whichever number suits their cause. This is irresponsible empiricism. The Federal Circuit's claim construction reversal rate is not a judgment call. There is a right answer to the question: How often does the Federal Circuit determine that the district court got the claim construction wrong? The reversal rate (rate at which the Federal Circuit determined the claim construction was wrong) for appealed claim terms from 1996, after Markman was decided, [FN8] through 2003 is 34.5%. [FN9]

In Part II, this Article reviews existing empirical studies on the claim construction process and discusses the shortcomings of these studies. In Part III, the Article presents updated and additional empirical findings on the Federal Circuit's reversal rates of appealed claim construction decisions. Part IV analyzes these results and concludes that criticism over the lack of guidance and unpredictability caused by the current claim construction process is warranted. The problem is getting worse, not better.

## II. EMPIRICAL STUDIES OF CLAIM CONSTRUCTION

There are two categories of empirical studies of claim construction that have been performed: result-based and methodology-based. The result-based *234 studies, like this one, focus on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

outcome data to determine, among other things, how bad the problem is. The methodology-based studies focus on the process itself to explain why the problem is so bad. Both are useful in judging the process.

A. Result-Based Studies: What is the Reversal Rate?

It is undoubtedly frustrating to have several studies which purport to present the Federal Circuit's reversal rate of district court claim construction. The existing literature asserts a reversal rate ranging from 25% to 50%, depending on the study cited. The other empirical literature on this subject suffers from several serious flaws. The most substantial of which is the failure to review the Federal Circuit's Rule 36 summary affirmances. [FN10]

When the Federal Circuit resolves an appeal, it can issue a precedential opinion, a non-precedential opinion, or a summary affirmance. Precedential opinions are opinions in which the court can either affirm or reverse the district court judgment, and these opinions are published and create citable precedent on the issues of law to which they pertain. Non-precedential opinions are law of the case in which they are issued, but do not create citable precedent. [FN11] These opinions can also either affirm or reverse the district court judgment. The court may also resolve a case by a Rule 36 summary affirmance. [FN12] This is an affirmance of the district court without opinion. These affirmances leave intact and affirm the judgment of the district court (and any claim construction determinations by the district court which were appealed). A case is not summarily affirmed because it is unimportant and should not be considered. [FN13] It is summarily affirmed because the district court got it right, and there is no new law that needs to be explained, defined, clarified or established. [FN14] There are no **235 summary reversals. Whenever the Federal Circuit reverses, it issues an opinion explaining how and why the district court was wrong.

The Federal Circuit resolves claim construction appeals by all three means (precedential opinion, non-precedential opinion and Rule 36 summary affirmance). Obviously, eliminating a large group of non-randomly selected cases would affect the results. Studies that did not consider the Rule 36 summary affirmances eliminated a large group of affirmances from their dataset. This skewed their results and they report a significantly higher reversal rate than actually exists. All of the other early claim construction studies (the Chu Study (44% reversal rate), [FN15] the Bender Study (40% reversal rate), [FN16] and the Zidel Study (41.5% reversal rate) [FN17]) omitted Rule 36 cases from their claim **236 construction reversal rate determinations. [FN18] Although the studies were generally clear about what they considered, [FN19] and some even pointed out that they did not include Rule 36 summary affirmances, [FN20] they generally did not explain the consequences of this omission. Without the Rule 36 summary affirmances, these reversal rates are inaccurate--they are artificially high. It is common sense that if one excludes a bunch of affirmances, it will appear as though the court reverses more often than it does.

The empirical studies, other than this one, omitted the Rule 36 summary affirmances because they are simply too difficult to include. Since the summary affirmances simply indicate that the case was affirmed, there is no easy way of determining what issues where involved in the appeal. The information cannot be obtained from a quick search on Westlaw or Lexis, but instead requires resort to the briefs filed with the Federal Circuit. Unless one obtains the original appellate briefs that were filed, and painstakingly reviews each one, one cannot determine whether a summary affirmance is an affirmance of a district court claim construction or an affirmance of some other unrelated issue. Obtaining the actual briefs is both time consuming and expensive. This study did just that; it reviewed every Rule 36 summary affirmance during the period of interest to ascertain whether the appeal involved claim construction. If so, it was included.

To understand the magnitude of the error in data collection and its impact, consider this study. Of the 1100 claim construction terms appealed in this study, 15.5% (170) were resolved by Rule 36 summary affirmance, 34.7% (328) were resolved via non-precedential opinion of the court, and 49.8% (548) were resolved via precedential opinion of the court. The resultant reversal rate of 34.5% considered all of these cases. If the Rule 36 summary affirmances are left out, the reversal rate becomes 40.8%.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

None of the studies which omitted the Rule 36 cases explain how profound the impact on the results would likely be despite the fact that the significance was intuitively obvious. When one eliminates affirmances, one finds a higher reversal rate. Moreover, it is sensible to assume that a large number of Rule 36 cases would likely involve claim construction, because the construction of any individual claim term does not have significant impact beyond the parties. The meaning of a particular claim term does not have precedential value beyond the *237 patent at issue. In short, claim construction cases seem likely candidates for Rule 36 affirmance--that is, when the district court gets the construction right. However, the data show that claim construction appeals are actually less likely to be affirmed via Rule 36 then other patent appeals. As mentioned above, 15.5% of all the claim construction appeals were summarily affirmed. Another study found that among the 502 patent appeals to the Federal Circuit resolved between January 1, 1998 and April 30, 2000, 106 were summarily affirmed--21.1%. [FN21] This result suggests that claim construction cases are, thus far, less likely to be the subject of a Rule 36 summary affirmance despite the intuition that these sorts of cases would be the least likely to have precedential value. This is likely correlated to the ultimate finding of this study; namely, that claim construction reversals have gotten worse over time, not better. Since the Federal Circuit is reversing more claim construction decisions in recent years, [FN22] there are fewer Rule 36 summary affirmances.

The first assertion regarding claim construction reversal rates came directly from one of the Federal Circuit judges and appeared in a concurrence to the en banc decision in Cybor Corp. [FN23] This, of course, gives the number the imprimatur of accuracy. In this decision, Judge Rader states as follows:

> [O]ne study shows that the plenary standard of review has produced reversal, in whole or in part, of almost 40% of all claim constructions since Markman I. A reversal rate in this range reverses more than the work of numerous trial courts; it also reverses the benefits of Markman I. In fact, this reversal rate, hovering near 50%, is the worst possible. Even a rate that was much higher

would provide greater certainty. [FN24]

Interestingly the Judge cites the reversal rate as "almost 40%" then says that 40% is "hovering near 50%." With this empirical slight of hand, claim construction reversal is raised from the actual finding of the study, 38.3%, to 50%, and quoted by people accordingly. [FN25] Although we have no idea from the opinion who conducted the study, the opinion does explain:

> This figure is based on a survey of every patent decision rendered by the Court of Appeals for the Federal Circuit between 5 April 1995 (the date Markman I was decided) and 24 November 1997. A total of 246 patent cases, originating in the Board of Patent Appeals and Interferences (BPAI), the district courts, and the Court of Federal Claims, were evaluated. Of the 246 cases, 141 cases expressly reviewed claim construction issues. Among these 141 decisions, this court reversed, in whole or in part, 54 or 38.3% of all claim constructions. With respect to *238 the district court and Court of Federal Claims cases, the rate of reversal of claim constructions is 47 out of 126 or 37.3%. [FN26] This explanation does not clarify whether the empiricist considered all Federal Circuit cases: Rule 36, non-precedential, and precedential. It is also unclear when a case is considered "reversed." Are cases only included if they result in an actual reversal of the district court judgment, or are they included whenever the Federal Circuit determines that the district court wrongly construed claim construction? It is possible that the district court could get claim construction wrong but the case would still be affirmed. For example, suppose the district court construed two terms favorably for the infringer, each of which results in a finding of non-infringement. The Federal Circuit may determine that the district court construed one of the terms wrongly but still affirm the judgment of non-infringement based on the other term.

In comparing all of these empirical studies, one must be mindful not only of the shortcomings of some of the empirical collection but also of exactly what the study means by "reversal rate." There are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

three possibilities. First, reversal rate can be the rate at which the Federal Circuit determined that the district court claim construction was wrong (even if it did not actually result in reversal of the judgment) on a term-by-term basis. In many appeals, more than one construed term was appealed, so statistics can be reported on a term-by-term basis or on a case-by-case basis. In this study, the Federal Circuit determined that the district court wrongly interpreted 34.5% of all claim terms that were appealed. Second, the reversal rate could be the number of cases in which one or more claim term was erroneously construed. In this study, that reversal rate would be 37.5%. Finally, the reversal rate could be only the cases in which a claim construction error actually resulted in reversal of the appealed judgment. In this study, 29.7% of the cases were reversed or vacated and remanded because of erroneous claim construction. Obviously, the definition of "reversal rate" could impact the percentage by almost 8% (29.7%-37.5%).

### B. Methodology-Based Studies

Few empirical studies examine the methodology behind Federal Circuit decision-making on any issue. There are two such studies on the issue of claim construction. A study by Wagner and Petherbridge found that the Federal Circuit is divided between two methodological approaches to claim construction: procedural and holistic. [FN27] Additionally, the study found evidence of panel dependence in claim construction decision-making. [FN28] The most recent empirical study, by Miller and Hilsenteger, analyzes the Federal Circuit's use of dictionaries in defining claim terms. [FN29] This study will undoubtedly be useful to the court in resolving the en banc Phillips case on this very point.

### *239 III. THE EMPIRICAL STUDY

In this study, I update and expand my earlier empirical project described in Are District Court Judges Equipped to Resolve Patent Cases?. [FN30] This original database now contains all precedential, non-precedential, and Rule 36 (summary affirmances) decisions of the Federal Circuit on claim construction from the Supreme Court's Markman decision (1996) through 2003. [FN31] This dataset contains 1100 appealed claim construction terms from 651 separate cases.

### A. Reversal Rates

After a de novo appeal, the Federal Circuit held that 34.5% of the terms were wrongly construed by the district court. In the 651 cases, the Federal Circuit held at least one term was wrongly construed in 37.5% of the cases. In the cases in which one or more term was wrongly construed, the erroneous claim construction required the Federal Circuit to reverse or vacate the district court's judgment in 29.7% of the cases.

### *240 B. Who Wins--Patentee or Infringer?

The Federal Circuit has long been criticized as a pro-patentee forum. [FN32] Analyzing the claim construction data according to infringer and patentee wins may shed some light on this critique. Among the claim construction terms appealed to the Federal Circuit, 76% were won by the infringer at the district court level. This probably confirms popular perceptions that district courts are increasingly granting summary judgment of non-infringement following claim construction because it is the only way to get appellate review of claim construction at an early stage in the proceedings. [FN33] In fact, in another study, I found that 86% of all summary judgments granted in all patent cases terminated from 1999-2000 were summary judgments of non-infringement. There could be another possible explanation: namely, that patentees who lose on claim construction are more likely to appeal than infringers who lose. Hence, the pool of appealed cases is not random or representative of district court decisions, but rather appeal is more likely whenever the patentee loses. There are asymmetric stakes in most patent litigations. [FN34] The patentee has more to lose than the infringer because, if the claims are construed narrowly, the patentee will not be able to assert them against other potential infringers. These asymmetric stakes make appeal by the patentee more likely, which would skew the pool of appealed cases.

Regardless of the pool of district court decision-making, appellate review statistics can provide insight into the patentee/infringer debate. While the infringer won 76% of the appealed claim constructions from the district court, *241 after appellate review, the claim construction only favored the infringer in 58% of the cases. This may lead some to conclude that the Federal Circuit is in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fact pro-patentee, because they reverse a higher number of infringer wins. The fact that their claim constructions favor the infringer 58% of the time with de novo review suggests that the court, if anything, favors the infringer. However, there is, of course, a selection effect story to tell. Normally, the party with more at stake would only try stronger cases because a loss would harm them more. [FN35] However, the appeal is a different matter altogether. In this case, there already exists a negative claim construction determination that harms the patentee not just in this action, but with all other possible infringers. The determination harms their ability to secure licensing revenue and their chances at litigation. In addition, appeals have low transaction costs as compared to trials. Since patentees have more at stake in patent cases, and with claim construction in particular, and since the appeal costs little, it makes sense that they would actually appeal even weaker cases. With the de novo review, patentees have little to lose. [FN36] This might explain why on appeal claim construction decisions favor infringers slightly more than patentees. Hence, while the Federal Circuit finds in favor of patentees more often than the district court judges looking at the same terms, the overall rate of 58% in favor of infringers belies claims that the Federal Circuit is pro-patentee. Table 1 indicates that the Federal Circuit is just as likely to reverse a claim construction appeal which was won by the infringer at the district court level as one won by the patentee.

L1-2Table 1: Patentee v. Infringer Win Rates........

| Who Won At District Court........ | Federal Circuit Claim Construction Reversal Rate........ |
|---|---|
| Patentee Won........ | 32.3%................. |
| Infringer Won........ | 33.2%................. |

## *242 C. Means-Plus-Function Terms

Construing means-plus-function claim terms is even more difficult. [FN37] The patentee has the option of using function rather than structural claim language. If the patentee chooses to use a means-plus-function term, then the court looks to the specification to identify the structure that corresponds to the claimed means. [FN38] According to the Federal Circuit, means-plus-function infringement analysis requires several steps. First, the judge must determine whether a claim term even employs means-plus-function language. [FN39] Second, the judge must identify the function. [FN40] Third, the judge must identify the corresponding structure from the patent's specification. [FN41] Finally, the factfinder must determine whether the accused device has the same or equivalent structure. The first three steps are all part of the claim construction analysis and must therefore be performed by the district court judge.

The overall rate of district court errors on means-plus-function terms according to appellate review is 39.3%. In 39% of the term appeals, the district *243 court failed to correctly perform one of the three steps described above. If

means-plus-function language appeals are removed from the study, the Federal Circuit determined that the district court claim construction was wrong in 33.4% of the terms. Hence, the overall reversal rate for non-means-plus-function terms is lower than that for means-plus-function terms. It seems that district court judges do struggle slightly more with means-plus-function terms.

Breaking down the errors helps to find where the problems arise. Means-plus-function language was at issue in 191 of the appealed claim terms. In 162 terms, both the Federal Circuit and the district court agreed that the term was a means-plus-function term. In 25 terms, the district court held that a term employed means-plus-function language, but the Federal Circuit disagreed. Finally, in four instances, the district court held that a term did not employ means-plus-function language, but the Federal Circuit disagreed. Hence in 15.2% of the means-plus-function term appeals, the district court wrongly assessed whether means-plus-function language even applied.

Isolating just the cases where both the Federal Circuit and the district court identified the term as employing means-plus-function language (162 cases), the reversal rate was only 30.9%. It appears from this that district courts struggle more with the question of whether a term employs § 112, para. 6 means-plus-function language than they do with claim construction generally. This may support adoption of a black letter application standard; namely, if the term uses the word "means," it is a means-plus-function term, but if it does not use the term "means," it does not employ § 112, para. 6. [FN42]

D. Claim Construction By the Federal Circuit Judges

The Federal Circuit consists of twelve active judges and four senior judges. Five of the active judges were appointed after Markman was decided [FN43] and three after Cybor Corp. [FN44] There are twenty Federal Circuit judges that have participated in claim construction decisions during the eight years of this study. Twelve of the judges have participated in more than 100 claim construction decisions. As Table 2 shows, in the 1100 claim constructions that were appealed, there were only 36 dissents. Hence, while the Federal

Circuit disagreed with the district court judges as to the proper claim constructions in **244** 34.5% of the appeals, they only disagreed amongst themselves in 3% of the appeals.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

L1-6Table 2- Participation by Federal Circuit Judges in Claim Construction Appeals.........

| Judge...... ........... | # of Cases........ ............. | # Terms Construe d........ ............. | Majority........ ............. | # of Terms Opinion Authored ........ ............. | Dissents........ ............. |
|---|---|---|---|---|---|
| Archer.... .......... | 53............. ............. | 83............ ............. | 83............ ............. | 14............ ............. | 0.............. ............. |
| Bryson.... .......... | 150........... ............. | 256.......... ............. | 255.......... ............. | 79............ ............. | 1............. ............. |
| Clevenger..... .......... | 170........... ............. | 280.......... ............. | 277.......... ............. | 85............. ............. | 3............. ............. |
| Cowen...... ........... | 7.............. ............. | 10............ ............. | 10............ ............. | 0.............. ............. | 0............. ............. |
| Dyk.......... ............ | 83............. ............. | 139.......... ............. | 138.......... ............. | 37............. ............. | 1............. ............. |
| Friedman ........ | 42............. ............. | 73............ ............. | 71............ ............. | 0............. ............. | 2............. ............. |
| Gajarsa.. ........ | 147........... ............. | 239.......... ............. | 236.......... ............. | 55............. ............. | 3............. ............. |
| Linn........ ........... | 73............. ............. | 147.......... ............. | 146.......... ............. | 61............. ............. | 1............. ............. |
| Lourie.... .......... | 163........... ............. | 269.......... ............. | 268.......... ............. | 106........... ............. | 1............. ............. |
| Mayer...... .......... | 149........... ............. | 249.......... ............. | 245.......... ............. | 10............ ............. | 4............. ............. |
| Michel.... ........... | 158........... ............. | 288.......... ............. | 285.......... ............. | 86............. ............. | 3............. ............. |
| Newman.... .......... | 171........... ............. | 263.......... ............. | 257.......... ............. | 59............. ............. | 6............. ............. |
| Nies........ ........... | 2.............. ............. | 2............. ............. | 2............. ............. | 1.............. ............. | 0............. ............. |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

| | | | | |
|---|---|---|---|---|
| Plager.... | 84............ | 143.......... | 143.......... | 24............ | 0............ |
| Prost...... | 40............ | 71............ | 71............ | 13............ | 0............ |
| Rader...... | 190.......... | 341.......... | 335.......... | 138.......... | 6............ |
| Rich........ | 59............ | 95............ | 95............ | 39............ | 0............ |
| Schall.... | 159.......... | 278.......... | 273.......... | 54............ | 5............ |
| Skelton.. | 15............ | 23............ | 23............ | 0............. | 0............ |
| Smith...... | 16............ | 24............ | 24............ | 0............. | 0............ |

Table 3, below, details the outcomes by judge. There is significant variation in likelihood of reversal by judge. As the table details, affirmance rates by judge vary from 50% to 90%. There also appears to be considerable variation in patentee win rates by judge. Of course, this may be a function of the population of appealed cases. As noted earlier, more pro-infringer claim constructions are appealed.

Interestingly, Judge Newman, who has previously been shown to have a high patent holder win rate on the issue of validity, [FN45] has a low patentee win rate on the issue of claim construction. Reconciling these findings may suggest that Judge Newman is pro-patent but not necessarily pro-patentee.

L1-5Table 3-Substantive Outcomes Among Federal Circuit Judges of Claim Construction Appeals........

| Judge................. | # of Claim Terms Construed........ | % of Terms District Court Construed Correctly........ | % of Cases District Court Construed All Terms Correctly........ | % of Terms Patentee Wins........ |
|---|---|---|---|---|

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

9 Lewis & Clark L. Rev. 231

| Archer | 83 | 73% | 72% | 37% |
|---|---|---|---|---|
| Bryson | 256 | 62% | 59% | 38% |
| Clevenger | 280 | 72% | 66% | 44% |
| Cowen | 10 | 90% | 86% | 20% |
| Dyk | 139 | 55% | 48% | 52% |
| Friedman | 73 | 58% | 50% | 42% |
| Gajarsa | 239 | 67% | 65% | 38% |
| Linn | 147 | 50% | 51% | 54% |
| Lourie | 268 | 65% | 59% | 38% |
| Mayer | 249 | 68% | 63% | 45% |
| Michel | 288 | 68% | 67% | 40% |
| Newman | 263 | 70% | 68% | 39% |
| Nies | 2 | 50% | 50% | 50% |
| Plager | 143 | 67% | 67% | 30% |
| Prost | 71 | 69% | 68% | 35% |
| Rader | 341 | 64% | 58% | 47% |
| Rich | 95 | 59% | 58% | 41% |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

9 Lewis & Clark L. Rev. 231                                                                 Page 11

| Schall.............. | 278...................... | 63%.......... | 60%.......... | 43%.......... |
| | | ............ | ............ | ............ |
| Skelton........... | 23.......................... | 83%.......... | 80%.......... | 17%.......... |
| | | ............ | ............ | ............ |
| Smith................. | 24.......................... | 79%.......... | 81%.......... | 38%.......... |
| | | ............ | ............ | ............ |

**\*245** While it might seem that judges with a technical background themselves might be more inclined to substitute their own claim construction for that of the district court judge, the data does not support this assumption. It is a common misconception that all the Federal Circuit judges were first engineers or scientists. In fact, only four of the twenty judges in this study had some sort of scientific background (Judges Gajarsa, Linn, Lourie, and Newman). A simple linear regression comparing the likelihood of reversal rates of judges with a technical background versus nontechnically trained Federal Circuit judges defies this prediction. In short, technical judges are not more likely to reverse than nontechnical judges. Moreover, there is not a greater likelihood that the opinion will be authored by a technically trained judge when the claim construction is reversed (p=0.073). However, judges with technical backgrounds are more likely to dissent in claim construction cases (p=0.000).

## IV. THE REVERSAL RATE IS GETTING WORSE NOT BETTER

It seemed logical that the reversal rate would be highest shortly after Markman was decided because at that time claim construction was new to district court judges. Many held the belief that over time, with the evolution of **\*246** precedent and clear canons of claim construction to guide the district courts, the reversal rate would go down. [FN46] In short, if the Federal Circuit provides adequate guidance, the district court judges should get better at construing claims. As the figure below shows, the claim construction reversal rate did decline after Markman but rose again after Cybor Corp. This is not surprising, given that in Cybor Corp. the court resolved a dispute regarding how much deference ought to be given to district court claim constructions, concluding that a de novo standard of review ought to apply. The continued rise in reversal rates five years after the Cybor Corp. decision suggests that the district court judges are not able to resolve claim construction issues as the Federal Circuit judges would like.

The high reversal rate could be due to the fact that district court judges lack technical training and repeat exposure to claim construction. But this seems unlikely, given that the Federal Circuit judges themselves generally lack technical training in the particular issues being appealed. As previously discussed, only four of the judges have technical backgrounds. In addition, a chemistry background is only useful in chemistry cases but would not provide that judge a background for electrical engineering, mechanical engineering or even biotech cases.

While the Federal Circuit judges undoubtedly construe more claim terms than a given district court judge, the claim construction inquiry depends entirely on what information is presented in the specification and what the ordinary and customary meaning of the term would be to one of skill in the art--clearly a factual inquiry that will vary with each patent. In short, construing claim terms in a given patent does not make construing claim terms in a different patent any easier.

With judicial claim construction now nearing its adolescence (eight years from the Supreme Court's Markman and ten years from the Federal Circuit's **\*247** Markman), there should be more predictability. The reversal rate ought to be going down, not up. The fault, at this point, undoubtedly lies with the Federal Circuit itself. The court is not providing sufficient guidance on claim construction. There have not evolved any clear canons of claim construction to aid district court judges, and in fact the Federal Circuit judges seem to disagree among themselves regarding the tools available for claim construction.

The court seems to realize that the internal conflict warrants en banc scrutiny, and hopefully

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Phillips decision will provide the clarity that has yet to emerge from eight to ten years of claim construction. Again, only time will tell.

[FNa1]. Professor of Law, George Mason University School of Law. I am grateful to Banner & Witcoff, Howrey Simon Arnold & White, Kenyon & Kenyon, and Morgan, Lewis & Bockius for generously sponsoring this research. I can be contacted at kamoore@gmu.edu with any comments. I am also grateful to the George Mason Center for Law and Economics for continued financial support. Finally, thanks are due to participants at the Tenth Annual Lewis & Clark Business Law Forum for helpful comments, as well as to Scott Thomas, Andrew Sommer, and Joshua Liu for research assistance. © 2004 Kimberly A. Moore.

[FN1]. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1451 (Fed. Cir. 1998) (determining that the Federal Circuit shall review district court claim construction decisions de novo).

[FN2]. See, e.g., SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337 (Fed. Cir. 2001) (Dyk, J., concurring) ("[O]ur decisions provide inadequate guidance as to when it is appropriate to look to the specification to narrow the claim by interpretation and when it is not appropriate to do so. Until we provide better guidance, I fear that the lower courts and litigants will remain confused."); William C. Rooklidge & Matthew F. Weil, Judicial Hyperactivity: The Federal Circuit's Discomfort with its Appellate Role, 15 Berkeley Tech. L.J. 725, 729-30 (2000) (criticizing the Federal Circuit's claim construction as appellate fact finding which encourages protracted litigation); Mark T. Banner, Keeping Current with the Chair, IPL Newsletter, Summer 2003, at 1, 15 (attributing the high Federal Circuit reversal rate to a "morass of confused and contradictory claim construction canons"); William F. Lee & Anita K. Krug, Still Adjusting to Markman: A Prescription for the Timing of Claim Construction Hearings, 13 Harv. J.L. & Tech. 55, 67 (1999) ("Although, according to the Federal Circuit and the Supreme Court, Markman should have ushered in greater uniformity, predictability, and certainty in patent litigation, many believe that the holding has had the opposite effect. This is largely because Federal Circuit review of claim interpretation is de novo."); Michael O'Shea, A Changing Role for the Markman Hearing: In Light of Festo IX, Markman Hearings Could Become M-F-G Hearings Which Are Longer, More Complex and Ripe for Appeal, 37 Creighton L. Rev. 843, 843 (2004) (noting three problems in the post-Markman world: "(1) a high reversal rate of claim construction decisions by the Court of Appeals for the Federal Circuit results in uncertainty even after trial, (2) litigating patents continues to be expensive, and (3) court resources are routinely wasted by empanelling juries only to re-try the same case in the future"); Victoria Slind-Flor, Formerly Obscure Court is in Spotlight: Importance of New Technology Makes its Decisions Big News, Nat'l L.J., Apr. 30, 2001, at B9, B12 (noting that the reversal rates on claim construction issues "has so enraged the bench that one federal judge--Samuel Kent of Galveston, Texas--has dismissed the appeals court as 'little green men wearing propeller hats who don't know Tuesday from Philadelphia'"); George J. Awad & George A. Frank, Federal Circuit Construction Project: Hard Hats Required, Legal Intelligencer, Aug. 25, 2004, at 5 (stating that "[w]hat is certain is that uncertainty reigns supreme in trying to prognosticate how the CAFC will resolve [the issues in Phillips]"); Erik Paul Belt, Federal Circuit Stresses Ordinary Meaning: In Recent Cases, The Court Has Limited the Narrowing of Claims, Often Benefiting Patent Owners, Nat'l L.J., Sept. 22, 2003 at S1, S14 (stating that "many feel that Markman has not yet led to the hoped-for certainty in claim construction"); Anthony R. Zeuli & Rachel Clark Hugley, Avoiding Patent Claim Construction Errors: Determining the Ordinary and Customary Meaning Before Reading the Written Description, Fed. Law., June 2004, at 29, 30 (stating that "[i]t comes as little surprise that some trial judges have grown apathetic to the process, and that nearly all litigants unhappy with the outcome of their cases will appeal and include a claim construction issue"); Victoria Slind-Flor, Judges Receive Mixed Reviews on Handling of Patent Claims, N.Y.L.J., March 14, 2002, at 1 ("By most accounts, the Markman decision has added uncertainty, costs and delay to a system that already had plenty of all three.") [hereinafter Slind-Flor, Judges Receive Mixed Reviews].

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN3]. Victoria Slind-Flor, Markman Precedent Holds Up Patents: Ruling Intended to Add Predictability and Speed Fails to Do So, Nat'l L.J., Jan. 15, 2001, at A1, A12 (quoting Bradford P. Lyerla, patent litigator) (alteration in original).

[FN4]. Rooklidge & Weil, supra note 2, at 727. Rooklidge and Weil distinguish judicial activism from judicial hyperactivity, as follows:

Unlike critics who level the charge of ' judicial activism' when they believe that a court has improperly usurped the policy-making role of the legislature, we are concerned with what happens when an intermediate appellate court usurps elements of the decision-making process that are supposed to be the province of the lower courts, administrative bodies, or even litigants.

Id.; see also Control Resources, Inc. v. Delta Elecs., Inc., 133 F. Supp. 2d 121, 123-24 (D. Mass. 2001) ("Disappointed litigants and commentators alike have criticized the court for fact-finding and other forms of hyperactive judging. Increasingly, the bar is expressing concern over the court's decision-making procedures and its apparent willingness to take over the roles of patent examiner, advocate and trier of fact.").

[FN5]. The previous en banc claim construction decisions were Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996), and Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448 (Fed. Cir. 1998).

[FN6]. Phillips v. AWH Corp., 376 F.3d 1382 (Fed. Cir. 2004).

[FN7]. Id. at 1383. Although the court has seven numbered questions, with subparts in most of them, there are in actuality fourteen questions the court is inviting the parties and amici to address.

[FN8]. Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).

[FN9]. See infra Part III.A.

[FN10]. Only this study and its predecessor include all Rule 36 cases. See Kimberly A. Moore, Are District Court Judges Equipped to Resolve Patent Cases?, 15 Harv. J.L. & Tech. 1, 8-10 (2001).

[FN11]. Fed. Cir. R. 47.6(b).

Nonprecedential Opinion or Order. An opinion or order which is designated as not to be cited as precedent is one determined by the panel issuing it as not adding significantly to the body of law. Any opinion or order so designated must not be employed or cited as precedent. This rule does not preclude assertion of claim preclusion, issue preclusion, judicial estoppel, law of the case, or the like based on a decision of the court designated as nonprecedential.

Id.; see also Penelope Pether, Inequitable Injunctions: The Scandal of Private Judging in the U.S. Courts, 56 Stan. L. Rev. 1435, 1442-44 (2004) (explaining the origin, purpose and current state of unpublished, non-precedential decisions); Dean A. Morande, Publication Plans in the United States Courts of Appeals: The Unattainable Paradigm, 31 Fla. St. U. L. Rev. 751 (2004); Richard B. Cappalli, The Common Law's Case Against Non-Precedential Opinions, 76 S. Cal. L. Rev. 755 (2003).

[FN12]. Fed. Cir. R. 36.

[FN13]. One commentator suggested that it was acceptable to omit the Rule 36 affirmances because these were "quickies." Slind-Flor, Judges Receive Mixed Reviews, supra, note 2, at 7.

[FN14]. Entering judgment without opinion under this rule is proper when:

[A]ny of the following conditions exist and an opinion would have no precedential value: (a) the judgment, decision, or order of the trial court appealed from is based on findings that are not clearly erroneous; (b) the evidence supporting the jury's verdict is sufficient; (c) the record supports summary judgment, directed verdict, or judgment on the pleadings; (d) the decision of an administrative agency warrants affirmance under the standard of review in the statute authorizing the petition for review; or (e) a judgment or decision has been entered without an error of law.

Fed. Cir. R. 36.

[FN15]. Christian A. Chu, Empirical Analysis of the Federal Circuit's Claim Construction Trends, 16 Berkeley Tech. L.J. 1075, 1104 (2001) (finding that the Federal Circuit overturned 44% of the 179 district court claim constructions that were appealed between January 1, 1998 and April 30, 2000). The Chu Study appears at first blush to have included Rule 36 summary affirmances, and in fact it did for

overall reversal rates, but not for the claim construction calculations. Chu states "because this methodological definition requires that claim constructions explicitly appear in the court's opinions, cases implicitly construing claims and summary affirmances would be excluded from the subset of cases where the court has 'reviewed' claim constructions." Id. at 1094. "[T]his study first examined the Federal Circuit's reversal rate of lower court judgments by analyzing the court's written opinions...." Id. at 1097. "Using the 396 cases with available written opinions, this study ascertained the number of cases per month in which the court changed at least one claim interpretation...." Id. at 1100-01. Chu explains that his approach "excludes all 106 summary affirmances because the methodology's focus on express claim construction requires the availability of a written opinion." Id. at 1100 n.121. I am uncertain what methodology Chu refers to or the justification for excluding Rule 36 decisions which affirm claim construction, other than the difficulty attendant the identification and empirical collection of these cases. Although Chu does not perform any analysis of the 106 actual Rule 36 cases, not even a sample of them to ascertain the frequency with which they address claim construction, he does "attempt[] to estimate the effect of summary affirmances on the rate of claim construction changes and claim interpretation-based reversals." Id. at 1101 n.121 (referring to an estimation in Appendix A). While Chu's reversal rate of 44% does not include any summary affirmances, he does include a table in the appendix showing the results if no summary affirmances are included and the results if all summary affirmances are assumed to be claim construction cases. My criticism of the Chu study is limited to its omission of summary affirmances from issue specific reversal rate statistics. The study is otherwise well done and provides interesting insights on appeals of other patent issues and of patent cases generally.

[FN16]. Gretchen Ann Bender, Uncertainty and Unpredictability in Patent Litigation: The Time is Ripe for a Consistent Claim Construction Methodology, 8 J. Intell. Prop. L. 175, 207 (2001) (finding that the Federal Circuit reversed 40% of the 160 claim constructions appealed in from Markman through 2000).

[FN17]. Andrew T. Zidel, Patent Claim Construction in the Trial Courts: A Study Showing the Need for Clear Guidance from the Federal Circuit, 33 Seton Hall L. Rev. 711, 741-42 (2003) (finding that the Federal Circuit reversed 39 of the 94 claim construction decisions in 2001).

[FN18]. There have been other studies attempting to quantify the reversal rates such as one by the American Bar Association Section on Intellectual Property, which surveyed its members to ascertain frequency of reversal (using just six cases where the surveys were returned (five of which were reversals)). See American Bar Association Section of Intellectual Property Law 1999 Markman Survey, IPL Newsletter, Spring 2000, at 14-15; see also W. Thad Adams, III & J. Derel Monteith, Jr., The Continuing Saga of Federal Circuit Patent Claim Construction Jurisprudence: Extrinsic Evidence and Other Stories, 8 Fed. Cir. B.J. 83 (1999) (finding that the Federal Circuit reversed 35% of all claim construction decisions appealed in 1998 and part of 1999 (34 cases)).

[FN19]. In fact, the Bender and Zidel studies list all of the cases considered in very long footnotes and appendices. Bender, supra note 16, at 204-07 nn.215-16; Zidel, supra note 17, app. A.

[FN20]. The Chu study says "this study did not include Rule 36 summary affirmances in the dataset of Figure A-1." Chu, supra note 15, at 1097 n.112.

[FN21]. Id. at 1099.

[FN22]. See infra Part III.

[FN23]. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1473 (Fed. Cir. 1998) (Rader, J., concurring).

[FN24]. Id. at 1476.

[FN25]. Zeuli & Hugley, supra note 2, at 29 ("The reversal rate of patent claim constructions is nearing 50 percent. Many believe the process is flawed, the results too unpredictable, and the procedures too costly.").

[FN26]. Cybor Corp., 138 F.3d at 1476 n.4.

[FN27]. R. Polk Wagner & Lee Petherbridge, Is the Federal Circuit Succeeding? An Empirical Assessment of Judicial Performance, 152 U. Pa. L.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Rev. 1105, 1111 (2004).

[FN28]. Id. at 1112.

[FN29]. Joseph Scott Miller & James A. Hilsenteger, The Proven Key: Roles and Rules for Dictionaries and the Patents Office and the Courts, 54 Am. U. L. Rev. (forthcoming May 2005) (manuscript on file with author, available at http://ssrn.com/abstract=577262 (empirically demonstrating that the "caprice with which judges currently may choose dictionaries effectively eliminates whatever neutrality and predictability gains the turn to dictionaries can offer" and recommending that the patentee be required to list dictionary selections for defining claim terms in the patent application itself) (quoting from abstract).

[FN30]. Moore, supra note 10. See this earlier Article for a detailed description of the data collection process and the acknowledged shortcomings of the dataset.

[FN31]. I conducted a search on Westlaw using the query "patent & claim/s interp! or constru!." Each case retrieved was examined to determine whether the district court judge's claim construction was being appealed to the Federal Circuit. I also collected the data on all Rule 36 summary affirmances that occurred during this same time period in order to ascertain whether the issue affirmed was claim construction. Pursuant to Rule 36 of the Federal Circuit Rules of Procedure, the court can summarily affirm without opinion a district court judgment. There were 276 Rule 36 affirmances during the time period of this study. After obtaining the appeal briefs in these cases (two cases could not be located by the Federal Circuit), I discovered that 104 cases did appeal district court claim constructions. There were 170 claim terms appealed in these 104 cases.

[FN32]. See Mark D. Janis, Reforming Patent Validity Litigation: The "Dubious Preponderance", 19 Berkeley Tech. L.J. 923, 928 (2004) (stating that "[t]he perception that the Federal Circuit enhanced the effect of the presumption of validity coincides with the generally received wisdom that the Federal Circuit adopted a pro-patent bias early in its tenure"); Hon. Richard Linn, The Future Role of the United States Court of Appeals for the Federal Circuit Now That It Has Turned 21, 53 Am. U. L.

Rev. 731, 733 (2004) (stating that the belief that the CAFC was a pro-patent court "may have been justified" citing to "[c]omparative statistics from the years just before and just after the court's establishment"); William M. Landes & Richard A. Posner, An Empirical Analysis of the Patent Court, 71 U. Chi. L. Rev. 111, 112 (2004) (asserting that " [a]s expected, the Federal Circuit has turned out to be a pro-patent court in comparison to the average of the regional courts that it displaced in the patent domain"); William M. Landes & Richard A. Posner, The Economic Structure of Intellectual Property Law 335 (2003) (arguing that, as predicted, the CAFC would become a pro-patent court due, at least in part, to special interest groups including "the patent bar and its clients", who " would exert themselves to influence" judicial selection for the court); John R. Allison & Mark A. Lemley, Empirical Evidence on the Validity of Litigated Patents, 26 AIPLA Q.J. 185, 251 (1998) (concluding that findings of patent validity have been significantly higher since the establishment of the Federal Circuit). But cf. Glynn S. Lunney, Jr., Patent Law, the Federal Circuit, and the Supreme Court: A Quiet Revolution, 11 Sup. Ct. Econ. Rev. 1, 3 (2004) (stating that "[d]espite the Federal Circuit's pro-patent holder reputation, this summary reveals that claims of patent infringement are no more likely to succeed since the Federal Circuit's advent").

[FN33]. See Wagner & Petherbridge, supra note 27, at 1119 n.47 (observing that "[m]any district court judges, however, simply enter summary judgment for one of the parties after construing the claims, creating a de facto interlocutory appeal").

[FN34]. Kimberly A. Moore, Judges, Juries & Patent Cases--An Empirical Peek Inside the Black Box, 99 Mich. L. Rev. 365, 377 (2000).

[FN35]. George L. Priest & Benjamin Klein, The Selection of Disputes for Litigation, 13 J. Legal Stud. 1 (1984) (explaining the effect of asymmetric stakes on trial rates).

[FN36]. Even if the review was more deferential, there would likely be a "Hail Mary" appeal by the patentee in these circumstances.

[FN37]. See Dawn Equip. Co. v. Kentucky Farms Inc., 140 F.3d 1009, 1018 (Fed. Cir. 1998) (Plager,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

J. concurring) (stating that with respect to the application of the doctrine of equivalents to means-plus-function claims that the "law in this area [is] confused and confusing"); Eva M. Ogielska, Note, IMS Technology, Inc. v. Haas Automation, Inc. & Kemco Sales, Inc. v. Control Papers Co., 16 Berkeley Tech. L.J. 71 (2001) (noting that "[t]he difficulties of claim interpretation are particularly apparent in the judicial construction of means-plus-function claims"); Yoncha Lynn Kundupoglu, The Law of Means-Plus-Function Language (Part I of II), 28 AIPLA Q.J. 39, 43 (2000) (observing that the "[i]nterpretation of means-plus-function limitations has been complicated by the competing [policy-based] roles played by claims"); Rudolph P. Hofmann, Jr. & Edward P. Heller, III, The Rosetta Stone for the Doctrines of Means-Plus-Function Patent Claims, Rutgers Computer and Tech. L.J. 227, 240 (1997) (noting that "uncertainty as to the construction of a means-plus-function limitation ... makes difficult the assessment of likely outcomes of patent infringement litigation"); Lawrence Kass, Comment, Computer Software Patentability and the Role of Means-Plus-Function Format in Computer Software Claims, 15 Pace L. Rev. 787, 850 (1995) (stating that the construction of means-plus-function claims "has bred confusion and controversy, particularly with regard to computer program and mathematical algorithm inventions"); Chris Ullsperger, Lessons in Claim Construction from the Federal Circuit; Reading, Writing, and Reversal, Intell. Prop. Today, Sept. 1, 2002, at 14 (concluding from review of patent related claims in 2001 that "complicated issues such as the construction of 'means-plus-function' claims remain especially resistant to resolution at the district court level").

[FN38]. 35 U.S.C. § 112 (2000).

[FN39]. See Kimberly A. Moore et al., Patent Litigation & Strategy 321-24 (2d ed. 2003) (explaining that while the rule of thumb is that if a claim uses the word "means" it invokes § 112, para. 6, there are several exceptions); cf. Lighting World, Inc. v. Birchwood Lighting, Inc., 382 F.3d 1354, 1358 (Fed. Cir. 2004) ("The task of determining whether the limitation in question should be regarded as a means-plus-function limitation, like all claim construction issues, is a question of law for the court, even though it is a question on which evidence from experts may be relevant.").

[FN40]. Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n, 383 F.3d 1352, 1361 (Fed. Cir. 2004) ("In construing a means-plus-function claim limitation, the recited function within that limitation must first be identified.").

[FN41]. Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327, 1334 (Fed. Cir. 2004) ("The next step in construing a means-plus-function claim limitation is to look to the specification and identify the corresponding structure for that function.").

[FN42]. Moore et al., supra note 39, at 321-24 (suggesting a black letter rule); cf. Michael T. Hopkins, When a Lack of Equivalence Can Still Be Equivalent--Litigating Infringement of Means-Plus-Function Claims, 40 IDEA 581, 586 (2000) (noting that despite "seemingly rational and straightforward exceptions to the general means-plus-functions rules" there is an "inherent difficulty surrounding the application" of the rules); Mark D. Janis, Who's Afraid of Functional Claims? Reforming the Patent Law's § 112, P 6, Jurisprudence, 15 Santa Clara Computer & High Tech. L.J. 231, 236 (1998) (arguing that § 112, para. 6 should be eliminated because of "the sudden emergence of a vexing and Byzantine threshold scheme for determining whether an arguably functional expression in fact qualifies as a 'means plus function' expression").

[FN43]. Judges Bryson, Gajarsa, Linn, Dyk, and Prost are all new to the court. Judge Bryson was actually appointed before the Markman decision issued but after the appeal was initiated, and he therefore did not participate in the decision.

[FN44]. Judges Dyk, Linn and Prost were appointed after Cybor Corp.

[FN45]. John R. Allison & Mark A. Lemley, How Federal Circuit Judges Vote in Patent Validity Cases, 10 Fed. Cir. B.J. 435, 446 (2001).

[FN46]. Moore, supra note 10, at 29; Chu, supra note 15, at 1097 ("Over time, claim construction should thus become more predictable and consistent, thereby reducing reversible errors in claim construction.").

9 LCLR 231

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

9 Lewis & Clark L. Rev. 231

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3



# Interesting RV Articles

This page sponsored

- **RV Waste Systems**
- **RV Chalet**
- **RV Maintenance, Service, and Repair**
- **A Safe LP System**
- **AC Power Line Problems--A Mystifying Menace**

**The Era of the Slideout Room**

By Gary Bunzer



Ads by **Google**

**RV Parts & Accessories**
1000's of RV Parts & Accessories Low prices Fast shipping since 1997
www.tweetys.com

**RV Parts**
Flexsteel and Villa RV Furniture Surplus RV Parts and Accessories
www.rvsurplus.net

**Discount RV Parts**
New RV Parts at Great Prices Fast Shipping to your door
www.adventurerv.net

**RV info & advice**
Help with RV problems. Learn how things work on your RV. Video
www.rvwalkthru.com

Innovative, revolutionary, transformational, neological and metamorphic are just a few phrases that come to mind when contemplating the popularity of the latest trend in recreation vehicle D&D, (demand and design) - the slideout room. Conceptually not a brand new thought, today's technology though, has fully exploited the very idea of creating extra living space simply by moving exterior walls outward.

While yesterday's cumbersome and not-so-convenient "tip-out" got its impetus by borrowing from the mobile home industry's innovation, the "Expando-Room," the current proliferation of slideout units is the culminating point where technology and customer demand have met. Coach manufacturers have scrambled to provide their customer base with a multitude of slideout choices. Virtually all makers offer some style of a slideout room extension.

Accordingly, aftermarket dealers and service centers have had to ramp up their efforts to keep current with the technology as well. Mike Eidsmoe of Eidsmoe's RV Service Center, a California-based facility that deals primarily with high-line coaches proffers, "The slideout room, along with the popularity of the diesel powered coach, has been the biggest innovation to come along since the introduction of the basement model RV." His technicians have been trained in adjustments and troubleshooting for most of the slide mechanisms found today, including those proprietary systems offered by a few makers.

Apparently the popularity of the slideout has even surpassed that of the basement model. The number of models available with the basement feature is simply dwarfed by the number of models available with a slideout. And remember many RVs have more than one slideout! In fact multiple slides have become the rule rather than the exception. Need four slide outs? They're out there. Extra dining space, larger living room, even an expanded galley, with flexible water and drain lines is now possible. This quest for extra space has spurred manufacturers and their design engineers quickly back to their CAD programs and drawing boards. Even pop-up tent camper manufacturers have gotten in on the act with slideout appurtenances on a few models.

Of course, not all is 100% rosy when it comes to slideout applications. There is usually a trade-off of sorts. You gain extra living space, but you may loose some under-the-coach storage for instance. You may have a larger kitchen and dining area, but structural integrity, sidewall reinforcement and leak proofing can become a challenge. Sure, you net more square footage, but will your favorite campground be able to handle the extra width? This last point is a high concern for those older parks that do not have the luxury of offering such spacious

campsite locations. Additionally, dealers are finding it increasingly difficult to move those older coaches not equipped with a slideout. Your trade-in may not be worth as much as you thought. Be that as it may, it is generally felt that slideout rooms are here to stay, at least for the time being.

What should you look for in a slideout room? Let's explore a few generic areas. An informal survey among RVers revealed that a leak proof environment is the number one consideration. Air and water leaks must be avoided for obvious reasons. Many RV manufacturers pride themselves on the design and integrity of their slideout room seals. Look under and on top of the room for gaps in the seal. To ward off pooling water on top of the room, many employ a small awning as an integral portion of the assembly, thereby eliminating the chance of a water leak from above. This is a desirable addition, even if your present rig is not so equipped. Slide out awnings are readily available in the aftermarket.

Have someone activate the room while you observe the relationship between the moving room and the sidewall of the RV. Does it move smoothly? Be sure to observe the movement from above and below as well as from the sides of the room. Are there any annoying sounds or grinding noises that are audible? Verify that the room does not "walk" out as it extends. Does each side of the slideout move in unison or does it tend to "crab walk" its way to the outer position. Smoothness of operation is the second-most desirable facet of slideout rooms.

Okay, so what is the driving force that powers these magical multipliers of interior cubic space? You will find an assortment of rack and pinion gears, pulleys, cables, rollers, chains, hydraulic cylinders, air cylinders, screw jack mechanisms and even garage door openers on some homemade applications just to name a few. Predominantly the two most popular methods of actuation at the root level are the electric motor and accompanying gearing and the hydraulic cylinders.

Electric motors with rack and pinion gearboxes are far less complicated than the hydraulic slide mechanisms available, but can indeed add a strain on the 12-volt battery system. It is vital that the 12-volt auxiliary system be optimized fully. That is, the batteries should be correctly and fully charged whenever possible in order to retain their maximum potential. Electrically driven assemblies are inherently less expensive, but according to the aforementioned survey, cost is seldom a factor to the typical RVer. Another advantage of the electric motor and gears - most electric room extension systems can be user maintained. The typical RV handyman can handle most tasks.

However, hydraulic systems, such as HWH Corporation's line of systems require less maintenance overall. Where rack and pinion gears require lubrication and periodic maintenance, the sealed hydraulic cylinders are equipped with state-of-the-art polymer bearings that eliminate the need for periodic lubrication. Another advantage of the hydraulic system is a smoother, quieter, more refined movement of the slideout room.

HWH has been at the forefront of slideout technology since Newmar Corporation offered the first slideout in a motorhome in 1989. One of their innovations is the Vertical Room Extension; a hydraulic slideout mechanism hidden above the floor in a cabinet or sofa arm assembly. This above the floor design preserves the under floor storage area. Another advantage of the hydraulic systems offered by HWH is the melding of their hydraulic leveling system with the room extension. Only one pump and one reservoir are needed for most applications.

In the event of hydraulic system failure or a dead battery, all slideout room extensions, (electric and hydraulic), can be manually retracted and locked guaranteeing an extended room

will not hold you captive or stationary.

So according to most sources, you, the typical RVer, have been the motivating factor in this latest quest for more "space." And the industry thanks you! Your demands have triggered the genius among RV design engineers everywhere. Only imagination can conjure up what the future has yet to unfold under the heading of "The Latest and Greatest Innovation for RVs." It's for sure, it will have to boast of uniqueness and inventiveness in order to "one-up" the current popularity of the slideout room. Got any new ideas?

---

[ Home ] [ Ask the RV Doctor ] [ RV Doctor Column ] [ Memorandums ] [ Interesting Articles ] [ Video Library ]
[ Product Spotlight ] [RV Service Technician Training ] [ Seminars ] [ Links ] [ Gary's Bio ]

Send your questions and comments to: gbunzer@cox.net

Copyright©2002 Bunzer Consulting
Website Design by Camping World, Inc.

EXHIBIT 4

May 19, 1970     A. VITALINI     3,512,315

BUILDING HAVING TELESCOPIC SECTION

Original Filed April 21, 1967        6 Sheets-Sheet 1



FIG. 1

FIG. 2

INVENTOR

ALBERTO VITALINI

BY *Stevens, Davis, Miller & Mosher*

ATTORNEYS

May 19, 1970            A. VITALINI            3,512,315
BUILDING HAVING TELESCOPIC SECTION
Original Filed April 21, 1967                6 Sheets–Sheet 2



FIG. 3

FIG. 4

INVENTOR
ALBERTO VITALINI

BY *Stevens, Davis, Miller & Mosher*
ATTORNEYS

May 19, 1970                    A. VITALINI                    3,512,315
BUILDING HAVING TELESCOPIC SECTION
Original Filed April 21, 1967                    6 Sheets-Sheet 3



FIG. 5

INVENTOR

ALBERTO VITALINI
BY
Stevens, Davis, Miller & Mosher
ATTORNEYS

May 19, 1970                    A. VITALINI                    3,512,315

BUILDING HAVING TELESCOPIC SECTION

Original Filed April 21, 1967                    6 Sheets-Sheet 4



FIG. 6

INVENTOR
ALBERTO VITALINI

BY Stevens, Davis, Miller & Mosher

ATTORNEYS

May 19, 1970                 A. VITALINI                    3,512,315
                    BUILDING HAVING TELESCOPIC SECTION
Original Filed April 21, 1967                        6 Sheets—Sheet 5



FIG. 7



FIG. 8

FIG. 10

FIG. 9

INVENTOR

ALBERTO VITALINI

BY Stevens, Davis, Miller & Mosher
ATTORNEYS

May 19, 1970                    A. VITALINI                    3,512,315

BUILDING HAVING TELESCOPIC SECTION

Original Filed April 21, 1967                    6 Sheets—Sheet 6



FIG. 12

FIG. 11

INVENTOR
ALBERTO VITALINI

BY *Stevens, Davis, Miller & Mosher*
ATTORNEYS

# United States Patent Office

**3,512,315**
**Patented May 19, 1970**

1

3,512,315
**BUILDING HAVING TELESCOPIC SECTION**
Alberto Vitalini, Via Clivo Monte del Gallo 34,
Rome, Italy
Continuation of application Ser. No. 632,735, Apr. 21,
1967. This application June 10, 1969, Ser. No. 834,609
Claims priority, application Italy, Mar. 13, 1967,
35,391/67, 35,392/67
Int. Cl. E06b 1/343; E04h 1/04; E04c 3/283
U.S. Cl. 52—67                                   26 Claims

## ABSTRACT OF THE DISCLOSURE

A building construction wherein various units of the building are dynamically constructed relative to the main static supporting structure thereof so that said units are extensible and retractable relative to an exterior wall of said building as, for example, externally protruding balconies which can be telescoped into the building and also entire room structures which can overhang from an exterior wall in the nature of balconies and which can be retracted inwardly to form a flush exterior wall on said building.

This is a continuation of my copending application Ser. No. 632,735, filed Apr. 21, 1967, and now abandoned.

This invention relates to a system for constructing buildings wherein various parts thereof, such as balconies, terraces, and even closed room structures are movably arranged relative to a static supporting structure whereby such parts can be selectively extended or withdrawn relative to an exterior wall of the building.

The invention is, for example, applicable to balconies which extend outwardly from an exterior vertical wall of the building and which, conventionally, are static relative to said wall. Consequently, in conventional building structures the extent to which a balcony protrudes from the building wall is constant and the profile of said wall is unchangeable.

According to this invention, however, such balconies are dynamically arranged whereby they can be selectively retracted towards the building exterior wall as would, for example, be done in winter to avoid the accumulation of snow thereon, or extended outwardly of said wall as would be done in summer for conventional "al fresco" living. In any event, according to this invention the profile of a building exterior wall can be changed through the extension or withdrawal of balconies, terraces, or entire room structures at various locations on said wall.

The invention is also applicable to a closed room structure having a floor, side walls, an exterior end wall, and a ceiling. In this instance, the entire room structure including the aforementioned walls, floor, and ceiling would be slidably arranged, in the nature of a desk drawer, relative to the static exterior wall construction of the building.

Generally, therefore, this invention relates to a novel building construction wherein various areas thereof are arranged to slide inwardly and outwardly relative to a static supporting structure and specifically, inwardly and outwardly relative to an exterior vertical wall of said structure. The concept of this invention could to some extent be analogized to the concept of a desk or a chest of drawers wherein various areas thereof (the drawers) are horizontally slidable relative to the static frame of said desk or chest of drawers. The application of this concept, however, to a building structure, and especially a large building having many floor levels, involves problems which are quite remote from the relatively simple problems involved in the construction of a desk, etc., and

2

it is the solution of such problems that this invention is directed to.

In this regard, it should be noted that buildings are constructed in accordance with particular conventional building techniques and that a construction requiring a radical departure from such techniques could involve prohibitive building costs. Further, buildings must be constructed in accordance with certain stress principles to assure the strength and rigidity thereof and any constructional features which would tend to undermine or weaken the building from this point of view, would be summarily rejected by architects, buyers, and by building code inspectors. In the case of a multi-level building, there must be continuity of the vertical pillar supports from one level to the next. Heretofore, a major problem which has arisen when it has been attempted to provide a multi-level building with components which could slide exteriorly of the building outer walls has been the fact that it was necessary to locate the supporting beams or rails for the sliding structure on the inside of the pillars so that the pillars would not obstruct the movement of the sliding structure. In addition, it was necessary to provide the usual crossbeams in the plane of the pillars, these cross-beams being parallel and adjacent to the rails for the sliding structure. According to this invention, however, a special cross-beam is provided which extends in the plane of the pillars as the usual cross-beams do but which also, because of its novel construction, serves as a support rail for the sliding structure and thereby eliminates the need for separate support rail members for said sliding structure.

As a still further consideration, it will be noted that structural members such as pillars, girders, beams, etc., are to a large extent constructed of reinforced concrete and that, additionally, such members are prefabricated at locations remote from the building site. A new constructional arrangement, therefore, should be adaptable to use of reinforced concrete members and also adaptable to prefabrication techniques for such members.

It is, therefore, an object of this invention to provide a building construction whereby parts thereof defining balconies, rooms, etc., are dynamically arranged relative to a static supporting structure.

It is a further object of this invention to provide a building construction whereby the areas of various components such as balconies, room, etc., can be selectively enlarged or reduced and wherein such components in their entirety can be individually added to or subtracted from an existing static structure.

It is a further object of this invention to provide a building construction wherein various areas thereof such as balconies, rooms, etc., are movably arranged relative to a fixed external vertical wall of said building.

It is a further object of this invention to provide a building construction wherein various areas thereof are telescopically arranged in relation to a fixed static supporting structure to either project or be withdrawn relative to a fixed external wall of the building.

A further object of this invention is to provide a building construction wherein various components thereof such as balconies and closed rooms can be prefabricated in their entirety as movable structures and then lifted by a crane for installation into appropriate spaces in the building static structure, said components being movably installed relative to said static structure. It is, conversely, an object of this invention to provide a building construction wherein said movable structures can be in their entirety dismounted from the static support structure of the building and removed therefrom by a crane.

A further object of this invention is to provide specially designed structural members for realizing the building construction of any of the aforementioned objects.

3,512,315

3

It is a further object to provide such structural members which are susceptible to being constructed in reinforced concrete.

It is a further object to provide such structural members which are susceptible to being prefabricated in reinforced concrete.

It is a further object of this invention to provide specially designed roller supporting means for slidably supporting the building movable parts relative to the static supporting structure.

It is further an object of this invention to provide a novel reinforced concrete I-beam construction which is especially adapted for the movable balcony, room, etc., construction of this invention but which is also of utility in a conventional, non-dynamic structural environment because of its space and cost saving features as well as its increased strength relative to known reinforced concrete beams.

Other objects are those which are inherent in the invention, a detailed description of which follows with reference to the accompanying drawings, in which:

FIG. 1 is a foreshortened isometric view showing various of the static structural members of a building according to this invention;

FIG. 2 is a cross-sectional view of the novel I-beam of this invention showing also the flooring which is supported thereon;

FIG. 3 is a vertical longitudinal sectional view along the beam 3;

FIG. 4 is a horizontal sectional view taken along line 4—4 in FIG. 3;

FIG. 5 is a vertical section view taken along line 5—5 in FIG. 6;

FIG. 6 is a horizontal section view taken along line 6—6 in FIG. 5;

FIG. 7 is a sectional view taken along line 7—7 in FIG. 3;

FIG. 8 is a sectional view taken along line 8—8 in FIG. 6;

FIG. 9 is a detail isometric view of the roller means attached to the front end of the movable flooring;

FIG. 10 is an isometric view of a further embodiment of the roller means shown in FIG. 7;

FIG. 11 shows the trueing-up member of this invention; and,

FIG. 12 is a vertical sectional view of another embodiment of this invention wherein the movable flooring is part of a complete room structure which is extensible relative to the building external wall in the nature of a balcony.

With reference to FIG. 1, the building comprises a plurality of pillars 1 which serve as vertical support members for the transverse beams 2 and for the cross-beams 3. The pillars 1 and the transverse beams 2 are reinforced concrete members of conventional construction. On the other hand, the cross-beams 3 are especially constructed and constitute one of the important aspects of this invention. Supported upon the cross-beams 3 is a fixed flooring 4 which is shown as being of concrete but which could also be of other construction.

The special I-beam 3 of this invention comprises a concrete core 5 of inverted-T-cross section enclosed in a sheet steel casing 6 which preferably is cold formed from one piece of flat steel into the I-shape shown in FIGS. 1 and 2. The I-beams 3 can be prefabricated in which case the prefabricated portion of concrete core 5 would only partially fill casing 6 leaving appropriate spaces therein along the length thereof corresponding to the width $w$ of each pillar 1. Further, a hole 7 would be cut out of the bottom of casing 6 substantially symmetrically about the vertical axis of each pillar 1. If, therefore, beams 3 were prefabricated, the construction of the building would proceed as follows.

First the lower sections 1a of pillars 1 and the beams 2 would be poured in place, these members being made

4

of reinforced concrete. Then the prefabricated cross-beams 3 would be set in place as shown in FIG. 1 and finally the concrete for the upper sections 1b of the pillars would be poured, this concrete filling the unfilled portion of casing 6 and flowing through the hole 7 in the casing 6 and forming an integral bond with the concrete of lower section 1a. Further, it should be noted that reinforcing rods extend upwardly from the lower pillar section 1a and tie in with reinforcing rods in the upper pillar section 1b. If the fixed floor 4 is also of concrete, it can be poured simultaneously with the pouring of the upper pillar sections 1b or subsequent thereto. In any event, as is seen in FIG. 2, the concrete core 5 of beam 3 forms an integral mass with the concrete of flooring 4. It should be noted that as regards the reinforced concrete beams 3 themselves, the core 5 actually may also comprise an upper portion 5a overlapping the flanges 9 as is indicated in dash lines in FIG. 2. Since in FIG. 2 the static flooring 4 is also of concrete which may be poured simultaneously with the pouring of core 5 in situ, the flooring concrete 4 and core concrete 5 form an integral mass; however, if flooring 4 were not of concrete or if beam 3 including core 5 were prefabricated, said core would still include portion 5a.

In the event that the I-beams 3 are not to be prefabricated, the metal casings 6 are still provided with holes 7 so that when these casings 6 are set in place and the concrete for pillars 1 is poured, the pillar sections 1a and 1b will still form an integral mass of concrete. In the case of beams 3 not being prefabricated, the casings 6 act as forms for the concrete which is poured in situ. While in the case of the pillars 1 and the transverse beams 2 the concrete forms or molds into which the concrete is poured must be assembled, and then disassembled in place after the concrete has set, the casings 6 are in all cases prefabricated and they are never removed.

With reference to FIGS. 1 and 2, it is seen that casing 6 is generally in the shape of an I and comprises an upper pair of flanges 9 extending perpendicularly to spaced apart vertical walls 10, bottom flanges 11 parallel to top flanges 9, vertical side walls 12, and bottom wall 13. An extremely important aspect of the new I-beam 3 is that casing 6, in addition to various other functions, constitutes a metallic reinforcing structure for the concrete core 5. Conventionally, concrete beams are reinforced by means of metal rods embedded with the concrete portion of the beam. The metal casing 6, however, provides considerably greater reinforcement than the conventional metal rods so that the beam 3 of this invention can be considerably smaller in height than an equivalent strength conventional reinforced concrete beam. Further, it should be noted that casing 6 serves important functions other than the reinforcing one. It serves as a form or mold for the concrete core 5 and thereby eliminates the costly and time consuming labor required for constructing and then disassembling the forms which are usually used when concrete beams are either formed in situ or even prefabricated. Further, casing 6 provides external metallic surfaces, namely the undersurface of flange 9 and the facing upper surface of flange 11, which are suitable as sliding bearing surfaces for the yet to be described movable floor structure. In this regard, it will be noted that a concrete surface is totally unsuitable as a bearing surface between moving parts because of its coarse, abrasive texture. A smooth metallic surface is the most practical for such a purpose; however, it is not a simple matter to attach a metal bearing surface to a concrete body because, among other difficulties, it is very difficult to permanently secure the metal bearing surface to the concrete and further, it is very difficult to obtain a level orientation of said surface when it is to be attached to concrete because the concrete surface against which attachment is to occur cannot be finished within close tolerances. On the other hand, the casing 6 of this invention ob-

3,512,315

viates all such problems since the flanges 0 and 11 can be accurately formed by conventional bending methods and their disposition is not determined by the contour of the concrete core 5; instead, the casing 6 determines the contour of the concrete core.

It should be noted that for purposes of increased strength, even the beam 3 of this invention could be provided with further reinforcing means in the form of conventional steel rods embedded within the concrete core 5. The upper rods alone could be used for a certain additional amount of reinforcement and for still additional reinforcement the lower rods could be used in conjunction with the upper ones. The amount of reinforcement used, namely whether only casing 6 will be used, or also upper rods, or also upper and lower rods, will depend upon the height of beam 3 and also upon the distance between outer pillars and inner pillars 1'.

A movable flooring 40 (FIGS. 5 and 6), preferably prefabricated, can now be slidably mounted relative to the static supporting structure of FIG. 1 in a manner somewhat analogous to a sliding desk drawer. In this regard, it should be noted that in FIG. 1 the outer pillars 1 represent an external wall of the building while pillars 1' are interior pillars of said building. The sliding direction of the movable floor structure is indicated by the arrows in FIG. 1.

According to this invention a novel fixed roller means 14 provides a low friction support for the movable flooring at the front end of the static support structure. With reference to FIG. 1 it is seen that the front end 15 of portions 11 and 12 of beam 3 is cut back relative to the front edge 16 of transverse beam 2 so as to accommodate roller means 14 between end 15 and edge 16. The bottom 13 of casing 6 is not cut back.

The roller means 14 comprises a pair of plates 17 welded to opposite ones of walls 10 on the interior side thereof. A tube 18 extends between plates 17 and through aligned holes 19 in the plates and in the walls 10, said tube being welded to said plates 17. A spacer 20 is positioned centrally in said tube relative to its length and a pair of axles 21 are fixedly mounted in said tube on opposite sides of the spacer and extend through the respective holes 19 to points outwardly of the casing walls 10. A pair of roller bearings 22 in tandem are mounted on the end of each axle 21. In order to prevent axial displacement of said bearings on said axles, an annular spacer 23 is positioned between the end of tube 18 and the inner side of one bearing while an L-shaped bracket 24 is secured by screw means to the upper surface of beam 2 and acts as a limit means against the outer side of the other bearing. The vertical leg 24' of bracket 24 includes a recess 27 within which is supported the end portion of axle 21 whereby said axle is supported at both ends thereof. A cylindrical sleeve 25 is tightly fitted over the outer periphery of both bearings and acts to evenly distribute a load to both bearings. Said sleeve 25 includes an inner spacer means 26 for preventing the two bearings from rubbing against each other. The diameter of the roller bearings sleeve 25 is such that a space exists between the outer periphery thereof and the top surface of bottom 13 of beam 3 whereby said bearings and sleeve are free to rotate without touching said bottom 13.

It is of course understood that plates 17 and tube 18 are welded in place within casing 6 before any concrete is poured into the end portion of said casing. The concrete which eventually is poured into said casing can easily flow around tube 18 in order to form an integral pillar of concrete as is shown on the right side of FIG. 1 wherein it is seen that the plates 17 and tube 18 become permanently and solidly embedded in the concrete which forms the front pillars 1. The brackets 24 and the axles 21 with the bearings 22 are, however, mounted in place after the concrete is poured and these last mentioned parts are replaceably mounted in the structure.

FIG. 1 shows the bearing roller means 14 extending

from both sides of each beam 3, this arrangement being adapted to accommodate sliding flooring on each side of the respective pillars. If a fixed floor were to be mounted adjacent to a sliding floor, the roller means 24 would only require one axle and one pair of bearings extending from only one side of each beam 3. Even in this instance, however, two plates 17 would be required and tube 18 would still extend the full distance between walls 10 of casing 6 in order to possess sufficient rigidity and strength.

As an alternative to the roller supporting means 14, it is also possible to provide a variation of such means upon the upper surface of transverse beam 2 at locations thereon spaced from the cross-beams 3. A roller means for this purpose is shown in FIG. 10 wherein the roller means comprises a pair of roller bearings 26 having a sleeve 27' thereover analogous to the aforedescribed sleeve 25 and bearings 22. The bearings 26 are mounted on an axle 28 which in turn is fixedly mounted at both ends within openings in spaced apart vertical plates 29 which are rigid with a connecting web 30. Web 30, in turn, is fixedly mountable on the upper surface of beam 2 by suitable screw means extending through holes 31 in said web.

The purpose in having two roller bearings in tandem interconnected by a sleeve such as 25 or 27' is to make use of commercially available roller bearings and yet obtain a larger bearing surface to support the considerable loads to which said bearings may be subjected. Of course, specially sized single bearings could be constructed for this purpose; however, this would increase the cost of the arrangement.

In order to true-up the respective walls of the casing 6, that is, in order to assure perpendicularity between walls 10 and flanges 9 and 11, a number of trueing brackets 32 are secured within casing 6 at spaced locations along the length thereof before the concrete core 5 is poured, said brackets remaining permanently embedded within the concrete core. It is seen that said brackets include a horizontal web portion 33 which overlaps the upper casing flanges 9 and is secured thereto by bolt means extending through holes in portion 33 and in the flanges 9. Perpendicularly and rigidly extending from the web portion are two parallel legs 34 which snugly fit between the walls 10. It is seen, therefore, that by making brackets 32 of considerably heavier metal than the metal of casing 6, said brackets serve to true-up the casing walls when the bolt means extending through the aligned holes in the bracket and in flanges 9 are tightened.

In FIGS. 5 and 6 it is seen that the movable flooring 40 comprises main lateral structural members 43 from which all other flooring members are supported. A reversible motor M is mounted on the static part of the building structure and is connected through a speed reducer 44 and a flexible coupling 46 to an elongated screw member 45. The screw member 45 is received within a correspondingly threaded nut member 47 which is fixedly mounted on the movable flooring 40. An elongate casing 48 is mounted on flooring 40 around screw member 45, said member resting upon the inner surface of said casing and obtaining support therefrom while at the same time said screw member can turn. Friction between the screw member and the casing is minimized by virtue of said casing containing a quantity of lubricating oil therein.

It is evident, therefore, that actuation of the motor M through suitable control means will result in rotation of screw member 45 and consequent movement of flooring 40 in either of two directions dependent upon the direction of rotation of the motor. Screw member 45 can also be rotated through a manually powered handle instead of the motor means in instances wherein it is desired to eliminate the motor because, for example, of cost considerations. Of course, a manual operating means can be installed in conjunction with a motor means to account for possible breakdown in the motor.

3,512,315

7

The flooring also comprises roller means 49 mounted on the inner end thereof and arranged to roll respectively along the underside of flange 9 and the upper side of flange 11. Roller means 49 is comprised of a pair of rollers 50 and 51 rotatively mounted on parallel axles which are fixedly mounted between the two parallel plates 53. Said plates are attached to the rear end of the flooring main structural members. The lower roller 51 comprises a smaller diameter portion 54 which rolls along flange 11 and a larger diameter portion 55 whose radial face bears against the wall 12 of casing 6.

When the flooring 40 is retracted within the beams 3, the load thereof is borne by the lower rollers 51 by virtue of portion 54 bearing against flange 11; however, when the flooring 40 is extended in cantilever fashion to a certain extent outwardly of beams 3, the load shifts to the upper rollers 50 which then bear upwardly against flanges 9.

The function of larger diameter portions 55 is to provide sidewise guiding of flooring 40 in order to maintain its sides parallel to the adjacent sides 10 of beams 3 and thereby prevent jamming of flooring 40 against said sides 10.

A fixed vertical balustrade means such as an end wall or railing 70 extends upwardly from flooring 40 along its outer end while side railings 71 of the accordion type are hingedly connected at 72 and 73 to the opposite ends of fixed railing 70 and to the exterior wall of the building static structure, respectively. It is seen, therefore, that when flooring 40 is fully retracted within the beams 3 the hinged railing sides 71 fold upon each other so that railing sides 71 and railing end 71 lie substantially flat against the building static exterior wall structure. On the other hand, when the flooring 40 is extended, the railing sides pivot about their respective pivot points 72, 73, 74 and 35 become extended as railing end 70 moves outwardly away from said exterior wall structure. In FIGS. 5 and 6 the railing and flooring 40 are shown only partially extended.

The flooring 40 with railing 70, 71, therefore, constitutes a retractable balcony structure whose retractability can serve many purposes. For example, in colder climates the balcony can be retracted in order to avoid the accumulation of snow thereon during the winter season. Also, the retraction and extension of the balconies of a building can be used to vary the building profile at will. A further purpose of retractability is especially noteworthy in regard to the lower floors of the building. During the night or during an absence of the occupants from the related quarters, it would be desirable to retract the balconies to prevent unwanted trespassers, such as burglars, from using the balconies as convenient stepping means for climbing up to the floor level and for standing on the balconies while attempting to break into the apartment. Retractability of the balconies at all levels can serve many useful purposes other than those specifically mentioned herein.

FIG. 12 shows another embodiment of the invention wherein a component of a building is constructed as a vehicle adapted to move on various of the static structural members of the building from a retracted position to an extended position relative to an exterior static wall of said building.

According to this embodiment, the building comprises an exterior wall structure 80 and various levels of static flooring 81 and 82. The lower level of static flooring 81 terminates at 83 at a distance from the exterior wall structure 80. Underlying the shortened flooring 81 is a movable flooring structure 81' supported on four wheels 84 by suitable axle means 85, said wheels riding on static cross-beams 86 which extend between the static pillars 87. The movable flooring 81', therefore, constitutes an extension of the static flooring 81, a small step 88 existing between the upper surfaces of these two floorings.

At its outer end the movable flooring 81' is integral with a vertical wall 89 which constitutes a part of the building exterior wall 80 when flooring 81' is fully retracted or telescoped beneath flooring 81. A low ceiling 60 extends inwardly from wall 89 and is supported at its inner end by a vertical structure 61 which extends down to the movable flooring 81'. A stairway 62 leads from flooring 81' to the upper level of ceiling 60. A railing or other balustrade means 63 extends upwardly from and along both sides of ceiling 60 between outer wall 89 and inner support structure 61. Further, a side wall means 63' also extends along both sides of the flooring 81' up to the low ceiling and inwardly from the wall 89 so as to enclose the space beneath said low ceiling.

When the vehicle is fully retracted within the static framework of the building, the wall 89 forms a substantially flat continuation of the building outer wall 80 and the building appears as a conventional one with windows 64 on each floor facing outwardly. Internally, the lower floor 81 has the same area as the upper floor 82 and differs therefrom only in that while the upper flooring 82 is completely flat all the way up to the exterior wall 80, the lower floor 81 includes a step at 83; further, the lower level A differs from upper level B in that the ceiling in the lower level is lower at 60 than the ceiling height throughout the remainder of the level. Ceiling 60, however, is sufficiently high so that the space thereunder is still useable as a continuation of the remainder of the level A.

When the vehicle is extended so that wall 89 protrudes outwardly from static wall structure 80 to an extent substantially equal to the distance between 89 and 61, the ceiling 60 becomes an open air terrace and, in addition, floor 81' has become enlarged by an amount equal to the distance between wall 89 and support 61. In other words, the living area of the room will have been increased by an amount equal to about two new rooms, one of said new rooms being due to the increase in size of flooring 81' and the other new room being constituted by the conversion of ceiling 60 to an open air terrace.

In this regard, it should be noted that if the distance between ceiling 60 and the window sill 62 on the window of the upper level B is about six feet, the privacy of persons using upper level B will not be infringed by persons standing or sitting on ceiling 60. It should further be noted that ceiling 60 is constructed sufficiently strong to serve its intended function as a terrace.

With reference to FIG. 8, it is seen that the movable flooring 40 may constitute a reinforced concrete slab supported on either side by the main flooring members 43 which in turn are slidably mounted between flanges 9 and 11 of beams 3. The strength required in flooring 40 will determine the thickness thereof and in the instance of FIG. 8 it is seen that flooring 40 is considerably of less height or thickness than the distance between flanges 9 and 11. In such an instance, therefore, the main flooring beams 43 are in the form of channel members, as shown, and C-channel member 90 is mounted between flange 11 and the bottom of flooring 40 in order to support said flooring at the highest position possible against the upper flange of the channel member 43. Member 90 can be welded to member 43, both these members being of structural metal.

With reference to FIGS. 5 and 8, it is seen that in order to laterally guide the flooring 40 at a location near to the outer end of the static structure, a bracket 59 is attached to each beam 3, said bracket mounting roller means 57 thereon for rotation about respective vertical axes. The rollers 57 roll against the exposed surface of the web portion of the respective channel members 90 and thereby function together with the rollers 51 on the inner end of movable flooring 40 to maintain the flooring 40 in a straight condition relative to beams 3.

It will be understood that flooring 40 is not necessarily of concrete but could be made up in various manners and of various materials. In any event, the top surface of said flooring will be finished with a suitable floor covering.

3,512,315

9 10

The details presented herein with reference to various preferred embodiments of realization are by way of illustration and are not intended to be limitative of the applicability of the inventive concept presented herein at this time or by way of subsequent amendment, it being understood that all modifications, substitutions, or equivalents which are either obvious or well within the purview of one skilled in the art are intended to be within the scope of said concept.

What is claimed is:

1. A building construction having an exterior wall and a supporting structure defining a floor level, part of said structure being static and other parts thereof being dynamically arranged relative to the static structure, said other parts comprising a floor of said building, said movable floor being movably supported by said static structure for movement inwardly and outwardly relative to said exterior wall, said movable floor constituting a permanent structural part of said building and being totally supported by said static structure while it is in either of its inward or extended positions, means for horizontally displacing said movable floor from one to the other of said positions as a normal function thereof for varying the horizontal extent of said floor level, said supporting structure including a static flooring located inwardly of said exterior wall, said movable floor being mounted for telescopic movement relative to said static flooring, said movable floor being arranged to form a horizontal extension of said static flooring to extend outwardly beyond said exterior wall.

2. The construction of claim 1, wherein said static flooring terminates at a distance inwardly from said exterior wall and said movable floor includes a fully retracted position whereby a portion thereof is telescopically overlapped by said static flooring and another portion thereof forms a horizontal extension of said static flooring from the termination of said static flooring and up to said exterior wall.

3. The construction of claim 2, wherein said movable floor lies in a plane parallel and adjacent to the plane of said static flooring whereby a vertical step exists between said floor and flooring along the termination of said static flooring.

4. The construction of claim 1, wherein said building exterior wall comprises an access opening leading outwardly onto the movable floor when the latter is extended relative to said wall, an end railing extending upwardly from the outer end of the movable floor and extending generally parallel to said exterior wall, said railing lying adjacent to said wall when the movable floor is retracted, accordion type railing sides connected at opposite ends thereof to said end railing and to said wall.

5. A building construction having an exterior wall and a supporting structure defining a floor level, part of said structure being static and other parts thereof being dynamically arranged relative to the static structure, said other parts comprising a floor of said building, said movable floor being movably supported by said static structure for movement inwardly and outwardly relative to said exterior wall, said movable floor constituting a permanent structural part of said building and being totally supported by said static structure while it is in either its inward or extended positions, means for horizontally displacing said movable floor from one to the other of said positions as a normal function thereof for varying the horizontal extent of said floor level, said static structure comprising vertical pillars extending upwardly of the movable floor, cross-beams extending between said pillars in a direction perpendicular to said exterior wall, and transverse beams extending between said pillars in a direction parallel to that of said wall, the movable floor having a first bearing means mounted thereon adjacent the inner end thereof and engaging said cross-beams for providing continuous bearing support at the inner portion of said movable floor upon said cross-beams, a second bearing means mounted at a fixed location on said static structure at a point adjacent said exterior wall and supportingly engaging said movable floor, said movable floor being movable along the length of said cross-beams.

6. The construction of claim 5, wherein said pillars and cross-beams are reinforced concrete structural members.

7. A building construction having an exterior wall and a supporting structure defining a plurality of floor levels, part of said structure being static and other parts thereof being dynamically arranged relative to the static structure, said other parts comprising a floor of said building, said movable floor being movably supported by said static structure for movement inwardly and outwardly relative to said exterior wall, said static structure comprising vertical pillars extending upwardly of the movable floor, cross-beams extending between said pillars in a direction perpendicular to said exterior wall, and transverse beams extending between said pillars in a direction parallel to that of said wall, the movable floor being movably supported on said cross-beams and between said pillars, said pillars and cross-beams being of reinforced concrete, the concrete of said pillars being integrally joined with the concrete of said cross-beams and said pillars extending uninterruptedly in a vertical direction through the central plane of said cross-beams.

8. The construction of claim 5, said cross-beams comprising a concrete core encased in a reinforcing sheet metal casing, said casing having laterally directed upper and lower flanges, the movable floor comprising a main floor beam on each side thereof slidably mounted between said flanges in respective ones of said cross-beams on each side of said movable floor.

9. A building construction having an exterior wall and a supporting structure defining a plurality of floor levels, part of said structure being static and other parts thereof being dynamically arranged relative to the static structure, said other parts comprising a floor of said building, said movable floor being movably supported by said static structure for movement inwardly and outwardly relative to said exterior wall, said static structure comprising vertical pillars extending upwardly of the movable floor, cross-beams extending between said pillars in a direction perpendicular to said exterior wall, and transverse beams extending between said pillars in a direction parallel to that of said wall, the movable floor being movably supported on said cross-beams and between said pillars, said cross-beams comprising a concrete core encased in a reinforcing sheet metal casing, said casing having laterally directed upper and lower flanges, the movable floor comprising a main floor beam on each side thereof slidably mounted between said flanges in respective ones of said cross-beams on each side of said movable floor, including first roller means mounted on the inner end of each said main floor beams, said roller means being in rolling contact with said upper and lower flanges, a second roller means mounted on said static structure in a plane corresponding to the outer plane of said cross-beams, said second roller means bearing against the underside of said movable floor.

10. The construction of claim 9, said second roller means comprising a roller rotatably mounted adjacent the outer end portion of each said cross-beams in alignment with the axis of said lower flange whereby said main floor beam bears against said lower roller.

11. The construction of claim 10, wherein said second roller means comprises a roller rotatably mounted on an axle, said axle being fixedly mounted in said cross-beam and extending laterally into said concrete core and laterally outwardly of said casing.

12. The construction of claim 11, including a tube extending between the walls of said casing and surrounding said axle, said tube being encased in said concrete core, said axle being fixedly but removably mounted in said tube.

3,512,315

**11**

**12**

**13.** The construction of claim **12**, including a support member attached to the end of said axle which extends outwardly of said cross-beam, said support member resting against a said transverse beam.

**14.** The construction of claim **9**, said second roller means comprising a pair of roller bearings in tandem, a sleeve tightly extending over both roller bearings whereby the load of the movable floor is evenly distributed to both said bearings.

**15.** The construction of claim **14**, including spacer means between said bearings.

**16.** The construction of claim **5**, said cross-beams comprising a concrete core encased in a sheet metal casing, said casing in cross-section having a generally I-beam shape, said casing comprising a pair of vertical, spaced parallel walls, an upper and a lower flange respectively extending perpendicularly from the respective upper and lower end of said walls, a bottom wall parallel to said flanges and spaced vertically from the bottom flanges, vertical side walls connecting the bottom flanges to said bottom wall, the concrete core within said casing having an inverted-T cross-section.

**17.** The construction of claim **16**, including a concrete static flooring supported over said cross-beams, the concrete in said flooring and in said cross-beam cores being a single integral mass of concrete.

**18.** The construction of claim **16**, wherein said concrete core includes an upper portion extending upwardly beyond the upper ends of said vertical walls and transversely overlapping said upper flanges, whereby said core is itself T-shaped in cross-section.

**19.** The construction of claim **16**, said pillars being of reinforced concrete integrally joined to the concrete of said core, said pillars extending uninterruptedly in a vertical direction through the central plane of said core and between said casing vertical walls, said casing vertical walls respectively lying adjacent to the outer sides of said pillars, an opening in said casing bottom wall through which passes a respective pillar.

**20.** The construction of claim **9**, said first roller means also including a roller which bears laterally against a side of said casing thereby providing lateral guiding of said movable floor.

**21.** A building construction having an exterior wall, and a supporting structure defining a floor level, part of said structure being static and other parts thereof being dynamically arranged relative to the static structure, said other parts comprising a floor of said building, said movable floor being movably supported by said static structure for movement inwardly and outwardly relative to said exterior wall, said movable floor constituting a permanent structural part of said building and being totally supported by said static structure while it is in either its inward or extended positions, means for horizontally displacing said movable floor from one to the other of said positions as a normal function thereof for varying the horizontal extent of said floor level, wherein said building includes a static flooring located inwardly of said exterior wall, said movable floor being mounted for telescopic movement relative to said static flooring in a parallel plane adjacent thereto, said movable floor forming a horizontal extension of said static floor in a plane adjacent thereto when said movably supported floor is

extended outwardly of said exterior wall, wherein the movable floor forms a horizontal extension of said static flooring in a plane adjacent thereto when the movable floor is retracted inwardly relative to said exterior wall, and said static structure defining a compartment space, and including a movable vertical end wall portion extending rigidly along the outer end of said movable floor, said end wall portion forming a substantially flat continuation of the static exterior wall of said building when said movable floor is fully retracted and thereby closing the outer vertical area of said compartment, a low ceiling extending from said wall portion at a distance from the top thereof and inwardly over said movable floor, a stair means leading from said movable floor to the upper side of said low ceiling, a side wall means projecting upwardly from the sides of said movable floor to above said low ceiling and extending from said movable end wall inwardly to the inner end of said low ceiling, whereby said low ceiling functions as an open air terrace when said movable floor is extended with said side wall means and said end wall serving as a balustrade therefor, and whereby said movable floor with said side wall means and said end wall portion define an enclosed room below said low ceiling extending outwardly of said building exterior wall when said movable floor is extended.

**22.** The building construction of claim **21**, wherein said end wall portion includes a window therein.

**23.** The building construction of claim **21**, wherein said static structure defines a second compartment above the first mentioned one, said building exterior wall enclosing the outer end of said compartment and including a window therein for said second compartment, the vertical distance from said low ceiling to the window sill of said second compartment window being greater than the average height of a person.

**24.** The building construction of claim **21**, wherein said movable floor is supported on four wheels in the nature of a four-wheel vehicle, said wheels riding upon the upper surfaces of static cross-beams which extend perpendicularly to the plane of said exterior wall, a power means operatively connected to said wheels to rotate same.

**25.** The construction of claim **5**, said second bearing means being mounted on a one of said transverse beams located adjacent to said exterior wall.

**26.** The construction of claim **5**, said second bearing means being mounted on each of two successive said cross-beams at points thereon immediately adjacent to said exterior wall.

**References Cited**

UNITED STATES PATENTS

| | | | |
|---|---|---|---|
| 1,279,819 | 9/1918 | Zingsheim et al. | 52—67 |
| 1,448,235 | 3/1923 | Read | 52—79 |
| 2,049,926 | 8/1936 | Rafter | 52—724 |
| 2,499,498 | 3/1950 | Hammond | 52—67 |
| 3,000,061 | 9/1961 | Cooper | 52—236 X |
| 3,169,280 | 2/1965 | Jarman | 52—67 |
| 3,341,986 | 9/1967 | Brosig | 52—67 |

PRICE C. FAW, JR., Primary Examiner

U.S. Cl. X.R.

52—79, 236, 725

# EXHIBIT 5

US005620224A

# United States Patent [19]

## DiBiagio et al.

[11] **Patent Number:** 5,620,224

[45] **Date of Patent:** Apr. 15, 1997

[54] **TRAILER SLIDEOUT MECHANISM WITH VERTICALLY MOVABLE CABIN FLOOR**

[75] Inventors: **Anthony J. DiBiagio**, Granger; **Marvin P. Burns**, Nappanee; **Larry Martin**, Goshen, all of Ind.

[73] Assignee: **Holiday Rambler LLC**, Wakarusa, Ind.

[21] Appl. No.: **311,945**

[22] Filed: **Sep. 26, 1994**

[51] Int. Cl.⁶ ..................................................... B60P 3/35

[52] **U.S. Cl.** ............................ **296/26**; 74/110; 74/89.17; 296/165; 296/171; 384/40

[58] **Field of Search** ..................... 296/26, 165, 171, 296/175; 74/110, 89.17; 384/40, 58

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,813,747 | 11/1957 | Rice, Jr. ................................. | 296/23 |
| 2,842,972 | 7/1958 | Houdart ............................... | 296/175 X |
| 3,106,750 | 10/1963 | Jarman ................................. | 20/2 |
| 3,137,041 | 6/1964 | Mullen ................................. | 296/171 X |
| 3,181,910 | 5/1965 | Thomas ................................. | 296/23 |
| 4,277,919 | 7/1981 | Artweger et al. ...................... | 52/2 |
| 4,930,837 | 6/1990 | Marsh et al. ......................... | 296/165 |
| 5,238,290 | 8/1993 | Farmont ............................... | 296/223 X |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1570553 | 5/1969 | France ................................. | 296/26 |
| 2001589 | 2/1979 | United Kingdom .................... | 296/26 |

*Primary Examiner*—David M. Mitchell
*Assistant Examiner*—Kia M. Robinson
*Attorney, Agent, or Firm*—Leydig, Voit & Mayer, Ltd.

[57] **ABSTRACT**

A trailer having a slideout mechanism for moving an extensible cabin between a retracted position wherein the cabin is substantially inside the trailer and an extended position wherein the cabin is substantially outside the trailer. The slideout mechanism comprising an extension means for positioning the cabin between the retracted and extended positions and a leveling means for vertically positioning the cabin floor between a raised position wherein the cabin floor is substantially above the trailer floor and a lowered position wherein the cabin floor is substantially level with the trailer floor. In one embodiment, the leveling means comprises a frame member having a predetermined profile for controlling the vertical movement of the outboard end of the cabin floor as the cabin is positioned between the retracted and extended positions. In other embodiments, the leveling means comprises a cam assembly or a riser assembly for controlling the vertical position of the cabin floor.

**15 Claims, 19 Drawing Sheets**







FIG. 2



FIG. 3

Case 1:06-cv-00762-JJF    Document 27-3    Filed 09/14/2007    Page 52 of 93



FIG. 4



FIG 5

FIG 6



FIG. 7



FIG.8          FIG.9



FIG.10



FIG. 11



FIG. 12



FIG.13

U.S. Patent

Apr. 15, 1997

Sheet 10 of 19

5,620,224



FIG.14

FIG.15





FIG. 18



FIG. 19



FIG. 20



FIG. 21



FIG. 22



FIG. 23



FIG. 24



254
257
256
255
258
256

# FIG.25

5,620,224

1

# TRAILER SLIDEOUT MECHANISM WITH VERTICALLY MOVABLE CABIN FLOOR

## FIELD OF THE INVENTION

This invention generally relates to travel trailers, fifth wheel trailers, motor homes, recreation vehicles and the like and, more particularly, to such trailers provided with extensible room portions for increasing the living space in the trailer.

## BACKGROUND OF THE INVENTION

Many travel trailers have a central or main room containing an extensible cabin portion which is laterally extendable in order to increase the interior space of the trailer when the trailer is parked at its final destination. The extensible cabin portion is typically slidably supported upon the floor of the main room for movement between a stored, retracted position and an extended position.

Typically, the level of the cabin floor is raised slightly above the trailer floor of the main room, forming a raised step which may be several inches high. Unfortunately, in many trailers, the cabin floor remains in the raised position when the cabin is positioned in the extended position. Attempts to provide an extensible cabin room in which the floor is level or flush with the trailer have been unsuccessful.

## OBJECTS AND SUMMARY OF THE INVENTION

It is an object of the invention to provide a vehicle such as a mobile home, house trailer, recreation vehicle or the like having a laterally extensible cabin which increases the interior space of the vehicle, while maintaining the traveling size of the vehicle.

It is an object of the invention to provide a trailer having an extensible cabin which can be positioned between a retracted position wherein the cabin is substantially inside the trailer and an extended position wherein the cabin is substantially outside the trailer.

Another object of the present invention is to provide an extensible cabin having a cabin floor which is level with the trailer floor when the cabin is in its extended position.

A further object of the present invention is to provide a cabin which can be extended and retracted while maintaining the cabin floor in a horizontal and level orientation.

A more specific object of the present invention is to provide a mechanism for vertically positioning the outboard end of the cabin floor in unison with the inboard end of the cabin floor to maintain the cabin floor in a horizontal and level orientation.

It is another object of the invention to provide a trailer having an extensible cabin which is easily and quickly assembled and disassembled.

Yet a further object of the present invention is to provide a trailer having an extensible cabin which may be used when the cabin is in the retracted position.

It is an object of the invention to provide a vehicle having an extensible cabin which is completely sealed about the periphery.

These and other features and advantages of the invention will be more readily apparent upon reading the following description of a preferred exemplified embodiment of the invention and upon reference to the accompanying drawings wherein:

2

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of a fifth wheel trailer with an extensible cabin in the extended position and one embodiment of a slideout mechanism in accordance with the invention;

FIG. 2 is a partial sectional view taken along line 2—2 in FIG. 1 showing the extensible cabin and the slideout mechanism in the retracted position;

FIG. 3 is a partial sectional view taken along line 3—3 in FIG. 1 showing the extensible cabin and the slideout mechanism in a position intermediate the retracted and extended positions;

FIG. 4 is a partial sectional view taken along line 4—4 in FIG. 1 showing the extensible cabin and the slideout mechanism in an extended position;

FIG. 5 is a partial sectional view taken along line 5—5 in FIG. 1 showing a first embodiment of an extension assembly in the retracted position;

FIG. 6 is a partial sectional view taken along line 6—6 in FIG. 1 showing the extension assembly in the extended position;

FIG. 7 is a perspective view of the extension assembly taken along line 7—7 in FIG. 6;

FIG. 8 is a sectional view taken along line 8—8 in FIG. 1, showing one embodiment of a seal assembly for sealing the gap between the cabin wall and the trailer wall;

FIG. 9 is a view similar to FIG. 8 showing another embodiment of the seal assembly for sealing the gap between the cabin wall and the trailer wall;

FIG. 10 is a sectional view taken along line 10—10 in FIG. 1, showing one embodiment of the seal assembly for sealing the gap between the cabin ceiling and the trailer walls;

FIG. 11 is another embodiment of the seal assembly for sealing the gap between the cabin floor and the trailer floor;

FIG. 12 is a sectional view similar to FIG. 2 but showing the extensible cabin, a second embodiment of the slideout mechanism in the retracted position and a second embodiment of the extension assembly;

FIG. 13 is a sectional view of the second embodiment of the slideout mechanism showing the extensible cabin, and the slideout mechanism in an extended position;

FIG. 14 is a sectional view of a floor leveler assembly taken along line 14—14 in FIG. 12 showing the cabin floor and the cam assembly in the lowered position;

FIG. 15 is a sectional view of the floor leveler assembly similar to FIG. 14, showing the cabin floor and the cam assembly in the raised position;

FIG. 16 is a sectional view taken along line 16—16 in FIG. 12 showing the attachment between the cabin floor and the walls;

FIG. 17 is a sectional view taken along line 17—17 in FIG. 16 showing the attachment between the cabin floor and the walls;

FIG. 18 is a sectional view similar to the view in FIG. 14 showing a third embodiment of the floor leveler assembly having a left and fight set of levelers in the lowered position (in solid lines) and in the raised position (in phantom lines);

FIG. 19 is a sectional view of the floor leveler assembly taken along line 19—19 in FIG. 18 showing the right leveler in the lowered position;

FIG. 20 is a sectional view of the floor leveler assembly taken along line 20—20 in FIG. 18 showing the right leveler in the raised position;

5,620,224

3

FIG. 21 is a perspective view of a fourth embodiment of the floor leveler assembly in the lowered position;

FIG. 22 is an elevational view of the fourth embodiment of the floor leveler assembly in the retracted position;

FIG. 23 is an elevational view of the fourth embodiment of the floor leveler assembly in the extended position;

FIG. 24 is a perspective view of the support assembly and a third embodiment of the extension assembly; and

FIG. 25 is a perspective of the drive assembly for controlling the extension of the support assembly.

While the invention will be described and disclosed in connection with certain preferred embodiments and procedures, it is not intended to limit the invention to those specific embodiments. Rather it is intended to cover all such alternative embodiments and modifications as fall within the spirit and scope of the invention.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to the drawings and particularly to FIG. 1, the illustrated trailer 10 has an extensible cabin or room 12 and a slideout mechanism for moving the cabin between a retracted or stored position and an extended position in accordance with the invention. Although the illustrated trailer 10 is of the "fifth wheel" type which is adapted to be towed by a vehicle (not shown) disposed at the front end, it will be appreciated that the invention is applicable to any type of vehicle or trailer.

The trailer 10 generally has a ceiling 14, a front wall 16, a rear wall 18, two opposing side walls 20 (only the left wall is shown), and a floor 22 which generally define an interior living space 24. The trailer floor 22 is supported on a subfloor frame which is generally referenced as 26 and a trailer frame generally referenced as 62 in FIG. 2. In the illustrated embodiment, the left side wall 20 has an opening 28 for receiving the extensible cabin 12.

The extensible cabin 12 is movable between an extended position generally shown in FIG. 1 and a retracted or stored position generally shown in FIG. 2. In the extended position, the cabin 12 is extended outwardly from the interior trailer space 24 which increases the overall space available inside the trailer 10. In the retracted position, the cabin 12 is positioned inwardly into the interior space 24 of the trailer 10 which decreases the exterior dimensions of the trailer 10 for towing and transport over the highways.

As best shown in FIGS. 1–2, the extensible cabin 12 has a cabin ceiling 30, a front wall 32, a rear wall 34, side wall 36, and a floor 38. For ease of reference, the cabin floor 38 has a wall or outboard end referenced as 38w and an interior or inboard end referenced as 38i. The cabin floor 38 will typically have at least one roller 40 disposed at the interior end 38i for slidably engaging and supporting the cabin floor 38 above the trailer floor 22 in the retracted position. As shown in FIG. 2, when the cabin 12 is in the stored position, the cabin floor 38 and the trailer floor 22 are generally parallel to each other and the level of the cabin floor 38 is raised above the level of the trailer floor 22.

In accordance with certain objects of the invention, the trailer 10 has a slideout mechanism for positioning the cabin 12 to an extended position wherein the cabin and the trailer floors 38, 22 are flush with each other. The slideout mechanism comprises (i) means for positioning the cabin 12 between the retracted position (generally shown in FIG. 2) and the extended position (generally shown in FIG. 4) and

4

(ii) means for vertically positioning the cabin floor 22 between a raised position wherein the cabin floor 38 is positioned above the trailer floor 22 in the retracted position and a lowered position wherein the cabin floor 38 is substantially level with the trailer floor 22 in the extended position.

The trailer frame 62 supports the trailer 10 and the slideout mechanism 50. The cabin walls 32, 34, 36 are supported by a rigid vertical frame, generally referenced as 56, which is capable of supporting the cabin walls 32, 34, 36 as the cabin 12 is positioned between the retracted and extended positions. The frame 56 also extends below the cabin floor 38 for engagement with the slideout mechanism 50 as will be described below. The cabin floor 38 has a rigid frame or subfloor, best shown as 58 in FIGS. 30 14–15, for supporting the cabin floor 38 during movement between the retracted and extended positions and between the raised and lowered positions.

### THE FIRST EMBODIMENT

FIGS. 1–11 describe a first embodiment of the slideout mechanism 50 for positioning the extensible cabin 12 between the retracted and extended positions. In the illustrated embodiment, the means for vertically positioning the cabin floor 22 so that the cabin floor 38 is substantially level with the trailer floor 22 comprises a floor leveler assembly 54. The floor leveler assembly 54 also acts to support the cabin 12 in the extended position.

The floor leveler assembly 54 comprises a channel 64 which is rigidly attached to the trailer frame 62 and which is adapted to slidably and telescopingly receive a frame member 60 for movement between a retracted and extended position in unison with the cabin 12. The rollers 40 disposed on the trailer floor 22 support the interior end 38i of the cabin floor 38i. The wall end 60w of the frame 60 is rigidly attached to the wall frame 56, permitting the channel 64 and the frame member 60 to cooperate to support the wall end 38w of the cabin 12 in the extended position. A roller 66, rigidly attached to the trailer frame 62, is disposed between the wall end 60w and the interior end 60i of the frame 60 for slidably supporting the frame 60. The frame interior end 60i has a roller 68 for slidably engaging the top wall of the channel 64. Although only one frame 60 is illustrated, the leveler assembly 54 preferably has a frame 60 disposed at the front and rear ends of the cabin section 12.

In order to raise and lower the wall end 38w and the interior end 38i of the cabin floor 38 relative to the trailer floor 22, the frame member 60 has a predetermined profile adapted to control the vertical movement of the cabin floor 38 relative to the trailer floor 22 as the frame 60 moves between the retracted and extended positions. The frame 60 has an inclined section designated as 70 and a straight section designated as 72 which provides the predetermined vertical movement of the cabin floor 38.

The inclined section 70 permits the wall end 38w of the cabin floor 38 to be lowered from its initial level above the trailer floor 22 (as shown in FIG. 2) to a lower level which is level with the trailer floor 22 (as shown in FIG. 3). In the retracted position as shown in FIG. 2, the outboard end of the inclined section 70 rests upon the trailer roller 66 so that the cabin floor 38 is above and generally parallel to the trailer floor 22. As the cabin 12 is positioned toward the extended position, the inclined section 70 travels downwardly relative to the trailer roller 66 causing the cabin walls 32, 34, 36 and the outboard end 38w of the floor to be

5,620,224

<table>
<tr><td>5</td><td>6</td></tr>
</table>

similarly lowered. It will be seen in FIG. 3 that the difference in level between the interior end 38*i* and wall end 38*w* of the cabin floor 38 causes the cabin floor 38 to be slightly inclined. When the upper and inboard end of the inclined section 70 engages the trailer roller 66 as shown in FIG. 3, it will be appreciated that the wall end 38*w* of the floor 38 is at the same level as the trailer floor 22.

Referring to FIG. 3, it will be seen that the continued extension of the cabin section 12 causes the straight portion 72 of the frame 60 to engage the roller 66. The extension of the cabin 12 and the frame 60 causes the cabin rollers 40 to engage a ramp member 74 disposed at the wall end 22*w* of the trailer floor 22, lowering the interior end 38*i* of the cabin floor 38 to the same level as the trailer floor 22 as shown in FIG. 4.

Conversely, as the cabin section 12 is positioned toward the retracted position, the cabin rollers 40 roll up the trailer ramp member 74, thereby raising the interior end 38*i* of the cabin floor 38 above the trailer floor 22. Similarly, engagement between the inclined section 70 of the frame 60 and the roller 66 raises the wall end 38*w* of the cabin floor 38 in response to the relative position of the inclined section 70 and the roller 66.

The means for positioning the cabin 12 between the retracted position (FIG. 5) and the extended position (FIG. 6) comprises an extension assembly 52. The specific embodiment of the extension assembly 52 illustrated in FIGS. 5–7 comprises an actuator 75 centrally disposed between the front and rear ends of the cabin 12. The actuator 75 comprises a hydraulic cylinder 76 rigidly attached to the trailer frame 62 and an extensible piston rod 78 attached to the cabin frame 56. Movement of the piston rod 78 causes the cabin frame 56 and the cabin 12 to move between the retracted and extended positions.

In order to accommodate the vertical movement of the cabin section 12 relative to the trailer frame 62 and hence the actuator 75, the piston rod 78 slidably engages the cabin frame 56. Referring to FIG. 7, a bolt 80 slidably attaches the piston rod 78 to a slot 82 in the cabin frame 56. Thus, the cabin frame 56 may be positioned between the retracted and extended positions in response to the movement of the actuator 75 whereas the vertical movement of the cabin frame 86 caused by the leveler assembly 54 does not affect the horizontal position of the actuator 75. Although a hydraulic actuator is described in the illustrated embodiment, it will be appreciated that other actuation means will be known to those skilled in the art including, but not limited to, an electrically driven cylinder.

The trailer 10 also has means for sealing the gaps defined by the periphery of the cabin section 12 and the opening 28 in the trailer wall 20 in order to prevent infiltration of outside air and engine fumes into the trailer interior 28. In order to seal the gap between the cabin walls 32, 34 and the trailer wall 20 when the cabin section 12 is positioned at the retracted position, the periphery of the cabin side wall 36 has a flange 36*a* adapted to extend in overlapping relationship with the trailer wall 20 as shown in FIG. 8. The wall flange 36*a* has an inner side 36*b* opposing the exterior side of the trailer wall 20*a*. A resilient seal member 80*a* attached to the inner side 36*b* sealably engages the exterior side of the trailer wall 20*a* to close the gap when the cabin section 12 is in the retracted position. In the embodiment illustrated in the FIG. 8, the seal member 80*a* comprises a plurality of resilient tubular or bulb members which are adapted to sealably engage the trailer wall 20*a* in response to engagement with the trailer exterior 20*a*. In the embodiment

illustrated in FIG. 9, the seal member 80*b* comprises one tubular member disposed on the flange inner side 36*b* which is adapted to cooperatively engage a U-shaped channel 82 on the exterior surface 20*a* of the trailer wall 20.

In order to seal the gap between the cabin ceiling 14 and the trailer wall 20 when the cabin section 12 is in the retracted position, the top periphery of the cabin wall 36 has a flange 36*c* which is adapted to extend in overlapping relationship with the trailer wall 20. As shown in FIG. 10, the flange 36*c* has an inner side 36*d* opposing the exterior side 20*a* of the trailer wall 20 and a resilient seal member 80*c* attached to the flange inner side 36*d* which sealably engages the trailer wall 20*a* to close the gap when the cabin section 12 is positioned at the retracted position. The trailer wall 20, adjacent the cabin ceiling, also has a brush seal member 86 and a flexible lip seal member 88 to enhance the seal and minimize infiltration of dirt and particulate matter which may collect on the cabin ceiling 30.

In order to seal the gap between the cabin walls 32, 34 and the trailer wall 20 when the cabin section 12 is positioned at the extended position, the periphery of the cabin ceiling 30 and the front and rear walls 32, 34 have a flange 84 partially shown in FIGS. 2–6, which is adapted to extend in overlapping relationship with the interior side 20*b* of the trailer wall 20. Any of the resilient seal members 80 described above may be attached to the inner side of the flange 84 to sealably engage the trailer wall 20 to close the gap when the cabin section 12 is positioned at the extended position.

In order to seal the gap between the cabin floor 38 and the trailer floor 22 when the cabin 12 is positioned at the extended position, the lower end of the trailer ramp section 74 has at least one seal member 80*d* disposed for engaging the underside 38*a* of the cabin floor 38 when the cabin floor 38 is in its lowered position, i.e., when the cabin section 12 is positioned at the extended position. In the illustrated embodiment, the seal member 80*d* comprises a resilient tubular member although other shapes will be appropriate and will be known to those skilled in the art.

In order to seal the gap between the cabin floor 38 and trailer floor 22 when the cabin 12 is positioned at the retracted position, a seal member 80*e* is disposed subjacent the cabin floor 38 for sealing engagement with the ramp 74 as best shown in FIG. 2.

The seal members 80 described above and illustrated in FIGS. 8–11 may be made from any resilient flexible material which will be known to those skilled in the art and which is adapted to deform in response to engagement with the trailer wall 20, thereby maximizing the seal surface and enhancing the seal. It will also be appreciated that the different embodiments of the seal members 80*a, b, c, d, e* described above are interchangeable with each other.

### THE SECOND EMBODIMENT

FIGS. 12–17 illustrate a second embodiment of the slideout mechanism 150. In the second embodiment of the slideout mechanism 150, the means for positioning the cabin section between the retracted position (FIG. 12) and the extended position (FIG. 13) comprises the extension assembly 152 and the means for vertically positioning the floor between the raised and lowered positions comprises the floor leveler assembly 154.

Like the first embodiment, the floor leveler assembly 154 comprises a plurality of rollers 40 which supports the interior end 38*i* of the cabin floor 38 on the trailer floor 22, and a ramp section 74 disposed at the wall end 22*w* of the

5,620,224

7                                                                                                8

trailer floor 22 controls the elevation of the interior end 38*i* of the cabin floor 38. In this embodiment, however, the wall frame 56 (and the wall end of the cabin 12) is supported by a substantially straight frame member 155 which slidably engages the channel member 64.

The floor leveler assembly 154 has a cam assembly, generally designated as 156, which controls the elevation of the wall end 38*w* of the cabin floor 38. The wall end 38*w* of the cabin floor 38 is supported by at least one cam assembly 156 and preferably two cam assemblies rigidly attached to the trailer frame 56 and disposed at the front and rear ends of the cabin section 12. Referring to FIGS. 14–15, each cam assembly 156 comprises a cam member 160 operatively connected to an actuator 158 adapted for rotating the cam members 160 between raised and lowered positions. Each cam member 160 has a first end 162 defining a cam surface 166 which slidably engages the underside of the wall end 38*w* of the cabin floor 38. The second end 164 of the cam member 160 is attached to a pivot actuator 158 by linkages 168 and 169 for pivoting the cam member 160 between a raised position in which the cam member 160 raises the wall end 38*w* of the cabin floor 38 above and parallel to the trailer floor 22, and a lowered position in which the cam member 160 lowers the wall end 38*w* of the cabin floor 38 to the same level as the trailer floor 22. In FIGS. 14 and 15, rotation of the linkage 169 in the clockwise direction positions the cam member 160 toward the raised position. Conversely, rotation in the counterclockwise direction positions the cam member 160 toward the lowered position. In the illustrated embodiment, the cam actuator 158 is a hydraulic cylinder, although other actuation means will be known to those skilled in the art, including, but not limited to electric-driven cylinders.

When the cabin 12 is in the retracted position as generally shown in FIG. 12, the level of the cabin floor 38 is above and substantially parallel to the trailer floor 22, and the cam member 150 and the wall end 38*w* of the cabin floor 38 are in the raised position and the cabin rollers 40 rest upon the trailer floor 22. As the extension assembly 152 positions the cabin section 12 toward the extended position, the cabin frame 56 and the cam assembly 156 attached to the cabin frame 56 also extend, maintaining the cabin floor 38 substantially parallel with the trailer floor 22. At an intermediate position in which the cabin rollers 40 initially engage the inclined ramp section 74, it will be appreciated that the cabin floor interior end 38*i* initially begins to lower, creating an incline in the cabin floor 38.

In accordance with certain objects of the invention, the leveler 5 assembly 154 is adapted to maintain the cabin floor in a horizontal and level orientation. The operation of the cam actuator 158 is synchronized with the position of the cabin rollers 40 relative to the trailer ramp section 74 to maintain the cabin floor 38 in a horizontal and level orientation. The cam member 160 raises and lowers the wall end 38*w* of the cabin floor 38 in response to the vertical movement of the interior end 38*i* of the cabin floor 38, thereby maintaining a horizontal and level orientation of the cabin floor 38. Thus, when the interior end 38*i* of the cabin floor 38 is level with the trailer floor 22 and positioned at the bottom of the trailer ramp 74, the cam member 160 is positioned at its lowered position (FIG. 14).

Conversely, as the extension assembly 152 retracts the cabin section 12 into the trailer and the cabin rollers 40 travel up the ramp section 74, the cam actuator 158 is synchronized to rotate the linkage 169 in the counterclockwise direction, raising the cam member 160 and the wall end 38*w* of the cabin floor 38 in unison with the interior end 38*i* of the cabin floor.

In one embodiment, the inboard end of the cabin floor has a limit switch (not shown) which activates the actuator when the roller engages the top of the ramp, thereby lowering the outboard and inboard ends of the cabin floor in unison. The limit switch deactivates the actuator when the cabin floor reaches the lowered position. Conversely, the limit switch activates the actuator to raise the outboard end of the cabin floor when the rollers travel up the ramp and deactivates the switch when the cabin floor is at the raised position. Other means will be known to those skilled in the art for synchronizing the operation of the actuator to control, in unison, the orientation of the outboard and inboard ends of the cabin floor.

It should now be appreciated that the floor leveler assembly 154 maintains the cabin floor in level orientation throughout the cabin's movement between the retracted and extended positions. In addition, the cabin floor 38 moves in unison with the cabin walls 32, 34, 36 in the horizontal direction and independently of the cabin walls 32, 34, 36 in the vertical direction. That is, the cabin walls 32, 34, 36 remain at the same vertical position while only the cabin floor 38 changes its vertical position in order to eliminate the height differential with the trailer floor 22. In order to adjust the vertical position of the cabin floor 38 independently of the cabin walls 32, 34, 36, a linkage assembly generally designated as 170 in FIGS. 16–17 slidably attaches the cabin floor 38 to the cabin walls 32, 34, 36. FIGS. 16–17 illustrate the linkage assembly 170 associated with the rear cabin wall 34 but each wall will have at least one linkage assembly 170. The cabin wall 34 has a wall roller 172 for permitting the cabin wall 34 to roll on the trailer floor 22 in response to movement of the cabin section 12 by the extension assembly 152. The cabin wall 34 also has a bracket 174 disposed about the inner periphery of the cabin wall 34. The cabin floor 38 has a plurality of brackets 176 corresponding to the wall brackets 174, each floor bracket 176 having a protruding pin 178 adapted for slidably engaging a vertical slot 180 disposed in the wall bracket 174. It should now be appreciated that the linkage assembly 170 maintains a generally perpendicular orientation and spacing between the cabin floor 38 and walls 30, 32, 34 as the cabin floor 38 moves between the raised position (phantom lines) and the lowered position shown in FIG. 17.

The extension assembly 152 in the embodiment illustrated in FIGS. 12–13 comprises an actuator 153 rigidly attached to the trailer frame 62 and the frame 155 for positioning the frame 155 and the cabin 12 between the retracted and extended positions.

A third embodiment of the extension assembly 252 is also illustrated in FIGS. 24–25. The extension assembly 252 comprises a plurality of stationary channel members 253 which are rigidly attached to the trailer frame (generally referenced as 62 in FIGS. 24–25) and corresponding frame members 254 which slidably and telescopically engage the channel members 253. The wall ends 254*w* of the frame members 254 are rigidly attached to the wall frame (generally referenced as 56), and, thus, support the wall end of the cabin 12 during movement between the retracted and extended positions as described above.

The extension assembly 252 also comprises a roller 255 having a plurality of fingers 256 projecting outwardly from periphery of the roller 255. The fingers 256 are adapted to engage corresponding holes 257 disposed on the frame member 254 such that rotation of the roller 255 creates linear movement of the frame member 254 and the cabin 12 attached thereto. A conventional motor 258 drives the rollers 255. In the illustrated embodiment, the extension assembly

5,620,224

9

252 comprises front and rear rollers 255f, 255r (and corresponding frame members) disposed near the front and rear of the cabin and rigidly connected by linkage 258 to insure that the cabin 12 is positioned evenly. A third roller 259 and frame member 261 is disposed in the middle of the cabin 12 to provide additional support for the cabin 12.

It will be appreciated that any of the three extension assemblies described may be utilized to position the cabin 12 between the retracted and extended positions.

### THE THIRD EMBODIMENT

FIGS. 18–20 illustrate a third embodiment of the slideout mechanism 200. The slideout mechanism 200 comprises one of extension assemblies (not shown in FIGS. 18–20) as previously described for positioning the cabin between the retracted and extended positions. The floor leveler assembly 210, comprises at least one riser assembly 212 attached to the wall frame 56 for controlling the vertical orientation and movement of the wall end 38w of the cabin floor 38 and at least one riser assembly 214 attached to the trailer frame 62 for controlling the vertical position and movement of the interior end 38i of the floor 38. The illustrated embodiment comprises two pairs of riser assemblies disposed adjacent the wall end of the cabin floor 38w and the trailer floor 22w, respectively.

The riser assembly 214 for controlling the vertical position of the interior end 38i of the cabin floor 38 (shown in FIG. 19) comprises a bottom and top riser frame 216, 218 having a generally triangular cross section. A horizontal roller 220 is rotatably attached to the top riser frame 218 for supporting the cabin floor 38 and permitting the floor 38 to slide in response to the extension assembly. The bottom riser frame 216, operatively supported by the trailer floor 22, has an inclined face 216a and a plurality of rollers 222 on the bottom side 216b for permitting the riser frame 216 to slide adjacent the trailer floor 62 in the horizontal direction as viewed in FIG. 19. The top triangular riser frame 218 has an inclined face 218a and a plurality of rollers 224 slidably engaging the bottom inclined face 216a. It will be appreciated that movement of the bottom riser 216 in the horizontal direction (as shown in FIGS. 19–20) causes vertical movement of the top riser 218.

The bottom riser frames 216 are attached to an actuator 226 by linkages 228, 230. Rotation of the linkage 230 in the clockwise direction by the actuator 226 causes the bottom riser frames 216 to move inwardly toward the actuator 226, thereby raising the top riser frame 218 and floor roller 220. Thus, the cabin floor 38 is raised in response to the actuator 226. Conversely, rotation of the linkage 230 in the counterclockwise direction causes the bottom riser frames 216 to move outwardly, resulting in downward vertical movement of the top riser frame 218 and floor roller 220. Thus, the cabin floor 38 is lowered in response to the actuator 226.

The riser assemblies 212 for controlling the vertical position of the wall end 38w of the cabin floor 38 operates as described above except that the top riser frame 218 is rigidly attached to the underside of the cabin floor 38. The riser assembly 212 moves between the retracted and extended position in unison with the cabin floor 38 and, therefore, does not require the floor roller 220.

When the cabin floor 38 is positioned at the retracted position, the riser assemblies 212, 214 are in the raised position. As the cabin floor 38 is positioned toward the extended position by the extension assembly 202, the riser assembly 212 attached to the wall end 38w travels in unison

10

cabin floor 38. The horizontal floor roller 220, associated with second riser assembly 214, slidably supports the cabin floor 38. Thus, the cabin floor 38 remains in a substantially level orientation until it reaches the extended and outboard position generally illustrated in phantom in FIG. 18. The actuator 226 rotates the linkages 228, 230 in the clockwise direction which causes the cabin floor 38 to be lowered until the cabin floor 38 is level with the trailer floor 22 as shown in FIG. 18. It will be appreciated that the riser assemblies 212, 214 only lower the cabin floor when the cabin is positioned at the extended position.

### THE FOURTH EMBODIMENT

FIGS. 21–23 illustrate a fourth embodiment of the slide-out mechanism 250, comprising a leveler assembly 260. The leveler assembly 260 comprises a pivot bar 262 pivotably mounted in the side wall 36 of the cabin section 12 and extending between the front and rear walls 32, 34 of the cabin section 12. A generally L-shaped linkage 264 is attached to the rear end 262a of the pivot bar 262. One end 264a of the linkage 264 is pivotably attached to an actuation cylinder 266 and the second end 264b is pivotably attached to a support bracket 268 mounted to the wall end 38w of the cabin floor 38.

The actuation cylinder 266 is pivotably mounted at the side wall 36 so that the piston rod 266a may be moved between a retracted position as shown in FIG. 22 and an extended position as shown in FIGS. 21 and 23. In the retracted position, the piston rod 266a supports the wall end 38w of the cabin floor 38 above the trailer floor 22. Conversely, in the extended position, the piston rod 266a supports the cabin floor 38 so that the cabin floor 38 is level with the trailer floor 22.

In operation, one of the embodiments of the extension assembly described above is used to move the cabin section 12 in the horizontal direction, from the retracted position toward the extended position shown in FIG. 22. The piston rod 266a is in the retracted position and the wall end 38w and interior ends 38i of the cabin floor 38 are level with each other as generally shown in FIG. 22. When the floor rollers 40 reach the trailer ramp section 74, the horizontal movement of the cabin walls 32, 34, 36 is terminated and the leveler assembly 250 is actuated. The actuation cylinder 266 is activated to pivot the wall end 38w of the cabin floor downwardly, thereby pulling the interior end 38i of the cabin floor 38 and the floor rollers 40 down the ramp section 74. Specifically, the linkage 264 is rotated in the clockwise direction in response to the extension of the piston rod 266a which causes the wall end 38w of the cabin floor to be lowered into level engagement with the trailer floor 22. It will be appreciated that the cabin floor 38 moves independently of the cabin walls 32, 34, 36.

Thus, it will be seen that a novel and improved trailer slideout mechanism has been provided which attains the aforenoted objects. Various additional modifications of the embodiments specifically illustrated and described herein will be apparent to those skilled in the art, particularly in light of the teachings of this invention.

We claim as our invention:

1. A slideout mechanism for use in a vehicle having a floor, a wall, an opening in the wall, and an extensible cabin movable through the opening between retracted and extended positions, said slideout mechanism comprising

    extension means for positioning the cabin between the retracted position wherein the cabin is disposed sub-

5,620,224

**11**

stantially inside the vehicle and the extended position wherein the cabin is disposed substantially outside of the vehicle,

the cabin having walls and a cabin floor vertically movable relative to the cabin walls, and

leveling means for vertically positioning the cabin floor independently of the cabin walls between a raised position wherein the cabin floor is above the vehicle floor and a lowered position wherein the cabin floor is substantially level with the vehicle floor.

2. The mechanism as set forth in claim **1** wherein the leveling means comprises at least one leveler assembly for vertically positioning an outboard end of the cabin floor between the raised and lowered positions when the cabin is at the extended position.

3. The mechanism as set forth in claim **2** wherein the leveler assembly comprises at least one riser assembly for vertically positioning the outboard end of the cabin floor between the raised and lowered position.

4. The mechanism as set forth in claim **3** wherein the riser assembly comprises upper and lower members slidably engaging each other such that movement of the lower member causes vertical movement of the upper member, and

the upper member supportably engages the cabin floor for movement between the raised position wherein the cabin floor is positioned substantially above the vehicle floor and the lowered position wherein the cabin floor is positioned substantially level with the vehicle floor.

5. The mechanism as set forth in claim **4** wherein the riser assembly comprises an actuator for moving the lower member.

6. The mechanism as set forth in claim **4** wherein the lower and upper members have opposing inclined faces such that movement of the lower member causes the inclined faces to slide relative to each other.

7. The mechanism as set forth in claim **1** wherein the leveling means comprises at least one outboard leveler assembly and at least one inboard leveler assembly for vertically positioning the outboard and inboard ends, respectively, of the cabin floor between the raised and lowered positions when the cabin is positioned at the extended position.

**12**

8. The mechanism as set forth in claim **7** wherein each leveler assembly comprises at least one riser assembly for vertically positioning the cabin floor between the raised and lowered position.

9. The mechanism as set forth in claim **8** wherein each riser assembly comprises upper and lower members slidably engaging each other such that movement of the lower member causes vertical movement of the upper member,

the upper member supporting the cabin floor for movement between the raised position wherein the cabin floor is positioned substantially above the vehicle floor and the lowered position wherein the cabin floor is positioned substantially level with the vehicle floor.

10. The mechanism as set forth in claim **9** Wherein the riser assembly comprises an actuator for moving the lower member.

11. The mechanism as set forth in claim **9** wherein the lower and upper members have opposing inclined faces such that movement of the lower member causes the inclined faces to slide relative to each other.

12. The mechanism as set forth in claim **8** wherein the riser assembly is synchronized to vertically position the outboard end of the cabin floor in unison with the inboard end of the cabin floor for maintaining a level orientation of the cabin floor between the raised and lowered positions.

13. The mechanism as set forth in claim **1** wherein the extension means comprises an actuator connecting the vehicle and the frame member for positioning the frame member between the retracted and extended positions.

14. The mechanism as set forth in claim **1** wherein the extension means comprises at least one frame member having one end slidably supported by the vehicle and another end rigidly attached to the cabin for supporting the cabin.

15. The mechanism as set forth in claim **14** wherein at least one of the frame members has a plurality of holes for receiving corresponding fingers projecting from the periphery of a roller, an actuator operatively connected to the roller such that rotation of the roller causes linear movement of the frame members between the retracted and extended positions.

\* \* \* \* \*

EXHIBIT 6

US005491933A

# United States Patent [19]

## Miller et al.

[11] **Patent Number:** 5,491,933

[45] **Date of Patent:** Feb. 20, 1996

[54] **FLAT FLOOR SLIDE OUT APPARATUS FOR EXPANDABLE ROOMS**

[75] Inventors: **Mahlon A. Miller,** 8443W 1100N, Nappanee, Ind. 46550; **David A. Blosser,** Middlebury, Ind.

[73] Assignee: **Mahlon A. Miller,** Nappanee, Ind.

[21] Appl. No.: **308,971**

[22] Filed: **Sep. 20, 1994**

[51] Int. Cl.$^6$ ...................................... **B60P 3/34**
[52] U.S. Cl. ............................... **52/67;** 296/26; 296/165; 296/171; 296/175; D12/104
[58] Field of Search .................... 52/67; 296/171, 296/172, 173, 175, 176, 165, 26; D12/104

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| Re. 32,262 | 10/1986 | Stewart | 52/67 X |
| 1,279,819 | 9/1918 | Zingsheim et al. | 52/67 |
| 1,521,635 | 1/1925 | Lewis | 52/67 |
| 2,136,130 | 11/1938 | Gorlenko | 52/67 X |
| 2,704,223 | 3/1955 | Houdart | 52/67 X |
| 2,813,747 | 11/1957 | Rice, Jr. | 296/171 |
| 4,900,217 | 2/1990 | Nelson | 296/26 X |
| 4,930,837 | 6/1990 | Marsh et al. | 296/175 X |
| 5,237,782 | 8/1993 | Cooper | 52/67 |
| 5,332,276 | 7/1994 | Blodgett, Jr. | 296/171 X |
| 5,333,420 | 8/1994 | Eden | 52/67 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1570553 | 6/1969 | France | 296/26 |

OTHER PUBLICATIONS

Barker Manufacturing Co., of Battle Creek, MI; Rollout Rack Drive Assembly Print; Jan. 6, 1994.

*Primary Examiner*—Carl D. Friedman
*Assistant Examiner*—Laura A. Saladino
*Attorney, Agent, or Firm*—Ryan M. Fountain

[57] **ABSTRACT**

An expandable room structure is provided having relatively movable room portions supported by telescopically sliding tubes, at least one of those tubes being movable also laterally to pivot as the room portion floors slide into the same horizontal plane when the room structure is moving into expanded positions. In retracted positions the room portion floors are vertically spaced to permit one room portion to nest within the other. A rack and pinion drive arrangement is provided to cause relative movement between the tubes. Lateral movement of one of the tubes is permitted by engagement with an inclined surface extending out of the other tube such that the laterally moving tube pivots about the pinion. A ramp surface is formed on the abutting edge of the floor of one room portion, and the abutting edge of the floor of the other room portion moves up and down that ramp portion when transitioning between expanded and retracted positions. When moving to expanded positions, such movement down the ramp occurs prior to pivoting of the sliding tube(s), such that end wall weather sealing is pivotally clamped without vertical sliding.

**14 Claims, 6 Drawing Sheets**





FIG. I



FIG. IA



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6

5,491,933

**1**

# FLAT FLOOR SLIDE OUT APPARATUS FOR EXPANDABLE ROOMS

## BACKGROUND AND SUMMARY OF THE INVENTION

The present invention relates generally to expandable rooms for habitable accommodations in static structures and vehicles. More particularly, this invention relates to room structures that are telescopically slidable between retracted and expanded positions.

Various motorized and towable vehicles are known which have rooms or portions thereof that can be adjusted between expanded and retracted positions in order to provide more or less internal accommodation, respectively, as desired by the user. In a typical structure, one portion of room is movable and telescopically received or nested within a portion of the room that remains fixed. Similar structures can be used effectively in buildings, although for convenience the discussion below focusses primarily on the vehicular examples.

When the vehicle, a Class A motor home, for example, is in motion the room remains in a retracted position. As such, there is typically adequate space within the room to accommodate users in transit and remain within the standard width limitations imposed upon motor vehicles. When the motor home is stopped for a length of time, however, it is often desirable to increase the size of internal accommodations. At that point users can slide the nested room portion out to its fully expanded position.

These movable room portions usually include a floor, a roof, a side wall and one or more end walls. In the retracted positions, the roof and end walls are typically concealed from exterior view and the room side wall forms a portion of the vehicle side wall. At the same time, the floor of the movable portion of the room typically rests above the floor of that portion of the room which remains fixed, and may form a portion of the usable interior floor during vehicle transit. Similarly, the ceiling of the movable roof portion may define the interior ceiling of that part of the vehicle during transit.

However, since the movable portion of the room is nested within the fixed portion of the room, the movable portion usually has at least some smaller dimensions than the fixed portion. Thus, when the movable portion is in expanded positions it is not uncommon for the floor of the movable portion to be higher than the floor of the fixed portion and for the ceiling of the movable portion to be lower than the ceiling of the fixed portion. Unfortunately, such stepped flooring has frequently been found to be undesirable, inconvenient and somewhat hazardous.

For example, due to the slight height difference of the step between floor portions, it can be overlooked by users an cause tripping or stumbling if care is not taken. Further, that step limits the freedom of movement of furniture within the room. Also, the step makes it more difficult to create an aesthetically pleasing floor appearance.

In response, certain slide out room structures have been suggested which permit the floor sections to have a flush upper surface in at least some expanded positions. Unfortunately, such structures can be overly complicated, expensive and relatively heavy. These can be serious drawbacks. In the vehicular environment, unnecessary slide mechanism weight cuts down on fuel economy when the vehicle is in transit. Also, vehicular structures often need to have greater insensitivity to vibration. Further, expandable or slide out

rooms are commonly employed in recreational vehicles. As such, reliability, of operation and minimal cost are important factors in marketing of the vehicle.

Also, some of these prior room structures have been found to have deficiencies in the weather sealing between the room portions. Since recreational vehicles are often used during inclement weather, defective weather sealing is a significant matter. It is believed that the weather sealing problems of certain prior movable room structures arise because the method of room movement involves first fully extending the movable room portion and then lowering the movable floor portion into alignment with the fixed floor portion. In doing so, the weather sealing strips often placed on the movable end walls first fully engage the receiving end walls of the fixed portion of the room and are then slid downwardly as the floors arc nude flush. Unfortunately, this downward sliding can damage the weather sealing strips and/or cause the sealing integrity to be reduced.

In designing an improved slide out mechanism for movable rooms, several other factors should be considered as well. For example, as the room expands, misalignment of the movable room portion can cause the end walls to bind together. This misalignment concern increases as the length of the movable room increases and as multiple slide support structures are employed to move the room portion. Further, as the width of the room and/or the extension distance out from the vehicle increases, the cantilevering forces exerted on the slide mechanism tend to cause sagging of the movable side wall. As a result, there is a tendency for the floor portions to separate at their abutting edges. Also, since for safety reasons and convenience the room portions typically need to be locked in place once in the expanded and retracted positions, the slide out mechanism should not interfere with or preclude ease of using the locking mechanism. In addition, since primary drive devices for the slide out mechanism, such as electric motors, will after time wear out, an easily available back up or emergency drive device should be included.

Accordingly, it is an object of this invention to provide an improved expandable room structure. Further objects include the provision of an expandable room structure that:

A. is relatively inexpensive to manufacture and reliable in use,

B. is of minimal weight and maintains sliding alignment against end wall binding,

C. creates a flush overall floor in expanded positions,

D. includes an easily accessible back up drive arrangement,

E. is durable and convenient to use in vehicles, and

F. maintains effective weather sealing.

These and other objects of the present invention are obtained by the provision of an expandable room structure having relatively movable room portions supported by telescopically sliding tubes, at least one of those tubes being movable also laterally to pivot as the room portion floors slide into the same horizontal plane when the room structure is moving into expanded positions. In retracted positions the room portion floors are vertically spaced to permit one room portion to nest within the other. A rack and pinion drive an-arrangement is provided to cause relative movement between the tubes. Lateral movement of one of the tubes is permitted by engagement with an inclined surface extending out of the other tube such that the laterally moving tube pivots about the pinion. A ramp surface is formed along the abutting edge of the floor of one room portion, and the abutting edge of the floor of the other room portion moves

5,491,933

3

up and down that ramp surface when transitioning between expanded and retracted positions. When moving to expanded positions, such movement down the ramp surface occurs prior to pivoting of the sliding tube(s), such that end wall weather sealing is pivotably clamped substantially without vertical sliding.

Especially for longer room structures, a plurality of such sets of telescopically sliding tubes can be used in cooperation to avoid end wall binding. A common cross shaft is joined to the pinions of the drive arrangements of each set, and a drive motor is connected to that cross shaft. Also, a keyed surface can be formed on the cross shaft to permit manual driving force to be applied.

Other objects, advantages and novel features of the present invention will now be readily apparent to those of skill in the pertinent art from the following drawings and detailed description.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows schematically a cross sectional front end view of a vehicle having an expandable room according to the teachings of the present invention when the room is in a partially retracted position.

FIG. 1A shows schematically a cross sectional top view as taken along line A—A of FIG. 1.

FIG 2 shows an enlarged cross sectional front view of a the lower portion of the expandable room of the vehicle of FIG. 1 when that room is in a retracted position.

FIG. 3 shows a cross sectional front view, corresponding to that of FIG. 2, when the room is in an expanded position.

FIG. 4 shows a top, back perspective view of the room support structure of the embodiment of FIG. 2 when in an expanded position, with portions thereof broken away.

FIG. 5 a cross sectional side view of a specific embodiment of the support structure system of the embodiment of FIG. 2, as taken along line 5—5 of FIG. 4.

FIG. 6 shows a further enlarged cross sectional front view of the end wall junction of the embodiment of FIG. 2, taken along line 6—6 of FIG. 1A as the end walls are coming together during room expansion.

DESCRIPTION OF PREFERRED
EMBODIMENTS

FIG. 1 through 6 and 1A show a preferred embodiment of the present invention as mounted in a vehicle, such as a Class A motor home or like motorized or towable recreational vehicle. The view of FIG. 1 is from the front of the vehicle looking to the rear, with the slide out room mounted for expansion on the left side of the vehicle. The present invention is not, however, limited to such arrangements, and has applicability, for example, to slide out rooms mounted for expansion on the right side or rear of the vehicle. Similarly, this invention is suitable as well for use in static structures, such as buildings, even though the preferred embodiments described herein are explicitly for vehicular applications.

Vehicle 10 includes slide out or expandable room structure 20 having first room portion 30 and second room portion 40. Room structure 20 is typically placed in a middle region along the length of the vehicle and forms a living and/or dining room area. Room portion 30 is, for example, fixed or stationary relative to vehicle 10, and room portion 40 is movable relative to vehicle 10 and room portion 30. In retracted positions, room portion 40 is telescopically

4

received or nested within room portion 30. In expanded positions, room portion 40 extends outwardly from room portion 30 in a cantilevered manner. The present invention provides a means for obtaining a flush floor within room structure 20 when room portion 40 is in expanded positions.

Room structure 30 includes first floor section 32, side wall sections 34, roof section 36 and end wall sections 38. In FIG. 1–6, only a single side wall and end wall section are shown. It will be understood from FIG. 1A, however, that another set of such walls is formed on the opposite side of the opening made in vehicle 10 to receive room portion 40. Side wall sections 34 preferably form part of the exterior sides of the vehicle. End wall sections 38 extend inwardly from side wall sections 34 and define a stop to the expansion movement of room portion 40. To achieve the maximum width of room structure 20 in expanded positions, the inward length of end wall sections 38 can be minimal. In especially preferred embodiments that length is nominal, and end wall sections 38 serve only to define the portion adjacent to or integral with side wall 34 upon which the weather sealing strips are mounted and/or in abutment

Room portion 40 includes second floor section 42, side wall section 44, roof section 46 and end wall sections 48. Again, in FIGS. 1–6 only a single end wall section 48 is shown, but it will be understood from FIG. 1A that such an end wall section is formed on each end of side wall section 44. These end wall sections extend inwardly to close side wall section 44 with side wall sections 34 when room portion 40 is in expanded positions. Thus, the inward length of end wall sections 48 define the limit of expansion of room portion 40. To achieve the maximum width of room structure 20, the inward length of end wall sections 48 can be maximized up to the point where those walls interfere with structure on the inside of vehicle 10 opposite side wall section 44 (such as cabinets, sinks, wall 39 or the like). However, in especially preferred embodiments where the vehicle is to be occupied when room portion 40 is in retracted positions, the inward length of end wall sections 48 is not maximized. Instead, a balance is achieved by making the inward length as large as it can be without unduly interfering with use of the vehicle interior during transit.

As shown especially in FIGS. 2 and 3, telescopically sliding tubes or rails are mounted under room structure 20 to provide support and control during expansion and retraction. In the embodiments shown, these tubes provide both support for room portion 40 and the actuation means for positioning that room portion. However, the present invention contemplates that in certain embodiments those functions can be achieved by separate elements.

Preferably, at least two of such tubes are mounted at positions spaced apart along the length of room structure 20, that length forming a portion of the length of vehicle 10. In especially preferred embodiments, these sets of tubes are aligned such that their length in longitudinal direction A is along the line of expansion and retraction of room portion 40, across the width of the vehicle. Each set of these tubes includes at least two tube elements.

A first, outer support tube 50 is, for example, fixedly mounted to the main frame or flooring beam structure 35 beneath room portion 30. A second, inner support tube 60 is slidably mounted within tube 50 and fixed at one end to room portion 40 adjacent the lower portion of side wall section 44. In this way, room portion 40 has a slidable, cantilever mounting to room portion 30.

A free rolling wheel 62 or similar device is attached to the opposite end of tube 60 and inserted within tube 50 to serve

5,491,933

| 5 | 6 |

as a support roller and assist in the longitudinal sliding of tube 60 into and out of tube 50. Tube 60 is formed, for example, as a rectangular conduit and also includes a series of spaced apart openings or slots 64, preferably along its lower surface or side. In the example shown, tube 60 is dimensioned to have clearance for sliding within tube 50 and for lateral upward movement as will be described further below. However, it will be understood that other embodiments can reverse the orientation of tubes, such that tube 50 is within tube 60, especially if an open rail structure is employed.

Preferably, a rack and pinion-type drive mechanism is employed for causing relative movement between tubes 50 and 60. For example, a drive and support wheel 52 is mounted adjacent the open end of tube 50 through which tube 60 moves. This wheel has a plurality of projections or prong teeth 54 about its circumference which are dimensioned so as to be freely engagable within slots 64. Wheel 52 is positioned on tube 50 and relative to tube 60 such that teeth 54 are aligned with and inserted into slots 64. In this way, rotation of wheel 52 supports tube 60, drives the sliding movement of tube 60 and positively locates that tube within tube 50. Thus, wheel 52 also precisely locates room portion 40 with respect to room portion 30.

Tube 50 further includes an inclined ramp or surface 56 extending upwardly which functions as an outward notch in lateral direction B toward room portion 30. In especially preferred embodiments where tube 50 has a rectangular cross section, ramp 56 is formed on the upper interior surface of the tube, facing tube 60, by separating a portion of that surface from the rest of the tube. For example, tube 50 can be cut at the intersection of the side walls and top wall of the tube and then sliced across the top wall at one end of that cut (preferably that end closest to drive wheel 52) in order to permit the flap formed thereby in the top wall to be lifted upward and outward. To maintain the desired slope and upward location of the flap, a strap element 58 is welded or otherwise secured in place between the free end of the flap and the portion of tube 50 below that free end. The interior dimensions of ramp 56 are established to permit wheel 62 to roll or slide upward to strap element 58. Preferably, the lateral elevation of ramp 56 at its upper end is sufficient that strap element 58 defines the limit of travel of wheel 62 towards drive wheel 52 and the open end of tube 50.

Floor section 32 includes an inclined or sloped end region or surface 33 at the edge which abuts floor section 42 when room structure 20 is in expanded positions. This inclined surface 33 serves as a ramp to permit room portion 40 to move laterally, as it moves longitudinally, between positions where floor section 42 is above floor section 32 and positions where floor section 42 is flush with floor section 32. As used herein, when these floor sections are "flush" their top surfaces are in substantially the same plane, preferably a horizontal plane, without a noticeable elevation between them.

Floor section 42 includes, for example, mating inclined surface 43 so as to facilitate a smooth and flush abutment between the floor sections. Floor section 42 also includes at least one roller or carrier 45 mounted to the underside of that floor section to movably support room portion 40 on room portion 30 in retracted positions. Roller 45 also facilitates telescopic sliding of the room portions between expanded and retracted positions, and especially up and down inclined surface 33.

As shown especially in FIG. 4, each set of tubes 50 and 60 are connected by a cross shaft 70 joining drive wheels 52,

preferably through the axis (or axes) of rotation of those drive wheels. Thus, cross shaft 70 can serve as a direct drive shaft to transmit rotational force to drive wheels 52 In this way, both sets of tubes (and, thereby, both ends of room portion 40) can be driven at the same speed.

FIG. 5 shows a specific embodiment of a preferred drive shaft arrangement for that purpose. It is not, for example, necessary to employ a single rod for cross shaft 70: multiple shaft segments or rods 72 (separately or combined into drive wheels 52) can be rigidly joined by various conventional adapters or couplings 74. If it becomes important to avoid radial bending of the cross shaft in a particularly long expandable room, one or more bearings 76 can be disposed intermediate the adjacent drive wheels 52 and secured to any convenient support surface. At least one motor 80 is connected through coupling 78 to cross shaft 70 as the primary drive device to provide rotational force thereto. Preferably one synchronized electric gear motor 80 is disposed on each of the two ends of the cross shaft for this purpose.

In addition, a keyed or flattened surface or adjacent bushing 82 is provided with at least one of the adapters or couplings 74 attached to cross shaft 70, preferably intermediate drive wheels 52. Keyed surface 82 is configured to mate with a common hand tool, such as a wrench, or a specially formed tool to permit the application of rotational force to the cross shaft manually, as in the case of an emergency or break down of the primary drive device. Conventional electric control circuits are, for example, connected to electric motors 80 to permit operation from inside the vehicle. Preferably, however, Keyed surface 82 is located in an easily accessible region of the vehicle exterior.

In operation, after stopping the vehicle the user or operator will typically first unlock the room structure from a retracted position. Any number of conventional locking devices can be employed, although it is preferred to use a system that is compact and connects adjacent to the end wall sections inside of the vehicle. After that, electric motors 80 are actuated to cause tubes 60 to slide out of tubes 50. Since each tube 60 is being driven at the same speed, binding of the end wall sections can be avoided even in relatively long room structures. As tubes 60 continue to slide out, roller 45 moves down inclined surface 33 and wheel 62 moves up ramp 56 so that floor sections 32 and 42 can become flush in expanded positions of the room structure.

However, preferred embodiments these movements of roller 45 and wheel 62 are in a specific sequence so as to provide proper sealing and streamlined construction. For example, ramp 56 is preferably disposed within tube 50 at a location where wheel 62 comes into contact with the ramp after most of tube 60 has slide out from tube 50. As wheel 62 moves laterally up ramp 56, tube 60 will pivot about drive wheel 52 and the end of tube 60 attached below side wall section 44 will sag downwardly. This results from the torque exerted by gravity on the cantilevered support of room portion 40. Floor section 42 is dimensioned and configured so as to be flush with floor section 32 after that pivoting or "sagging" has occurred. Therefore, prior to pivoting, floor section 42 would be slightly inclined with respect to floor section 32 because of the upthrusting effect at side wall 44 as a result of roller 45 starting to move down inclined surface 33. If this slight incline is maintained even as roller 45 continues to move down inclined surface 33 further advantage is obtained.

FIG. 6 shows an enlarged, partial view taken along the vertical plane of line 6—6 of FIG. 1A. Unlike FIG. 1A, in this view the converging end wall sections 38 and 48 are

5,491,933

7

illustrated just as room portion 40 is moving to a fully expanded position. End wall sections 48 each include a stop wall 90 extending outwardly from that room portion. These stop walls serve to engage end walls 38 when room portion 40 is fully expanded and thereby limit the travel of that room portion outwardly from the vehicle. Conventional weather sealing material 92, as in compressible strip form, is placed on the abutting faces of stop walls 90 and/or end wall sections 38. If floor section 42 maintains a slight incline of angle C (that angle being exagerated in degree in FIG. 6 for ease of viewing) with respect to floor section 32 as roller 45 moves down inclined surface 33, then stop walls 90 will first engage end wall sections 38 only at their lower portions 94. Subsequent pivoting of tube 60 about drive wheel 52 will cause stop walls 90 to pivot through angle C to fully abut end walls 38 and clamp sealing material 90 therebetween without adverse vertical sliding. In this way, weather sealing of the end wall sections can occur in a bottom to top sequence. Thereafter, the operator will typically lock each side of the room structure in an expanded position via the conventional locking devices.

To achieve this combination of results, the components of the present invention and their relative placement are preferably dimensioned such that roller 45 starts to move down inclined surface 33 before wheel 62 starts to move up ramp 56. After the initial movement of roller 45 down inclined surface 33, wheel 62 moves up ramp 56 as roller 45 continues downward, such that some longitudinal and lateral movement of room portion 40 occurs simultaneously. I However, the relative angles and length of inclined surface 33 and ramp 5(5, are preferably established such that at least some pivoting of tube 60 occurs after roller 45 moves off inclined surface 33. Thus, the lateral distance that room portion 40 nee&; to be lowered in moving to expanded positions can be minimized and the supporting mechanism streamlined for minimal size and weight within a vehicle or other confined space.

Although the present invention has been described above with respect to specific embodiments, the same is by way of illustration and example only and is not to be taken as limitation. Numerous variations of the invention are contemplated in addition to those recited herein without departing from the essential features of this invention. Accordingly, the spirit and scope of the present invention are to be limited only by the terms of the claims below.

What is claimed is:

1. An expandable room structure comprising:

first and second room portions, each room portion having a floor,

said second room portion being mounted so as to be movable with respect to said first room portion between expanded and retracted positions, the floor of the second room portion being disposed above the floor of the first room portion in the retracted positions,

a first support tube mounted under said first room portion,

a second support tube mounted under said second room portion,

said second support tube being telescopically mounted with respect to the longitudinal length of said first support tube, and

said second support tube being mounted for lateral movement with respect to said first support tube, the extent of that lateral movement being sufficient to permit the floor of said second room portion to be flush with the floor of said first room portion when the second room portion is in the expanded position.

8

2. The invention according to claim 1 wherein rack and pinion drive means are connected to said first and second support tubes for causing relative movement between those tubes.

3. The invention according to claim 2 wherein said rack and pinion drive means includes as the pinion a drive wheel mounted on one end of said first support tube and an inclined surface is mounted on said first support tube such that, at a predetermined point in telescopic extension of said second support tube from said first support tube, said second support tube pivots about said drive wheel and a portion of said second support tube moves laterally along said inclined surface.

4. The invention according to claim 1 wherein said first support tube includes a laterally inclined surface and said lateral movement of said second support tube is achieved by sliding engagement of said second support tube with said inclined surface.

5. An expandable floor structure, including a first floor and a second floor which are relatively movable between expanded and retracted positions, the second floor being disposed above said first floor in the retracted positions, and an apparatus for causing relative movement between the first and second floors such that the first floor is flush with the second floor in the expanded position, that apparatus comprising:

an outer rail connected to the first floor and extending longitudinally,

an inner rail connected to the second floor and slidably mounted along the outer rail,

a drive wheel connected to the outer rail and having a surface which engages the inner rail to cause sliding of the inner rail with respect to the outer rail,

an inclined surface on the outer rail which extends laterally outward and is dimensioned so as to receive an end portion of the inner rail and thereby permit the inner rail to pivot about the drive wheel as the inner rail slides with respect to the outer rail.

6. The apparatus according to claim 5 wherein the first floor includes an inclined ramp along one side of that floor and the second floor includes at least one roller on its underside to permit the second floor to be movably supported on the first floor when in the retracted positions and to facilitate movement of the second floor down and up the inclined ramp as the second floor moves to and from the expanded position.

7. The apparatus according to claim 6 wherein the inner rail is connected to the second floor by a cantilevered mounting at one end of the inner rail, a plurality of openings are spaced along the length of the inner rail, and the surface of the drive wheel which engages the inner rail includes a plurality of projections which can be received in those openings.

8. The apparatus according to claim 7 wherein the inner and outer rails are formed as telescoping tubular elements, a free rolling wheel is attached to the end of the inner rail mounted within the outer rail to facilitate sliding movement between those rails and the free rolling wheel is engagable with the inclined surface as the inner rail slides with respect to the outer rail.

9. The apparatus according to claim 8 wherein the expandable floor structure includes at least two sets of the inner and outer rails, each set being spaced apart and having a common cross shaft connected to the drive wheel of each set, and includes at least one drive motor connected to that cross shaft so as to cause rotation of the drive wheels of each set of inner and outer rails.

5,491,933

9

10. The apparatus according to claim 9 wherein the cross shaft includes a keyed portion for receiving a hand tool for manually rotating the drive wheels.

11. A vehicle having a slide out room structure therein to selectively expand the internal accommodation of that vehicle, said room structure including a first portion and a second portion slidably nested within said first portion when said room structure is in retracted positions, each of said first and second portions having a roof section, side and end wall sections and a floor section, the floor section of said second portion being spaced above the floor section of said first portion when said room structure is in the retracted positions, and including means for moving said second portion relative to said first portion to define an expanded position of said room structure wherein the floor section of said first portion and the floor section of said second portion are disposed on the same horizontal plane, that means comprising:

at least first and second sets of telescoping tubular support members mounted beneath said room structure, each set including a inner tube and an outer tube,

said first and second sets of tubular support members being spaced apart, aligned longitudinally along the line of expansion and retraction of said room structure and connected by a cross shaft element,

one end of each of said inner tubes being connected adjacent said side wall section of said second portion and the other end of each of those tubes having a rotatable wheel element attached thereto and being mounted for sliding movement within one of said outer tubes,

rack and pinion drive means provided on each of said sets of tubular support members, including a toothed drive wheel fixedly mounted at one end of each of said outer tubes and a plurality of spaced slots along each of said inner tubes for receiving the teeth of said drive wheel,

said cross shaft joining each of said drive wheels to provide rotational force thereto,

at least one drive motor connected to said cross shaft,

10

an inclined ramp means formed on the interior of each of said outer tubes for receiving said wheel element,

said inclined ramp means extending laterally out of said outer tube and being disposed along the length of said outer tube such that when said wheel element slides along said inclined ramp means said inner tube pivots about said drive wheel,

a sloped end region provided on the side of the floor section of said first portion toward which said second portion moves in expansion of said room structure, and

a carrier means mounted beneath the floor section of said second portion for supporting said second portion at least in part on said first portion when said room structure is in the retracted positions and for facilitating movement of the floor section of said second portion up and down said sloped end region.

12. The vehicle according to claim 11 wherein the length of said inner tubes, said outer tubes and the floor section of said second portion along the line of expansion and retraction of said room structure as well as the position of said inclined ramp means and the carrier means are correlated such that as the room structure is expanded said carrier means engages said sloped end region before said wheel elements engage said inclined ramp.

13. The vehicle according to claim 12 wherein the end wall sections of said first and second portions each include substantially vertical elements which abut the vertical elements of the end wall section of the other portion when the room structure is in the expanded position, and wherein during expansion of said room structure the abutting vertical elements first engage at one end thereof and thereafter pivot together coincident with the pivoting of said inner tubes about said drive wheels.

14. The vehicle according to claim 13 wherein at least one of said vertical elements includes a weather sealing surface thereon and locking means are provided on at least one of said end wall sections to selectively secure said room structure in the expanded position.

*    *    *    *    *

EXHIBIT 7



US005333420A

# United States Patent [19]

### Eden

| [11] | Patent Number: | **5,333,420** |
|---|---|---|
| [45] | Date of Patent: | **Aug. 2, 1994** |

[54] **RACK AND GEAR MODULAR ROOM EXTENDER**

[75] Inventor: **Edward J. Eden,** Jackson, Mich.

[73] Assignee: **Barker Manufacturing Co., Inc.,** Battle Creek, Mich.

[21] Appl. No.: **908,042**

[22] Filed: **Jul. 6, 1992**

[51] Int. Cl.⁵ ............................................... E04B 1/346
[52] U.S. Cl. .............................................. 52/67; 52/64
[58] Field of Search ....................................... 52/67, 69

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| 1,521,635 | 1/1925 | Lewis . | |
| 3,137,041 | 6/1964 | Mullen ........................................ 20/2 |
| 3,169,280 | 2/1965 | Jarman ..................................... 52/67 |
| 3,181,910 | 5/1965 | Thomas ...................................... 52/67 |
| 3,884,520 | 5/1975 | Peterson ................................... 296/27 |
| 4,128,269 | 12/1978 | Stewart ................................. 52/67 X |
| 4,133,571 | 1/1979 | Fillios .................................... 296/23 |
| 4,253,283 | 3/1981 | May .......................................... 52/67 |

| 4,657,300 | 4/1987 | Penny et al. ......................... 296/173 |
| 4,711,257 | 12/1987 | Kabayashi .......................... 52/67 X |
| 5,154,469 | 10/1992 | Morrow .............................. 52/67 X |

*Primary Examiner*—Carl D. Friedman
*Assistant Examiner*—Beth A. Aubrey
*Attorney, Agent, or Firm*—Beaman & Beaman

[57] **ABSTRACT**

A modular room extender for recreational vehicles, modular homes and the like utilizing a pair of axially displaceable slide rods having outer ends attached to the extendible room. The slide rods are mounted within a bracket which includes spaced parallel guides wherein the bracket slide rods and guides define a modular unit which may be installed as a complete assembly. The slide rod's inner ends are free and not connected to other structure, and a reversible electric motor operates a gear and rack system for extending and retracting the slide rods. A stamped metal rack of economical construction is attached to each slide rod.

**8 Claims, 2 Drawing Sheets**







5,333,420

1

# RACK AND GEAR MODULAR ROOM EXTENDER

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The invention pertains to room extenders such as used with recreational vehicles and modular homes wherein the room extender unit constitutes a complete pre-assembled module for simplifying installation.

### 2. Description of the Related Art

For many years, the living space of trailers, recreational vehicles, modular homes, and the like, has been increased by the utilization of room extenders, i.e. designing a room which may be extended from the primary housing structure to increase the usable interior space, and retracting the room into the primary structure to reduce its dimensions for highway transport purposes.

A wide variety of operating mechanisms have been employed to extend the rooms of transportable housing structures, and such mechanisms may be manually operated, hydraulically operated, or mechanically actuated. The mechanically actuated room extender mechanism may utilize screws or rack and gear systems for translating the room structure.

The instant invention pertains to a modular room extender particularly suitable for rack and gear operation, and the invention defines improvements over known rack and gear room extenders such as illustrated in U.S. Pat. Nos. 1,521,635; 3,137,041; 3,884,520; 4,133,571; and 4,657,300. A problem with room extenders of the above type results from the fact that the extending mechanism, while it may consist of a plurality of retractable and extendible elements, are custom constructed and installed, and installation is expensive and time consuming.

Another deficiency with prior art room extenders results from the interconnecting of the inner ends of the extendible elements whereby the room extender limits clearance for vehicle floor installed equipment, such as heating and air conditioning ducts, plumbing and wiring.

Room extenders presently available, because of their custom installation procedures, cannot readily be installed in complete assembled sets, and require installation by skilled craftsman capable of fitting each extender unit to its associated room structure.

## SUMMARY OF THE INVENTION

It is an object of the invention to provide a modular room extender which, in itself, constitutes a complete assembly for installation into the associated vehicle, and may be properly installed without requiring extraordinary skills.

Another object of the invention is to provide a modular room extender constituting a complete assembly wherein a plurality of modular extenders may be used together, and the installation of a plurality of modular extenders can be made without requiring special skills.

Yet another object of the invention is to provide a modular room extender utilizing a pair of spaced parallel sliding rods capable of being extended and retracted, and wherein the inner ends of the sliding rods are free and not interconnected permitting maximum use of the vehicle floor area and minimizing clearance problems with air control ducts, plumbing and electrical wire.

A further object of the invention is to provide a modular room extender assembly utilizing slidable rods

2

wherein the rods are displaced by rack and gear drives powered by a reversible electric motor.

Another object of the invention is to provide a rack and gear type modular room extender wherein the extender utilizes sliding rods supported within channel shaped guides, and the guides incorporate rollers engaging the sliding rods to minimize friction and reduce the power requirements for room extension and retraction.

Yet another object of the invention is to provide a rack and gear modular room extender utilizing an elongated toothed rack wherein a rack having accurately formed teeth is formed by an economical stamping process.

In the practice of the invention, the modular room extender includes a support bracket adapted to be mounted within the floor of a recreational vehicle, such as a trailer or motor home, or could be mounted in the floor of a modular home transportable upon wheels. The bracket includes of a pair of parallel spaced U-shaped guides wherein each guide supports a sliding rod and utilizes rollers for engaging the rod to minimize friction. The sliding rods include outer ends which are attached to the room to be extended, and the inner ends of the rods are free, i.e. not interconnected, so as to be receivable within openings defined in the vehicle undercarriage and occupy a minimal space within the undercarriage when the sliding rods are retracted.

A rack formed of metal plate is welded to each of the sliding rods, and a gear is rotatably mounted upon each guide meshing with the associated rack. The gears are bi-directionally rotated by a reversible electric motor, and a drive shaft interconnecting the gears permits the single electric motor to rotate the gears in either direction to permit room extension and retraction.

Preferably, the racks welded to the sliding rods are formed by an economical stamping operation wherein an elongated blank of metal plate is centrally pierced to produce a plurality of linearly related evenly spaced openings having a configuration such that upon the openings being centrally sheared, the blank forms two rack portions having teeth more accurately formed at the rack edge than is possible if the teeth were directly stamped into the edge of a metal blank plate.

## BRIEF DESCRIPTION OF THE DRAWINGS

The aforementioned objects and advantages of the invention will be appreciated from the following description and accompanying drawings wherein:

FIG. 1 is a plan view of a recreational vehicle frame or undercarriage illustrating a modular room extender in accord with the invention as installed, the extended position of the sliding rods being shown in full lines, while the retracted position of the rods being illustrated in dotted lines,

FIG. 2 is a plan view of the modular room extender assembly of the invention, per se,

FIG. 3 is a side elevational view of the room extender as taken from the right of FIG. 2,

FIG. 4 is an enlarged elevational sectional view as taken through a guide illustrating the reversible electric motor and the drive gear,

FIG. 5 is an enlarged elevational sectional view as taken through a channel guide along Section 5—5 of FIG. 3,

FIG. 6 is an enlarged, detail, elevational sectional view illustrating the meshing of the gear and rack as taken along Section 6—6 of FIG. 4,

5,333,420

**3**

FIG. 7 is an elevational sectional view take through the guide channel along Section 7—7 of FIG. 3,

FIG. 8 is an elevational sectional view similar to FIG. 7 of another embodiment of the invention utilizing a cylindrical sliding rod,

FIG. 9 is an elevational view of the gear rack, per se, and

FIG. 10 is an elevational view of the blank used to form the gear rack after forming of the openings, and prior to the severing of the blank to define the exposed rack teeth.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

In FIG. 1, a typical trailer type frame or undercarriage is illustrated at 10 such as would be used as a recreational vehicle or modular home. The frame 10 includes a plurality of longitudinally extending elements 12 connected to transversely disposed elements 14. The undercarriage elements are mounted upon wheels 16, and the trailer hitch is represented at 18.

If it is desired to include a laterally extendible room upon the frame or undercarriage 10, the room extender assembly 20 is mounted to the undercarriage and becomes a permanent part of the vehicle. A modular gear and rack room extender 20 in accord with the invention is shown in its entirety in FIGS. 2 and 3.

The modular room extender in accord with the invention constitutes a unitary assembly which includes the support bracket 22. The support bracket consists of a pair of channel type guides 24 and 26 maintained in spaced parallel relationship by braces 28 reinforced by diagonals 30. Elongated slide rods 32 and 34 are supported within the guides 24 and 26, respectively, for longitudinal displacement therein, and the slide rods each include an outer end 36 having a bracket 38 mounted thereon for attachment to the room to be extended, not shown, and the slide rods also each include a free inner end 40. It is to be noted that the slide rod's inner ends 40 are not interconnected. Each of the slide rods 32 and 34 has an elongated gear rack 42 welded thereto, and gears rotatably supported on the channel guides meshes with each rack for bi-directional rotation through a reversible electric motor 44, FIG. 4, and its associated transmission 46. Depending on the direction of rotation of the motor 44, the slide rods 32 and 34 will be extended as shown in the full line position of FIG. 1, or retracted to the dotted line position of FIG. 1 when the vehicle room is to be retracted into the vehicle structure during transportation.

The details of construction of the guides is best shown in FIGS. 4–7. The primary component of the guides is the U-shaped channel 48 having a base 50, and perpendicularly disposed sides 52 and 54. Plates 56 are welded to the outer ends of the channels 48, FIG. 3, while plates 58 are welded to the inner ends of the channels, and an upper roller 60 and a lower roller 62 are rotatably mounted upon the outer end plates 56 for rotation thereon. In a similar manner, upper roller 64 and lower roller 66 are rotatably supported upon the inner end plates 58. The upper rollers 60 and 64 engage the upper edge of the associated slide rod, while the lower rollers 62 and 66 are positioned to engage the lower edge of the slide rods.

In the embodiment of FIGS. 1–7, the slide rods 32 and 34 constitute square box beams, FIG. 5, having an upper side 68 engaged by the rollers 60 and 64, and a lower side 70 engaged by the rollers 62 and 66. As the

**4**

inner rollers 64 and 66 are substantially spaced from the outer rollers 60 and 62, the weight of the extended room is borne by the rollers 62 and 64, and the relatively close relationship between the rollers and the slide rod box beams permits the extended room to be properly mechanically supported.

The gear rack 42 is welded to a side of each slide rod box beam through an intermediary plate 72 attached to the box beam. The racks 42 are formed of a plate sheet metal, as described below, and are of a length as will be appreciated from FIGS. 2 and 3. The racks include holes 74 permitting the racks to be welded to the plate 72, and the lower edge of the rack is provided with teeth 76 for engagement with the associated gear, FIG. 6.

The gears 78 and 80, associated with the racks 42, are mounted upon drive shaft elements 82 and 84, telescopingly interconnected, which are rotatably supported within the guide inner plates 58. The drive shaft element 84 is rotated by the drive shaft 86 extending from the motor transmission 46 wherein rotation of the motor 44 in either direction will cause the drive shaft elements and associated gears 78 and 80 to rotate and thereby translate the slide rods 32 and 34 in the selected extended or retracted direction.

In the disclosed embodiment, the motor 44 and transmission 46 are illustrated as mounted exteriorly of the associated guide channel plates 58. It is to be understood that the motor 44 and transmission 46 could be mounted "inside" of the associated plate 58 locating the motor and transmission between the guide channels 24 and 26. In such instance, drive shafts would extend from both directions through the transmission 46 for association with the gears 78 and 80.

The use of the gear and rack drive in conjunction with the bracket 22 consisting of the guide channels 24 and 26 maintained in a spaced pre-assembled relationship by the braces 28 permits the entire assembly 20 to be handled and installed as a unit. If desired, a plurality of modular extender assemblies 20 may be mounted in a side by side relationship upon the vehicle frame if a large room is to be extended, and the modular assembly of the extender components simplifies installation, assures alignment of the slide rods, and eliminates many of the binding problems which previously existed with room extender operating mechanisms.

FIG. 8 illustrates a variation of a slide rod configuration wherein the slide rod takes the form of a cylindrical tube 88 slidably located within the channel guide 90. The rack 92 is constructed as in the previously described embodiment, and is welded to a side of the tube 88 through hole 94, and as the plate configuration of the rack corresponds to the guide channel side 96, the presence of the rack 92 welded to the cylindrical slide rod 88 functions as a guide or way to maintain the proper orientation of the slide rod.

Preferably, the rack 42 or 92 welded to the slide rods is economically formed of a steel strip plate member having teeth 76 formed along the lower edge. The teeth 76 are defined by the sides 98 and the flat peak surface 100. While the rack configuration shown in FIG. 9 could be stamped with the teeth intersecting the edge of the rack body, such forming of the teeth is difficult if accuracy and surface quality is to be achieved. Accordingly, the racks attached to the slide rods are formed as illustrated in FIG. 10 and described below.

To form the racks 42 or 92, a blank 102 of plate material having edges 104 and 106 is placed within a stamp-

5,333,420

5

ing or punch press and a plurality of openings 108 are formed in the blank central region. Each of the openings 108 includes a base surface 110 and 112, and side surfaces 114 intersect base 110, and side surfaces 116 intersect base 112. The sides 114 and 116 disposed on a common side of an opening 108 intersect at an apex 118. The openings 108 are evenly spaced along the central region of the blank and the apices 118 of all of the openings are in alignment as to lie upon a common line. The weld holes 74 may also be punched into the blank at the same time as the openings 108 are formed therein.

After the blank 102 is formed as shown in FIG. 10, it is placed within a shearing die, not shown, and the blank is sheared along the dotted line 120 through the apices 118. Such shearing occurs without removal of metal from the blank 102 and results in the accurate formation of the gear teeth 76 as shown in FIG. 9 wherein the opening surfaces 114 and 116 become the teeth sides 98. In this manner, two racks are formed from each blank 102, and as the process can be rapidly produced on stamping equipment the formation of the racks is economical, and yet an accurate and structurally sound gear rack is achieved.

It is appreciated that various modifications to the inventive concepts may be apparent to those skilled in the art without departing from the spirit and scope of the invention.

I claim:

1. A pre-assembled modular extender for installation as a unit comprising, in combination, a support bracket adapted to be separately mounted as a unit upon primary support structure, said bracket including a pair of substantially parallel elongated spaced guides each having a longitudinal axis, reinforced braces transversely extending between and affixed to said guides maintaining said guides in a substantially rigid parallel spaced relationship and alignment, an elongated slide rod supported within each guide for axial movement therein, each slide rod having a free inner end and an outer end, a slide rod operator affixed to each slide rod, and a reversible slide rod actuator operatively connected to each slide rod operator for selectively translating the associated slide rod in a predetermined axial direction, whereby said support bracket comprises a separate structurally integral unit with respect to the primary support structure maintaining the assembly, rigidity and alignment of said spaced guides.

2. In a pre-assembled modular room extender as in claim 1, said slide rod operator comprising an elongated gear rack affixed to each slide rod, and said slide rod actuator comprising a gear meshing with each gear rack

6

and drive means operatively associated with said gears for rotating said gears.

3. In a pre-assembled modular room extender as in claim 2, said drive means comprising a reversible electric motor.

4. In a pre-assembled modular room extender as in claim 3, a common drive shaft operatively interconnecting said electric motor with said gears.

5. In a pre-assembled modular room extender as in claim 1, each of said guides comprising a U-shaped channel having an inner end and an outer end, an upper roller transversely extending over said guide channel at each end thereof, a lower roller transversely related to the guide length located at each guide channel end below the adjacent upper roller, said rollers adapted to engage the slide rod located within the associated guide channel for the associated slide rod to facilitate axial movement thereof.

6. A pre-assembled modular extender for installation as a unit comprising, in combination, a support bracket adapted to be separately mounted as a unit upon primary support structure, said bracket including a pair of substantially parallel elongated spaced guides each having a longitudinal axis, reinforced braces transversely extending between and affixed to said guides maintaining said guides in a substantially rigid parallel spaced relationship and alignment, an elongated slide rod supported within each guide for axial movement therein, each slide rod having a free inner end and an outer end, an elongated gear rack affixed to each said slide rod substantially parallel thereto, a gear rotatably mounted on each said guide meshing with the rack attached to the slide rod within the associated guide, a reversible electric motor mounted on said support bracket and drive shaft means interconnecting said motor with said gears, whereby said support bracket comprises a separate structurally integral unit with respect to the primary support structure maintaining the assembly, rigidity and alignment of said spaced guides.

7. In a pre-assembled modular room extender as in claim 6, said drive shaft means comprising first and second telescopingly connected drive shaft elements.

8. In a pre-assembled modular room extender as in claim 6, each of said guides comprising a U-shaped channel having an inner end and an outer end, an upper roller transversely extending over said guide channel at each end thereof, a lower roller transversely related to the guide length located at each guide channel end below the adjacent upper roller, said rollers adapted to engage the slide rod located within the associated guide channel for the associated slide rod to facilitate axial movement thereof.

* * * * *

EXHIBIT 8

US005332276A

# United States Patent [19]

**Blodgett, Jr.**

[11] **Patent Number:** 5,332,276

[45] **Date of Patent:** Jul. 26, 1994

[54] **CABLE-DRIVEN EXTENSION MECHANISM FOR TRAILER SLIDE-OUT**

[75] Inventor: **Raymond W. Blodgett, Jr.,** Norco, Calif.

[73] Assignee: **RBW Industries, Inc.,** Corona, Calif.

[21] Appl. No.: **839,595**

[22] Filed: **Feb. 21, 1992**

[51] Int. Cl.5 .............................................. B60R 27/00
[52] U.S. Cl. ...................................... 296/26; 296/171; 296/175
[58] Field of Search .................. 296/26, 27, 170, 171, 296/172, 173, 175, 176, 165

[56] **References Cited**

## U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 1,471,549 | 10/1923 | Clement . |
| 1,763,044 | 6/1930 | Heath . |
| 2,147,892 | 2/1939 | Gray ................................ 20/2 |
| 2,323,106 | 6/1943 | Whiteman ...................... 20/2 |
| 2,581,192 | 1/1952 | La Fleur ......................... 20/2 |
| 2,842,972 | 7/1958 | Houdart .......................... 74/91 |
| 2,857,197 | 10/1958 | Hogg ............................ 296/37 |
| 2,902,312 | 9/1959 | Ferrera ......................... 296/23 |
| 3,482,716 | 12/1969 | Leadley ....................... 214/75 |
| 3,556,249 | 1/1971 | Jackson ....................... 182/16 |
| 3,672,238 | 6/1972 | Young et al. ................ 74/89.2 |
| 4,050,595 | 9/1977 | Bussard ....................... 214/84 |
| 4,192,544 | 3/1980 | Patterson .................. 296/165 |
| 4,270,791 | 6/1981 | Tann .......................... 296/171 |
| 4,557,518 | 12/1985 | Maclean et al. ........... 296/156 |
| 5,090,749 | 2/1992 | Lee ......................... 296/26 X |

## FOREIGN PATENT DOCUMENTS

9086 of 1841 United Kingdom ................. 296/26

*Primary Examiner*—Joseph D. Pape
*Attorney, Agent, or Firm*—Klein & Szekeres

[57] **ABSTRACT**

Apparatus for selectively extending and withdrawing a trailer slide-out portion includes first and second rails, each slidably supported in a channel mounted underneath the trailer body. The outer ends of the rails are attached to the underside of the slide-out portion. A sheave driven by a reversible motor is mounted between the channels. First and second cables are wrapped around the sheave, the first cable having its ends attached to the first rail, and the second cable having its ends attached to the second rail. A pulley assembly supports each of the cables as it passes from the sheave to its respective rail. The cables, in conjunction with the pulley assemblies, translate the rotation of the sheave into longitudinal motion of the rails through the channels. Thus, sheave rotation in a first direction causes the cables to pull the rails outwardly, extending the slide-out, while sheave rotation in the opposite direction causes the cables to pull the rails inwardly, withdrawing the slide-out. A slack-compensation attachment device attaches each of the cables to its respective rail, whereby slack resulting from cable stretching is taken up. A shaft is provided, having a first end coupled to the sheave and a second end engageable by a hand crank, for allowing manual rotation of the sheave.

**35 Claims, 2 Drawing Sheets**





FIG.1

FIG.1A

FIG.2



5,332,276

**1**

# CABLE-DRIVEN EXTENSION MECHANISM FOR TRAILER SLIDE-OUT

## BACKGROUND OF THE INVENTION

This invention relates to the field of extensions for trailers and the like. More specifically, the present invention relates to an apparatus for selectively extending outwardly and withdrawing a portion of the side of a trailer.

In the field of house trailers that are towed by motor vehicles, it has long been desired to provide a trailer that is relatively compact while it is being towed, but which can be expanded when parked to provide additional room. Numerous arrangements have been employed in the prior art to accomplish this result. For example, U.S. Pat. No. 4,557,518—Maclean et al. discloses a trailer with a pull-out side extension that is supported on bars that slide in and out of channels mounted on the underside of the trailer body. Other examples of trailers that are laterally expandable are disclosed in U.S. Pat. No. 2,581,192—La Fleur and U.S. Pat. No. 2,842,972—Houdart, both of which disclose rack-and-pinion mechanisms to move an extensible trailer body portion.

One common type of mechanism used in the prior art for extending or expanding trailer bodies is a cable and pulley mechanism, typically operated by a motor-driven drum or sheave. For example, U.S. Pat. No. 2,902,312—Ferrera discloses a trailer body comprising a fixed section and a movable section that slides laterally to double the width of the trailer when extended. The movable section has rollers that ride on rails at the front and back of the fixed section. Movement is effected by a cable and pulley mechanism operated by a motor-driven drum.

Other examples of expansible or extensible trailer bodies using cable and pulley mechanisms are disclosed in the following U.S. Pat. No. 1,471,549—Clement; U.S. Pat. No. 2,147,892—Gray; U.S. Pat. No. 3,482,716—-Leadley; U.S. Pat. No. 3,672,238—Young et al.; U.S. Pat. No. 4,192,544—Patterson; and U.S. Pat. No. 4,270,791—Tann.

A relatively recent development in this field is the "slide-out" type of trailer extension, wherein an extensible portion of the side of the trailer body is carried on a pair of rails that are mounted for linear translation in a pair of hollow tubes or channels that are fixed to the bottom of the trailer body. In the prior art slide-out extension, the channels are joined by a first transverse member, on which is mounted an electric motor, and the rails are joined at one end by a second transverse member. The motor is connected to the second transverse member by an elongate drive screw, whereby rotation of the screw in a first direction pulls the rails outwardly from the channels to extend the slide-out portion, and rotation in the opposite direction pulls the rails into the channels to withdraw the slide-out portion back into the main portion of the trailer body.

While some of the prior art trailer extension and expansion devices have yielded satisfactory results, most have demonstrated a number of shortcomings. For example, most of the prior art devices must be installed at the time the trailer is manufactured, and cannot readily be adapted for retrofitting existing trailers. In addition, many of the prior art devices are cumbersome or inconvenient to operate, or have proven to be unreliable or noisy. The drive screw-operated extension,

**2**

while suitable for retrofit applications, can be particularly noisy, and it is subject to binding due to bending of the rails as they are pulled into and out of the channels.

Accordingly, there has been a need for a trailer extension or expansion device that is sturdy and reliable, easily operated, and quiet in operation, and that can be either incorporated into a trailer body during manufacture, or retrofitted onto existing trailer bodies.

## SUMMARY OF THE INVENTION

Broadly, the present invention is an extension mechanism for a trailer slide-out, comprising a pair of parallel rails that are slidably carried in a pair of parallel hollow tubes or channels fixed to the underside of the main portion of the trailer body, wherein the rails, on which the slide-out is mounted, are translated longitudinally through the channels by a cable and pulley mechanism for selectively extending and withdrawing the slide-out.

More specifically, the channels are joined by a transverse structural member, on which is mounted an electric motor that drives a rotatable drum or sheave, also mounted on the transverse member. Wrapped around the sheave are a pair of cables, each of which has its ends attached to opposite ends of one of the rails, so that each rail is translated through its associated channel by its own cable. Each cable passes from a first end of the rail, through an upper pulley mounted adjacent the juncture between one of the channels and the transverse member, and then around the sheave and through a lower pulley, mounted in alignment with and below the upper pulley, and finally to the other end of the rail. This arrangement substantially prevents bending moments or torque from being applied to the rails as they are translated through the channels, thereby minimizing the possibility of binding due to the bending of the rails within the channels.

Rotation of the sheave by the motor in a first direction causes the cables to pull the rails outwardly from the channels, thereby extending the extensible trailer body portion. Rotation of the sheave in the opposite direction causes the cable to pull the rails inwardly into the channels, thereby withdrawing the extensible portion back into the main part of the trailer body.

The present invention incorporates several advantageous features. For example, the rails are mounted within the channels on roller bearings for smoothness and reliability of operation. The motor can advantageously be a low current (e.g., approximately 10 amp), 12 volt reversible motor that can turn at relatively low speeds for quiet operation. A hand crank mechanism is included for manual rotation of the sheave if the motor is inoperative. Each of the cables is preferably anchored to one end of each rail through a compression spring mechanism that maintains a substantially constant cable tension, even if the cable stretches, to minimize slippage around the sheave.

The present invention offers a number of significant advantages over the prior art. For example, the present invention is well-adapted for retrofitting onto existing trailers, offering relatively easy installation. It is quiet in operation, and it is reliable, not being prone to jamming or binding. It is capable of high speed operation, even with a low power motor. Furthermore, the extension mechanism requires a minimum number of load-bearing members, substantially all of the weight of the extended trailer portion being borne by the extended rails and the chassis of the trailer. These and other advantages will

5,332,276

**3**

be more fully appreciated from the detailed description that follows.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 of the slide-out extension mechanism in accordance with a preferred embodiment of the present invention;

FIG. 1A is a detailed view of the sheave used in the embodiment of FIG. 1;

FIG. 2 is a plan view of a portion of the bottom of a trailer having a slide-out incorporating the extension mechanism of FIG. 1, wherein the extension mechanism is shown in phantom outline;

FIG. 3 is a cross-sectional view taken along line 3—3 of FIG. 2;

FIG. 4 is a cross-sectional view taken along line 4—4 of FIG. 3;

FIG. 5 is a cross-sectional view taken along line 5—5 of FIG. 1;

FIG. 6 is a cross-sectional view taken along line 6—6 of FIG. 5;

FIG. 7 is a detailed view of the cable tensioning mechanism used in the preferred embodiment of the invention;

FIG. 8 is cross-sectional view taken along line 8—8 of FIG. 7;

FIG. 9 is a cross-sectional view taken along line 9—9 of FIG. 2; and

FIG. 10 is a fragmentary elevational view taken along line 10—10 of FIG. 9.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring first to FIGS. 1, 1A, and 2, a slide-out extension mechanism 10, in accordance with a preferred embodiment of the present invention, comprises a pair of parallel rails 12 slidably carried, by means to be described below, in a pair of hollow parallel tubes or channels 14 for longitudinal translation therethrough. The channels 14 are connected by a transverse structural member 16, on one side of which is mounted an electric motor 18. The motor 18 is a 12 volt reversible motor for operation in the electrical system of a typical trailer. Preferably, the motor 18 is a permanent magnet gear motor, of the type available from BMI, of Elk Grove, Calif., and Fasco, of St. Louis, Mo., among others. This type of motor typically draws relatively little current (usually less than 10 amps in this application), and runs with little noise. The motor 18 drives a drum or sheave 20 that is rotatably mounted on the opposite side of the transverse member 16. In the illustrated embodiment, the sheave 20 is mounted coaxially on the motor shaft (not shown), which extends through the transverse member 16. Alternatively, the sheave can be fixed to a separate shaft that is rotatably mounted on the transverse member 16 and that is driven by the motor shaft through a set of spur gears or the like.

As shown in FIG. 2, a trailer slide-out 22 is a portion of a trailer body 24 that is extensible outwardly from the body to provide additional interior room. The extension mechanism 10 is adapted to be mounted under the body 24 in the following manner, reference being made to FIGS. 2, 3, and 4:

Each of the rails 12 has an outer end 26 and an inner end 28. Attached to the outer end 26 of each rail 12 is a bracket 30. The brackets 30 are adapted for attachment to the underside of the trailer slide-out 22 by suitable anchoring means, such as bolts 32 (FIG. 3). The rails 12

**4**

thus provide substantially all of the support for the weight of the slide-out portion 22.

Each of the channels 14 is mounted on a transverse structural member 34 that extends underneath the trailer body between the longitudinal members 36 of the trailer chassis. The transverse member 34 is secured to the longitudinal chassis members (only one of which is shown in FIG. 3) by welding. A pair of U-shaped brackets 38 are welded to each of the transverse members 34, the brackets 38 being spaced apart by a distance slightly less than the length of the channel 14. Each channel 14 is secured near its ends to the brackets 38 on one of the transverse members 34, using anchoring means such as bolts 40 and nuts 42 (FIG. 4). As shown in FIG. 3, the longitudinal chassis member 36 on the side of the body 24 having the slide-out 22 is provided with a pair of apertures 44 (only one of which is shown) to allow the rails 12 to pass through the chassis member 36.

The rails 12 are carried in the channels 14 on rollers 46a and 46b. Preferably, each channel has two rollers: a lower roller 46a at the outer end of the channel; and an upper roller 46b at the inner end of the channel. Bolts 48, secured by nuts 50, may be used at each end of the channel to maintain the rail in contact with its associated rollers.

Secured to the inner side of the transverse member 34 near each of its junctures with the channels 14 is a pulley mount 52. Each pulley mount 52 comprises a vertically-oriented U-shaped bracket 56 and a retention member 58 welded to the vertical portion of the bracket 56. The bracket 56 has upper and lower horizontal portions 60a and 60b, respectively, and the retention member 58 has upper and lower horizontal flanges 62a and 62b, respectively, that are vertically spaced from the upper and lower horizontal bracket portions 60a and 60b. The upper and lower bracket portions 60a and 60b and the upper and lower flanges 62a and 62b have apertures in alignment, through which is installed vertical axle means 64, which may be provided by a bolt secured by a nut 66. Rotatably carried on the axle means 64 are an upper pulley 68a and a lower pulley 68b, preferably mounted in tandem so as to be vertically aligned. The upper pulley 68a is located on the axle means between the upper horizontal bracket portion 60 and the upper flange 62a, and the lower pulley 68b is located between the lower horizontal bracket portion 60b and the lower flange 62b.

Referring once again to FIGS. 1 and 1A, a pair of cables 70 are wrapped around the sheave 20. The sheave 20 preferably has a helical groove to minimize axial slippage of the cables 70. One end of each cable 70 is connected to a cable anchor member 71, fixed to the inner end 28 of each of the rails 12, and the other end of each cable is connected to the outer end 26 of the same rail, by means to be described below. Thus, one cable is connected to opposite ends of the left rail, and the other cable is connected to opposite ends of the right rail. From the inner end 28 of the rail, the cable passes around the upper pulley 68a adjacent that rail, then wraps around the sheave 20 (preferably at least two full turns). From the sheave 20, the cable extends back to the outer end 26 of the same rail, passing around the lower pulley 68b. Thus, the pulleys provide support for the cables, and change the direction of cable travel from substantially transverse to the channels to substantially parallel to the rails.

In operation, the sheave 20 is rotated by the motor selectively in either of two directions. The cables 70, in

5,332,276

**5**

conjunction with the pulleys 68a and 68b, translate the rotational motion of the sheave 20 into linear, longitudinal motion of the rails 12. Thus, when the sheave 20 is rotated in a first direction, the rails 12 are pulled in the outward direction (as seen from the trailer body) by the cables 70, thereby extending the slide-out 22 outwardly from the body 24, to the position shown in FIGS. 2 and 3. When the sheave is rotated in the second direction, the rails are pulled in the inward direction, thereby withdrawing the slide-out 22 back into the body 24.

A uniquely advantageous feature of the present invention is shown in FIGS. 7 and 8. The cables 70 are attached to the outer ends 26 of the rails 12 by slack-compensating attachment means 72, comprising an elongate eye-bolt 74 extending coaxially through a coil spring 76 that is enclosed within a tubular spring housing 78, the axial dimension of which is such that the ends of the housing are axially spaced from the ends of the eye-bolt 74. The outer end of each of the housings 78 is sealed with an end cap 80 having a central aperture through which the threaded end of the eye-bolt 74 passes. The eye-bolt 74 is secured within the housing 78 by a hex-nut 82 that fastens the threaded end of the eye-bolt 74 to the end cap 80. The inner end of the housing 78 bears against one leg of an an angle bracket 84, the other leg of which is fixed to the rail 12. The bracket leg against which the housing 78 engages has an aperture 86 for passage of the eye-bolt 74. The spring 76 is under compression between the end cap 80 and the bracket 84. The end of the cable 70 is formed into a loop 88 that is fastened to the eyelet of the eye-bolt 74.

The cable 70, being under constant tension, may have a tendency to stretch with prolonged usage. Such stretching could yield slack that would result in slippage around the sheave 20. The spring 76, however, being under compression, pushes against the end cap 80, and thus urges the eye-bolt 74 toward the outer end of the rail 12, thereby taking up the slack in the cable 70.

In the event that the motor 18 is inoperable, the slide-out extension mechanism may still be operated manually by means of a crank extension member 90, shown in phantom outline in FIG. 2, and in detail in FIGS. 9 and 10. The crank extension member 90 comprises an elongate rod or shaft 92 having a socket 94 at its distal end. The socket 94 conforms to, and is adapted to receive, a hub 96 extending axially from the sheave 20, as shown in FIG. 1A. The socket 94 and the hub 96 are preferably square, as illustrated, but they may be hexagonal, or some other suitable shape.

The proximal end of the crank extension shaft 92 is accessible through the wall 98 of the trailer body opposite the wall from which the slide-out extends by means of a crank access fitting 100. The crank access fitting 100 comprises a tubular portion 102 installed in a hole in the wall 98, the outer end of the tubular portion 102 being surrounded by an integral annular flange 104. The flange 104 seats against the outside surface of the wall 98, and is secured to the wall 98 by means such as screws 106. The flange 104 surrounds a central aperture 108 that communicates with the tubular portion 102.

The crank extension shaft 92 has a proximal end portion 109 that is received in the tubular portion 102, preferably being journaled therein through an anti-friction sleeve 110, formed of a suitable low-friction polymeric material, such as PTFE, although other durable, low-friction polymers may be used. Extending proximally from the sleeve 110, and accessible through the aperture 108, is a crank engagement element at, or

**6**

closely adjacent to, the proximal end of the crank extension shaft 92. As shown in the drawings, the crank engagement element comprises a crank engagement pin 112 disposed diametrically through the shaft 92 near its proximal end, with the ends of the pin 112 extending radially outwardly from the shaft. The exposed ends of the pin 112 are adapted for engagement by a hand crank (not shown), of a type well-known in the art. Alternatively, the crank engagement member may be a hexagonal hub at the end of the shaft 92, adapted for engagement by a conventional lug wrench, of the type used on the lug nuts of a motor vehicle wheel.

As shown in the drawings, the crank extension shaft 94 is permanently installed in the extension mechanism by having its distal end fixed to the sheave hub 96 by a nut-and-bolt assembly 114 or the like, and by having its proximal end installed in the crank access fitting 100. Alternatively, the shaft 94 can be a removable accessory by making its distal end removable from the hub 96, and by suitably modifying the access fitting 100 in ways that will readily suggest themselves to those skilled in the pertinent arts.

From the foregoing description, a number of advantages for the present invention will be appreciated. For example, the cable and pulley mechanism, driven by the sheave 20, is capable of reliable operation, with little or no torque or bending forces being applied to the rails. As a result, the possibility of the rails binding in the channels is reduced to a minimum. The motor-driven sheave allows relatively high speed operation (depending, of course, on motor speed and sheave diameter), with little noise, as compared to, for example, the drive screw mechanisms of the prior art. As previously described, cable slippage around the sheave, due to cable stretching, is minimized, if not substantially eliminated, by the slack-compensating attachment means 72. Furthermore, the present invention is readily adapted for retrofit applications.

While a preferred embodiment of the invention has been described herein, it will be appreciated that a number of modifications and variations will suggest themselves to those skilled in the pertinent arts. Some of these modifications and variations have been discussed above. Other variations may include alternative arrangements for the bearings that support the rails in the channels, and alternative arrangements for the pulleys. These and other variations and modifications that may suggest themselves should be considered within the spirit and scope of the present invention, as defined in the claims that follow.

What is claimed is:

1. Apparatus for selectively extending and withdrawing a slide-out portion of a trailer body, comprising:

first and second substantially parallel hollow channel members mounted on the underside of the trailer body;

first and second substantially parallel rails slidably supported in the first and second channel members, respectively, for longitudinal translation therein, each of the rails having an outer end and an inner end, the outer end including means for attachment to the slide-out portion;

a transverse structural member connecting the channel members;

a sheave rotatably mounted on the structural member between the channel members;

drive means for selectively driving the sheave to rotate in first and second directions.

5,332,276

<table>
<tr><td>7</td><td>8</td></tr>
</table>

first pulley means located adjacent the juncture between the first channel member and the structural member;

second pulley means located adjacent the juncture between the second channel member and the structural member;

a first cable wrapped around the sheave and passing through the first pulley means and having a first end attached to the outer end of the first rail and a second end attached to the inner end of the first rail; and

a second cable wrapped around the sheave and passing through the second pulley means and having a first end attached to the outer end of the second rail and a second end attached to the inner end of the second rail;

whereby the rotation of the sheave in the first direction causes the first and second cables to pull the first and second rails, respectively, in a first longitudinal direction through the first and second channel members, respectively, and the rotation of the sheave in the second direction causes the first and second cables to pull the first and second rails, respectively, in a second longitudinal direction through the first and second channel members, respectively.

2. The apparatus of claim 1, wherein the drive means includes a reversible electric motor coupled to the sheave.

3. The apparatus of claim 1, wherein the drive means includes a shaft having a first end coupled to the sheave and a second end having means for engagement by a hand crank.

4. The apparatus of claim 1, wherein the first pulley means comprises a first upper pulley and a first lower pulley, and wherein the second pulley means comprises a second upper pulley and a second lower pulley.

5. The apparatus of claim 4, wherein the first cable passes from the inner end of the first rail, through the first upper pulley, around the sheave, through the first lower pulley, and to the outer end of the first rail; and

wherein the second cable passes from the inner end of the second rail, through the second upper pulley, around the sheave, through the second lower pulley, and to the outer end of the second rail.

6. The apparatus of claim 1, further comprising slack compensation means, attached between the first end of each of the cables and the outer end of the respective rail to which each cable is attached, for taking up slack in the cable resulting from cable stretch.

7. The apparatus of claim 6, wherein the slack compensation means comprises:

an elongate member having a first end attached to the cable, and a second end;

a coil spring disposed coaxially around the elongate member;

first means for placing the spring under compression; and

second means for securing the second end of the elongate member to the first means.

8. The apparatus of claim 7, wherein the first means comprises:

a tubular housing surrounding the spring and having a first end axially spaced from the first end of the elongate member and a second end axially spaced from the second end of the elongate member;

an end cap attached to the second end of the tubular housing and having an aperture through which the second end of the elongate member passes; and

a bracket having a first portion secured to the rail near the outer end thereof and a second portion engaged against the first end of the tubular housing, the second bracket portion having an aperture through which the elongate member passes.

9. The apparatus of claim 8, wherein the first end of the elongate member has an eyelet to which the cable is attached, wherein the second end of the elongate member is threaded, and wherein the second means includes a nut, threaded onto the second end, that secures the second end of the elongate member to the end cap.

10. Apparatus for selectively extending and withdrawing a slide-out portion of a trailer body, comprising:

channel means mounted on the underside of the trailer body, the channel means comprising first and second substantially parallel channels;

a transverse structural member connecting the first and second channels;

rail means for supporting the slide-out portion, slidably carried within the channel means for longitudinal movement therethrough between an extended position and a withdrawn position, the rail means comprising a first rail slidably carried within the first channel and a second rail slidably carried within the second channel, each of the rails having an inner end and an outer end;

attachment means on the outer end of each of the rails for attachment to the underside of the slide-out portion;

a rotatable sheave rotatably mounted on the transverse structural member;

drive means for selectively rotating the sheave in first and second directions;

pulley means disposed adjacent to the channel means; and

cable means, operatively connecting the sheave and the rail means through the pulley means, for translating the rotational motion of the sheave into longitudinal motion of the rail means, whereby rotation of the sheave in the first direction moves the rail means from the the withdrawn position to the extended position, and rotation of the sheave in the second direction moves the rail means from the extended position to the withdrawn position.

11. Apparatus for selectively extending and withdrawing a slide-out portion of a trailer body, comprising:

channel means mounted on the underside of the trailer body;

rail means for supporting the slide-out portion, slidably carried within the channel means for longitudinal movement therethrough between an extended position and a withdrawn position, and having an outer end and an inner end;

attachment means on the outer end of the rail means for attachment to the underside of the slide-out portion;

a rotatable sheave;

drive means for selectively rotating the sheave in first and second directions, the drive means including a shaft having a first end coupled to the sheave, and a second end having means for engagement by a hand crank;

5,332,276

9  |  10

pulley means disposed adjacent to the channel means; and

cable means, operatively connecting the sheave and the rail means through the pulley means, for translating the rotational motion of the sheave into longitudinal motion of the rail means, whereby rotation of the sheave in the first direction moves the rail means from the withdrawn position to the extended position, and rotation of the sheave in the second direction moves the rail means from the extended position to the withdrawn position.

12. The apparatus of claim 11, wherein the channel means comprises first and second substantially parallel channels, and wherein the rail means comprises a first rail slidably carried within the first channel and a second rail slidably carried within the second channel, each of the rails having an inner end and an outer end.

13. The apparatus of claim 12, further comprising a transverse structural member connecting the first and second channels.

14. The apparatus of claim 13, wherein the sheave is rotatably mounted on the structural member.

15. The apparatus of claim 10, wherein the drive means includes a reversible electric motor coupled to the sheave.

16. The apparatus of claim 10, wherein the drive means includes a shaft having a first end coupled to the sheave, and a second end having means for engagement by a hand crank.

17. The apparatus of claim 10, further comprising slack compensation means, attached between the cable means and one end of the rail means, for taking up slack in the cable means resulting from stretching of the cable means.

18. The apparatus of claim 17, wherein the slack compensation means comprises:

an elongate member having a first end attached to the cable means, and a second end;

a coil spring disposed coaxially around the elongate member;

first means for placing the spring under compression; and

second means for securing the second end of the elongate member to the first means.

19. The apparatus of claim 18, wherein the first means comprises:

a tubular housing surrounding the spring and having a first end axially spaced from the first end of the elongate member and a second end axially spaced from the second end of the elongate member;

an end cap attached to the second end of the tubular housing and having an aperture through which the second end of the elongate member passes; and

a bracket having a first portion secured to the rail means near the outer end thereof and a second portion engaged against the first end of the tubular housing, the second bracket portion having an aperture through which the elongate member passes.

20. The apparatus of claim 19, wherein the first end of the elongate member has an eyelet to which the cable means is attached, wherein the second end of the elongate member is threaded, and wherein the second means includes a nut, threaded onto the second end, that secures the second end of the elongate member to the end cap.

21. The apparatus of claim 10, wherein the pulley means comprises first pulley means located adjacent the first channel and second pulley means located adjacent the second channel, and wherein the cable means comprises:

a first cable having a first end attached to the outer end of the first rail, the first cable then passing through the first pulley means, around the sheave, then again through the first pulley means, to the inner end of the first rail, the first cable having a second end attached to the inner end of the first rail; and

a second cable having a first end attached to the outer end of the second rail, the second cable then passing through the second pulley means, around the sheave, then again through the second pulley means, to the inner end of the second rail, the second cable having a second end attached to the inner end of the second rail.

22. Apparatus for selectively extending and withdrawing a slide-out portion of a trailer body, comprising:

first and second substantially parallel hollow channel members mounted on the underside of the trailer body

first and second substantially parallel rails slidably supported in the first and second channel members, respectively, for longitudinal translation therein, each of the rails having an outer end and an inner end, the outer end including means for attachment to the slide-out portion;

a rotatable sheave;

drive means for selectively driving the sheave to rotate in first and second directions;

first and second vertically-aligned pulleys located adjacent the first channel member;

third and fourth pulleys located adjacent the second channel member;

a first cable having a first end attached to the outer end of the first rail, the first cable then passing through the first pulley, then around the sheave and through the second pulley, and then to the inner end of the first rail, the first cable having a second end attached to the inner end of the first rail; and

a second cable having a first end attached to the outer end of the second rail, the second cable then passing through the third pulley, then around the sheave and through the fourth pulley, and then to the inner end of the second rail, the second cable having a second end attached to the inner end of the second rail;

whereby the rotation of the sheave in the first direction causes the first and second cables to pull the first and second rails, respectively, in a first longitudinal direction through the second channel members, respectively, and the rotation of the sheave in the second direction causes the first and second cables to pull the first and second rails, respectively, in a second longitudinal direction through the first and second channel members, respectively.

23. The apparatus of claim 22, further comprising slack compensation means for each of the first and second cables, the slack compensation means being attached between one end of the first cable and the adjacent end of the first rail, and between one end of the second cable and the adjacent end of the second rail, for taking up slack in the first and second cables resulting from stretching of the cables.

5,332,276

**11**

24. The apparatus of claim 23, wherein the slack compensation means for each cable comprises:

an elongate member having a first end attached to the cable, and a second end;

a coil spring disposed coaxially around the elongate member;

first means for placing the spring under compression; and

second means for securing the second end of the elongate member to the first means.

25. The apparatus of claim 24, wherein the first means comprises:

a tubular housing surrounding the spring and having a first end axially spaced from the first end of the elongate member and a second end axially spaced from the second end of the elongate member;

an end cap attached to the second end of the tubular housing and having an aperture through which the second end of the elongate member passes; and

a bracket having a first portion secured to the rail near the outer end thereof and a second portion engaged against the first end of the tubular housing, the second bracket portion having an aperture through which the elongate member passes.

26. The apparatus of claim 25, wherein the first end of the elongate member has an eyelet to which the cable is attached, wherein the second end of the elongate member is threaded, and wherein the second means includes a nut, threaded onto the second end, that secures the second end of the elongate member to the end cap.

27. Apparatus for selectively extending and withdrawing a slide-out portion of a trailer body, comprising:

rail means, slidably mounted on the underside of the trailer body, for supporting the slide-out portion, the rail means having an inner end and an outer end;

attachment means, on the outer end of the rail means, for attachment to the slide-out portion;

a rotatable sheave;

drive means for selectively rotating the sheave in first and second directions;

cable means, engaging the sheave and attached to the rail means, for translating the rotational movement of the sheave into a linear, longitudinal movement of the rail means between first and second positions, whereby the rotation of the sheave in the first direction moves the rail means from the first position to the second position to extend the slide-out portion from the trailer body, and the rotation of the sheave in the second direction moves the rail means from the second position to the first position to withdraw the slide-out portion into the trailer body; and

slack compensation means, attached between the cable means and one end of the rail means, for taking up slack in the cable means resulting from stretching of the cable means, wherein the slack compensation means comprises:

an elongate member having a first end attached to the cable means, and a second end;

a coil spring disposed coaxially around the elongate member;

first means for placing the spring under compression; ad

second means for securing the second end of the elongate member to the first means.

**12**

28. The apparatus of claim 27, wherein the first means comprises:

a tubular housing surrounding the spring and having a first end axially spaced from the first end of the elongate member and a second end axially spaced from the second end of the elongate member;

an end cap attached to the second end of the tubular housing and having an aperture through which the second end of the elongate member passes; and

a bracket having a first portion secured to the rail means near the outer end thereof and a second portion engaged against the first end of the tubular housing, the second bracket portion having an aperture through which the elongate member passes.

29. The apparatus of claim 28, wherein the first end of the elongate member has an eyelet to which the cable means is attached, wherein the second end of the elongate member is threaded, and wherein the second means includes a nut, threaded onto the second end, that secures the second end of the elongate member to the end cap.

30. The apparatus of claim 27, further comprising:

channel means, mounted on the underside of the trailer body, for slidably carrying the rail means for longitudinal movement therethrough.

31. The apparatus of claim 30, wherein the cable means includes a cable wrapped around the sheave and having first and second ends attached to the rail means, at least one of the cable ends being attached to the rail means by the slack compensation means.

32. The apparatus of claim 31, further comprising:

pulley means, operatively mounted adjacent the channel means and supporting the cable, for changing the direction cable travel from substantially transverse to the channel means to substantially parallel to the rail means as the cable passes from the sheave to the rail means.

33. The apparatus of claim 32, wherein the pulley means includes first and second pulleys, and wherein the cable passes from the sheave to the inner end of the rail means through the first pulley, and from the sheave to the outer end of the rail means through the second pulley.

34. Apparatus for selectively extending and withdrawing a slide-out portion of a trailer body, comprising:

channel means mounted on the underside of the trailer body;

rail means for supporting the slide-out portion, slidably carried within the channel means for longitudinal movement therethrough between an extended position and a withdrawn position, and having an outer end and an inner end;

attachment means on the outer end of the rail means for attachment to the underside of the slide-out portion;

a rotatable sheave;

drive means for selectively rotating the sheave in first and second directions;

pulley means disposed adjacent to the channel means;

cable means, operatively connecting the sheave and the rail means through the pulley means, for translating the rotational motion of the sheave into longitudinal motion of the rail means, whereby rotation of the sheave in the first direction moves the rail means from the withdrawn position to the extended position, and rotation of the sheave in the

5,332,276

13

second direction moves the rail means from the extended position to the withdrawn position; and

slack compensation means, attached between the cable means and one end of the rail means, for taking up slack in the cable means resulting from stretching of the cable means, wherein the slack compensation means comprises:

an elongate member having a first end attached to the cable means, and a second end;

a coil spring disposed coaxially around the elongate member;

first means for placing the spring under compression; and

second means for securing the second end of the elongate member to the first means.

**35.** Apparatus for selectively extending and withdrawing a slide-out portion of a trailer body, comprising:

channel means mounted on the underside of the trailer body, the channel means comprising first and second substantially parallel channels;

rail means for supporting the slide-out portion, slidably carried within the channel means for longitudinal movement therethrough between an extended position and a withdrawn position, the rail means comprising a first rail slidably carried within the first channel and a second rail slidably carried within the second channel, each of the rails having an inner end and an outer end;

14

attachment means on the outer end of each of the rails for attachment to the underside of the slide-out portion;

a rotatable sheave;

drive means for selectively rotating the sheave in first and second directions;

first and second pulley means respectively located adjacent the first and second channels; and

cable means, operatively connecting the sheave and the rail means through the pulley means, for translating the rotational motion of the sheave into longitudinal motion of the rail means, whereby rotation of the sheave in the first direction moves the rail means from the withdrawn position to the extended position, and rotation of the sheave in the second direction moves the rail means from the extended position to the withdrawn position, the cable means comprising:

a first cable having a first end attached to the outer end of the first rail, the first cable then passing through the first pulley means, around the sheave, then again through the first pulley means, to the inner end of the first rail, the first cable having a second end attached to the inner end of the first rail; and

a second cable having a first end attached to the outer end of the second rail, the second cable then passing through the second pulley means, around the sheave, then again through the second pulley means, to the inner end of the second rail, the second cable having a second end attached to the inner end of the second rail.

*  *  *  *  *

EXHIBIT 9

US006338523B1

| (12) | United States Patent | (10) Patent No.: | US 6,338,523 B1 |
| | Rasmussen | (45) Date of Patent: | Jan. 15, 2002 |

(54) **SLIDING MECHANISMS AND SYSTEMS**

(75) Inventor: **C. Martin Rasmussen**, Fruit Heights, UT (US)

(73) Assignee: **Happijac Company**, Kaysville, UT (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/448,410**

(22) Filed: **Nov. 23, 1999**

(51) Int. Cl.[7] ................................................. **B60P 3/34**
(52) U.S. Cl. .................. **296/175**; 296/26.13; 296/26.01
(58) Field of Search ................................ 296/171, 172, 296/175, 176, 26.01, 26.03, 26.08, 26.09, 26.12, 26.13; 192/89.21, 89.27; 52/67

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 981,113 A | 1/1911 | Richards | 248/422 X |
| 1,039,960 A | 10/1912 | Klein et al. | 254/103 |
| 1,275,971 A | 8/1918 | Michelin | 254/103 X |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| FR | 1088640 | 3/1957 | 254/103 |
| FR | 1562197 | 4/1969 | 248/354.3 |

OTHER PUBLICATIONS

Atwood Industries, Inc. Product Brochure, Form No. BR–1043, 1992.
Atwood Industries, Inc. Product Brochure, Form No. TS–2000, 1993 (estimated).
Atwood Industries, Inc. Product Brochure, Form No. TS–2002, 1993 (estimated).
Happijac Company Product Brochure, 1993 (estimated).
Rieco, Inc. Camper Jacks Product Brochure, 1980 (estimated).
Rieco, Inc. Swing–A–Way Bracket Product Brochure, 1980 (estimated).
Rieco, Inc. Ball Screw Camper Jacks Product Brochure, 1993 (estimated).
Rieco, Inc. Remote Controlled Electric Camper Jacks Product Brochure, 1993 (estimated).
Titan Jack, Inc. 4–Corner Camper Jack Product Brochure, 1993 (estimated).

*Primary Examiner*—Dennis H. Pedder
(74) *Attorney, Agent, or Firm*—Workman, Nydegger & Seeley

(57) **ABSTRACT**

A sliding mechanism for extending and retracting a slide-out compartment comprising a guide member having two securing flanges separated by a gap that communicates with an interior channel. A slider rail is disposed within the interior channel and has a middle portion adapted with a plurality of holes formed therein. Extending from the middle portion are two securing members that cooperate with the securing flanges of the guide member to maintain slider rail within the interior channel as middle portion extends into the gap. Disposed within the interior channel at one end of the guide element is a gear mechanism. The gear mechanism includes a gear shaft and a gear attached to the gear shaft. The gear mechanism drivingly engages a plurality of teeth on the gear within the plurality of holes in the middle portion of the slider rail to extend or retract the slide-out compartment. A timing assembly is attached to the gear shaft to allow two or more gear shafts to be timed relative to one another. Attached to the second end of the gear shaft is a manual activation assembly, such as a hand crank. Alternatively, a motorized activation assembly may be attached to gear shaft. One embodiment of the motorized activation assembly includes a quick-release arrangement that allows a motor to be quickly and easily released from the gear shaft or a motorized activation assembly.

**41 Claims, 14 Drawing Sheets**



**US 6,338,523 B1**
Page 2

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 1,447,603 A | | 3/1923 | Runner ................... | 254/103 X |
| 1,914,566 A | * | 6/1933 | Haseltine ............ | 192/89.21 X |
| 2,201,826 A | | 5/1940 | Ditchfield .................. | 248/200 |
| 2,477,466 A | | 7/1949 | Richardson ........... | 403/384 X |
| 2,535,613 A | | 12/1950 | Vanderbeek ........... | 248/188.4 |
| 2,583,923 A | | 1/1952 | Anschuetz ................ | 254/134 |
| 2,597,709 A | * | 5/1952 | Dath et al. .......... | 192/89.21 X |
| 3,080,185 A | | 3/1963 | Walker ...................... | 287/104 |
| 3,148,795 A | | 9/1964 | Leach ....................... | 214/515 |
| 3,338,554 A | | 8/1967 | Gostomski ................. | 254/103 |
| 3,549,027 A | | 12/1970 | Batson ...................... | 214/38 |
| 3,567,271 A | | 3/1971 | Gostomski ............... | 254/45 X |
| 3,592,443 A | | 7/1971 | Budrow et al. ............. | 254/86 |
| 3,640,502 A | | 2/1972 | Bargman, Jr. ............ | 254/45 X |
| 3,709,467 A | | 1/1973 | Mann ....................... | 254/45 |
| 3,758,074 A | | 9/1973 | Jeffries et al. ............... | 254/45 |
| 3,819,077 A | | 6/1974 | Rasmussen et al. ........ | 214/516 |
| 3,874,244 A | | 4/1975 | Rasmussen et al. .......... | 74/30 |
| 3,897,044 A | | 7/1975 | Tallman ....................... | 254/45 |
| 3,934,688 A | | 1/1976 | Sides et al. ............... | 192/48.5 |
| 4,015,822 A | | 4/1977 | Rasmussen ................. | 254/45 |
| 4,169,581 A | | 10/1979 | Thurmond, Jr. ........... | 254/45 |
| 4,316,601 A | | 2/1982 | Osborne et al. ............. | 254/86 |
| 4,723,931 A | | 2/1988 | Allen et al. ................. | 446/268 |
| 4,842,252 A | | 6/1989 | McMahan ................... | 254/420 |
| 4,872,903 A | | 10/1989 | Periou ...................... | 74/89.15 |
| 4,930,270 A | | 6/1990 | Bevacqua ................. | 52/126.1 |
| 5,199,738 A | | 4/1993 | VanDenberg ............ | 280/766.1 |
| 5,237,782 A | | 8/1993 | Cooper ......................... | 52/67 |
| 5,273,256 A | | 12/1993 | Chambers ................ | 254/45 |
| 5,553,825 A | | 9/1996 | Rasmussen ............. | 248/354.3 |
| 5,570,924 A | | 11/1996 | Few et al. ................ | 296/175 |
| 5,758,918 A | * | 6/1998 | Schneider et al. ....... | 296/26.13 |
| 5,785,373 A | | 7/1998 | Futrell et al. ............ | 296/26.01 |
| 5,984,353 A | * | 11/1999 | Rasmussen ............ | 280/766.1 |
| 6,116,671 A | * | 9/2000 | Schneider ............... | 296/26.01 |

* cited by examiner



FIG. 1



FIG. 2

U.S. Patent     Jan. 15, 2002     Sheet 3 of 14     US 6,338,523 B1



FIG. 3



FIG. 4



FIG. 5A

FIG. 5B



FIG. 6

U.S. Patent    Jan. 15, 2002    Sheet 7 of 14    US 6,338,523 B1



FIG. 7

U.S. Patent

Jan. 15, 2002

Sheet 8 of 14

US 6,338,523 B1



FIG. 8



FIG. 10

FIG. 11

FIG. 9

U.S. Patent    Jan. 15, 2002    Sheet 9 of 14    US 6,338,523 B1

U.S. Patent    Jan. 15, 2002    Sheet 10 of 14    US 6,338,523 B1



FIG. 12

FIG. 19A

FIG. 19B



FIG. 13



FIG. 14



FIG. 15



FIG. 16



FIG. 17



FIG. 18

US 6,338,523 B1

1

# SLIDING MECHANISMS AND SYSTEMS

## BACKGROUND OF THE INVENTION

### 1. The Field of the Invention

The present invention generally relates to a device for sliding objects in a controlled manner, and, more specifically, to a sliding mechanism for a "slide-out" compartment or room for a recreational vehicle, such as a camper, trailer, motor home, or the like.

### 2. The Prior State of the Art

Recreational vehicles (RVs), such as travel trailers, campers, and motor homes offer users the opportunity to escape the rigors of everyday life and explore the world we live in. Resembling a small home on wheels, an RV is capable of transporting and comfortably sheltering people for extended periods of time. The primary benefit of such a vehicle is to enhance the camping or traveling experience by providing the comforts of home away from home. Additionally, the occupant is given the option of braving the elements, commonly known as "roughing it", or retreating to the protection afforded by the RV. Thus, the spirit of "roughing it" may be maintained without deprivation of the full camping experience.

Although freely mobile, as the size of RV's increase, the ease of handling tends to decrease. Additionally, RV's have dimensional limits dictated by highway regulations or the specific configuration of truck bed that contains the camper. Responding to the need for more living space inside a smaller vehicle, numerous different RVs incorporate pop-up tops and/or slide-out rooms for selectively expanding the living area. Designed to be used only when the RV is parked, these rooms are retracted and stored in the interior of the vehicle during travel, and are slid outwardly when the vehicle is parked. Generally, upon parking the recreational vehicle, the pop-up tops or slide-out rooms are moved horizontally to an extended position to increase the useable interior space of the vehicle.

Several different devices have been proposed for use as slide-out rooms. Included among those proposed are expandable camper bodies and enclosures, and slidable room assemblies for RVs. Envisioned for recreational vehicle use, some older slide-out devices generally include accordion-like side walls laterally joined to a rigid end wall. Supporting the walls is a slidable frame carried on the main RV frame to slidably extend and retract from and within the main RV frame. Traditionally, a manually operated or motorized driving mechanism interconnects between the sliding frame and the main frame for expansion and retraction of the slide-out.

The trend in the RV industry over the last several years concerning slide-out rooms has been to incorporate the entire slide-out assembly within the main frame of the RV. This trend, has led to the use of sliding tubes or beams that are attached to or integrally formed with the main frame of the RV. The associated driving mechanism is attached to the main frame or in close proximity thereto. However, the components forming the slide out mechanism tend to be scattered within the interior of the RV with the motor in one location, the driving mechanism encompassing another interior region, and the load bearing members extending across a substantial part of the interior of the RV. As such, the drive mechanisms and other components associated with these sliding mechanisms have become more complex and costly to install, repair, and/or replace.

Driving mechanisms for RV slide-out rooms, that are currently available, function in many different forms. They

2

tend to, however, generally share many of the same functional and structural characteristics. One variation of slide-out drive mechanisms involves the use of threaded drive screws to drive racks and pivoted cross-members that extend or retract the slide-out room. Another type of drive mechanism uses toothed geared drive assemblies having racks that expand or contract upon rotation of a toothed gear. Unfortunately, during the rigors of travel, the racks may become disengaged from the gears thereby preventing the slide-out room from being extended or retracted.

Further efforts to provide drives for slide-out rooms have led to the use of hydraulic cylinders. Resembling horizontally installed hydraulic jacks, these mechanisms slidably force the room open as the hydraulic jack extends. Likewise, the hydraulic cylinder can slidably close the room. Although straightforward in design, hydraulic systems often tend to be fragile in nature and being subject to deleterious rigors of vibration in the transport of the RV over the roadway can experience a relatively short service life.

Though these various devices solve many problems, they still require a significant amount of space within the recreational vehicle for the motor and drive mechanism. While motor home type RV's have substantial amounts of space to accommodate the required motors and driving mechanisms, the space within camper and trailer type RV's is at a premium and limits the application of currently slide-out room technology. For example, in motor home type slide-out rooms, the trend is to include a drive mechanism that extends from one side of the motor home to the other to provide the necessary load bearing strength. This technique is inoperable for camper type RV's because a camper slide-out room must slide out from a small wing wall that extends over the side of a pick-up. To allow an individual to use the camper, the driving mechanism may not extend into the central isle of the camper, and therefore must be limited to the dimensional restrictions of the wing wall. Furthermore, people still desire access to the interior of the camper when the slide-out room is retracted. Consequently, the slide-out room and associated driving mechanism cannot substantially block the interior isle. As such, it would be beneficial to reduce the space required for the motor and drive mechanism of a slide-out room for motor homes, and especially campers and trailers.

Another problematic characteristic often shared by prior art drive mechanism designs is the intended location of the operating mechanism. Slide-out driving mechanisms are usually installed as original equipment during manufacture of the RV. Termed "OEM" equipment, the installation locations of these devices is often chosen without consideration of the fact that it may be desirable to subsequently gain access to such mechanisms for repair and/or replacement. As a result, the devices are often incorporated within the confines of the main frame of the RV making repairs costly and replacement nearly impossible.

Additionally, with current slide-out room construction a relatively large gap is created between the slide-out room and the RV body when the slide-out room is extended. During use under adverse weather conditions, such as wind, rain, sleet, or snow, water tends to leak into the interior of the vehicle in the area between the slide-out room and the exterior wall of the vehicle. Current approaches to solving this problem involve filling the gap with a sealer to prevent infiltration of inclement weather. Unfortunately, since the gap between the bottom of the slide-out room and the RV body is large, the effectiveness of the sealer is limited. Furthermore, since the sealing material is less durable than other portions of the RV, overtime, the larger sealers tend to

US 6,338,523 B1

3

4

deteriorate, thereby allowing wind, rain, sleet, or snow to creep into the drive mechanisms of the slide-out room or to damage the walls of the RV body.

Another problem with current RV mechanisms occurs once the RV has been in use for a period of time. During construction of an RV, the slide-out room is adjusted to properly fit the sidewalls and cooperate with the slide mechanisms. During use, however, the dimensions of the slide-out room and the body of the recreational vehicle may change due to a number of conditions. Current construction techniques and slide mechanisms make it difficult to readjust the fit of the slide-out room relative to the vehicle's sidewalls and floors, thereby providing inefficient sliding, binding, and damage to the sides and floor of both the slide-out room and the body of the recreational vehicle.

It would be an advance to provide RV mechanisms for sliding a slide-out room on a recreational vehicle, such as a camper, trailer, motor home, or the like, that is compact, reliable, while reducing the possibility of infiltration of adverse weather conditions within the interior of the RV. In particular, it would be an advance to provide a sliding systems that incorporates sliding mechanisms, driving mechanisms, and structural support elements within a single unit, that requires little space for installation and use, while being reliable.

OBJECTS AND SUMMARY OF THE INVENTION

It is an object of the present invention to provide a sliding mechanism and system for moving a slide-out compartment of a recreational vehicle that is compact while maintaining the required strength and rigidity.

It is another object of the present invention to provide a sliding mechanism and system that provides additional structural support to the exterior wall of a recreational vehicle.

Another object of the present invention is to provide a sliding mechanism and system that that may be activated manually to extend and retract a slide-out compartment of a recreational vehicle.

Yet another object of the present invention is to provide sliding mechanisms and systems that are capable being easily modified to accommodate for changes in the structural dimensions of the recreational vehicle.

Still yet another object of the present invention is to provide a sliding mechanism and system that is capable of being utilized on various types of recreational.

Another object of the present invention is to provide a sliding mechanism and system that minimizes the space required for both installation and use of the sliding mechanism on various types of recreational vehicles.

Still another object of the present is to provide a sliding mechanism and system that cooperates with seals to prevent infiltration of adverse weather conditions within the interior of various types of recreational vehicle.

Additional objects and advantages of the invention will be set forth in the description which follows, and in part will be obvious from the description, or may be learned by the practice of the invention. The objects and advantages of the invention may be realized and obtained by means of the instruments and combinations particularly pointed out in the appended claims.

To achieve the foregoing objects, and in accordance with the invention as embodied and broadly described herein, a sliding mechanism for extending and retracting a slide-out

compartment is disclosed. The sliding mechanism includes a guide member having two securing flanges separated by a gap that is in communication with an interior channel. A slider rail is disposed within the interior channel and has a middle portion adapted with a plurality of holes formed therein. Extending from the middle portion are two securing members that cooperate with the securing flanges of the guide member to maintain slider rail within the interior channel as middle portion extends into the gap. Disposed within the interior channel at one end of the guide element is a gear mechanism. The gear mechanism drivingly engages with the plurality of holes in the middle portion of the slider rail to extend or retract the slide-out compartment. As such, in one embodiment, gear mechanism includes a gear shaft and a gear attached to the gear shaft. The gear includes a plurality of teeth that extend into the gap between the securing members to engage with the holes in the middle portion of the slider rail. In this configuration, the slider rail is continuously maintained in the interior channel and the teeth are in continuous engagement with the slider rail. This prevents the teeth from disengaging from the slider rail and being incapable of moving slide-out compartment.

According to another aspect of the present invention, the gear shaft is adapted to cooperate with one or more activation assemblies. In one embodiment, the activation assembly is a manual activation assembly. The manual activation assembly includes a connector member that is adapted to attach to one end of the gear shaft. Located at another end of the connector member is a hand crank. As the hand crank is rotated, the connector member is rotated, thereby activating the gear mechanism to extend or retract the slide-out compartment.

In another embodiment, the activation assembly is a motorized activation assembly. The motorized activation assembly includes a quick-release arrangement that allows a motor to be engaged and disengaged through rotation of a cam lever. Motorized activation assembly allows a motor to communicate with the gear shaft to thereby allow the motor to extend and retract the slide-out compartment. Additionally, when the sliding mechanism includes two connected gear shaft, with a manual activation assembly coupled to one gear shaft and a motorized activation assembly coupled to the other gear shaft, activation of the quick-release arrangement releases engagement of the motor with one gear shaft thereby allowing operation of the manual activation assembly. In one embodiment, the two gear shafts can be coupled together by a timing assembly. The timing assembly includes a detachable drive shaft that is capable of engaging and disengaging to the two gear shafts independently of each other.

In another embodiment of the present invention, a system for extending and retracting a slide-out compartment incorporated within a recreational vehicle is disclosed. The system includes a base assembly that is adapted for fixably attachment to the recreational vehicle. The base assembly includes the guide element and a number of support elements that combine to provide structural support to both the slide-out compartment and the remaining parts of the recreational vehicle. The base assembly cooperates with the sliding mechanism to allow a slide-out compartment to be extended and retracted. In one embodiment of the sliding system, two slider rails are attached together through two slider supports.

BRIEF DESCRIPTION OF THE DRAWINGS

In order that the manner in which the above recited and other advantages and objects of the invention are obtained,

5

a more particular description of the invention briefly described above will be rendered by reference to specific embodiments thereof that are illustrated in the appended drawings. Understanding that these drawings depict only typical embodiments of the invention and are therefore not to be considered limiting of its scope, the invention will be described with additional specificity and detail through the use of the accompanying drawings in which:

FIG. 1 is a partial breakaway perspective view of one embodiment of a vehicle and camper within one embodiment of the sliding system of the present invention.

FIG. 2 is a perspective view of one embodiment of a sliding system.

FIG. 3 is an exploded perspective view of one embodiment of a base assembly of the sliding system of FIG. 2.

FIG. 4 is an exploded perspective view of one embodiment of a sliding assembly of the sliding system of FIG. 2.

FIGS. 5A and 5B are partial perspective views of embodiments of a slider rail for one embodiment of the sliding assembly of FIG. 4.

FIG. 6 is an exploded perspective view of one embodiment of a roller assembly of the sliding system of FIG. 2.

FIG. 7 is an exploded perspective view of one embodiment of a gear mechanism of the sliding system of FIG. 2.

FIG. 8 is partial cross-sectional view of the gear mechanism of FIG. 7 installed in a base assembly of FIG. 3.

FIG. 9 is a plan view of the sliding system of FIG. 2.

FIG. 10 is an end view of one embodiment of a first end of a drive shaft of the sliding system of FIG. 2.

FIG. 11 is an end view of one embodiment of a second end of a drive shaft of the sliding system of FIG. 2.

FIG. 12 is an exploded perspective view of one embodiment of a motorized assembly that can be used with the sliding system of FIG. 2.

FIG. 13 illustrates a cross-sectional view of one embodiment of a quick-release arrangement having a cam member in a cammed.

FIG. 14 illustrates a cross-sectional view of the embodiment of a quick-release arrangement of FIG. 13 with the cam member in an uncammed.

FIG. 15 is an exploded perspective view of a portion of the quick release arrangement of FIG. 13.

FIG. 16 illustrates a cross-sectional view that depicts the relative positions of the cam member and a second end of a second gear, in the cammed orientation, of the quick-release arrangement of FIG. 13.

FIG. 17 illustrates a cross-sectional view that depicts the relative positions of the cam member and a second end of a second gear, in the uncammed orientation, of the quick-release arrangement of FIG. 13.

FIG. 18 is an exploded perspective view of another embodiment of a cam member that is adapted to be added to an existing motorized activation assembly.

FIG. 19A is a cross-sectional view of another embodiment of a slider rail

FIG. 19B is a cross-sectional view of another embodiment of a slider rail.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention relates to sliding mechanisms and systems which may be used to extend and retract a slide-out compartment incorporated within a recreational vehicle,

6

such as but not limited to campers, trailers, motor homes, and the like. The sliding mechanism is configured to be compact, while being capable extending and retracting variously sized slide-out rooms or compartments to increase the living space within a recreational vehicle. Furthermore, the sliding mechanism and systems of the present incorporate numerous sliding and driving components into a single unit thereby making installation simpler and quicker, while maintaining structural support and providing additional structural support to the recreational vehicle. Additionally, the sliding mechanisms and systems are capable of being installed on various recreational vehicles and at varying locations on the recreational vehicle without the need to substantially alter any portion of the mechanisms or components. As such, the sliding mechanisms and systems of the present invention are interchangeable or may be used without modification for slide-out rooms or compartments on the right, left, front, or rear of the recreational vehicle.

Generally, the sliding mechanisms and systems shall be described hereinafter with reference to a camper that is contained within the bed of a pick-up truck. The discussion relating to application of the present invention to campers should not be considered as limiting the application of the general principals of the invention to other types of recreational vehicle, such as trailers and motor homes. Additionally, reference is made herein to a single slide-out compartment; however, it can be appreciated by one skilled in the art that multiple slide-out compartments may be incorporated within a single recreational vehicle.

FIG. 1 depicts a vehicle 10 with a cab 12 and a vehicle bed (not shown) that supports a camper 18. As shown, camper 18 has a forward portion 20 that extends over cab 12 of vehicle 10 and a rear portion 22 that extends beyond the rear of vehicle 10. Camper 18 has a step configuration formed with a lower exterior wall 24 retained within the interior of the bed (not shown) and an upper exterior wall 26 that is located above the bed (not shown). Lower exterior wall 24 and upper exterior wall 26 are joined together by way of a wing wall 28 (FIG. 2) that extends over a side 16 of vehicle 10. As depicted in FIG. 1, in one embodiment camper 18 includes a slide-out room or compartment 30. As illustrated, in one embodiment, slide-out compartment 30 is located intermediate between forward portion 20 and rear portion 22 of camper 18. Slide-out compartment 30, however, may be located at the forward portion or rearward portion of the side of camper 18. Alternatively, slide-out compartment 30 may be located at the front or rear of camper 18. Furthermore, camper 18 may include a multiple number of slide-out compartments 30 which are located at the front, rear, and/or on both sides of camper 18.

According to one aspect of the present invention, slide-out compartment 30 is extended and retracted by way of a sliding system, as referenced by numeral 40 in FIG. 2. The configuration of sliding system 40 minimizes the space required for installation and usage of sliding system 40 to extend and retract slide-out compartment 30, thereby increasing the available living area while providing the requisite strength and functionality to operate slide-out compartment 30.

Sliding system 40 includes a base assembly 42, a gear mechanism 44, and a slider assembly 46. As depicted in FIG. 2, base assembly 42 is attached to wing wall 28 of camper 18. Base assembly 42 is configured to both provide structural support for gear mechanism 44 and slider assembly 46, while providing structural support to camper 18.

Additionally, base assembly 42 is adapted to form the central unit of sliding system 40 upon which gear mecha-

US 6,338,523 B1

7

nism 44 and slider assembly 46 may be attached and to which portions of camper 118 are affixed.

One embodiment of base assembly 42 includes support elements 50 that provided structural support to both sliding system 40 and camper 18. Attached to support elements 50 are optional feet 52 (FIG. 3) that are capable of assisting in leveling and attaching support elements 50 to camper 18. As illustrated in FIG. 2, also attached to support element 50 are a number of guide members 54 that cooperate with gear mechanism 44 and slider assembly 46 to allow slide-out room 30 to be retracted or extended as required.

In the case of use with camper 18 (FIG. 1), base assembly 42 is sized so that when support elements 50 are coupled to wing wall 28, the location of support elements 50 on wing wall 28 coincides with the top of lower exterior wall 24 and the bottom portion of upper exterior wall 26. Base assembly 42, and therefore support elements 50, provide structural support to camper 18.

As depicted in both FIG. 2 and 3, each support element 50 has a generally U-shaped cross-section having an outer portion 60 and an inner portion 62 that are separated by a base portion 64. Outer portion 60 and inner portion 62 have a spaced apart relationship that allows attachment of guide members 54, while giving strength to base assembly 42. As shown in FIG. 2, support elements 50 are capable of being attached to wing wall 28, while also attaching to lower exterior wall 24 and upper exterior wall 26. As such, the cross-sectional configuration of support element 50 may be varied as necessary dependent on the particular use thereof, such that support element 50 may have a cross-section in the configuration of a square, rectangular, oval, trapezoidal, or the like, or combinations thereof.

As depicted in FIG. 3, inner portion 62 includes a plurality of feet fastening holes 66 through which optional feet 52 may be coupled thereto. In one embodiment, both base portion 64 and outer portion 60 include numerous fastening holes 68 which are configured to allow portions of camper 18 to be attached to support element 50. By way of example, and not limitation, fastening holes 68 in outer portion 60 may be sized to allow fasteners to attach outer portion 60 to upper exterior wall 26, while fastening holes 68 in base portion 64 may be sized to allow fasteners to attach base assembly 42 to wing wall 28. It will be appreciated that the number, size, and dimensions of feet fastening holes 66 and fastening holes 68 may be varied as needed. In addition, feet fastening holes 66 and fastening holes 68 may have various other configurations that are not illustrated in FIG. 3. By way of example and not limitation, feet fastening holes 66 and fastening holes 68 may be round, oval, elliptical, elongated, square, triangular, rectangular, or the like.

Support element 50 may be composed of various types of materials, such as by way of example and not limitation, metals, composites, plastics, or the like, as long as the material used is capable of providing support to the other components of the present invention, while giving structural support to camper 18. In one embodiment, support element 50 is substantially composed of steel.

In one embodiment, feet 52 are releasably attached to support element 50. It will be appreciated by one skilled in the art that feet 52 are an optional feature of sliding system 10. Siding system 10 is equally effective without feet 52. Feet 52 allow support element 50 to be leveled with respect to wing wall 28 and the other components and dimensions of camper 18, such as lower and upper exterior walls 24, 26, respectively. Additionally, feet 52 are particularly useful as the camper ages, because feet 52 may be utilized to assist

8

with eliminating problems such as the camper not being level. Furthermore, feet 52 may be used to compensate for defects in the construction of camper 18 that would otherwise affect the sliding motion of slider system 40. In one embodiment, feet 52 have a generally L-shaped cross-section. As depicted in FIG. 3, feet 52 have a first foot portion 70 adapted to couple to support element 50 at feet fastening holes 66, while a second foot portion 72 is adapted to couple to wing wall 28. Each foot portion 70, 72 includes a number of apertures 74 which are adapted to cooperate with numerous types of fastener (not shown) to allow secure attachment of feet 52 to either wing wall 28 or support element 50. Additionally, in one embodiment, each aperture 74 has an ovular or slotted form to allow adjustment of support elements 50 and feet 52.

In view of the teaching contained herein, one skilled in the art can identify various other configurations of feet 52 which are capable of performing the function thereof. By way of example and not imitation, each foot 52 may have various other cross-sectional configuration, such as square, rectangular, or the like. Additionally, in an another configuration, feet 52 are integrally formed with support element 50 and washers slidably engages with a fastener to vary the distance between each second foot portion 72 and wing wall 28. In another configuration, feet 52 are in the form of a post or cylindrical member that has a threaded portion encompassing the exterior surface thereof. The threaded portion cooperates with a complementary threaded portion formed in support element 50, to thereby level base assembly 42. In yet another configuration, feet 52 may have the form of a post or cylindrical member that is spring-loaded to maintain separation between wing wall 28 and second foot portion 72.

As shown in FIG. 2, guide member 54 is attached to support element 50. Guide member 54 separates and gives structural support to support elements 50, thereby providing structural integrity to base assembly 42. Guide member 54, additionally, cooperates with slider assembly 46 and gear mechanism 44 to allow slider assembly 46 to be extended and retracted during operation of sliding system 40.

In one embodiment, guide member 54, shown in greater detail in FIG. 3, has a generally C-shaped cross-section. Guide member 54 has a first side 80 and a second side 82 separated by a base 84. Extending from first side 80 and second side 82 is a first securing flange 86 and a second securing flange 88, respectively. First and second securing flanges 86, 88, respectively, are sized such that a gap 90 remains therebetween. It will be appreciated that tile configuration of guide member 54 defines a channel along the longitudinal length thereof. In this embodiment, as illustrated in FIG. 2, guide member 54 is adapted to cooperate with gear mechanism 44 and slider assembly 46 to allow slide-out compartment 30 to be extended and retracted.

Referring back to FIG. 3, guide member 54 has a first end 124 and a second end 126. Located at first end 124 of guide member 54 is a gear mount 94. At second end 126 is a roller mount 96. It can be appreciated by one skilled in the art, however, that gear mount 94 may be located at second end 126 and roller mount 96 may be located at first end 124. Similarly, it can be appreciated that both gear mount 94 and roller mount 96 may be located at any longitudinal distance along guide element 54. Furthermore, in another embodiment of base assembly 42, gear mount 94 is located at first end 124 and roller mount is located at second end 126, however, base assembly 42 is rotated 180° from that shown in FIGS. 2 and 3 when installed on camper 18.

Gear mount 94 includes two bushing protrusions 98 which extend from respective surfaces of first side 80 and

US 6,338,523 B1

9

second side 82. An axial gear shaft hole 100 passes through bushing protrusion 98 and the associated first side 80 or second side 82. Axial gear shaft holes 100 are adapted to cooperate with gear mechanism 44, and allow free rotation thereof. Bushing protrusions 98 and axial gear shaft holes 100 are one embodiment of structure capable of performing the function of a connecting means for coupling gearing mechanism 44 to guide member 54. It will be appreciated by one skilled in the art that various other configurations of connecting means are possible. For example, connecting means could utilize gear shaft holes 100 that have the form of a slot that extends to the end of first side 80 or second side 82, distal from base 84. In this embodiment, the slot is capped with a securing flange that closes the open end thereof and attaches gearing mechanism 44 to guide member 54. In another embodiment, bushing protrusions 98 are detachable and secured to guide member 54 by way of one or more fasteners. In yet another embodiment, connecting means comprises of a hole that has an interior tapered form that frictionally retains gear mechanism 44 to guide member 54.

Roller mount 96 includes two axially coinciding roller shaft holes 102 formed in first side 80 and second side 82. Roller shaft holes 102 are capable of cooperating with the components of roller assembly 96. Roller shaft hole 102 is one structure capable of performing the function of connecting means for coupling roller assembly 96 to guide member 54. It will be appreciated that various other configurations of connecting means are capable of performing the function thereof. For example, roller shaft hole 102 may be tapered to cause a friction fit with roller assembly 96. In another embodiment of connecting means, roller shaft hole 102 includes protrusions similar to those of bushing protrusions 98. In yet another embodiment of connecting means, roller shaft hole 102 is a slot.

As depicted in FIG. 2, sliding assembly 46 is disposed in the channel defined by guide member 54 and cooperates with securing flanges 86, 88 (FIG. 2). Slider assembly 46 is attached to slide-out compartment 30, as well as being slidably engaged with the channel defined by guide member 54 and gear mechanism 44. Slider assembly 46, in cooperation with guide member 54, provides the structural support and load bearing members that carry the weight and dissipate the forces resulting from extending and retracting slide-out compartment 30. As depicted in FIG. 4, slider assembly 46 includes slider rails 110 that are coupled to slider supports 112. While FIG. 4 depicts slider assembly 46 as having two slider rails 110 and two slider supports 112, it will be appreciated that various other numbers of slider rails 110 and slider supports 112 could be used.

In one embodiment of slider rail 110, as illustrated in FIG. 5A, slider rail 110 has a raised middle portion 114, with a first securing member 116 and a second securing member 118. First and second securing members 116 and 118, respectively, extend outwardly from the peripheral edges of middle portion 114. Securing members 116, 118 may have various widths, so long as they are capable of cooperating with securing flanges 86, 88 of guide members 54 to retain slider rail 110 within the channel defined by guide member 54. Middle portion 114 includes a number of slots 120 that are configured to cooperate with gear mechanism 44 to allow movement of slider assembly 46. In one embodiment, each slot 120 has a generally rectangular form. It will be appreciated, however, that various other configurations are capable of performing the function thereof. By way of example and not limitation, slot 120 may be round, oval, elliptical or any combination thereof. What is important is

10

that slot 120 be configured to cooperate with gear mechanism 44. In addition, as shown in FIG. 5A, one or more of slot 120 may include a curved section that is capable of accommodating a fastener (not shown) to attach slider rail 110 to a portion of slide-out compartment 30. First end 124 and second end 126 of slider rail 110 have a number of retaining holes 128 formed therein. In one embodiment, retaining holes 128 include an optional threaded portion to allow slider rail 110 to be attached to slider support 112. Alternatively, slider support 112 may be bolted, welded, riveted, or glued to slider rail 110 during fabrication or manufacture.

Referring now to FIG. 5b, an alternate embodiment of a slider rail 110b is depicted. Slider rail 110b includes a first element 130 and a second element 132. A slot 133 is formed through the first element 130 and second element 132 that acts as slot 120 of slider rail 110. Alternatively, slot 133 may only passes through second element 132 and first element 132 is a solid piece of material.

The first element is adapted to act as middle portion 114, while the second element acts as securing member 116, 118. Therefore, first element 130 is fixably coupled to the central portion of second element 132 such that slots in each element align to form slot 133. Additionally, fixation of first element 130 to second element 132 leaves the sides 134, 135 of second element 132 exposed such that sides 134, 135 are capable of cooperating with securing flanges 86, 88 of guide members 54 to retain slider rail 110 within the channel defined by guide member 54. It can be appreciated by one skilled in the art that there are various other configuration of slider rails 110 and 110b that are possible.

Returning to FIG. 4, in one embodiment, slider support 112 has a generally L-shaped configuration that comprises an upper portion 136 and a side portion 138 extending therefrom. Side portion 138 is substantially perpendicular to upper portion 136. It will be appreciated, however, that side portion 138 may extend from upper portion 136 at various other angular orientations. In one embodiment, upper portion 136 of slider support 112 includes two notches 140 that are adapted to cooperated with first and second ends 124, 126 of slider rail 110. Surrounding each notch 140 in slider support 112 are retaining holes 128 that are configured to cooperate with retaining holes 128 in slider rail 110. As such, notches 140 and retaining holes 128 may have various dimensions and sizes so long as they assist in securely retaining slider rail 110 to slider support 112, i.e. allow fasteners to be disposed through retaining holes 128 in upper portion 136 and into retaining holes 128 of slider rail 110.

In one embodiment, both upper portion 136 and side portion 138 of slider support 112 include a number of securing orifices 144 that are formed to accommodate a fastener (not show) used to attach slider support 112 to a portion of slide-out compartment 30. Securing orifices 144, therefore, may have any desirable form, such as but not limited to, circular, angular, slot-like, or the like. Additionally, the fasteners described herein may comprise of various types of fasteners, such as but not limited to, screw, bolts, split pins, and the like.

The cross-sectional configuration of slider rail 110 and slider support 112 may be varied as necessary depending on the particular use thereof. By way of example and not limitation, slider rail 110 and slider support 112 may have various other configurations such as square, rectangular, or the like. Additionally, slider rail 110 and slider support 112 may be fabricated from various types of materials, such as for example, metals, composites, plastics, fibrous material,

US 6,338,523 B1

11                                                    12

or the like, so long as the material has sufficient strength for extending and retracting slide-out room **30**. In one embodiment, slider rail **110** and slider support **112** are substantially composed of a steel material.

In use of slider system **10**, slider rail **110** cooperates with roller assembly **148** as depicted in FIG. **6**. Roller assembly **148** includes a roller shaft **150** and a roller **152**. Roller shaft **150** is sized to securely fit within roller shaft holes **102** and an axial hole **164** formed through roller **152**. Roller shaft holes **102** and axial hole **164** are sized and configured to allow roller **152** to rotate about roller shaft **150**. In one embodiment, roller shaft **150** includes two fastening grooves **154** formed in the surface thereof, which are adapted to receive fastening clips **156**. Fastening clips **156** and fastening grooves **154** assist in retaining roller shaft **150** within roller shaft holes **102**. Various other structures are capable of performing the function of roller shaft **150**, fastening clips **156**, and fastening grooves **154**. For example, in another embodiment roller **152** is configured to cooperate with the underside of middle portion **114** of slider rail **110** so as to self center therein. In another embodiment, roller shaft **150** may be retained within roller shaft holes **102** through a friction fit and roller **152** is configured to rotate axially around roller shaft **150**. In yet another embodiment, roller shaft **150** includes pinholes that accommodate split pins or the like, which prevent retraction of roller shaft **150** from within roller shaft holes **102**.

Roller shaft **150** may be manufactured from various types of material, such as by way of example and not by way of limitation, metals, composites, plastics, and the like. In one embodiment, roller shaft **150** is composed of steel.

In one embodiment, roller **152** has a generally cylindrical configuration that includes a larger diameter portion **160** and a smaller diameter portion **162**. Larger diameter portion **160** of roller **152** is configured to cooperate with slider rails **110**. In addition, roller **152** self-centers within the channel defined by guide member **54** upon insertion of roller shaft **150** through axial hole **164**. Larger diameter portion **160** and middle portion **114** of slider rail **110** are configured to cooperate so as to allow roller **152** to self center. Consequently, larger portion **160** self-centers on the underside of middle portion **114** of slider rail **110** to provide smooth sliding of slider rail **110** within the channel defined by guide element **54**.

Roller **152** is rotatably mounted within the channel defined by guide member **54** as roller shaft **150** passes through roller shaft hole **102** and locates within roller mount **96**. In this embodiment, roller **152** has a length sufficient to extend across the width of the channel defined by guide member **54**. As such, roller **152** abuts against first side **80** and second side **82** to reduce movement of guide member **54** during use. Additionally, since roller **152** abuts the sides **80**, **82** of guide member **54**, larger diameter portion **160** is always in engagement with middle portion **114** of slider rail **110**. It will be appreciated that roller **152** may take various other forms such as bearing rollers, or the like.

Roller **152** may be composed of various types of material, such as by way of example and not by way of limitation, metal, composites, plastics, and the like. In one embodiment, roller **152** is formed from a plastic material.

As depicted in FIGS. **7** and **8**, gear mechanism **44** is adapted to cooperate with slider rail **110**. One embodiment of gear mechanism **44**, illustrated in FIG. **7**, includes a gear shaft **170** and a gear **172**. Gear shaft **170** is sized to securely fit within gear holes **100** of guide member **54** with the aid of bushings **174**, while being capable of freely rotating within

bushings **174**. As depicted, in one embodiment, gear shaft **170** has a generally cylindrical configuration. Gear shaft **170** has a first end **180**, a second end **182**, and an intermediate portion **176** disposed there between. First and second ends **180**, **182**, respectively, are shaped to allow driving activation assemblies and timing mechanism to be engaged thereto. As shown, in this embodiment, first and second ends **180**, **182** are generally square, while intermediate portion **176** is generally cylindrical. It will be appreciated by one skilled in the art that gear shaft **170**, first and second ends **180**, **182**, respectively, and intermediate portion **176** may have various other cross-sectional configurations, such as by example and not limitation, hexagonal, square, octagonal, triangular, oval, or the like. In another embodiment, gear shaft **170** has a generally hexagonal form with two cylindrical portions that cooperate with bushings **174** to allow free rotation of gear shaft **170**.

Gear **172** is adapted to cooperate with gear shaft **170**. In one embodiment depicted in FIG. **7**, gear **172** has a generally cylindrical form with a plurality of teeth **190** extending outwardly from a surface thereof. Teeth **190** are configured to cooperate with slots **120** formed in slider rail **110**, as shown in FIG. **8**. Returning to FIG. **7**, gear **172** has an axial hole **192** that is sized to cooperate with the dimensions of gear shaft **170**. In this embodiment, axial hole **194** has a generally cylindrical configuration, however, various other cross-sectional shapes are possible as long as axial hole **194** and intermediate portion **176** cooperate.

In addition, gear **172** has a retaining hole **194** that passes through gear **172** and is sized to cooperate with a retaining hole **184** formed in gear shaft **170**. As shown in FIG. **8**, when gear **172** is mounted on gear shaft **170**, retaining holes **184**, **194** align to accommodate a securing pin (not shown). The securing pin (not shown) prevents gear **172** from slipping relative to gear shaft **170** as gear shaft **170** rotates to extend or retract slide-out compartment **30**. Alternatively, as shown in FIG. **7** gear shaft **170** and axial hole **192** may have complementary shapes such that the complementary shape limits any slippage which might occur between gear shaft **170** and axial hole **192**. Retention clips **156** cooperate with coinciding retaining grooves **198** formed in gear shaft **170** to retain gear shaft **170** within gear shaft holes **100**. As illustrated in FIG. **8**, gear **172** is disposed in the channel defined by guide member **54** and extends into gap **90** between securing flanges **86**, **88**. Teeth **190**, therefore, engage with slots **120** of slider rail **110**.

It will be appreciated by one skilled in the art that various other configurations of gear mechanism **44** are capable of performing the function thereof. For example, gear **172** may be welded, brazed, or joined to gear shaft **170**. In another embodiment, gear shaft **170** may include pinholes which accommodate split pins that prevent gear shaft **170** from being retracted from gear shaft holes **100**. In another embodiment, gear shaft **170** may include two gears **172** that cooperate with a slider rail having two sets of slots. In still another embodiment, gear **172** may be retained on gear shaft **170**, solely through the combination of retaining hole **184**, **194** and a securing pin. In yet another embodiment, gear shaft **150** is located through gear holes **100** that are located at second end **126** of guide element **54**.

Gear **172**, gear shaft **170**, and bushing **174**, may be manufactured from various types of material, such as by way of example and not by way of limitation, metal, composites, plastics, and the like. In one embodiment, gear **172**, gear shaft **170**, and bushing **174**, are fabricated from steel. While in this embodiment gear **172**, gear shaft **170**, and bushings **174** are composed of the same material, this is not required.

US 6,338,523 B1

13                                                              14

Referring back to FIG. 2, sliding system **40** is depicted in a fully assembled and operational form. Support elements **50** are coupled to guide members **54** such that guide members **54** rest upon inner portions **62** of support elements **50**. Simultaneously, the ends of guide members **54** are attached to outer portions **60** of support elements **50**. Support elements **50** and guide members **54** combine to form a square or rectangular base assembly **42**.

As shown in FIG. 8, upon manufacture of base assembly **42**, gear mechanisms **44** are coupled to respective roller **152**, such that gear **172** is substantially centered within the channel defined by guide member **54**. It will be appreciated that when assembled, roller **152** is similarly centered within the channel defined by guide element **54**. Before slider rail **110** is attached, teeth **190** of gear **172** extend between securing flanges **86**, **88**, and await engagement with slots **120** of slider rail **110**.

Once slider rails **110** are fixably attached to slider supports **112**, slider rail **110** is located within the channel defined by guide element **54** such that securing flanges **86**, **88** of guide element **54** contact securing members **116**, **118** to retain slider **110**. In one embodiment, securing members **116**, **118** cooperate with wear guides **200** coupled to securing flanges **86**, **88**. Wear guides **200** separate securing flanges **86**, **88** from securing members **116**, **118**. Wear guides **200** minimize the effects of friction and reduce wear of the securing flanges **86**, **88** and securing members **116**, **118**. It will be appreciated that wear guides **200** may be fabricated from various materials such as plastics, or the like.

As securing members **116**, **118** couple with securing flanges **86**, **88**, middle portion **114** of slider **110** extends through gap **90**, thereby allowing slots **120** to engage teeth **190** of gears **172**. In this configuration, teeth **190** of gear **172** remain in contact with slots **120** of slider rail **110** throughout the life of sliding system **40**. There is, therefore, no possibility of gear **172** disengaging from slots **120** before, during, or after slide-out compartment **30** is extended or retracted. This eliminates the problem with prior sliding mechanisms and systems that disengage during travel of the recreational vehicle, thereby requiring costly repairs and maintenance.

During assembly, slider rail **110** is moved along the channel defined by guide element **54** until the detached end of slider rails **110** extends out of guide channel **92**. When this occurs, a second slider support **112**, depicted in FIG. 9, is attached to slider rail **110** to thereby form slider assembly **46**. Slider supports **112** prevent over extraction of slider rails **110** from the channel defined by guide member **54**, thereby preventing over extension of slide-out compartment **30** during use.

As shown in FIG. 9, in one embodiment, sliding system **40** utilizes two gear mechanisms **44** located at first ends **124** of guide members **54**. The combination of gear mechanism **44** is considered the gearing assembly of the present invention. It may be appreciated, however, that the gearing assembly may comprise of various other numbers of gear mechanism **44**. Additionally, the location of each gear mechanism **44** may be varied so that gear mechanism **44**, and so the gearing assembly, may be at any location along the length of guide members **54**.

The sliding system **40** as depicted herein encompasses substantially all the structural support members, sliding members, and driving elements within the interior confines of base assembly **42**. As such, sliding system **40** of the present invention is compact and has a height that is minimized to reduce the gap formed between the camper's exterior walls and the slider rails **110** of sliding system **40**.

By so doing, sliding system **40** reduces the area through which wind, rain, sleet, and snow can infiltrate during use if slide-out compartment **30**.

Additionally, since all the components are attached to base assembly **64**, shown in FIG. 1, sliding system **40** is simple to install on a camper, thereby reducing cost and time for fabricating campers with slide-out compartments. Furthermore, sliding system **40** reduces the required space for apparatus and devices that extend and retract slide-out compartments **30**.

According to another aspect of the present invention, as depicted in FIG. 9, gear shafts **170** of gear mechanism **44** are connected by way of a timing assembly **205**. Timing assembly **205** includes a drive shaft **210** and a retaining spring **212**. Although spring **212** is depicted as being on the right side of sliding system **40**, it is contemplated that spring **212** could be on the left side and have equal effectiveness. Drive shaft **210** has a generally elongated form with a first end **214** and a second end **216**. Each end **214**, **216** of drive shaft **210** has a respective connector recess. One embodiment of first connector recess **218** and second connector recess **220** are depicted in FIGS. 10 and 11. Connector recesses **218**, **220** are adapted to cooperate with the respective ends of gear shaft **170**. As shown in FIG. 10, first connector recess **218** has an interior configuration having six facets formed therein. In contrast, as illustrated in FIG. 11, second connector recess **220** has an interior configuration with twelve facets formed therein. Each interior configuration is capable of cooperating with either end of gear shaft **170**. It will be appreciated by one skilled in the art that various other configurations of timing assembly **205** are possible. For example, timing assembly **205** could include two retaining springs, one on each gear shaft **170** of this embodiment of sliding system **40**. In another example, timing assembly **205** is capable of rotating either gear mechanism **44** on either side of sliding system **40**.

One feature of the present invention is the ability of drive shaft **210** to be disengaged with respect to one gear shaft **170** attached to one guide element **54**, while remaining engaged with a second gear shaft **170** attached to a second guide element **54**. In this manner, the timing of sliding assembly **40** and gear mechanism **44** may be adjusted, thereby compensating for any misalignment between slide-out compartment **30** and camper **18** and reducing any binding and wearing of slider rails **10** and slide-out compartment **30**.

To time sliding system **40**, drive shaft **210** is pushed toward gear shaft **170** having retaining spring **212** proximal thereto. As retaining spring **212** depresses, second end **216** of drive shaft **210** disengages second connector recess **220** (FIG. 11) from a second gear shaft **170**. Upon being disengaged, drive shaft **210** may be rotated to turn gear shaft **170**, thereby modifying the starting position of gear shaft **170**. Upon achieving the desired rotation to time gear shaft **170**, drive shaft **210** is released and first connector recess **218** (FIG. 10) engages with gear shaft **170** as retaining spring **212** extends to an extended position.

This configuration also allows the user to compensate for deviations in the squareness of slide-out compartment **30** and camper **18** because second connector recess **220** (FIG. 11) of drive shaft **210** has twelve facets as compared to first connector recess **218** (FIG. 10) which has six. That is, drive shaft **210** may be rotated in increments of $1\!\!/_{12}^{th}$ of a complete rotation. It will be appreciated that connector recesses **218**, **220** may be formed with a variety of different internal facets, thereby providing a different number of increments of rotation.

15                                                    16

To extend or retract slide-out compartment 30 it is necessary to utilize an activation assembly, such as a manual activation assembly or a motorized activation assembly. Slider system 40 is configured to work with either one. A manual activation assembly 230 is depicted in FIG. 9. Manual activation assembly 230 includes a connector member 232 and a hand crank 234. Hand crank 234 has a generally S-shaped form with a handle 236 at one end thereof and a shaped connector end 238 distal thereto. Shaped connector end 238 releasably couples to connector member 232. Connector member 232 has a first end 240 adapted to hook to gear shaft 170 and a second end 242 that cooperates with shaped connector end 238 of hand crank 234. As such, rotational movement of hand crank 234 is translated along connector member 232 to gear shaft 170.

Connector member 232 may have various lengths and dimensions, so long as it is capable of cooperating with gear shaft 170 and hand crank 234. For example, connector member 232 may have a length sufficient to pass through a portion of exterior walls 24, 26 of camper 18 to engage with gear shaft 170 on either side of sliding system 40. Alternatively, connector member 232 may be integrally formed with hand crank 234. Connector member 232 and hand crank 234 may have various configurations as long as they are capable of cooperating and can translate rotational motion to gear shaft 170.

Alternative to, or in combination with manual activation assembly 230, sliding system 44 may incorporate a motorized activation assembly 250. One embodiment of which is illustrated in FIG. 12. One embodiment of motorized activation assembly 250 includes a gear reduction assembly 252 and a motor 254. Motor 254 is engaged to gear reduction assembly 252. As schematically depicted in FIG. 12, motor 254 includes a drive shaft 330 extending from a body thereof. Motor 254 may take various forms such as an electric, pneumatic, oil, gasoline, or the like. As such, one skilled in the art can identify various types of motor that may be utilized to rotate second end 292 of second gear 260, thereby rotating gear shaft 170 to extend and retract slide-out compartment 30.

Gear reduction assembly 252 includes a connector plate 256, a first gear 258, a second gear 260, and a connector box 266. In one embodiment, connector plate 256 has a generally square shape with a first aperture 268 and a second aperture 270 formed therein. Connector plate 256 further includes a plurality of retaining holes 288 located about the peripheral edge of connector plate 256 that cooperate with a plurality of fasteners (not shown) to allow connector plate 256 to be coupled to guide member 54.

Cooperating with first aperture 268 is first gear 258. First gear 258 has a first end 290 and a second end 292 with a plurality of teeth 294 located therebetween. First end 290 is adapted to be disposed within first aperture 268 of connector plate 256, while second end 292 cooperates with connector box 266. First end 290 includes an interior recess 296 that engages with gear shaft 170, such that rotational movement of first gear 258 rotates gear shaft 170. As such, interior recess 296 may have various forms and dimensions, so long as it is capable of engaging with gear shaft 170.

Second gear 260 is engaged with both first gear 258 and connector plate 256. Second gear 260 has a first end 300, an elongated second end 302, and a plurality of teeth 304 disposed therebetween. First end 300 cooperates with second aperture 270 of connector plate 256, while second end 302 cooperates with connector box 266. Second end 302 is further adapted to cooperate with motor 254 so that rota-

tional motion induced by motor 254 is translated to teeth 304 that are engaged with teeth 294 of first gear 258. Second end 302 of second gear 260 may have various forms as known by one skilled in the art.

In communication with second end 292 of first gear 258 and second end 302 of second gear 260 is connector box 266. Connector box 266 includes a body portion 280, a flange 282 mounted to body portion 280, and a cam lever 332. Cam lever 332 is the only component of a quick release arrangement 330 (FIG. 13) that is visible. Attached to one end of body portion 280 is flange 282. Flange 282, in one embodiment, has the same general configuration as connector plate 250, i.e., includes a first aperture 268, a second aperture 270, and a plurality of retaining holes 274 formed about a periphery thereof. It will be appreciated by one skilled in the art that connector box 266 may have various other configurations, such as round, hexagonal, rectangular, octagonal, trapezoidal, or the like. Additionally, connector box 266 may be fabricated from various types of material, such as plastics, composites, metals, or the like.

Body portion 280 of connector box 266 has a generally square cross-section with an interior 281. Interior 281 of body portion 280 is adapted to accommodate structures described in U.S. patent application Ser. No. 08/887,197 entitled "Quick Release Arrangement for a Camper Jack System," the disclosure of which is incorporated by this reference. Therefore, interior 281 includes quick release arrangement 330 (FIG. 13) that connects and releases the driving force of motor 254 to second end 302 of second gear 260.

FIG. 13 depicts a cross-sectional view of one embodiment of quick release arrangement 330. A coupler 334 having a bore 335 therethrough is adapted at a top end 336 to engage a lower end 338 of motor drive shaft 340. Motor drive shaft 340 is rotatable on its longitudinal axis but is fixed against vertical movement within body portion 280. Motor drive shaft 340 extends a short distance from coupler 334 and passes through an opening surrounded by a stationary flange 352 into a compartment for coupling with motor 254 in motor housing 255, such that motor drive shaft 340 is directionally rotated by motor 254. Motor 254 resists movement in an opposite direction to the motor's directional setting, and so provides brake control as well as drive control to second end 302 of second gear 260.

Coupler 334 has a bottom end 342 adapted to slidably engage second end 292 of second gear 260. Second gear 260 is also rotatable on its longitudinal axis but is fixed against longitudinal movement within connector box 266. Coupler 334 is configured to securely engage motor drive shaft 340 and second end 302 of second gear 260 such that, when coupled, motor drive shaft 340 and second gear 260 rotate together through operation of motor 254. At the same time, coupler 334 is adapted to slide along the longitudinal axis of motor drive shaft 340 and second end 302 of second gear 260.

It will be appreciated that various means for affecting the slidable engagement of coupler 334, motor drive shaft 340 and second gear 260 could be used. For example, as shown in FIG. 15, bore 335 through coupler 334 is configured to have notched corners 345 to thereby engage with corners 315 of the substantially square-shaped second end 302 of second gear 260 and motor drive shaft 340 such that coupled rotation will occur while still permitting coupler 334 to slide longitudinally along motor drive shaft 340 and second end 302 of second gear 260. To withstand the torque generated by operation of motor 254, coupler 334 is constructed of a

17

18

strong and durable metal material. Alternatively, in the event that quick release arrangement 330 is used with manual activation assembly 230 or some other manual activation means that do not generate as much torque, a very strong plastic or nylon material could be used, if desired.

In addition to the notched corners 345 within bore 335 of coupler 334, second end 302 of second gear 260 is configured to have beveled edges 341 that correspond to beveled edges 343 formed on a bottom end 342 of coupler 334 such that slidable engagement of coupler 334 and second gear 260 is facilitated.

A spring 348 is positioned to bias coupler 334 to engage with second end 302 of second gear 260. It will be appreciated that various other means for effecting the spring bias force could be used. In one embodiment illustrated in FIG. 13, flange 352 forms the stop for a top end of spring 348, while a protruding shoulder 350 formed on coupler 334 forms a stop for the bottom end of spring 348. The biased coupler 334, in turn, is stopped by a cam member 354 pivotally supported within body portion 280 of connector box 266. Cam member 354 is connected to cam lever 332 on the outside of connector box 266.

Cam member 354 is illustrated in the cammed orientation in FIG. 13 and in the uncammed orientation in FIG. 14. FIGS. 16 and 17 show the relative positions of cam member 354 and second end 302 of second gear 260 in, respectively, the cammed orientation and the uncammed orientation. The relative position of cam lever 332 on the exterior of connector box 266 is also illustrated in FIGS. 16 and 17.

As shown in FIGS. 13 and 16, when cam member 354 is pivoted approximately 90° into the cammed orientation, cam surface 356 is rotated towards motor drive shaft 340 as support surface 358 is rotated towards second end 302 of second gear 260. Since cam surface 356 is farther than support surface 358 from the axis of rotation of cam member 354, as cam member 354 pivots, cam surface 356 forces biased coupler 334 to be cammed against the spring bias force and made to slide along motor drive shaft 340 and, thus, to slide out of engagement with second gear 260. As shown in FIGS. 13 and 16, cam surface 356 ends up supporting coupler 334 at a position slightly above second end 302 of second gear 260. In this manner, motor 254 may be disconnected from gear mechanisms to allow manual activation of sliding system 10, without any braking occurring from motor 254.

Cam member 254 is configured to partially encircle second gear 260 in both the cammed and uncammed orientation. When uncammed, support surface 358 of cam member 354 is located slightly below second end 302 of second gear 260 (FIGS. 13 and 16) such that biased-coupler 334 is supported in the engaged position with second gear 260. Thus, when cam member 354 is uncammed, the spring bias force normally affects coupling of motor drive shaft 340 and second gear 260 through coupler 334 such that both motor drive shaft 340 and second gear 290 are directionally driven, i.e., selectively rotated in a forward or reverse direction by motor (not shown).

Since coupler 334 is biased by spring 348 to remain engaged with second gear 260, the spring bias force must be overcome by the pivoting cam member 354 to effect camming, i.e., disengagement of second gear 260 from coupler 334. Spring tension is adjusted as, for example, by selecting the thickness and flexibility of the material forming spring 348, to ensure that inadvertent release, i.e., inadvertent camming, due to normal vibration and jolting and jarring and, especially, the normal vibration and bouncing and

bumping that occurs during travel of the camper, is prevented because the spring bias force is not overcome by these occurrences. On the other hand, when cam member 354 is in the cammed orientation (FIG. 16), there is a slightly increased force on cam surface 358 applied by spring 348 that is tightened as coupler 334 was cammed. Cam member 354 must be constructed to securely support coupler 334 in the cammed direction.

As best shown in FIGS. 16 and 17, in one embodiment, cam member 354 is configured to have a rounded edge 360 between support surface 358 and cam surface 356. Surfaces 356, 358 are smooth and just slightly resilient to permit cam member 354 to smoothly pivot along bottom end 342 of coupler 334. Suitable materials, e.g., moldable nylon and plastic materials, are known in the art. In one embodiment, cam member 354 is constructed from a very strong but resilient nylon or plastic material. One possible product is the plastic known as DELRIN, a product of E.I. du Pont D Nemours & Co., Inc. In addition, this material and similar materials are readily available, moldable, durable and inexpensive. As best shown in FIG. 16, cam surface 356 is configured to have a slight slope 362 toward rounded edge 360 between cam surface 356 and support surface 358. If cam lever 332 is operated only partially, the force of coupler 334 upon sloped surface of cam surface 356 will tend to cause cam member 354 to "flip" back into the uncammed orientation. In this manner, cam member 354 is prevented from resting in a relatively unsafe position that is between the fully cammed orientation and the fully uncammed orientation. When cam level 332 is operated fully, however, cam member 354 is very securely positioned in the cammed orientation.

It will be appreciated that various means for pivotally supporting cam member 354 within connector box 266 could be used. As shown in FIG. 18, one embodiment of cam member 354 is adapted to be added to connector box 266 that is previously unprepared for use with quick release arrangement 330. Cam member 354 is formed with receiving holes 370 for securely receiving a connecting end 372 of cam lever 332 on one side and a bolt-type connector 372 on the opposite end. Bolt-type connector 374, in one embodiment, is made of a sturdy smooth material such as hard nylon or plastic. It will be appreciated that holes may be provided or may be made in connector box 266 to correspond to receiving holes 370 and cam member 354 may then be positioned within connector box 266 with receiving holes 370 aligned with the holes in connector box 266. The bolt-type connector 374 and connecting end 372 of cam lever 332 are passed through the holes in connector box 266 and into respective receiving holes 370 to thereby provide the pivotally supported cam member 354 of quick release arrangement 330. In addition, for ease of removal of cam member 354, small access holes 376 are provided within cam member 354 to connect with receiving holes 370 in a manner that permits the tip of a screwdriver or other small object to be inserted into access holes 376 such that the connecting end of cam lever 332 or bolt-type connector 374 may be pushed out of engagement with the respective receiving hole 370. In one embodiment, cam lever 332 and bolt-type connector 374 are composed of a strong but resilient nylon or plastic material.

Quick release arrangement 330 of the present invention is very safe. Since coupler 334 is biased by spring 348 to remain engaged with second gear 260, the spring bias force must be overcome by pivoting cam member 354 to effect camming, i.e., disengagement of second gear 260 from coupler 334. Therefore, only rotational motion of cam lever 332 will overcome the spring bias force and effect camming.

19

20

Referring again to FIG. **12**, connector plate **256** and connector box **266** maintain first gear **258** and second gear **260** within first aperture **268** and second aperture **270**, respectively. Connector plate **256** and connector box **266** are separated from each other a predetermined distance through the combination of fasteners **310** and spacers **312**. Fasteners **310** pass through retaining holes **274** in flange **282** and into spacers **312**. Fasteners **310** extend into retaining holes **274** in connector plate **250** that includes, optionally, a threaded portion that engages with the threads of fasteners **310**. Alternatively, retaining holes **274** in connector plate **250** are devoid of threads and fasteners **310** pass therethrough to attach to guide element (not shown). Various other means are applicable for attaching connector plate **256** to connector box **266**. Additionally, there are various other means for attaching gear reduction assembly **252** to guide element (not shown) or other portion of sliding system **40**. For example, gear reduction assembly **252** may be bolted, welded, brazed, glued, or integrally formed with sliding system **40**.

Both manual activation assembly **230** and motorized activation assembly **250** are structures capable of performing function of driving means for activating said gear mechanism to extend and retract the slide-out compartment. Other structures that are capable of performing the same function, in light of the teaching contained herein, are known by one skilled in the art. Additionally, the combination of manual activation assembly **230** and/or motorized activation assembly **250** with gear mechanism **44** is one structure capable of performing the function of moving means for extending and retracting the slide-out compartment. It will be appreciated that various other moving means are capable of performing the same function, and are known by one skilled in the art.

Referring now to FIGS. **19A** and **19B**, a alternate embodiment of a slider rail **380** is depicted. Slider rail **110**, as previously discussed above, supports the majority of the weight associated with slide-out compartment **30**, thereby acting as a load-bearing member. When the size of slide-out compartment **30** increases, however, slider rail **110** carries more load and requires strengthening. One configuration that provides increased strength to slider rail **110** is depicted as slider rail **380**. The majority of the features discussed with respect to slider rail **110** also relates to slider rail **380**. As shown, slider rail **380** includes a lower slider rail **384** and an upper slider rail **386**, thereby forming a load-bearing member. Upper slider rail **382** and lower slider rail **384** are attached together at their respective middle portions **386**, **388**, thereby forming an I-beam structure. The I-beam construction, as known in the art, is strong, rigid, and capable of providing the necessary support.

Alternatively, as shown in FIG. **19B**, a tubular member **390** may be fixably attached to slider rail **384**, such that strength is provided while retaining the capability of lower slider rail **384** to engage with gear mechanisms **44**. Tubular member **390** is depicted as having a square cross-section, however, it can be appreciated that one skilled in the art can identify various other cross-sectional shapes that are appropriate, such as but not limited to, oval, rectangular, trapezoidal, or the like.

Generally, it will be appreciated that various other configurations of slider rail **380** are possible and other methods may be used to increase the strength of slider rail **380**.

The present invention may be embodied in other specific forms without departing from its spirit or essential characteristics. The described embodiments are to be considered in all respects only as illustrative and not restrictive. The scope

of the invention is, therefore, indicated by the appended claims rather than by the foregoing description. All changes which corn within the meaning and range of equivalency of the claims are to be embraced within their scope.

What is claimed and desired to be secured by United States Letters Patent is:

1. A sliding mechanism for extending and retracting a slide-out compartment of a recreational vehicle having a stationary support portion, said sliding mechanism comprising:

(a) a base assembly attached to the stationary support portion so as to provide structural support to the slide-out compartment when it is extended, said base assembly comprising a guide member, said guide member being configured to define an interior channel therein;

(b) a slider assembly movably disposed in said interior channel of said guide member, said slider assembly being configured to allow the slide-out compartment to move relative to said base assembly, said slider assembly being configured such that upon being disposed in said interior channel defined by said guide member said slider assembly substantially closes said interior channel; and

(c) a gear mechanism configured to drivingly engage said slider assembly so as to extend or retract the slide-out compartment, said gear mechanism comprising a gear member mounted in said closed interior channel.

2. A sliding mechanism as recited in claim **1**, wherein said base assembly further comprises a support element attached to the stationary support portion.

3. A sliding mechanism as recited in claim **1**, wherein said slider assembly comprises:

(a) a slider rail disposed within said interior channel defined by said guide member; and

(b) a slider support attached to said slider rail, said slider support being attached to the slide-out compartment.

4. A sliding mechanism as recited in claim **3**, wherein said slider rail has a plurality of holes formed therein configured to cooperate with said gear mechanism.

5. A sliding mechanism as recited in claim **1**, wherein said slider assembly and said guide member of said base assembly are configured to cooperate such that said slider assembly is retained within said interior channel in said guide member.

6. A sliding mechanism as recited in claim **1**, wherein said gear member is substantially enclosed by said guide member and said slider assembly.

7. A sliding mechanism as recited in claim **1**, wherein said gear mechanism also comprises a gear shaft rotatably attached to said guide member, said gear shaft being disposed in said interior channel defined by said guide member.

8. A sliding mechanism as recited in claim **7**, wherein said gear member is mounted on said gear shaft.

9. A sliding mechanism as recited in claim **8**, wherein said gear mechanism further comprises a timing assembly.

10. A sliding mechanism as recited in claim **1**, further comprising a driving means for driving said gear mechanism so as to move said slider assembly along said interior channel defined by said guide member to extend or retract the slide-out compartment.

11. A sliding mechanism for extending and retracting a slide-out compartment of a recreational vehicle having a stationary support portion, said sliding mechanism comprising:

(a) a base assembly attached to the stationary support portion so as to provide structural support to the

US 6,338,523 B1

21

22

slide-out compartment when it is extended, said base assembly comprises a guide member mounted on said support portion and configured to define an interior channel therein;

(b) a slider assembly attached to the slide-out compartment, said slider assembly being movably disposed in said interior channel defined by said guide member, said slider assembly being configured to allow the slide-out compartment to move relative to said base assembly, said slider assembly comprises a slider rail, said slider rail being configured such that upon being disposed in said interior channel defined by said guide member said slider rail substantially closes said interior channel; and

(c) a gear mechanism configured to drivingly engage said slider assembly relative to said base assembly so as to extend or retract the slide-out compartment, said gear mechanism comprising a gear member mounted in said closed interior channel.

**12.** A sliding mechanism as recited in claim **11**, wherein said slider rail has a plurality of holes formed therein configured to cooperate with said gear member.

**13.** A sliding mechanism as recited in claim **12**, wherein said gear member is configured to drivingly engage said plurality of holes of said slider rail so as to move said slider rail along said interior channel defined by said guide member of said base assembly to thereby extend or retract the slide-out compartment.

**14.** A sliding mechanism as recited in claim **13**, wherein said slider rail and said guide member are configured to cooperate such that said slider rail is retained within said interior channel defined by said guide member.

**15.** A sliding mechanism as recited in claim **11**, further comprising a roller assembly rotatably attached to said guide member, said roller assembly being configured to cooperate with said slider assembly.

**16.** A sliding mechanism as recited in claim **15**, wherein said roller assembly is rotatably mounted in said interior channel defined by said guide member.

**17.** A sliding mechanism as recited in claim **16**, wherein:

(a) said guide member has a first end and a second end;

(b) said gear mechanism is rotatably attached to said first end of said guide member; and

(c) said roller assembly is attached to said second end of said guide member.

**18.** A sliding mechanism as recited in claim **16**, wherein said roller assembly is configured to cooperate with said slider rail so as to be self-centering.

**19.** A sliding mechanism as recited in claim **17**, further comprising a drive mechanism to drive said gear mechanism so as to move said slider rail along said channel in said guide member to extend or retract the slide-out compartment.

**20.** A sliding mechanism as recited in claim **19**, wherein said driving mechanism comprises a motorized activation assembly.

**21.** A sliding mechanism as recited in claim **19**, wherein said drive mechanism comprises a manual activation assembly capable of engaging said gear mechanism to extend and retract the slide-out compartment.

**22.** A sliding mechanism as recited in claim **20**, wherein said motorized activation assembly includes a motor, a gear reduction assembly, and a quick-release arrangement.

**23.** A sliding mechanism for extending and retracting a slide-out compartment of a recreational vehicle having a stationary support portion, said sliding mechanism comprising:

(a) a base assembly attached to the stationary support portion so as to provide structural support to the slide-out compartment when it is extended, said base assembly comprising a support element connected to the stationary support portion of the recreational vehicle and a guide member connected to said support portion, said guide member being configured to define an interior channel therein;

(b) a slider assembly attached to the slide-out compartment, said slider assembly being configured to allow the slide-out compartment to move relative to the stationary support member, said slider assembly comprising a slider rail movably disposed in said interior channel defined by said guide member, said slider rail being configured such that upon being disposed in interior channel defined by said guide member said slider rail substantially closes said interior channel, said slider rail having a plurality of holes formed therein;

(c) a gear mechanism disposed within said closed interior channel, said gear mechanism comprising a gear member mounted in said interior channel, said gear member being configured to cooperate with said plurality of holes formed in said slider rail so as to drivingly engage said slider rail thereby extending or retracting the slide-out compartment.

**24.** A sliding mechanism as recited in claim **23**, wherein said gear mechanism causes said slider rail to move longitudinally along said interior channel defined by said guide member so as to extend and retract the slide-out compartment.

**25.** A sliding mechanism as recited in claim **24**, where in said guide member comprises a securing flange configured to retain said slider rail in said interior channel.

**26.** A sliding mechanism as recited in claim **25**, wherein said slider rail is configured such that the longitudinal edge of said slider rail cooperates with said securing flange of said guide member such that said slider rail is retained within said interior channel of said guide member.

**27.** A system for extending and retracting a slide-out compartment incorporated within a recreational vehicle having a stationary support portion, said system comprising:

(a) a base assembly attached to the stationary support portion of the recreational vehicle, said base assembly comprising two guide members, each of said guide members being configured so as to define a channel therein;

(b) a slider assembly movably disposed in said guide member of said base assembly, said slider assembly being configured to cooperate with said guide member of said base assembly so as to allow the slide-out compartment to move relative to said base assembly, said slider assembly being configured such that upon being disposed in said channel of said guide members said slider assembly substantially closes said channel; and

(c) a gearing assembly movingly attached to said base assembly, said gearing assembly being configured to drivingly engage said slider assembly so as to extend or retract the slide-out compartment, said gearing assembly comprising a gear mechanism mounted in said closed channel.

**28.** A system as recited in claim **27**, wherein said slider assembly comprises two slider rails, one of said slider rails being disposed in said channel defined by one of said guide members.

**29.** A system as recited in claim **28**, wherein each of said slider rails has a plurality of holes formed therein.

US 6,338,523 B1

23

**30**. A system as recited in claim **29**, wherein said gearing assembly is adapted to drivingly engage with said plurality of holes in said slider rail such that activation of said gearing assembly slidably moves said slider rail along said channel in said guide members so as to extend or retract the slide-out compartment.

**31**. The system as recited in claim **27**, wherein said base assembly further comprises a support element attached to the stationary support portion of the recreational vehicle, said support element extending between said guide members.

**32**. A system as recited in claim **27**, wherein said gearing assembly comprises two gear mechanisms, each of said gear mechanisms being rotatably mounted in said channel defined by each of said guide members.

**33**. The system as recited in claim **32**, wherein each of said gear mechanisms comprises:

(a) a gear shaft adapted to cooperate with said guide member; and

(b) a gear member mounted on said gear shaft, said gear member being configured to drivingly cooperate with said plurality of holes formed in each of said slider rails.

**34**. A system as recited in claim **33**, wherein said gearing assembly further comprises a timing assembly, said timing assembly extending between each of said gear mechanisms.

**35**. A system as recited in claim **34**, wherein said timing assembly comprises a drive shaft and a retaining spring.

**36**. A system as recited in claim **35**, wherein said drive shaft is releasably coupled to said gear shafts of said gear mechanisms.

**37**. A system as recited in claim **28**, wherein said system further includes driving mechanism to drive said gearing assembly so as to drive each of said slider rails along said channel defined by each of said guide members to extend or retract the slide-out compartment.

**38**. A system as recited in claim **37**, wherein said driving mechanism comprises one of either a motorized activation assembly and a manual activation assembly.

**39**. A system as recited in claim **38**, wherein said motorized activation assembly comprises a motor, a gear reduction assembly, and a quick-release arrangement.

**40**. A system as recited in claim **39**, wherein said quick-release arrangement of said motorized activation assembly comprises:

(a) a connector box attached to the recreational vehicle;

(b) a cam member disposed within said connector box, said cam member being supported at a pivot axis within said connector box, said cam member having a support surface and an adjacent cam surface, said cam surface being farther from said pivot axis than said support surface, said cam member pivotal between having the cam surface oriented in a first direction and having the support surface oriented in said first direction;

24

(c) a coupler disposed within said connector box and being supported on the surface of said cam member in said first direction, said coupler having a bore there-through for slidably engaging a motor drive shaft and for slidably engaging a gear drive shaft that cooperates with the sliding mechanism such that rotation of said gear drive shaft effects movement of the slide-out compartment; and

(d) a spring positioned and tensioned to bias said coupler toward said gear drive shall to so as cause engagement therebetween,

wherein when said coupler is supported by said support surface of said cam member, said motor drive shaft and said gear drive shaft are engaged to thereby activate the slide-out compartment and, when said coupler is supported by said cam surface of said cam member, said motor drive shaft and said gear drive shaft are disengaged so as to prevent sliding of the slide-out compartment.

**41**. A sliding mechanism for extending and retracting a slide-out compartment of a recreational vehicle having a stationary support portion, said sliding mechanism comprising:

(a) a base assembly attached to the stationary support portion so as to provide structural support to the slide-out compartment when it is extended, said base assembly comprises a guide member mounted on said support portion and configured to define an interior channel therein, said guide member having a first end and a second end;

(b) a slider assembly attached to the slide-out compartment, said slider assembly being movably disposed in said interior channel defined by said guide member, said slider assembly being configured to allow the slide-out compartment to move relative to said base assembly, said slider assembly comprises a slider rail, said slider rail being configured such that upon being disposed in said interior channel defined by said guide member said slider rail substantially closes said interior channel;

(c) a gear mechanism configured to drivingly engage said slider assembly relative to said base assembly so as to extend or retract the slide-out compartment, said gear mechanism being rotatably attached to said first end of said guide member, said gear mechanism comprising a gear member mounted in said closed interior channel; and

(d) a roller assembly attached to said second end of said guide member, said roller assembly being rotatably mounted in said interior channel defined by said guide member.

* * * * *

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,338,523 B1                                    Page 1 of  2
DATED         : January 15, 2002
INVENTOR(S)   : C. Martin Rasmussen

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Column 1,
Line 25, after "size of" change "RV's" to -- RVs --
Line 26, after "Additionally," change "RV's" to -- RVs --

Column 2,
Line 23, after "home type" change "RV's" to -- RVs --
Line 25, after "trailer type" change "RV's" to -- RVs --
Line 31, after "camper type" change "RV's" to -- RVs --
Line 67, after "RV" change "overtime" to -- over time --

Column 3,
Line 21, after "would be" change "and" to -- an --
Line 22, before "that incorporate" change "systems" to -- system --
Line 39, after "system" and before "that" delete "that"
Line 48, after "recreational" insert -- vehicles --

Column 6,
Line 3, after "capable" and before "extending" insert -- of --

Column 7,
Line 62, after "10" change "Siding" to -- Sliding --

Column 8,
Line 47, after "appreciated that" change "tile" to -- the --

Column 10,
Line 18, after "only" change "passes" to -- pass --
Line 40, after "adapted to" change "cooperated" to -- cooperate --
Line 53, after "(not" change "show" to -- shown --

Column 14,
Line 2, after "during use" change "if" to -- of --

Column 16,
Line 61, after "with" change "comers" to -- corners --

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,338,523 B1                                    Page 2 of  2
DATED         : January 15, 2002
INVENTOR(S)   : C. Martin Rasmussen

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

<u>Column 18,</u>
Line 34, before "shown in" change "A" to -- As --

<u>Column 19,</u>
Line 34, before "alternate" change "a" to -- an --

<u>Column 21,</u>
Line 50, after "claim" change "17" to -- 11 --

<u>Column 22,</u>
Line 31, after "claim 24" change "where in" to -- wherein --

<u>Column 24,</u>
Line 10, after "drive" change "shall" to -- shaft --
Line 10, before "cause engagement" change "to so as" to -- so as to --


Signed and Sealed this

Twelfth Day of November, 2002

Attest:

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

*Attesting Officer*

EXHIBIT 10

SEALED DOCUMENT

EXHIBIT 11

WordNet Search - 3.0 - [WordNet home page](#) - [Glossary](#) - [Help](#)

Word to search for: mounted    [ Search WordNet ]

Display Options: (Select option to change)    [ ]  [ Change ]

Key: "S:" = Show Synset (semantic) relations, "W:" = Show Word (lexical) relations

## Verb

- **S:** (v) [mount](#) (attach to a support) *"They mounted the aerator on a floating"*
- **S:** (v) [wax](#), [mount](#), [climb](#), [rise](#) (go up or advance) *"Sales were climbing after prices were lowered"*
- **S:** (v) [mount](#) (fix onto a backing, setting, or support) *"mount slides for macroscopic analysis"*
- **S:** (v) [mount](#) (put up or launch) *"mount a campaign against pornography"*
- **S:** (v) [hop on](#), [mount](#), [mount up](#), [get on](#), [jump on](#), [climb on](#), [bestride](#) (get up on the back of) *"mount a horse"*
- **S:** (v) [climb](#), [climb up](#), [mount](#), [go up](#) (go upward with gradual or continuous progress) *"Did you ever climb up the hill behind your house?"*
- **S:** (v) [mount](#), [put on](#) (prepare and supply with the necessary equipment for execution or performance) *"mount a theater production"; "mount an attack"; "mount a play"*
- **S:** (v) [ride](#), [mount](#) (copulate with) *"The bull was riding the cow"*

## Adjective

- **S:** **(adj) mounted (assembled for use; especially by being attached to a support)**
  - *similar to*
  - *antonym*
- **S:** (adj) **mounted** (decorated with applied ornamentation; often used in combination) *"the trim brass-mounted carbine of the ranger"- F.V.W.Mason*

[WordNet home page](#)