**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| LIPPERT COMPONENTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:06cv762 JJF |
| | ) | |
| DEXTER CHASSIS GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**<u>DEXTER CHASSIS GROUP, INC.'S  RESPONSE TO PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF</u>**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................ 1

II.    DISCUSSION ..................................................................................... 2

    A.  Lippert Improperly Relied on Everything But the Specification. .. 2

    B.  Lippert's Late Discussion of the Specification is Misleading ........ 7

    C.  Discussion of Lippert's Use of Other Patents ................................ 8

    D.  Discussion of Lippert's Submission of Dexter's Drawings ......... 10

    E.  "Moveable Member" is a Means-Plus Function Limitation ......... 11

    F.  Lippert's Description of "One of Ordinary Skill in the Art" is
       Incorrect and Unsubstantiated ....................................................... 14

III.    CONCLUSION ................................................................................. 14

# TABLE OF AUTHORITIES

**Federal Cases**

*Alumed LLC v. Stryker Corp.,*
    483 F.3d 800, 809 (Fed. Cir. 2007)..................................................................... 3

*Advanced Display systems, Inc. v. Kent State University,*
    212 F.3d 1272, (Fed. Cir. 2000).................................................................... 10

*Al-Site Corp. v. VSI International, Inc.,*
    174 F.3d 1308, 1318 (Fed. Cir. 1999)........................................................ 13

*Atmel Corp. v. Information Storage Devices, Inc.,*
    198 F.3d 1374, 1381 (Fed. Cir. 1999)........................................................ 10

*Atofina v. Great Lakes Chem. Corp.,*
    441 F.3d 991, 996 (Fed. Cir. 2006)............................................................. 5

*CCS Fitness, Inc. v. Brunswick Corp.,*
    288 F.3d 1359 (Fed. Cir. 2002)............................................................. 3, 13

*Depuy Spine, Inc. v. Medtronic Sofamore Danek, Inc.,*
    469 F. 3d 1005, 1023 (Fed. Cir. 2006)...................................................... 13

*Free Motion Fitness, Inc. v. Cybex Int'lnc.,*
    423 F.3d 1343, 1348-49 (Fed. Cir. 2005) ................................................... 5

*Graham v. John Deere,*
    383 U.S. 1, 17 (1966).............................................................................. 14

*Honeywell Int'l, Inc. v. ITT Indus.,*
    452 F.3d 1312, 1318-19 (Fed. Cir. 2006) .................................................. 6

*In re Johnson,*
    435 F.3d 1381, 1384 (Fed. Cir. 2006)........................................................ 5

*In re Modine Manufacturing Company,*
    18 Fed. Appx. 857, *3 (Fed. Cir. 2001) ................................................... 10

*J. P. Peta, Inc. v. Club Protector,*
    65 Fed. App 724, 2003 WL 21206079, *3 n.2 (Fed. Cir. 2003).............................. 14

*Kwik Products, Inc. v. National Express, Inc.,*
    179 Fed. Appx. 34, *38 (Fed. Cir. 2006)................................................... 13

*Laitram Corp. v. Rexnord, Inc.,*
    939 F. 2d 1533, 1536 (Fed. Cir. 1991)...................................................... 13

*Lava Trading, Inc. v. Sonic Trading Management, LLC,*
    445 F.3d 1348, 1350 (Fed. Cir. 2006)....................................................... 11

*Lighting World, Inc. v. Brichwood Lighting, Inc.,*
    382 F.3d 1354, 1361 (Fed. Cir. 2004)................................................... 12,13

*Lizardtech, Inc. v. Earth Resource Mapping, Inc.*
    433 F.3d 1373, 1375 (Fed. Cir. 2006)..................................................... 4, 10

*Mas-Hamilton Group v. LaGard, Inc.,*
    156 F.3d 1206, 1215 (Fed. Cir. 1998)....................................................... 13

*NeoMagic, Corp. v. Trident Microsystems,*
    287 F.3d 1062, 1074 (Fed. Cir. 2000)....................................................... 11

*NetworkCommerce, Inc. v. Microsoft Corp.,*
    422 F.3d 1353, 1359-60 (Fed. Cir. 2005) ................................. 5
*Nystrom v. TREX, Co.,*
    424 F.3d 1136, 1145 (Fed. Cir. 2005) ...................................... 4
*Old Town Canoe Co. v. Confluence Holdings Corp.,*
    448 F.3d 1309, 1318 (Fed. Cir. 2006) ...................................... 5
*On Demand Machine Corp. v. Ingram Industries, Inc.*
    442 F.3d 1331, 1337 (Fed. Cir. 2006) ................................. 1, 2, 4,
*Phillips v. AWH Corp.*
    415 F.3d 1303, 1315-16 (Fed. Cir. 2005) ............................ 1,2,3,4,5,
*Playtex Prod., Inc. v. Proctor & Gamble Co.,*
    400 F.3d 901 (Fed. Cir. 2005) .................................................. 3
*Primos, Inc. v. Hunter's Specialties, Inc.*
    451 F.3d 841, 845, 847048 (Fed. Cir. 2006) ........................... 4
*Verizon Services Corp. v. Vonage Holdings Corp.,*
    2007 WL 2781869, *10 (Fed. Cir. 2007)……………………………………6
*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.,*
    442 F.3d 1322, 1326 ........................................................... 11

*DEL 86197501v1 10/5/2007*

Defendant Dexter Chasis Group, Inc. ("Dexter"), in response to Lippert Component Inc.'s Opening Brief on Claim Construction filed on September 14, 2008 ("Lippert's Brief"), states as follows:

## I.    INTRODUCTION

Lippert's claim construction is legally and factually deficient in numerous respects. Most glaring is Lippert's consideration of the specification last in its claim construction analysis. As noted in Dexter's Opening Brief, the Federal Circuit's *en banc Phillips* decision returned the specification to the primary source for determining the meaning of claim terms. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1315 (Fed. Cir. 1005) *See also, On Demand Machine Corp. v. Ingram Industries, Inc.*, 442 F. 3d 1331, 1337 (Fed. Cir. 2006). In doing so, the Federal Circuit resolved a conflict between numerous panel opinions. *On Demand,* 442 F.3d at 1337. Lippert ignores *Phillips,* and first refers to everything but the specification to arrive at an overly broad meaning of "slidably mounted." *See* Lippert's Brief, pp. 6 - 14. When it finally pays lip-service to the specification, under the heading "The Intrinsic Evidence Further Supports…," Lippert attempts to obscure the claimed manner in which the "movable member" or "slide plate" and the "stationary member" or rails must be connected, that is "slidably mounted." Lippert Brief, p. 14. Lippert attempts to have the Court focus on the drive mechanism (which, in one embodiment, has a spur gear that rotates), while construing the term "slidably mounted." However, the drive mechanism, including a rotating spur gear, is not even included in independent claims 1, 7, 13, 17, 18, 21, and 22, and has nothing to do with the claim limitation "slidably mounted," which modifies how the slide plate (or "moveable member") and rails (or stationary member) must be connected together.

1

## II.    DISCUSSION

### A.    Lippert Improperly Relied on Everything But the Specification.

Because it cannot prevail in its construction of "slide" by relying as it should on the specification as the primary source of meaning for claim construction, Lippert proceeds by first relying on a relatively obscure dictionary definition ("Wordnet", Lippert Brief, p. 11); second, relying on an extrinsic article regarding the "RV" industry that is not authenticated and copyrighted in 2002, six years after the relevant date for interpreting the claims, that is, 1996, the filing date; third, relying on cited and uncited prior art patents; and last, only after arguing all of the above, Lippert discusses the specification, albeit in a misleading way.  Lippert's Brief, pp. 14 – 15.  Lippert's "specification-last" approach is clear from the heading -- "The Intrinsic Evidence *Further* Supports LCI's Construction."  Lippert's Brief, p. 14 (emphasis added).  Lippert's approach is contrary to the *Phillips* decision, 415 F.3d at 1315-16 (Fed. Cir. 2005).

Prior to *Phillips*, "conflicting Federal Circuit panel opinions were producing uncertainty as to the law of claim construction."  *On Demand,* 442 F. 3d at 1337.  The *On Demand* court further stated:

> This court in *Phillips* emphasized that the proper judicial construction of a claim and its terms is from the viewpoint of a person of ordinary skill in the field of the invention; a court must determine how such a person would understand the claim in the context of the particular technology and the description in the  specification, with due reference to the prosecution history.  Thus the court in Phillips, resolving conflict, *stressed the dominance of the specification* in understanding the scope and defining the limits of the terms used in the claim.

*Id.* at 1337 – 1338 (emphasis added).  In view of the Federal Circuit's explicit instruction that the specification dominates claim construction, Lippert's saving of the specification to last (page 18 of its 23 page Brief) is legally incorrect.

The cases cited by Lippert are not controlling.  For example, Lippert cited to *CCS Fitness, Inc. v. Brunswick Corp*, 288 F. 3d 1359 (Fed. Cir. 2002), a case decided before *Phillips*.  Contrary to Phillips, *CCS Fitness* emphasized a "dictionary-first" approach.[1] Under this over-ruled approach,  the patentholder would first seek meaning from dictionaries, point to many different definitions all depending on context, and then argue that it was entitled to all of the definitions. *See CCS Fitness* at 1366.  The *Phillips* decision expressly rejected this approach.  *See Acumed LLC v. Stryker Corp.,* 483 F.3d 800, 809 (Fed. Cir. 2007); *Phillips*, 415 F.3d at 1319 – 1324; Dexter Brief, p. 7.

Lippert uses the approach found in *CCS Fitness*, among others, and rejected in *Phillips*.  It refers first to a single dictionary definition, cited patents, and extrinsic evidence without reference to the specification; asserts a very broad definition of "slide"; then argues that the term must be given the broad definition without regard to the context of how the terms "slidably mounted" and the word "slidably" (and its variations) are used in the specification.  Lippert attempts to raise the specter of "reading limitations from the specification into the claims"  Lippert Brief, p. 6.  This argument is a red-herring since one cannot "read-in" a limitation that was selected by the inventor and already present in the claims.  *Phillips* instructed courts to embrace the specification in claim interpretation, not to refer to it as a last resort.  "In general, the scope and outer boundary of claims is set

---

[1]        As another example of Lippert's use of out-dated case law, all of the cases cited in the heading "Claims Must be Read in Light of  the Specification, But The Specification Does Not Establish the Boundaries of the Claim", are all pre-*Phillips*.  The most recent, the *Playtex Prod., Inc. v. Proctor & Gamble Co. ,* 400 F.3d 901 (Fed. Cir. 2005) case, issued in March, 2005, before *Phillips,* which was decided in July 2005.  Attempting to reconcile pre-*Phillips* cases is a useless exercise; the Federal Circuit in *Phillips* acknowledged that there was conflict between panel opinions, and resolved the conflict.

by the patentee's description of his inventions." *On Demand*, 442 F3d. at 1331 (*citing Phillips*, 415 F.3d at 1313).

Construing "slidably mounted" broadly to include a connection between the slide plate and rails that enable a rolling motion in spite of the narrow usage of that term in the specification would provide patent coverage that is broader than what the inventor actually invented and disclosed in his specification. As Lippert notes, it is true that claims should not automatically be limited to the *preferred* embodiment. However, "[o]ne does not receive entitlement to a period of exclusivity for what one has not disclosed to the public. … But merely calling an embodiment "preferred," when there are no others, does not entitle one to claims broader than the disclosure." *Lizardtech, Inc. v. Earth Resource Mapping, Inc.,* 433 F.3d 1373, 1375 (Fed. Cir. 2006). Contrary to Lippert's contentions, Dexter's interpretation of the word "slidably," is not reading a limitation into the claim. *See* Lippert's Brief, p. 6.

Consistent with Dexter's approach to claim construction, all of the following post-*Phillips* cases involved interpreting a common word by first looking at its usage in the specification, then looking to a dictionary to confirm the meaning found therein based on the context provided by the specification. The specification must be the starting point for claim construction. For example, in *Nystrom v. TREX, Co.*, the court stated:

> [i]n the absence of something in the written description and/or prosecution history to provide explicit or implicit notice to the public-i.e., those of ordinary skill in the art-that the inventor intended a disputed term to cover more than the ordinary and customary meaning revealed by the context of the intrinsic record, it is improper to read the term to encompass a broader definition simply because it may be found in a dictionary, treatise, or other extrinsic source.

424 F.3d 1136, 1145 (Fed. Cir. 2005). Moreover, in *Primos, Inc. v. Hunter's Specialties, Inc.,*

4

451 F.3d 841, 845, 847-48 (Fed. Cir. 2006), the Federal Circuit affirmed the district court's claim construction of the word "engaging". In that case, the district court rejected a dictionary definition that was broader and inconsistent with the use of the claim term in the patent at issue. *Id.* at 845. In *Old Town Canoe Co. v. Confluence Holdings Corp.,* 448 F.3d 1309, 1318 (Fed. Cir. 2006), the court held that the patentee is "not entitled to a claim construction divorced from the context of the written description and prosecution history." The district court properly interpreted the term "coalescence" by reviewing the dictionary definitions and the context of its usage in the specification and prosecution history.

The court in *Atofina v. Great Lakes Chem. Corp.,* 441 F.3d 991, 996 (Fed. Cir. 2006) looked to a dictionary for assistance where the word "catalyst" was not defined in the intrinsic record. The court quoted *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.,* 423 F.3d 1343, 1348-49 (Fed. Cir. 2005) for the proposition that "in those circumstances where reference to dictionaries is appropriate, the [court's] task is to *scrutinize the intrinsic evidence in order to determine the most appropriate definition*" (emphasis added). *Atofina*, 441 F.3d at 996.

The court in *In re Johnson,* 435 F.3d 1381, 1384 (Fed. Cir. 2006) cited *Phillips,* 415 F.3d at 1303, for the proposition that "[i]t is well established that dictionary definitions must give way to the meaning imparted by the specification. Finally, in *NetworkCommerce, Inc. v. Microsoft Corp.,* 422 F.3d 1353, 1359-60 (Fed. Cir. 2005), the court rejected a proposed construction of the term "download component" based on the combination of two dictionary definitions as untenable "in light of the specification." As shown by these cases, claim terms must be interpreted using the specification first, and dictionaries may be consulted thereafter to assist in the interpretation.

The inventor's statements in the specification as to what "the invention" is, further supports Dexter's interpretation.  The inventor described "the invention" as a "slide plate" that is "slidably secured"  (i.e., slidably mounted") to "rails."   While the patentee sought to expand the definition of  "his invention" slightly by stating that "a wide variety of structure" was included, he then went on to limit "his invention" to a stationary member to which a "second member" "is mounted for slidable movement relative to the stationary member," "such as a tube within a tube or other systems known in the art."  '715 Patent, Co. 8, ll. 76-32.  From this description, the inventor limited the invention to a mechanism that consists of (1) a slide plate and rail or (2) "tube within a tube" systems.  Both of these mechanisms involve the movement of one surface relative to and in constant contact with another.  The reference to "other systems known in the art" is mere boilerplate that does not serve the public notice function, and furthermore, is encompassed within the context of the stationary member and a second member mounted for "slidable movement."

"When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention."  *Verizon Services Corp. v. Vonage Holdings Corp.*, 2007 WL 2781869, *10 (Fed. Cir. 2007) (citing *Honeywell Int'l., Inc. v. ITT Indus.*, 452 F.3d 1312, 1318-19 (Fed. Cir. 2006)).  By describing "the invention" as limited to mechanisms with a "second member" mounted to a "stationary member" for "slidable movement," one skilled in the art would have no reason to think that the inventor meant to include other types of movement, such as rolling.  Hence, Dexter's construction of "slidably mounted"  does not limit the inventor to the preferred embodiment of a slide plate and rail, as Lippert argues.  Instead, Dexter's interpretation

gives the inventor the full breadth of his disclosure, which also includes a "tube with a tube" system.

Dexter's construction of "slidably mounted" is consistent with the usage in the specification and is supported by a number of well-respected dictionaries. The patentee could have simply said "mounted." He did not. He could have said "moveably mounted" to include all kinds of motion. He did not. Instead, he chose a particular type of motion, sliding ("slidably"), which means a surface moving in constant contact with a stationary surface. This is far different than a rolling motion. In fact, at least one dictionary defines sliding as "not rolling" (see Dexter's Brief, p. 13, Ex. J, K). Because the dictionary definition of "slidably" is consistent with the use of the term in the specification, there is no need to go to other intrinsic or extrinsic evidence. Nevertheless, the remaining intrinsic and extrinsic evidence that is relevant and admissible further supports Dexter's interpretation.

## B.    Lippert's Late Discussion of the Specification Is Misleading

Even when Lippert does discuss the specification in connection with "slidably mounted," it deliberately confuses the "drive means" with the moveable member (or slide plate) and the support member (or rail) which are "slidably mounted." *See* Lippert Brief, p. 15. One of the several "drive means" described in the patent is a rotating spur gear ('715 Patent, Col. 6, ll. 43-45), along with "hydraulic pistons, chain drives, screw gears, scissor jacks, or manual means." (Col. 6, ll. 42-43). Lippert attempts to associate the rotating spur gear with the limitation "slidably mounted" and argues disingenuously that "slidably mounted" can include rollers. However, the "slide plate" or "moveable member" must be "mounted" to the "support member."

7

These structures exist apart from whatever "drive means" (of the several listed in the specification) a designer would choose to move the slide plate or movable member with respect to the support member.   The "slidably mounted" limitation has nothing to do with the "drive means" and, in particular, the rotating spur gear.  Thus, the mention of a rotating spur gear sheds no light on the meaning of "slidably mounted."

###    C.    Discussion of Lippert's Use of Other Patents

Lippert argues that "a number of third party patents addressing related inventions further illustrate the understanding of the term 'slide' within the RV industry… ."  Lippert Brief, p. 12. Contrary to Lippert's representation, the Vitalini patent has nothing to do with the "RV" industry.  It concerns a "Building Having a Telescopic Section."  Lippert's Brief, Ex. 4.  The DeBiaggio patent does disclose a "slideout mechanism," and one of the embodiments utilized rollers, but it also discloses a "tube within a tube" structure where two surfaces slide over one another.  *See* Lippert's Brief, Ex. 5, Fig. 24.  All that can be said is that the DeBiggio patent uses the term "slidably" inconsistent with not only the specification of the '715 Patent but also the dictionary definition of "slide."

A thorough study of the cited art demonstrates one thing—the inventor knew about rollers in connection with extendable rooms, yet failed to mention them as alternative embodiments as he did with the "tube within a tube" system.   Extendable rooms for campers or recreational vehicles are very old in the art.  *See* Dexter's Brief, Ex. B, Ex. 1, 2,225,319 Patent, issued in 1940;  Ex. D, 2,606,057 Patent, which issued in 1952.  The designs shown in these and other cited patents utilized rollers to some degree as part of the mechanism for extending and retracting the room, yet the rooms were not referred to as "slide-out" rooms.  For example,

United States Patent No. 4,500,132 (Ex. L attached hereto)[2] shows an extension mechanism (telescopic extension members 43) that resembles the slide plate or tube-within-a-tube structures described in the '715 Patent and did not utilize rollers.

United States Patent No. 5,237,782 uses the word "slide-out" to describe an assembly using a "tube within a tube" structure that slides, i.e., relative movement with continuous surface to surface contact. Ex. M, Figure 3; Col. 4. Likewise, the following cited references use "slide" or "slide-out" in connection with extension mechanisms in which two surfaces move in continuous, surface to surface contact. *See* Ex. N, United States Patent No. 5,577,351 (describing a tube 48 "slideably received" within a tube 46 (Col. 2, ll. 37-39)); Ex. O, United States Patent 5,491,933 (inner and outer support tubes (Col. 5, ll. 5-10)); Lippert's Brief, Ex. 5, United States Patent No. 5,620,224 (Col. 8, ll. 48-59; stationary channel members 253 and frame members 254 "slidably and telescopingly engage" one another). A few of the cited patents disclose rollers (*e.g.*, '319 Patent, issued in 1940, the '224 Patent, and the '276 Patent), but, the inventor did not mention rollers as alternative embodiments.

Perhaps the most telling references as to the meaning of the claim terms are the non-patent art, that is, the two drawings from Peterson Industries. Ex. P. In each of these, the inventor labeled the drawings "Slide out mechanism", and also labeled each part, including a "slide plate." The mechanism shown in these drawings is a slide plate having a surface which moves in constant contact over the surface of a support member. Hence, the cited art as a whole supports Dexter's interpretation.

---

[2] The last Exhibit to Dexter's Brief was Ex. K. Hence, the first exhibit to this Response is Ex. L.

9

The cited art demonstrates that, in this old and crowded field, the inventor claimed a very particular type of extension apparatus.[3]   The inventor of the '715 Patent knew of the prior art, yet, even though the use of rollers were well-known, he chose to limit his claims to mechanism that was "slidably mounted."   He did not disclose rollers, even though he did disclose the slide plate (e.g., as shown in the Peterson drawings), and also a "tube within a tube" structure.  Hence, one skilled in the art would have no reason to conclude that "slidably mounted" meant anything other than the dictionary definition which consists of two surfaces moving with respect to one another in constant contact.

**D.     Discussion of Lippert's Submission of Dexter's Drawings**

Lippert improperly attempts to inject infringement issues into claim construction by its discussion of the Dexter drawings.  Lippert Brief, p. 16.  The Federal Circuit, as noted in

---

[3]     In addition, it is important to remember that "[i]n general, the scope and outer boundary of claims is set by the patentee's description of his inventions."  *On Demand*, 442, F. 3d at 1331 (*citing Phillips*, 415 F.3d at 1313); *Lizardtech,* 433 F.3d at 1375 (Fed. Cir. 2006).   The inventor did not incorporate by reference into the specification any of the patents relied upon by Lippert. Even in cases where the inventor explicitly attempted to "incorporate by reference," the Federal Circuit still found that the references were not part of the disclosure. *See In re Modine Manufacturing Company*, 18 Fed. Appx. 857, *3 (Fed. Cir. 2001) (finding that the written description requirement was not met by a patent that was incorporated by reference, but not in a way that made it clear that the claimed range for a certain dimension was part of the application); *See also Atmel Corp. v. Information Storage Devices, Inc.,* 198 F.3d 1374, 1381 (Fed. Cir. 1999) (deciding that "the inquiry is whether structure *is* described in the specification" and not whether it is "incorporated by reference) (emphasis in original); *See generally Advanced Display Systems, Inc. v. Kent State University,* 212 F.3d 1272 (Fed. Cir. 2000) (holding material must be cited "in a manner that makes clear that the material is effectively part of the host document as if it were explicitly contained therein…the host document must identify with detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents"). Hence, the disclosure of the '715 Patent does not include the cited patents as part of the patentee's disclosure describing his inventions.

Dexter's Brief (p. 2, n.2), has recently held that the accused product provides context for claim

construction. *See Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.,* 442 F.3d 1322, 1326-

27, 1331 (Fed. Cir. 2006); *See Lava Trading, Inc. v. Sonic Trading Management, LLC,* 445 F.3d

1348, 1350 (Fed. Cir. 2006).  The purpose for doing so is to insure that the court is not merely

issuing an advisory opinion. *See Lava,* 445 F.3d at 1350.  However, this purpose was

accomplished by the introduction of photographs of the accused products.  Dexter's Brief (pp. 2-

3,10).  Lippert transcended the law by submitting Dexter's drawings of Exhibit 10 and discussing

them in connection with claim construction. *See Wilson.,* 442 F.3d at 1330-31 (*quoting*

*NeoMagic, Corp. v. Trident Microsystems,* 287 F.3d 1062, 1074 (Fed. Cir. 2000) ("It is well

settled that claims may not be construed by reference to the accused device.")).  Furthermore, the

drawings of Exhibit 10 are dated 2004 and 2006, but the relevant date for claim interpretation is

1996.  How a person skilled in the art would use the word "slide" to describe the entire structure

in 2004 or 2006 is entirely irrelevant.  Furthermore, how the entire assembly is described has no

bearing on the meaning of the claim term "slidably mounted."

### E.    "Moveable Member" is a Means-Plus-Function Limitation

As expected, Lippert lumps all of the "member" elements found in the claims, "moveable

member," "stationary member", and "support member," together, and argues that Dexter's

position is inconsistent.  The point Lippert misses or deliberately avoid is that "moveable

member" is a claim term that is not found in the specification.  Lippert's argument was addressed

in footnote 4 of Dexter's Brief.  As Lippert notes,  numerous "members" are described in the

specification:  "stationary member," "retractable member," "slidable member," "support

member," "slide member" "frame member," and "angle member."  Lippert's Brief, p. 18.

However, none of these terms, except for "stationary member" and "support member" are claim terms *and* are also found in the specification. Noticeably absent from the specification is the term "moveable member." Dexter's position is entirely consistent. By reference to the specification, a person skilled in the art reading the claim terms "stationary member" and "support member" in the context of the specification would have some chance of determining what the inventor claimed by these terms as his invention. The same cannot be said of "moveable member."

"Stationary member" is used synonymously in the specification with the word "rail," which are labeled elements 21 and 22. '715 Patent, Col. 8, ll. 33-39; *see* Dexter's Brief, n. 4. The word "support member" is found in the specification.

> Further it is foreseen that a wide *variety of support legs or members* could be used for supporting the rear ends 37 and 38 of the rails 21 and 22 above the floor 15 including support *means* such as threaded rods with pivotal feet, the rods being threadingly secured to the rails 21 and 22 or rear cross-brace 35. It is also foreseen that in some applications it may not be necessary to utilize a support member for supporting the rear end of the rail or stationary member. It may be possible support the stationary member only at a front end thereof.

The fact that the inventor used "member" and "means" interchangeably suggests that "member" should be construed as a "means-plus-function" limitation. Furthermore, because the two claim terms "stationary member" and "support member" are used in the specification, they are not indefinite when interpreted as "rail" (as set forth in Dexter's Brief) as to the former and as support legs as to the latter.

The cases Lippert cites are distinguishable. While it is true that in some of the cases upon which Lippert relies, the term "member" has been interpreted as a structural element, in those instances, the claim term was found in the specification. *E.g., Lighting World, Inc. v. Brichwood*

12

*Lighting, Inc.*, 382 F.3d 1354, 1361 (Fed. Cir. 2004) (construing "connector assembly" as a

structural term); *Kwik Products, Inc. v. National Express, Inc.*, 179 Fed. Appx. 34, *38 (Fed. Cir.

2006); *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1536 (Fed. Cir. 1991) (interpreting "cross

member," which was found in the specification and illustrated in drawings); *Depuy Spine, Inc. v.

Medtronic Sofamore Danek, Inc.*, 469 F. 3d 1005, 1023 (Fed. Cir. 2006); *CCS Fitness, Inc. v.

Brunswick Corp.,* 288 F.3d 1359, 1360 (Fed. Cir. 2002) (interpreting "reciprocating members,"

which is found in the specification (as found by a review of the patent at issue). The only case

Lippert cites where "member" was not used in the specification but still found to be a structural

element is *Al-Site Corp. v. VSI International, Inc.* 174 F.3d 1308, 1318  (Fed. Cir. 1999). This

case is distinguishable because the court found that there was sufficient structure in the claims

themselves for performing the claimed function. *Al-Site Corp.*, 174 F.3d at 1318.[4]  In contrast,

there are no additional structures set forth in the claims of the '715 Patent to perform the claimed

functions.

        Here, the terms "moveable" and "moveable member" are noticeably absent from the

specification is "moveable" and "moveable member."  The claimed function, "for securement of

the slide-out room thereto…" is found in the specification, and is associated with the structure of

a slide plate as further discussed in Dexter's Brief (pp. 17-19).  As noted above in connection

with the discussion of "support member," the inventor used "member" and "means"

interchangeably in the '715 Patent.  As shown by the highly analogous case,  *Mas-Hamilton*

---

[4]        "[A]lthough these claim elements include a function, namely, 'mounting a pair of
eyeglasses,' the claims themselves contain sufficient structural limitations for performing those
functions.  As noted above, claim 1 of the '345 patent describes the eyeglass hanger member as
'made from flat sheet material' with an 'opening means formed … below [its] upper edge.' This
structure removes this claim from the purview of § 112, ¶ 6."

*Group v. LaGard, Inc.*, 156 F.3d 1206, 1215 (Fed. Cir. 1998), cited in Dexter's Brief, where the word "member" is followed by a functional term and is not found in the specification, it should be interpreted under Section 112(6).  Hence, the term "moveable member" must be interpreted under Section 112(6).   Alternatively, the term "moveable means" should be found invalid for indefiniteness, lack of written description, and/or lack of enablement.

**F.     Lippert's Description of "One of Ordinary Skill in the Art" is Incorrect and Unsubstantiated**

Dexter disputes Lippert's description of the level of ordinary skill in the art. Lippert Brief, p. 10.  The level of experience and education is overstated.  Furthermore, the "level of one skilled in the art" is a fact question and Lippert's assertion is completely unsupported by any evidence.  *Graham v. John Deere,* 383 U.S. 1, 17 (1966).  In relatively simple technologies such as this, expert testimony for claim construction is unnecessary.  *See J. P. Peta, Inc. v. Club Protector,* 65 Fed. App. 724, 2003 WL 21206079, *3 n.2 (Fed. Cir. 2003).  The parties even agreed that expert testimony in this case would be unnecessary for claim construction.  Lippert's injection of a fact question that would require expert testimony to resolve is inconsistent with this agreement.[5]

### III.     CONCLUSION

For all of these reasons, Dexter respectfully requests that the Court adopt Dexter's proposed claim construction as set forth herein.

---

[5]     Nevertheless, in the event the court determines that expert testimony is desirable to resolve this fact issue, Dexter requests leave to submit extrinsic evidence of the "level of one skilled in the art."

14

Dated: October 5, 2007                    Respectfully submitted,

                                          GREENBERG TRAURIG, LLP


                                          By:/s/ Donald J. Detweiler
                                              Donald J. Detweiler (#3087)
                                              detweilerd@gtlaw.com
                                              Titania R. Mack (#4120)
                                              mackt@gtlaw.com
                                              The Nemours Building
                                              1007 North Orange Street
                                              Suite 1200
                                              Wilmington, Delaware 19801
                                              302-661-7000 - Telephone
                                              302-661-7360 - Facsimile


                                              -    and    -

                                              George G. Matava
                                              Brian A. Carpenter
                                              Greenberg Traurig LLP
                                              1200 Seventeenth St., Suite 2400
                                              Denver, Colorado 80202
                                              (303) 572-6500 - Telephone
                                              (303) 572-6540 - Facsimile

                                              *Attorneys for Defendant*
                                              *Dexter Axle Company*

15

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the foregoing were caused to be served on

October 5, 2007 upon the following individuals in the manner indicated.

VIA HAND DELIVERY:
Thomas C. Grimm
Leslie A. Polizoti
Morris, Nichols, Arsht & Tunnel, LLP
1201 N. Market Street
Wilmington, DE  19801

VIA FIRST CLASS MAIL:
Dean A. Monco
Brad R. Bertoglio
Wood Phillips
500 West Madison Street
Suite 3800
Chicago, IL  60661-2562

/s/ Donald J. Detweiler
Donald J. Detweiler (No. 3087)

*DEL 86197501v1 10/5/2007*

16

# EXHIBIT
# L

# United States Patent [19]

## Yoder

[11] Patent Number: 4,500,132

[45] Date of Patent: Feb. 19, 1985

[54] **TRAVEL TRAILER FRAME SUPPORT**

[76] Inventor: **Clarence T. Yoder,** 11642 County Road 36, Goshen, Ind. 46526

[21] Appl. No.: 535,946

[22] Filed: Sep. 26, 1983

[51] Int. Cl.³ .............................................. B62D 39/00
[52] U.S. Cl. ..................................... 296/171; 296/181; 296/188
[58] Field of Search ............... 296/181, 183, 187, 188, 296/170, 171, 172, 168; 52/73, 67

[56]                **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,813,747 | 11/1957 | Rice, Jr. | 296/171 |
| 2,820,666 | 1/1958 | Grochmal | 296/171 |
| 2,877,509 | 3/1959 | Klibanow | 296/171 |
| 4,108,326 | 8/1978 | Bertolini | 296/181 |

*Primary Examiner*—Robert R. Song
*Attorney, Agent, or Firm*—James D. Hall

[57]                **ABSTRACT**

In a travel trailer having a floor, side and end walls, and a roof where the floor is supported by frame members. The trailer is provided with a frame support taking the form of a strap which is connected at one end to a rear end portion of the floor or frame members and which passes upwardly and forwardly along the roof of the trailer where its opposite end is connected to the roof. The purpose of the frame support is to prevent sagging of the floor and frame members.

**4 Claims, 4 Drawing Figures**





Fig. 1



Fig. 2



*Fig. 3*



*Fig. 4*

4,500,132

1

## TRAVEL TRAILER FRAME SUPPORT

### SUMMARY OF THE INVENTION

This invention relates to a frame support for a mobile structure, such as a travel trailer.

The mobile structure includes a frame having longitudinal frame members. The frame is supported by axles which in turn mount a wheel at each of their ends for rolling support of the mobile structure. The structure includes side and end walls mounted to the frame, and a roof structure supported by the side and end walls. The axles of such mobile structures are usually located generally intermediate of the length of the longitudinal frame members, thereby producing a cantilevered frame supporting effect about the axles. The forward end of the mobile structure, however, is usually supported by a towing vehicle. The rearward end of the mobile structure is not supported and may be subject to sagging, especially when additional weight is placed on the rear end of the frame, such as by the addition of a slideout room.

It is, therefore, the intention of this invention to provide a mobile structure frame which does not sag about its axle support. One or more tensioning straps are secured each at one end to the rear end of the mobile structure frame or floor and extend upward along the roof structure toward the front end of the mobile structure. Each strap is secured at its opposite end to the structure and supports the frame against sagging.

Accordingly, it is an object of this invention to provide a novel and useful way of preventing sagging of the frame of a mobile structure.

Another object of this invention is to provide a novel and useful frame support for a mobile structure which prevents sagging of the frame when it carries excess weight, such as a slideout room, at one of its ends.

Another object of this invention is to provide a frame support for a mobile structure which is light in weight and easily attached.

Other objects of this invention will become apparent upon a reading of the following description.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a partial perspective view of a travel trailer with portions broken away to illustrate the frame support and showing an extended side room.

FIG. 2 is a side view of the travel trailer with the side room removed and portions broken away for purposes of illustration.

FIG. 3 is a rear end view of the travel trailer with portions broken away to illustrate the frame support.

FIG. 4 is a fragmentary sectional view taken along line 4—4 of FIG. 1.

### DESCRIPTION OF THE PREFERRED EMBODIMENT

The preferred embodiment illustrated is not intended to be exhaustive or to limit the invention to the precise form disclosed. It is chosen and described in order to explain the principles of the invention and its application and practical use to thereby enable others skilled in the art to utilize the invention.

This invention includes a mobile structure 10, such as a travel trailer, which includes longitudinal frame members 12. Outriggers 14 project laterally outwardly from the outer side faces of frame members 12. A floor structure 16 is supported upon frame members 12 and outrig-

2

gers 14 and is secured to the outriggers with bolts 18, or other fastening devices, which pass through the floor structure and into the outriggers. Longitudinal frame members 12 mount axles 20 which in turn journal wheels 22 for rolling transportation of mobile structure 10. Side walls 24 and end walls 26 are supported upon frame members 12 and outriggers 14. A roof 28 is supported by side walls 24 and end walls 26.

One side wall 24 has an opening 36 formed therein rearwardly of axles 20. Side wall opening 36 is adapted to accommodate a slideout room 38 which includes a floor 40, side walls 42, end wall 44, and a roof 46. Shifting of slideout room 38 between its retracted, or travel position shown in FIG. 3, and its extended, or set up position, shown in FIGS. 1 and 4, is accomplished with an electric motor 39 connected through a gearbox 41 to telescopic extension members 43 which, in turn, are connected to the slideout room.

Slideout room 38, when it is located rearwardly of axle 20 places additional weight on longitudinal frame members 12 which may cause the frame members to sag at the rear end of the trailer. The frame support of this invention is intended to prevent or reduce such sagging of longitudinal frame members 12. The frame support includes flexible stretch resistant straps 50, which are preferably formed of steel having a width of approximately one and one quarter inches. Each strap 50 is connected with screws 51 or similar fasteners at an end portion 52 to the underside and at a rearward lateral edge of floor structure 16. Each strap 50 continues from its end portion 52 upwardly along the rear end of a side wall 24 from where it extends in tension forwardly along roof 28 and is connected by screws 51 or similar fasteners at its opposite end portion 53 forwardly of trailer side wall opening 36 and preferably at least over axles 20 to the frame 29 of roof 28. If desired, each strap 50 may be tacked or anchored at spaced locations between its end portions to roof frame 29.

Straps 50 are applied to mobile structure 10 in the above mentioned fashion before slideout room 38 is added in order to place the straps in tension and cause longitudinal frame members 12 to be slightly cambered so that when the slideout room is added it will be supported without appreciable sagging of the frame members. Subsequent to the assembly of the frame support to mobile structure 10, siding 54 and roof skin 56 are added to the mobile structure.

It is to be understood that the invention is not to be limited by the terms of the above description, but may be modified within the scope of the appended claims.

I claim:

1. In combination, a mobile structure and a frame support for said mobile structure, said mobile structure including a longitudinal frame, an axle attached to said frame and carrying wheels, a floor secured to said frame, side walls and end walls extending upwardly from said floor, one of said side walls having an opening formed therein rearwardly of said axle, a roof overlying said end walls and side walls, a slideout room fitting in said side wall opening, and being shiftable between extended and retracted positions, said frame support including a strap secured at one end portion to one of said floor and frame and continuing in tension rearwardly of said side wall opening upwardly along one of said end walls and forwardly along said roof, said strap secured at its other end to said roof.

4,500,132

**3**

2. The combination of claim 1 wherein said strap is tacked along its length to said one end wall and said roof.

3. The combination of claim 1 wherein said frame support includes a second strap secured at one end portion to said one floor or frame and continuing in tension rearwardly of said side wall opening upwardly

**4**

along said one end wall and forwardly along said roof, said second strap secured at its other end to said roof, said first mentioned and second straps being spaced apart.

4. The combination of claim 3 wherein said straps extend along opposite sides of said mobile structure.

* * * * *

# EXHIBIT
# M



US005237782A

## United States Patent [19]

### Cooper

[11] Patent Number: **5,237,782**

[45] Date of Patent: **Aug. 24, 1993**

[54] **SLIDABLE ROOM ASSEMBLY FOR RECREATIONAL VEHICLES**

[75] Inventor: **Denzil R. Cooper, Nuevo, Calif.**

[73] Assignee: **Fleetwood Enterprises, Inc., Riverside, Calif.**

[21] Appl. No.: **694,122**

[22] Filed: **May 1, 1991**

[51] Int. Cl.⁵ ............................................. E04B 1/343
[52] U.S. Cl. ............................ 52/67; 296/26; 296/171; 296/175
[58] Field of Search ................. 296/26, 165, 171, 175; 52/67; 174/D9

[56]            **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| Re. 32,262 | 10/1986 | Stewart | 296/26 |
| 2,243,659 | 5/1941 | Thompson . | |
| 2,519,517 | 8/1950 | Van Tassel . | |
| 2,561,921 | 7/1951 | Guillot . | |
| 2,739,833 | 3/1956 | Schenkel et al. . | |
| 2,744,781 | 5/1956 | Black | 296/171 |
| 2,820,666 | 1/1958 | Grochmal | 296/171 |
| 2,822,212 | 2/1958 | Frey | 296/23 |
| 2,906,556 | 9/1959 | Cantele et al. | 296/26 |
| 3,116,085 | 12/1963 | Uttley | 296/26 |
| 3,341,986 | 9/1967 | Brosig . | |
| 3,572,809 | 3/1971 | Buland | 296/175 |
| 3,792,189 | 2/1974 | Stengel et al. | 174/69 |
| 3,797,880 | 3/1974 | Pezzaglia | 206/26 |
| 4,049,310 | 9/1977 | Yoder | 296/26 |
| 4,133,571 | 1/1979 | Fillios | 296/26 |
| 4,253,283 | 3/1981 | May | 52/67 |
| 4,955,661 | 9/1990 | Mattice | 296/171 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1055976 | 6/1956 | Fed. Rep. of Germany | 296/165 |
| 2026360 | 5/1970 | Fed. Rep. of Germany | 296/179 |
| 2712270 | 9/1978 | Fed. Rep. of Germany | 296/171 |
| 2573016 | 11/1984 | France | 296/165 |
| 0083317 | 7/1983 | Italy | 296/26 |
| 2001589 | 7/1978 | United Kingdom | 296/26 |

Primary Examiner—Carl D. Friedman
Assistant Examiner—Christopher Kent
Attorney, Agent, or Firm—Price, Gess & Ubell

[57]            **ABSTRACT**

A slidable room having an improved slide-out assembly and an improved liquid sealing assembly at an interface between an opening in the recreational vehicle and an exterior wall of the room is provided. The slide-out assembly includes a stationary main frame assembly having a pair of support members held in a fixed parallel relationship, a single transmission mechanism fixedly interposed between the support members, and a slidable support assembly slidably retained in the pair of support members for extending and contracting the room. The liquid sealing assembly is disposed around the interface between the slidable room and the opening in the recreational vehicle's exterior wall. A first flange member is affixed to a top edge and side edges of the slidable room's exterior wall. A second complementary flange member is affixed to a top edge and side edges of the opening in the recreational vehicle. The flange members include adjacent protrusions for inhibiting the flow of liquid therebetween when the slidable room is fully retracted into the recreational vehicle.

**22 Claims, 4 Drawing Sheets**



U.S. Patent    Aug. 24, 1993    Sheet 1 of 4    5,237,782



FIG. 1

FIG. 6



*FIG. 2*

## FIG. 3



## FIG. 5





5,237,782

1

## SLIDABLE ROOM ASSEMBLY FOR RECREATIONAL VEHICLES

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The subject invention relates generally to recreational vehicles and, more particularly, to an expandable or slidable room in a recreational vehicle that can be economically manufactured.

2. Description of Related Art

In order to increase the available interior space of recreational vehicles, such as trailers, including those commonly referred to as "fifth wheels," slide-out rooms can be made integral with the vehicle. During transit, these rooms can be retracted and stored in the vehicle's interior, with the exterior wall of the slide-out room approximately flush with the vehicle's exterior. To use the slide-out room, the vehicle is first parked and leveled. The slide-out room is then slid outward from the vehicle, increasing the interior space of the vehicle.

A problem with slide-out rooms is that during transit under adverse conditions such as rain, sleet, or snow, water tends to leak into the interior of the vehicle in the area between the slide-out room and the exterior wall of the vehicle. Water may even leak into the vehicle when the vehicle is being stored in inclement weather. The effectiveness of sealing systems currently being used can be improved to address this problem.

A number of motive devices are currently used to extend and retract slide-out rooms. These devices may be hydraulic, pneumatic, electric, simple gearing mechanisms, or various combinations thereof. An example of a prevalent electronically actuated gearing mechanism includes first and second cylindrical extending posts that are affixed to a power assembly. The power assembly is actuated electronically and is directly connected to the first cylindrical post using gears for extending and contracting an inner sleeve in the post. The second post is connected to the power assembly through a series of shafts and gear boxes. A gear box interposed between the posts has a hand crank adaptor so the posts can be extended or contracted by hand if the electrical power fails.

A disadvantage of this design exists in that the second post is connected to the power assembly through the series of gear boxes and shafts, and there may be synchronism problems between the first and second posts when they are extending or contracting. This can result in the room becoming skewed or binding during the transit sliding action. Another disadvantage of this design is that the post's inner sleeves are load-bearing, which can result in an excessive strain on the inner sleeves, posts, and power assembly when sliding the room. A further disadvantage of this design is that the inner sleeves of the posts are exposed to various environmental elements such as rain, dirt, and road grime when the room is extended, as well as during sliding of the room. These elements can slowly deteriorate the inner sleeves and the interior of the posts. An example of one type of slide-out mechanism is manufactured by Barker Manufacturing of Battle Creek, Mich.

Another slide-out mechanism design uses a pair of hydraulically-actuated cylindrical posts embodying some of the design features of the prior mechanism. This mechanism uses common hydraulic principles to extend and contract the room. A disadvantage of the hydraulically-actuated design is that the room is typi-

2

cally actuated from outside the vehicle, which can expose the user to adverse environmental elements. Other disadvantages of the hydraulic design include skewing and binding of the room while sliding the room, and load-bearing posts being exposed to environmental elements.

U.S. Pat. No. 2,822,212 discloses a mobile trailer that has a motor capable of driving three power screw members to expand and contract walls and floors of the mobile trailer.

U.S. Pat. No. 2,744,781 discloses an expansible vehicle body that has an expansion section on either side. An overlap of a floor member pivots downward when the vehicle body is in he expanded state. A hand crank is used to achieve expansion and retraction of the expansion sections.

Finally, housings having expansible sections and devices used to expand and contract expansible sections are disclosed in the following patents: U.S. Pat. Nos. 2,243,659; 2,519,517; 2,561,921; 2,739,833; 2,744,781; 2,822,212; and 3,341,986.

### SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide an improved slidable room for recreational vehicles;

It is another object of the invention to provide an improved liquid sealing assembly that inhibits the flow of liquid between an exterior wall of the slidable room and an opening in the recreational vehicle;

It is another object of the present invention to provide a slide-out assembly having a transmission assembly that is substantially free of load-bearing forces that support the weight of the slidable room;

It is another object of the present invention to provide a slide-out assembly that includes a single transmission mechanism; and

It is another object of the present invention to provide a slide-out assembly having a transmission mechanism which can be protected from external environmental elements.

These and other objects of the present invention are achieved by providing a slidable room for a recreational vehicle having a slide-out assembly that includes a stationary main frame assembly and a slidable support assembly that is affixed to the room.

The stationary main frame assembly is affixed to a chassis of the recreational vehicle and includes a pair of support members that are held in a fixed parallel relationship. A single transmission mechanism is interposed between the support members so that the transmission mechanism is not subject to load-bearing forces for supporting the weight of the room. The slidable support assembly is affixed to the room and is slidably retained in the pair of support members for extending and contracting the room in response to the operation of the transmission mechanism.

A preferred embodiment of the slidable room includes an improved sealing assembly between an interface of the slidable room and an opening in a side of the recreational vehicle for preventing water from leaking into the recreational vehicle when the room is fully contracted. A first flange member is affixed to a top edge and side edges of an exterior wall of the room. The flange member has an elongated portion extending axially away from the exterior wall of the room and includes a plurality of protrusions on its interior sides. A

5,237,782

**3**

second complementary flange member is affixed to a top edge and side edges of the opening in the recreational vehicle. The second flange member includes a plurality of complementary protrusions on its exterior sides for inhibiting water from flowing between the first flange member and the second flange member when the room is fully contracted. The sealing assembly further includes flexible seals for further preventing liquid from flowing between the flange members.

BRIEF DESCRIPTION OF THE DRAWINGS

The objects and features of the present invention, which are believed to be novel, are set forth with particularity in the appended claims. The present invention, both as to its organization and manner of operation, together with further objects and advantages, may best be understood by reference to the following description, taken in connection with the accompanying drawings.

FIG. 1 is a perspective view of a recreational vehicle including a preferred embodiment of the present invention, partially shown in phantom;

FIG. 2 is a perspective view of a preferred embodiment of the slide-out assembly;

FIG. 3 is a plan view of the preferred embodiment of the slide-out assembly;

FIG. 4 is a perspective view of a preferred embodiment of a sealing assembly of the present invention in an open position;

FIG. 5 is a partial cross-sectional view showing the preferred embodiment of the sealing assembly in an open configuration;

FIG. 6 is a partial cross-sectional view showing the sealing assembly in a sealed position; and

FIG. 7 is a side elevated partial cross-sectional view of the present invention in a storage position.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

The following description is provided to enable any person skilled in the recreational vehicle manufacturing art to make and use the invention and sets forth the best modes contemplated by the inventor of carrying out his invention. Various modifications, however, will remain readily apparent to those skilled in these arts, since the generic principles of the present invention have been defined herein specifically to provide a relatively economical process for manufacturing a slidable room on an improved structure on a production basis.

Referring to FIG. 1, there is shown a recreational vehicle (RV) 5, including a preferred embodiment of a slidable room 10 constructed according to the principles of the present invention. The slidable room 10 includes a slide-out assembly 12 for extending and contracting the room. A first liquid sealing assembly 14 is made integral with a top edge 16 and side edges 18 of an external wall 20 of the room 10. The wall 20 is larger than an opening 28 in the exterior wall 30 of the RV. A second liquid sealing assembly 22 is made integral with a top edge 24 and side edges 26 of the opening 28 in the exterior wall 30 of the RV 5.

A preferred embodiment of the slide-out assembly 12 is shown in FIGS. 2 and 3. The slide-out assembly 12 includes a stationary main frame assembly 32 affixed to chassis member 34 of the RV 5. The main frame assembly 32 includes two pairs of support beams 36, 38 that may be bolted or welded to the chassis members 34 for affixing the slide-out assembly 12 to the RV 5. The

**4**

support beams 36, 38 may be steel C-channels 3 inches long with 2-inch sides and 10 inches tall. Affixed on top of the pairs of support beams 36, 38 are a first rectangular, hollow, elongated guide or support member 40 and a second rectangular, hollow, elongated guide or support member 42. The support members 40, 42 may be steel, for example, and can be 22 inches long, 2½ inches wide, and 5 inches high. Affixed in each end 44, 46 of the support members 40, 42 are a top steel roller 48 and a bottom steel roller 50. The bottom rollers 50 are greater in diameter than the top rollers 48 in the preferred embodiment.

Interposed between the support members 40, 42 are a pair of parallel cross beams 52, 54. The cross beams 52, 54 hold the support members 40, 42 in a first parallel relationship. The cross beams 52, 54 may be steel U-channels that are 2 inches wide with 1½-inch sides, and may be affixed to the support members 40, 42 using bolts or welding. A pair of steel support rods 56 are angled between the cross beams 52, 54 to increase the structural stability of the main frame assembly 32.

A substantially square slidable support assembly 60 is slidably retained in the support members 40, 42. The slidably support assembly 60 includes a transmission beam 62, a pair of rails 64, and a support beam 66 affixed to the rails 64 using support flanges 68. The rails are affixed to the ends of the transmission beam 62 and to the support flanges 68 for holding the transmission beam 62 and support beam 66 in a fixed parallel position. The rails 64 may be 75 inches long and 2 inches square so they may be slidably retained in the hollow support members 40, 42. The support members' steel rollers 48, 50 enhance the ease with which the rails 64 slide through the support members 40, 42.

The support beam 66 may be a formed C-channel 3¼ inches wide with 2-inch sides. The support beam 66 may be two separate sections, depending upon mounting needs. The transmission beam 62 may be a 3-inch by 3-inch portion of angled steel. The length of the cross beams 52, 54, support beam 66, and transmission beam 62 may vary, depending upon the desired length of the room.

A transmission mechanism 70 is mounted at a center portion of the cross beam 52 located closest to the transmission beam 62. The transmission mechanism includes a motor 72, such as an electric motor, and an elongated worm gear 74. The worm gear 74 is disposed through an opening 76 in the cross beam 52, and extends through an opening 78 in the transmission beam 62. The worm gear 74 couples to the motor 72 through a steel coupling 80 mounted in the opening 76. A threaded sleeve 82 is welded in the transmission beam's opening 78 to rotatably couple the worm gear 74 to the transmission beam 62. A gear support 84 is affixed to the transmission beam 62 for supporting the worm gear 74 and the threaded sleeve 82.

An electric cable 86 is located in each rail 64 for providing electrical current to the room 10 through junction boxes 88. A pair of carrier chains 90 carry the cable 86 into the rails 64 for preventing the cable 86 from binding or becoming damaged when the slidable support assembly 60 is moving. Since the cable 86 is located in the rails 64, the cable 86 is also prevented from being damaged by environmental elements when the room 10 is extended and when the RV 5 is being transported.

FIGS. 4, 5, and 6 show the first liquid sealing assembly 14 and the second liquid sealing assembly 22 con-

5,237,782

**5**

structed according to the preferred embodiment 10. The first liquid sealing assembly 14 is made integral with the top edge 16 and side edges 18 of the room's exterior wall 20. The second sealing assembly is made integral with the top edge 24 and side edges 26 of the substantially rectangular opening 28 in the RV's exterior wall 30.

The first sealing assembly 14 includes a first L-shaped shoulder 92 that extends along the room's top edge 16 and side edges 18. A first L-shaped flange member 94 is affixed to the L-shaped shoulder 92. The flange member 94 includes an elongated end portion 96 that extends axially away from the room's exterior wall 20. The flange member 94 also has a plurality of protrusions 98 that extend away from the shoulder 92. An elongated flexible ridge seal 100 is affixed to the first flange member's elongated portion 96. A flexible ridge bulb seal 102 is affixed between a pair of the flange member's protrusions 98 located on an elongated portion 104 of the exterior wall's shoulder 92.

The second sealing assembly 22 includes a second L-shaped shoulder 106 complementary to the first L-shaped shoulder 92. A second L-shaped flange member 108 is affixed to the second L-shaped shoulder 106. The flange member 108 includes a plurality of protrusions 110 that extend away from the shoulder 106.

A pair of the second flange member's protrusions 110, located on an elongated portion 112 of the second L-shaped shoulder 106, are aligned with the pair of protrusions 98 located on the elongated portion 104 of the exterior wall's shoulder 92. The pairs of protrusions 98, 110 are aligned so that when the room 10 is completely contracted into the RV 5 (shown in FIG. 6), the flexible ridge bulb seal 102 is compressed between the first flange member 94 and second flange member 108. The adjacent pairs of protrusions 98, 100 extend into the compressed bulb seal 102, thus pinching compressed ends 114 of the bulb seal 102 to prevent fluid from flowing between the first and second flange members 94, 108.

A flexible wiper 116 is affixed to an end 118 of the second flange member 108 that extends parallel to a side wall 120 of the room 10. The wiper 116 extends away from the second flange member's end 118 and perpendicular thereto and abuts the room's side wall 120. When the room 10 is being extended or contracted, the wiper 116 wipes liquid from the room's side walls 120.

FIG. 7 shows a cross-section of the invented slidable room 10 fully contracted into the RV 5. In the preferred embodiment, a subfloor 122 is mounted to the chassis 34. The support beams 36, 38 extend through the subfloor 122 and affix to the support members 40, 42. A main floor 124 is mounted above the support members 40, 42 using floor joists 126. At least one roller 128 is mounted to the main floor 124 below a floor 130 of the slide-out room 10. Electrical current is provided to the room 10 from the cable 86 through the junction boxes 88.

When the RV 5 is being transported, the room 10 is maintained fully contracted into the RV 5. The first liquid sealing assembly's ridge flexible seals 100, 102 are pressed tightly against the second liquid sealing assembly 22 to prevent liquid such as rain water from flowing between the RV 5 and room 10 and into the RV 5. The protrusions 98, 110 of the sealing assemblies 14, 22 further decrease the possibility that water would flow between the flange members 94, 108. The room's exte-

**6**

rior wall 22 is flush with the RV's exterior wall 30 to enhance the aesthetics of the RV 5.

The room 10 is extended away from the RV 5 by energizing the motor 72. The motor 72 rotates the worm gear 74 in the desired direction to draw the slidable support assembly 60 towards the main frame assembly 32, thus extending the room 10 away from the RV 5. The main floor's rollers 128 increase the ease with which the room 10 travels across the RV's main floor 124. The steel rollers 48, 50 aid the rails 64 as they slide through the support members 40, 42. When the room 10 is fully extended from the RV 5, a current limiting switch (not shown) senses the excessive current draw and shuts off the motor 72. The room 10 is retracted by alternating the current limiting switch and reversely energizing the motor 72 to alter the angle of rotation of the worm gear 74, for pushing the slidable support assembly 60 into the RV 5 for contracting the room 10.

The support members 40, 42, in combination with the rails 64 and support beams 66, bear the load of the room 10, while the room 10 is in transition and when it is extended. Thus, the transmission mechanism 70 is not load-bearing. The electrical cable 86 and transmission mechanism 70 are not exposed to environmental elements, such as water and road grime, since the cable 86 is retained in the rails 64 and the transmission mechanism 70 is retained in the RV 5.

The above features of the present invention teach apparatus, method, and an improved slidable room having an improved slide-out assembly for sliding the room and an improved sealing assembly to prevent liquid from flowing between the room and the recreational vehicle. It can be readily appreciated that it would be possible to deviate from the above embodiments of the present invention and, as will be readily understood by those skilled in the art, the invention is capable of many modifications and improvements within the scope and spirit thereof. Accordingly, it will be understood that the invention is not to be limited by the specific embodiments, but only by the spirit and scope of the appended claims.

What is claimed is:

1. In a slidable room for use with a housing assembly having an opening with a top edge and side edges having an interior and an exterior side for receiving the slidable room, the slidable room having an exterior wall with a top edge and side edges having an interior and an exterior side, the improvement comprising:

a main frame assembly affixed to the housing assembly including a pair of spaced a hollow, elongated support members;

a transmission assembly fixedly interposed between the support members for providing a moving force to the slidable room;

a slidable support assembly coupled to the transmission assembly and affixed to the slidable room, the support assembly slidably retained in the pair of support members for extending and contracting in response to operation of the transmission assembly, and

a liquid sealing assembly extending between the top edge and side edges of the exterior wall of the room and the top edge and side edges of the opening, the sealing assembly including a first flange member affixed to the interior side of the top edge and side edges of the exterior wall of the room, and a second complementary flange member affixed to the exte-

5,237,782

**7**

rior side of the top edge and side edges of the opening, the first and second flange members having a plurality of adjacent protrusions for inhibiting liquid from flowing therebetween.

2. The invention of claim 1, wherein the sealing assembly further comprises a flexible bulb seal, having a plurality of ridges, affixed to the first flange member and interposed between two of said plurality of protrusions, a flexible seal, having a plurality of ridges, disposed on the first flange member and a flexible wiper affixed to the second flange member extending along the side edges of the opening.

3. The invention of claim 2, wherein the slidable support assembly includes a support beam affixed to the room, the support beam has respective ends and a transmission beam coupled to the transmission assembly, the transmission beam has respective ends and a pair of rails, the support beam and transmission beam being held in a fixed parallel relationship by the pair of rails, each affixed to either end of the support beam and the transmission beam, the pair of rails slidably retained in the hollow support members for sliding the support assembly.

4. The invention of claim 3, wherein the main frame assembly further comprises:
   a pair of parallel cross beams affixed to the hollow support members for retaining the support members in a fixed parallel relationship, and
   the transmission assembly includes a motor mounted to one of the cross beams located proximal to the transmission beam, an elongated rotatable worm gear is disposed through the cross beam and is coupled to the motor and rotatably affixed to the transmission beam for sliding the support assembly in a direction responsive to a rotation of the worm gear.

5. The slidable room of claim 4, including an electrical connection in the room and an electrical cable disposed in each of the rails and coupled to the electrical connection in the room for providing power to the room.

6. In a slidable room for use with a housing having an interface and an opening for receiving the slidable room, said room having an exterior wall including a top edge and side edges and said opening having a top edge and side edges, comprising:
   means for supporting the slidable room;
   means for extending and contracting the room support means affixed thereto, the extending and contracting means including a single transmission means, and
   means for inhibiting flow of any liquid entering between the interface of the top edge and side edges of the exterior wall of the room and the top edge and side edges of the opening, the liquid flow inhibiting means including a pair of complementary elongated flange members, a first flange member affixed to the top edge and side edges of the exterior wall of the room, and a second flange member affixed to the top edge and side edges of the opening, the complementary flange members having a plurality of adjacent elongated protrusions extending along a length of the respective flange members for inhibiting flow of liquid therebetween.

7. The slidable room of claim 6, wherein the support means comprises a slidable support assembly including a support beam affixed to the room and a transmission beam rotatably coupled to the extending and contract-

**8**

ing means and a pair of rails, the support beam and transmission beam held in a fixed parallel relationship by the pair of rails, each rail affixed to either end of the support beam and transmission beam.

8. The slidable room of claim 7, wherein the extending and contracting means comprises a stationary main frame assembly affixed to the housing, including a pair of parallel cross beams and a pair of rectangular, hollow, elongated support members held in a fixed parallel relationship by the pair of parallel cross beams, the support members adapted to slidably retain the rails of the support means for extending and contracting the support means, and the transmission means comprises a motor mounted to the cross beam located proximal to the transmission beam of the transmission means, the motor having an elongated rotatable worm gear disposed to the cross beam and rotatably affixed to the transmission beam for sliding the support means in a direction responsive to the rotation of the worm gear.

9. A slidable room having an exterior wall including a top edge and side edges for use with a housing assembly having a square opening with a top edge and side edges, comprising:
   a stationary main frame assembly affixed to the housing assembly, including a pair of spaced hollow, rectangular, elongated support members held in a fixed parallel relationship, and a transmission assembly fixedly interposed between the support members;
   a slidable support assembly coupled to the transmission assembly and affixed to the room, the support assembly slidably retained in the pair of hollow support members for extending and contracting the room in response to operation of the transmission assembly;
   a first flange member affixed to the top edge and side edges of the exterior wall of the room, the first flange member having an elongated portion extending axially away from the exterior wall of the room and including a plurality of protrusions, and
   a complementary second flange member affixed to the top edge and side edges of the opening, the second flange member having a plurality of protrusions complementary to the protrusions on the first flange member for inhibiting liquid from flowing between the first flange member and the second flange member.

10. The slidable room of claim 9, wherein the sealing assembly further comprises a flexible bulb seal, having a plurality of ridges, affixed to the first flange member and interposed between a pair of the plurality of protrusions, a flexible seal, having a plurality of ridges, disposed on the first flange member and a flexible wiper affixed to the second flange member extending along the side edges of the opening.

11. The slidable room of claim 10, wherein the slidable support assembly includes a support beam affixed to the room, a pair of rails, and a transmission beam coupled to the transmission assembly, the support beam and transmission beam held in a fixed parallel relationship by the pair of rails, each affixed to the support beam and the transmission beam, the pair of rails slidably retained in the hollow support members for sliding the support assembly.

12. The slidable room of claim 11, wherein the main frame further comprises:

5,237,782

| 9 | 10 |

a pair of parallel cross beams affixed to the hollow support members for retaining the support members in a fixed parallel relationship, and

the transmission assembly including a motor mounted to one of the cross beams located proximal to the transmission beam for sliding the support assembly.

13. The slidable room of claim 12, wherein an electrical cable is disposed in each of the rails and a junction box is connected to the room for providing power to the room, and each of the electrical cables is connected to the junction box.

14. In a slidable room with a ceiling, floor and walls for use with a housing assembly having an opening for receiving the slidable room, the improvement comprising:

a main frame assembly affixed to the housing assembly, including a pair of spaced hollow, elongated support members positioned beneath the slidable room;

sets of rollers mounted within each support member;

support rails mounted in each respective support member on a pair of the roller sets, the support rails being connected to the slidable room to move and support the slidable room;

a force transmission assembly mounted within the main frame assembly and between the support members and connected to each support rail for extending and contracting the slidable room relative to the housing assembly;

sealing means extending about the housing assembly opening and slidable room for sealing the slidable room in both an extended and contracted state;

an electrical junction assembly connected to the slidable room; and

an electrical cable connected to the electrical junction assembly for supplying electrical power, wherein at least one of the support rails is hollow and carries the electrical cable therethrough for connection to the electrical junction assembly.

15. The invention of claim 14 further including a protective carrier chain assembly extending from the hollow support rail to enable bending of the electrical cable during an extension and contraction of the slidable room.

16. The invention of claim 14 wherein the sealing means includes a stepped flange assembly having a first and second support surface adjacent the slidable room, and a first flexible bulbous seal attached inwardly on the flange assembly to the first support surface and a second flexible seal attached outwardly on the second support surface.

17. The invention of claim 16 further including a third wiper seal extending between the housing assembly and the slidable room.

18. The invention of claim 16 wherein the stepped flange assembly further includes elongated protrusions to guide liquid in a downward flow direction.

19. In a slidable room with a ceiling, floor and walls for use with a housing assembly having an opening for receiving the slidable room, the improvement comprising:

a main frame assembly affixed to the housing assembly, including a pair of spaced hollow, elongated support members positioned beneath the slidable room;

sets of rollers mounted on each support member;

support rails having a first end and a second end mounted in each respective support member on the roller sets, the support rails being connected to the slidable room to move and support the slidable room at the first end;

a force transmission assembly mounted within the main frame assembly and between the support members and being connected at the second end of each support rail for extending and contracting the slidable room relative to the housing assembly, wherein the force transmission assembly and the second end of the support rails stay within the main frame assembly for protection against the environment, with the first end connected to the slidable room assembly so as to be positioned adjacent the housing assembly opening when the slidable room is contracted, and the second end of the support rails being driven for extending the slidable room by the force transmission assembly; and

first and second sealing means extending about, respectively, the housing assembly opening and the slidable rooms for sealing the slidable room in both an extended and contracted state.

20. The invention of claim 19 wherein the first sealing means includes a wiper sealing member extending from the housing assembly towards the slidable room.

21. The invention of claim 20 wherein the second sealing means includes a stepped flange having a first and second support surface adjacent the slidable room, and a first flexible bulbous sealing member attached inwardly on the flange to the first support surface and a second flexible sealing member attached outwardly on the second support surface.

22. The invention of claim 21 wherein the stepped flange further includes elongated protrusions to guide liquid in a downward flow direction.

* * * * *

# EXHIBIT
# N

US005577351A

# United States Patent [19]

Dewald, Jr. et al.

[11] Patent Number: 5,577,351

[45] Date of Patent: Nov. 26, 1996

[54] **SLIDE OUT ROOM WITH FLUSH FLOOR**

[76] Inventors: **James E. Dewald, Jr.; Martin P. McManus; Patrick W. McManus,** all of 1023 W. Eighth St., P.O. Box 703, Mishawaka, India. 46544

[21] Appl. No.: **396,113**

[22] Filed: **Feb. 28, 1995**

[51] Int. Cl.⁶ .................................................. E04B 1/344
[52] U.S. Cl. ............................... **52/67;** 52/71; 52/126.1; 296/171
[58] Field of Search ..................................... 52/67, 64, 69, 52/71, 126.1, 126.5; 296/171, 175, 26, 170, 165

[56] **References Cited**

U.S. PATENT DOCUMENTS

2,820,666    1/1958    Grochmal ................................. 296/171

| | | |
|---|---|---|
| 3,106,750 | 10/1963 | Jarman ..................................... 52/67 X |
| 3,719,386 | 3/1973 | Puckett et al. ........................... 52/67 X |
| 4,955,661 | 9/1990 | Mattice .................................... 296/171 |
| 5,419,933 | 2/1996 | Miller et al. ............................. 52/67 |

*Primary Examiner*—Kien T. Nguyen
*Attorney, Agent, or Firm*—Baker & Daniels

[57] **ABSTRACT**

Mobile living quarters, such as that provided by a recreational vehicle, is equipped with a slide out room which is retractable into the main living area when the unit is moved and is extended from the main living area to provide auxiliary living space when the unit is used. The slide out room is prodded with a floor that slides along the main floor of the unit and then drops to a position flush with the main floor of the unit as the room is moved into the extended position. A camming linkage controls movement of the floor relative to the walls of the slide out unit to move the floor between the sliding and flush positions.

**15 Claims, 4 Drawing Sheets**





Fig. 1



Fig. 2

Fig. 3



Fig. 4

Fig. 5



5,577,351

1

## SLIDE OUT ROOM WITH FLUSH FLOOR

This invention relates to a retractable room for recreational vehicle or manufactured housing which has a floor that is moved into a position flush with the floor of the main living area when the retractable room is extended.

The width of recreational vehicles and manufactured housing, is limited to that which can be accommodated for travel on public roads. Accordingly, it is common to provide recreational vehicles and manufactured housing with a slide out room which can be retracted into the main living quarters when the mobile living quarters is moved, but which can be extended from the main living quarters to provide auxiliary living space when the mobile living quarters is parked for use. Since the retractable room must be retracted into the main living area, the floor of the retractable room must slide on the floor of the main living area when the retractable room is retracted. Accordingly, the level of the floor of the retractable room must be offset from the main floor when the retractable room is retracted. On the other hand, when the retractable room is extended to provide auxiliary living quarters the difference in level between the floor of the retractable or slide out room and the main floor is obviously extremely inconvenient. One way to level out the floors is to drop the entire retractable room to a level in which the level of the floor of the retractable or slide out room is flush with the main floor. However, by dropping the entire slide out room, head room is further reduced over that required to permit retraction of the slide out room.

The present invention provides a slide out or retractable room for mobile living quarters such as recreational vehicles and manufactured housing in which the floor of the slide out room moves relative to the walls and ceiling of the slide out room as the slide out room is moved into its extended position. The floor moves from a higher sliding position to permit the floor to slide along the main floor of the unit as the extendable or slide out room is extended or retracted, but the floor of the retractable room moves vertically relative to the walls of the room into a position flush with the main floor as the slide out room is moved into the extended position. As the room is retracted away from the extended position, the floor of the retractable room is moved upwardly relative to the main floor so that the floor of the retractable room can slide upon the main floor as the retractable room is retracted into the main living quarters. Accordingly, the desirable flush floor is provided, but the headroom in the retractable room is maintained, because the floor of the retractable room moves relative to the walls of the retractable room.

These and other advantages of the present invention will become apparent from the following description, with reference to the accompanying drawings, in which:

FIG. 1 is a cross sectional view of the mobile living quarters incorporating a retractable or slide out room; the room being shown in solid lines in its retracted position and in dashed lines in its extended position;

FIG. 2 is a fragmentary transverse cross sectional view taken through the floor, frame, and lower wall portions of the mobile living quarters illustrated in FIG. 1 with the retractable room being illustrated in its retracted position;

FIG. 3 is a view similar to FIG. 2, but illustrating the retractable room in its extended position;

FIG. 4 is a view similar to FIG. 2, but illustrating an alternate embodiment of the invention;

FIG. 5 is a view similar to FIG. 3, but illustrating still another alternate embodiment of the invention;

2

FIG. 6 is a view of still another embodiment of the invention taken in section through the lower portion of the walls, floor and the frame of the mobile living quarters illustrated in FIG. 1, but illustrating the relative position between the floor of the retractable room and the main floor just before the retractable room begins to move into the extended position; and

FIG. 7 is a view similar to FIG. 6 but illustrating the relative positions of the various components after the retractable room has been moved into the extended position.

Referring now to the drawings, mobile living quarters generally indicated by the numeral 10 includes a frame 12 supported by an axle 14 and wheels 16. A main floor 18 is supported by the frame 12, and side walls 20, 22 and ceiling 24 cooperate with floor 18 to define a main living quarters 26. An opening 28 is formed in the side wall 22 for receiving a slide out or retractable room generally indicated by the numeral 30. The retractable or slide out room 30 includes a ceiling 32, a floor 34, which will be described in detail hereinafter, an outer wall 36, and side walls 38. Side walls 38, floor 34, and ceiling 32 define an open end 40 such that when the slide out or retractable room 30 is moved into the extended position illustrated by the dotted lines in FIG. 1, access is provided between the main living quarters and the auxiliary living quarters provided by the slide out room 30. A lip 42 carried on the ceiling 32 and side walls 38 of the slide out or retractable room 30 extends at least part of the way around the opening 40 and is adapted to sealingly engage the portion of side wall 22 circumscribing the opening 28.

Referring now to FIGS. 2 and 3, a retractable or slide out room 30 is supported on the frame 12 by extensible members generally indicated by the numeral 44. Although only one set of extensible members 44 are illustrated, it will be understood that at least two, and possibly additional sets of extensible members 44 will be necessary to support the room 30 for movement relative to the unit 10. Extensible members 44 include an outer tube or channel member 46 which is secured to frame 12 and inner tube 48 which is slideably received within, and supported by, the outer tube 46. The inner tube 48 extends from end 50 of the tube 46 and is secured to the wall 36 of retractable room 30 to support and guide the latter for movement relative to the frame 12. A lever 52 is pivotally mounted on inner tube 48 at a pivot point 54 and projects upwardly therefrom (viewing FIG. 2) to engage lower surface 56 of floor 34 adjacent the end 58 thereof that is unattached but engages the wall 36. The opposite end of floor 34 terminates in a tapered portion 60 which is supported for movement relative to floor 18 by a roller 62. Main floor 18 terminates in a tapering section 64, and a lip 66 extends from frame 12 past the end of the tapering section 64 to receive roller 62 as the floor 34 moves into the position illustrated in FIG. 3, as will hereinafter be described. A toggle 68 is also pivotally mounted on inner tube 48 by a pivot 70 for movement with the inner tube 48 and for pivotable movement relative thereto. A link 72 interconnects the toggle 68 with the lever 52, and is pivotally mounted to the toggle 68 at pivot 74 and is pivotally secured to lever 52 by a pivot 76. End portion 78 of toggle 68 is adapted to receive in a slot 80 and a camming plate 82 is secured to the frame 12. The slot 80 includes a downwardly curving portion 84. The distance between end 78 of the toggle 68 and downwardly curving portion 84 of slot 80 is equal to the distance that the floor 34 moves as the room 30 is moved between its fully retracted and fully extended positions. The tube or channel member 46 is provided with a longitudinally extending slot 85 through which toggle 68 extends.

5,577,351

3

In operation, the slidably retractable room 30 is illustrated in FIG. 2 in the position which it assumes when the room is fully retracted. In this condition, the floor 34 of the retractable room slides across the main floor 18 and is supported in the raised position illustrated in FIG. 2 by the roller 62 and by the lever 52. When the room 30 is to be extended, room 30 is moved to the right viewing the figures by use of, for example, hydraulic rams (not shown) or other appropriate power devices, so that the inner tube 48 slides along the outer tube 46. As this occurs, the lever 52, link 72 and toggle 68 do not pivot relative to the inner tube 48, but are moved therewith, so that the lever 52 may support the end 58 of the floor 34 in the sliding position illustrated. As the roller 62 reaches the ramp 64 and begins to move down the ramp, the end 78 of toggle 68 enters the curved portion 84 of the slot 80. As this occurs, further outward movement of the inner tube 48 moves the link 72 relative to the inner tube 48 since the end 78 of toggle 68 is prevented from further outward movement by its engagement with the slot 80. Accordingly, further outward movement of the inner tube 48 pivots the toggle 68 relative to inner tube 48 about the pivot 70. Pivoting of the toggle 68 is transmitted to the lever 52 through the link 72, thereby pivoting the lever 52 about the pivot 54 in a counterclockwise direction until the lever 52 is rotated into the position illustrated in FIG. 3 and the toggle 68 is substantially vertical.

As the lever 52 rotates into the position illustrated in FIG. 3, end 58 of the floor 34 is gradually dropped at substantially the same rate as the roller 62 rides down the ramp 64. Accordingly, when the apparatus is in the FIG. 3 position, the roller 62 is supported on the lip 66 and the lever 52 is rotated downwardly as illustrated so that both ends 60 and 58 of the sliding floor 34 are supported at substantially the same level. It will be noted that, as the room 30 is extended, the floor 34 first moves slidably on the floor 18, and then moves downwardly until the flush position illustrated in FIG. 3. The walls 36 are supported on inner tube 48 and do not move vertically when the floor 34 moves relative to the walls 36 and the main floor 18 to move into the flush position. Accordingly, head room within the extendable or slide out room 30 is maintained, and no discontinuity in the floor is present.

When it is desired to retract room 30 into the main living quarters, the aforementioned hydraulic rams or other devices (not shown) are actuated to urge the inner tube 48 to the left in FIGS. 2 and 3. As this occurs, toggle 68 is pivoted about pivot 70 in the counter clockwise direction, since end 78 of toggle 68 is restrained against movement to the left in viewing FIG. 3 by curved portion 84 of the camming slot 80. Accordingly, counter clockwise pivoting of the toggle 68 urges link 72 to the left in viewing FIGS. 2 and 3, thereby rotating lever 52 about pivot 54 in a clockwise direction. Accordingly, the floor 34 will first be lifted by the lever 52 and by the action of roller 62 riding up the ramp 64 until the inner tube 48 has moved relative to tube 46 a distance sufficient to withdraw end 78 from the camming slot 80. Accordingly, the lever 52 is rotated back into position illustrated in FIG. 2, and lever 52, link 72, and toggle 68 travel with the inner tube 48 upon further retraction of the latter to bring the room 30 back into the retracted position illustrated in FIG. 2.

Referring now to the embodiment of FIG. 4, elements the same or substantially the same as those in the embodiment of FIGS. 1–3 retain the same reference numeral, but increased by 100. In the embodiment of FIG. 4, the camming plate 82 is replaced by a spring 186 which is secured to inner tube 48 as at 188. The opposite end of spring 186 is secured

4

at 190 to the link 172. Upon extension of the room 130, link 172 moves with inner tube 148 to the right viewing FIG. 4, until the end 178 of toggle 168 engages the frame 112. Engagement of end 178 with frame 112 prevents further movement of end 178 to the right viewing FIG. 4, so that further outward movement of the inner tube 148 relative to the tube 146 is transmitted through the link 172 that pivots the toggle 168, thereby bringing the latter to a vertical position and simultaneously lowering the lever 152 into the FIG. 3 position. When the room 130 is thereafter retracted, the inner tube 148 moves to the left viewing the figures, thereby moving the toggle 168 away from the frame member 112. Accordingly, the spring 186 urges the link 172 to the left viewing FIG. 4, thereby pivoting the toggle 168 into the position illustrated in FIG. 4. Accordingly, the lever 152 is pivoted into the raised position where it supports the end of 158 of movable floor 134 in the position illustrated in FIG. 4.

Referring now to the embodiment of FIG. 5, elements the same or substantially the same as those in the embodiment of FIG. 4, retain the same reference number. In FIG. 5, the spring 186 is replaced with a spring 192 connected between the wall 136 and the lever 152. Upon movement of the toggle 168 into engagement with the frame 112 as indicated in FIG. 5 during outward movement of the room 130, the lever 152 is rotated counterclockwise thereby lowering the floor 134 and extending the spring 192. Upon retraction of the room 130, movement of the toggle 168 away from the frame member 112 causes the spring 192 to rotate the lever 152 back into the upward position illustrated in FIGS. 2 and 4. Rotation of the lever 152 urges the floor 134 upwardly into the sliding position in which the floor 134 slides along the floor 118.

Referring now to the alternate embodiment of FIGS. 6 and 7, elements the same or substantially the same as those in the embodiment of FIGS. 1–3 retain the same reference characters, but increased by 200. The device illustrated in FIGS. 6 and 7 is similar to the device illustrated in FIGS. 1–3, except that the camming plates, toggle member, link and lever are replaced by a curved cam 294 which is pivotally mounted at 296 to the inner tube 248. An actuating stem 298 is pivotally connected to the camming member 294 at 300 and extends through frame member 212. A stop member 301 is secured to stem 298 and is adapted to engage engagement surface 302 on the frame member 212. Accordingly, the camming member 294 extends with the inner tube 248 until the stop member 301 engages engagement surface 302. When this occurs, further outward movement of the inner tube 248 pivots the camming member 294 in a clockwise direction into the position illustrated at FIG. 7. As the camming member 294 pivots, a spring 304 connected between the wall 236 and the camming member 294 extends, and simultaneously the floor 234 is gradually lowered into the FIG. 7 position. Upon retraction of the room 230 and resulting movement of the stop member 301 away from the stop surface 302, the spring 304 rotates the camming member 294 in the counterclockwise direction, thereby raising the floor 234 as the roller 262 rides up the ramp 264. Additional movement of the inner tube 248 to the left slides the floor 234 across the floor 218 until the room 230 is fully retracted.

We claim:

1. Mobile living quarters comprising a frame, a main floor supported by said frame, means extending from said main floor to define with said main floor a main living area, a retractable room mounted for movement from a retracted position retracted into the main living area to an extended

5,577,351

| 5 | 6 |

position extended from said main living area to provide an auxiliary living area, said retractable room having walls and a movable floor unattached to the walls of the retractable room and movable along said main floor with the walls of the retractable room and then movable relative to said walls of the retractable room from a sliding position sliding upon said main floor to a flush position substantially flush with said main floor when the retractable room is in the extended position, and linkage means mounted on said frame and engaging said movable floor for moving the latter relative to said walls of the retractable room from said sliding position to said flush position as said retractable room is moved into the extended position and from said flush position to said sliding position as the retractable room is moved away from the extended position.

2. Mobile living quarters as claimed in claim 1, wherein said retractable room moves horizontally between said extended and retracted positions and said movable floor moves vertically relative to the walls into said flush position as the retractable room approaches the extended position.

3. Mobile living quarters as claimed in claim 2, wherein said linkage means includes movable floor actuating means for causing the movable floor to move from said sliding position to said flush position as said retractable room approaches the extended position.

4. Mobile living quarters as claimed in claim 1, wherein said linkage means includes retractable room support means mounted on said frame and engaging said retractable room to guide the latter for movement relative to said frame.

5. Mobile living quarters as claimed in claim 1, wherein said linkage means includes retractable room support means mounted on said frame and engaging said retractable room to guide the latter for movement relative to said frame, a member carried by said support means for moving said movable floor between said sliding and said flush positions, and a link connected to said member for operating the latter, said link being responsive to movement of said retractable room into the extended position to move said member in a direction causing the movable floor to move into the flush position and responsive to movement of the retractable room away from the extended position to move said member in a direction causing the movable floor to move into the sliding position.

6. Mobile living quarters comprising a frame, a main floor supported by said frame, means extending from said main floor to define with said main floor a main living area, a retractable room mounted for movement from a retracted position retracted into the main living area to an extended position extended from said main living area to provide an auxiliary living area, said retractable room having walls and a movable floor movable along said main floor with the walls of the retractable room and then movable relative to said walls of the retractable room from a sliding position sliding upon said main floor to a flush position substantially flush with said main floor when the retractable room is in the extended position, and linkage means mounted on said frame and engaging said movable floor for moving the latter relative to said walls of the retractable room from said sliding position to said flush position as said retractable room is moved into the extended position and from said flush position to said sliding position as the retractable room is moved away from the extended position, said linkage means including retractable room support means mounted on said frame and engaging said retractable room to guide the latter for movement relative to said frame, said retractable room support means including a pair of relatively slidable members, one of said members being mounted on

said frame and supporting the other member for movement with said retractable room between said extended and retracted positions, said linkage means including an actuating linkage pivotally mounted on said other member and engaging said movable floor for moving said floor between said sliding position and said flush position.

7. Mobile living quarters comprising a frame, a main floor supported by said frame, means extending from said main floor to define with said main floor a main living area, a retractable room mounted for movement from a retracted position retracted into the main living area to an extended position extended from said main living area to provide an auxiliary living area, said retractable room having walls and a movable floor movable along said main floor with the walls of the retractable room and then movable relative to said walls of the retractable room from a sliding position sliding upon said main floor to a flush position substantially flush with said main floor when the retractable room is in the extended position, and linkage means mounted on said frame and engaging said movable floor for moving the latter relative to said walls of the retractable room from said sliding position to said flush position as said retractable room is moved into the extended position and from said flush position to said sliding position as the retractable room is moved away from the extended position, said retractable room moving horizontally between said extended and retracted positions and said movable floor moving vertically relative to the walls of the retractable room into said flush position as the retractable room approaches the extended position, said linkage means including movable floor actuating means for causing the movable floor to move from said sliding position to said flush position as said retractable room approaches the extended position, said linkage means including an arm pivotally mounted with respect to said frame and extending therefrom to support said movable floor, said arm being pivotal from a first position supporting said movable floor in said sliding position to a second position moving said floor into said flush position.

8. Mobile living quarters as claimed in claim 7, wherein said linkage means includes a lever pivotally mounted with respect to said frame and a link connecting said lever to said arm whereby pivoting of the link pivots said arm between said first and second positions, and pivoting means for pivoting said lever to move said arm between said first and second positions.

9. Mobile living quarters as claimed in claim 8, wherein said pivoting means includes a camming plate carried by said frame, said lever engaging a slot in said camming plate to pivot said lever from said first to said second position upon movement of said other member toward said extended position and from said second position to said first position upon movement of the other member away from said extended position.

10. Mobile living quarters as claimed in claim 7, wherein said linkage means includes a spring pivoting said lever from one of said first and second positions to the other position.

11. Mobile living quarters as claimed in claim 7, wherein said linkage means includes a link extending from said lever and stop means carried by said link for engaging a stop surface carried by said frame for pivoting said lever from one of said first and second positions to the other position.

12. Mobile living quarters as claimed in claim 11, wherein said linkage means includes a spring yieldably urging said lever from the other position to the one position.

13. Mobile living quarters as claimed in claim 7, wherein said linkage means includes means responsive to movement

5,577,351

7

of said retractable room into said extended position to pivot said lever from said first position to said second position, and a spring for returning said lever from said second position to said first position as said retractable room is moved away from said extended position toward said retracted position.

14. Mobile living quarters as claimed in claim 7, wherein said linkage means includes a camming link connected to said lever for moving the latter between said positions and a camming plate having a slot engaging said camming link for moving the latter in one direction in response to movement of said retractable room into said extended position and in the opposite direction in response to movement of said retractable room away from said extended position.

15. Mobile living quarters comprising a frame, a main floor supported by said frame, means extending from said main floor to define with said main floor a main living area, a retractable room mounted for movement from a retracted position retracted into the main living area to an extended

8

position extended from said main living area to provide an auxiliary living area, said retractable room having walls and a movable floor movable along said main floor with the walls of the retractable room and then movable relative to said walls of the retractable room from a sliding position sliding upon said main floor to a flush position substantially flush with said main floor when the retractable room is in the extended position, and linkage means mounted on said frame and engaging said movable floor for moving the latter relative to said walls of the retractable room from said sliding position to said flush position as said retractable room is moved into the extended position and from said flush position to said sliding position as the retractable room is moved away from the extended position, said linkage means including means for maintaining said movable floor substantially parallel to said main floor as the movable floor is moved between the flush and sliding positions.

* * * * *

# EXHIBIT
# O

US005491933A

# United States Patent [19]

## Miller et al.

[11] **Patent Number:** 5,491,933

[45] **Date of Patent:** Feb. 20, 1996

[54] **FLAT FLOOR SLIDE OUT APPARATUS FOR EXPANDABLE ROOMS**

[75] Inventors: **Mahlon A. Miller**, 8443W 1100N, Nappanee, Ind. 46550; **David A. Blosser**, Middlebury, Ind.

[73] Assignee: **Mahlon A. Miller**, Nappanee, Ind.

[21] Appl. No.: **308,971**

[22] Filed: **Sep. 20, 1994**

[51] Int. Cl.6 ........................................... B60P 3/34

[52] U.S. Cl. ....................... 52/67; 296/26; 296/165; 296/171; 296/175; D12/104

[58] Field of Search ................. 52/67; 296/171, 296/172, 173, 175, 176, 165, 26; D12/104

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| Re. 32,262 | 10/1986 | Stewart | 52/67 X |
| 1,279,819 | 9/1918 | Zingsheim et al. | 52/67 |
| 1,521,635 | 1/1925 | Lewis | 52/67 |
| 2,136,130 | 11/1938 | Gorlenko | 52/67 X |
| 2,704,223 | 3/1955 | Houdart | 52/67 X |
| 2,813,747 | 11/1957 | Rice, Jr. | 296/171 |
| 4,900,217 | 2/1990 | Nelson | 296/26 X |
| 4,930,837 | 6/1990 | Marsh et al. | 296/175 X |
| 5,237,782 | 8/1993 | Cooper | 52/67 |
| 5,332,276 | 7/1994 | Blodgett, Jr. | 296/171 X |
| 5,333,420 | 8/1994 | Eden | 52/67 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1570553 | 6/1969 | France | 296/26 |

### OTHER PUBLICATIONS

Barker Manufacturing Co., of Battle Creek, MI; Rollout Rack Drive Assembly Print; Jan. 6, 1994.

*Primary Examiner*—Carl D. Friedman
*Assistant Examiner*—Laura A. Saladino
*Attorney, Agent, or Firm*—Ryan M. Fountain

[57] **ABSTRACT**

An expandable room structure is provided having relatively movable room portions supported by telescopically sliding tubes, at least one of those tubes being movable also laterally to pivot as the room portion floors slide into the same horizontal plane when the room structure is moving into expanded positions. In retracted positions the room portion floors are vertically spaced to permit one room portion to nest within the other. A rack and pinion drive arrangement is provided to cause relative movement between the tubes. Lateral movement of one of the tubes is permitted by engagement with an inclined surface extending out of the other tube such that the laterally moving tube pivots about the pinion. A ramp surface is formed on the abutting edge of the floor of one room portion, and the abutting edge of the floor of the other room portion moves up and down that ramp portion when transitioning between expanded and retracted positions. When moving to expanded positions, such movement down the ramp occurs prior to pivoting of the sliding tube(s), such that end wall weather sealing is pivotably clamped without vertical sliding.

**14 Claims, 6 Drawing Sheets**



**U.S. Patent**          Feb. 20, 1996          Sheet 1 of 6          **5,491,933**



FIG. 1



FIG. 1A

FIG. 2

OUTER SUPPORT TUBE



FIG. 3



FIG. 4



FIG. 5



# FIG. 6

5,491,933

| 1 | 2 |
|---|---|

**FLAT FLOOR SLIDE OUT APPARATUS FOR EXPANDABLE ROOMS**

BACKGROUND AND SUMMARY OF THE INVENTION

The present invention relates generally to expandable rooms for habitable accommodations in static structures and vehicles. More particularly, this invention relates to room structures that are telescopically slidable between retracted and expanded positions.

Various motorized and towable vehicles are known which have rooms or portions thereof that can be adjusted between expanded and retracted positions in order to provide more or less internal accommodation, respectively, as desired by the user. In a typical structure, one portion of room is movable and telescopically received or nested within a portion of the room that remains fixed. Similar structures can be used effectively in buildings, although for convenience the discussion below focusses primarily on the vehicular examples.

When the vehicle, a Class A motor home, for example, is in motion the room remains in a retracted position. As such, there is typically adequate space within the room to accommodate users in transit and remain within the standard width limitations imposed upon motor vehicles. When the motor home is stopped for a length of time, however, it is often desirable to increase the size of internal accommodations. At that point users can slide the nested room portion out to its fully expanded position.

These movable room portions usually include a floor, a roof, a side wall and one or more end walls. In the retracted positions, the roof and end walls are typically concealed from exterior view and the room side wall forms a portion of the vehicle side wall. At the same time, the floor of the movable portion of the room typically rests above the floor of that portion of the room which remains fixed, and may form a portion of the usable interior floor during vehicle transit. Similarly, the ceiling of the movable roof portion may define the interior ceiling of that part of the vehicle during transit.

However, since the movable portion of the room is nested within the fixed portion of the room, the movable portion usually has at least some smaller dimensions than the fixed portion. Thus, when the movable portion is in expanded positions it is not uncommon for the floor of the movable portion to be higher than the floor of the fixed portion and for the ceiling of the movable portion to be lower than the ceiling of the fixed portion. Unfortunately, such stepped flooring has frequently been found to be undesirable, inconvenient and somewhat hazardous.

For example, due to the slight height difference of the step between floor portions, it can be overlooked by users an cause tripping or stumbling if care is not taken. Further, that step limits the freedom of movement of furniture within the room. Also, the step makes it more difficult to create an aesthetically pleasing floor appearance.

In response, certain slide out room structures have been suggested which permit the floor sections to have a flush upper surface in at least some expanded positions. Unfortunately, such structures can be overly complicated, expensive and relatively heavy. These can be serious drawbacks. In the vehicular environment, unnecessary slide mechanism weight cuts down on fuel economy when the vehicle is in transit. Also, vehicular structures often need to have greater insensitivity to vibration. Further, expandable or slide out

rooms are commonly employed in recreational vehicles. As such, reliability, of operation and minimal cost are important factors in marketing of the vehicle.

Also, some of these prior room structures have been found to have deficiencies in the weather sealing between the room portions. Since recreational vehicles are often used during inclement weather, defective weather sealing is a significant matter. It is believed that the weather sealing problems of certain prior movable room structures arise because the method of room movement involves first fully extending the movable room portion and then lowering the movable floor portion into alignment with the fixed floor portion. In doing so, the weather sealing strips often placed on the movable end walls first fully engage the receiving end walls of the fixed portion of the room and are then slid downwardly as the floors arc nude flush. Unfortunately, this downward sliding can damage the weather sealing strips and/or cause the sealing integrity to be reduced.

In designing an improved slide out mechanism for movable rooms, several other factors should be considered as well. For example, as the room expands, misalignment of the movable room portion can cause the end walls to bind together. This misalignment concern increases as the length of the movable room increases and as multiple slide support structures are employed to move the room portion. Further, as the width of the room and/or the extension distance out from the vehicle increases, the cantilevering forces exerted on the slide mechanism tend to cause sagging of the movable side wall. As a result, there is a tendency for the floor portions to separate at their abutting edges. Also, since for safety reasons and convenience the room portions typically need to be locked in place once in the expanded and retracted positions, the slide out mechanism should not interfere with or preclude ease of using the locking mechanism. In addition, since primary drive devices for the slide out mechanism, such as electric motors, will after time wear out, an easily available back up or emergency drive device should be included.

Accordingly, it is an object of this invention to provide an improved expandable room structure. Further objects include the provision of an expandable room structure that:

A. is relatively inexpensive to manufacture and reliable in use,

B. is of minimal weight and maintains sliding alignment against end wall binding,

C. creates a flush overall floor in expanded positions,

D. includes an easily accessible back up drive arrangement,

E. is durable and convenient to use in vehicles, and

F. maintains effective weather sealing.

These and other objects of the present invention are obtained by the provision of an expandable room structure having relatively movable room portions supported by telescopically sliding tubes, at least one of those tubes being movable also laterally to pivot as the room portion floors slide into the same horizontal plane when the room structure is moving into expanded positions. In retracted positions the room portion floors are vertically spaced to permit one room portion to nest within the other. A rack and pinion drive an-arrangement is provided to cause relative movement between the tubes. Lateral movement of one of the tubes is permitted by engagement with an inclined surface extending out of the other tube such that the laterally moving tube pivots about the pinion. A ramp surface is formed along the abutting edge of the floor of one room portion, and the abutting edge of the floor of the other room portion moves

5,491,933

**3**

up and down that ramp surface when transitioning between expanded and retracted positions. When moving to expanded positions, such movement down the ramp surface occurs prior to pivoting of the sliding tube(s), such that end wall weather sealing is pivotally clamped substantially without vertical sliding.

Especially for longer room structures, a plurality of such sets of telescopically sliding tubes can be used in cooperation to avoid end wall binding. A common cross shaft is joined to the pinions of the drive arrangements of each set, and a drive motor is connected to that cross shaft. Also, a keyed surface can be formed on the cross shaft to permit manual driving force to be applied.

Other objects, advantages and novel features of the present invention will now be readily apparent to those of skill in the pertinent art from the following drawings and detailed description.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows schematically a cross sectional front end view of a vehicle having an expandable room according to the teachings of the present invention when the room is in a partially retracted position.

FIG. 1A shows schematically a cross sectional top view as taken along line A—A of FIG. 1.

FIG 2 shows an enlarged cross sectional front view of a lower portion of the expandable room of the vehicle of FIG. 1 when that room is in a retracted position.

FIG. 3 shows a cross sectional front view, corresponding to that of FIG. 2, when the room is in an expanded position.

FIG. 4 shows a top, back perspective view of the room support structure of the embodiment of FIG. 2 when in an expanded position, with portions thereof broken away.

FIG. 5 a cross sectional side view of a specific embodiment of the support structure system of the embodiment of FIG. 2, as taken along line 5—5 of FIG. 4.

FIG. 6 shows a further enlarged cross sectional front view of the end wall junction of the embodiment of FIG. 2, taken along line 6—6 of FIG. 1A as the end walls are coming together during room expansion.

DESCRIPTION OF PREFERRED EMBODIMENTS

FIG. 1 through 6 and 1A show a preferred embodiment of the present invention as mounted in a vehicle, such as a Class A motor home or like motorized or towable recreational vehicle. The view of FIG. 1 is from the front of the vehicle looking to the rear, with the slide out room mounted for expansion on the left side of the vehicle. The present invention is not, however, limited to such arrangements, and has applicability, for example, to slide out rooms mounted for expansion on the right side or rear of the vehicle. Similarly, this invention is suitable as well for use in static structures, such as buildings, even though the preferred embodiments described herein are explicitly for vehicular applications.

Vehicle 10 includes slide out or expandable room structure 20 having first room portion 30 and second room portion 40. Room structure 20 is typically placed in a middle region along the length of the vehicle and forms a living and/or dining room area. Room portion 30 is, for example, fixed or stationary relative to vehicle 10, and room portion 40 is movable relative to vehicle 10 and room portion 30. In retracted positions, room portion 40 is telescopically

**4**

received or nested within room portion 30. In expanded positions, room portion 40 extends outwardly from room portion 30 in a cantilevered manner. The present invention provides a means for obtaining a flush floor within room structure 20 when room portion 40 is in expanded positions.

Room structure 30 includes first floor section 32, side wall sections 34, roof section 36 and end wall sections 38. In FIG. 1–6, only a single side wall and end wall section are shown. It will be understood from FIG. 1A, however, that another set of such walls is formed on the opposite side of the opening made in vehicle 10 to receive room portion 40. Side wall sections 34 preferably form part of the exterior sides of the vehicle. End wall sections 38 extend inwardly from side wall sections 34 and define a stop to the expansion movement of room portion 40. To achieve the maximum width of room structure 20 in expanded positions, the inward length of end wall sections 38 can be minimal. In especially preferred embodiments that length is nominal, and end wall sections 38 serve only to define the portion adjacent to or integral with side wall 34 upon which the weather sealing strips are mounted and/or in abutment.

Room portion 40 includes second floor section 42, side wall section 44, roof section 46 and end wall sections 48. Again, in FIGS. 1–6 only a single wall section 48 is shown, but it will be understood from FIG. 1A that such an end wall section is formed on each end of side wall section 44. These end wall sections extend inwardly to close side wall section 44 with side wall sections 34 when room portion 40 is in expanded positions. Thus, the inward length of end wall sections 48 define the limit of expansion of room portion 40. To achieve the maximum width of room structure 20, the inward length of end wall sections 48 can be maximized up to the point where those walls interfere with structure on the inside of vehicle 10 opposite side wall section 44 (such as cabinets, sinks, wall 39 or the like). However, in especially preferred embodiments where the vehicle is to be occupied when room portion 40 is in retracted positions, the inward length of end wall sections 48 is not maximized. Instead, a balance is achieved by making the inward length as large as it can be without unduly interfering with use of the vehicle interior during transit.

As shown especially in FIGS. 2 and 3, telescopically sliding tubes or rails are mounted under room structure 20 to provide support and control during expansion and retraction. In the embodiments shown, these tubes provide both support for room portion 40 and the actuation means for positioning that room portion. However, the present invention contemplates that in certain embodiments those functions can be achieved by separate elements.

Preferably, at least two of such tubes are mounted at positions spaced apart along the length of room structure 20, that length forming a portion of the length of vehicle 10. In especially preferred embodiments, these sets of tubes are aligned such that their length in longitudinal direction A is along the line of expansion and retraction of room portion 40, across the width of the vehicle. Each set of these tubes includes at least two tube elements.

A first, outer support tube 50 is, for example, fixedly mounted to the main frame or flooring beam structure 35 beneath room portion 30. A second, inner support tube 60 is slidably mounted within tube 50 and fixed at one end to room portion 40 adjacent the lower portion of side wall section 44. In this way, room portion 40 has a slidable, cantilever mounting to room portion 30.

A free rolling wheel 62 or similar device is attached to the opposite end of tube 60 and inserted within tube 50 to serve

5,491,933

| 5 | 6 |

as a support roller and assist in the longitudinal sliding of tube 60 into and out of tube 50. Tube 60 is formed, for example, as a rectangular conduit and also includes a series of spaced apart openings or slots 64, preferably along its lower surface or side. In the example shown, tube 60 is dimensioned to have clearance for sliding within tube 50 and for lateral upward movement as will be described further below. However, it will be understood that other embodiments can reverse the orientation of tubes, such that tube 50 is within tube 60, especially if an open rail structure is employed.

Preferably, a rack and pinion-type drive mechanism is employed for causing relative movement between tubes 50 and 60. For example, a drive and support wheel 52 is mounted adjacent the open end of tube 50 through which tube 60 moves. This wheel has a plurality of projections or prong teeth 54 about its circumference which are dimensioned so as to be freely engagable within slots 64. Wheel 52 is positioned on tube 50 and relative to tube 60 such that teeth 54 are aligned with and inserted into slots 64. In this way, rotation of wheel 52 supports tube 60, drives the sliding movement of tube 60 and positively locates that tube within tube 50. Thus, wheel 52 also precisely locates room portion 40 with respect to room portion 30.

Tube 50 further includes an inclined ramp or surface 56 extending upwardly which functions as an outward notch in lateral direction B toward room portion 30. In especially preferred embodiments where tube 50 has a rectangular cross section, ramp 56 is formed on the upper interior surface of the tube, facing tube 60, by separating a portion of that surface from the rest of the tube. For example, tube 50 can be cut at the intersection of the side walls and top wall of the tube and then sliced across the top wall at one end of that cut (preferably that end closest to drive wheel 52) in order to permit the flap formed thereby in the top wall to be lifted upward and outward. To maintain the desired slope and upward location of the flap, a strap element 58 is welded or otherwise secured in place between the free end of the flap and the portion of tube 50 below its free end. The interior dimensions of ramp 56 are established to permit wheel 62 to roll or slide upward to strap element 58. Preferably, the lateral elevation of ramp 56 at its upper end is sufficient that strap element 58 defines the limit of travel of wheel 62 towards drive wheel 52 and the open end of tube 50.

Floor section 32 includes an inclined or sloped end region or surface 33 at the edge which abuts floor section 42 when room structure 20 is in expanded positions. This inclined surface 33 serves as a ramp to permit room portion 40 to move laterally, as it moves longitudinally, between positions where floor section 42 is above floor section 32 and positions where floor section 42 is flush with floor section 32. As used herein, when these floor sections are "flush" their top surfaces are in substantially the same plane, preferably a horizontal plane, without a noticeable elevation between them.

Floor section 42 includes, for example, mating inclined surface 43 so as to facilitate a smooth and flush abutment between the floor sections. Floor section 42 also includes at least one roller or carrier 45 mounted to the underside of that floor section to movably support room portion 40 on room portion 30 in retracted positions. Roller 45 also facilitates telescopic sliding of the room portions between expanded and retracted positions, and especially up and down inclined surface 33.

As shown especially in FIG. 4, each set of tubes 50 and 60 are connected by a cross shaft 70 joining drive wheels 52,

preferably through the axis (or axes) of rotation of those drive wheels. Thus, cross shaft 70 can serve as a direct drive shaft to transmit rotational force to drive wheels 52 In this way, both sets of tubes (and, thereby, both ends of room portion 40) can be driven at the same speed.

FIG. 5 shows a specific embodiment of a preferred drive shaft arrangement for that purpose. It is not, for example, necessary to employ a single rod for cross shaft 70: multiple shaft segments or rods 72 (separately or combined into drive wheels 52) can be rigidly joined by various conventional adapters or couplings 74. If it becomes important to avoid radial bending of the cross shaft in a particularly long expandable room, one or more bearings 76 can be disposed intermediate drive wheels 52 and secured to any convenient support surface. At least one motor 80 is connected through coupling 78 to cross shaft 70 as the primary drive device to provide rotational force thereto. Preferably one synchronized electric gear motor 80 is disposed on each of the two ends of the cross shaft for this purpose.

In addition, a keyed or flattened surface or adjacent bushing 82 is provided with at least one of the adapters or couplings 74 attached to cross shaft 70, preferably intermediate drive wheels 52. Keyed surface 82 is configured to mate with a common hand tool, such as a wrench, or a specially formed tool to permit the application of rotational force to the cross shaft manually, as in the case of an emergency or break down of the primary drive device. Conventional electric control circuits are, for example, connected to electric motors 80 to permit operation from inside the vehicle. Preferably, however, Keyed surface 82 is located in an easily accessible region of the vehicle exterior.

In operation, after stopping the vehicle the user or operator will typically first unlock the room structure from a retracted position. Any number of conventional locking devices can be employed, although it is preferred to use a system that is compact and connects adjacent to the end wall sections inside of the vehicle. After that, electric motors 80 are actuated to cause tubes 60 to slide out of tubes 50. Since each tube 60 is being driven at the same speed, binding of the end wall sections can be avoided even in relatively long room structures. As tubes 60 continue to slide out, roller 45 moves down inclined surface 33 and wheel 62 moves up ramp 56 so that floor sections 32 and 42 can become flush in expanded positions of the room structure.

However, preferred embodiments these movements of roller 45 and wheel 62 are in a specific sequence so as to provide proper sealing and streamlined construction. For example, ramp 56 is preferably disposed within tube 50 at a location where wheel 62 comes into contact with the ramp after most of tube 60 has slide out from tube 50. As wheel 62 moves laterally up ramp 56, tube 60 will pivot about drive wheel 52 and the end of tube 60 attached below side wall section 44 will sag downwardly. This results from the torque exerted by gravity on the cantilevered support of room portion 40. Floor section 42 is dimensioned and configured so as to be flush with floor section 32 after that pivoting or "sagging" has occurred. Therefore, prior to pivoting, floor section 42 would be slightly inclined with respect to floor section 32 because of the upthrusting effect at side wall 44 as a result of roller 45 starting to move down inclined surface 33. If this slight incline is maintained even as roller 45 continues to move down inclined surface 33 further advantage is obtained.

FIG. 6 shows an enlarged, partial view taken along the vertical plane of line 6—6 of FIG. 1A. Unlike FIG. 1A, in this view the converging end wall sections 38 and 48 are

5,491,933

7

illustrated just as room portion 40 is moving to a fully expanded position. End wall sections 48 each include a stop wall 90 extending outwardly from that room portion. These stop walls serve to engage end walls 38 when room portion 40 is fully expanded and thereby limit the travel of that room portion outwardly from the vehicle. Conventional weather sealing material 92, also in compressible strip form, is placed on the abutting faces of stop walls 90 and/or end wall sections 38. If floor section 42 maintains a slight incline of angle C (that angle being exagerated in degree in FIG. 6 for ease of viewing) with respect to floor section 32 as roller 45 moves down inclined surface 33, then stop walls 90 will first engage end wall sections 38 only at their lower portions 94. Subsequent pivoting of tube 60 about drive wheel 52 will cause stop walls 90 to pivot through angle C to fully abut end walls 38 and clamp sealing material 90 therebetween without adverse vertical sliding. In this way, weather sealing of the end wall sections can occur in a bottom to top sequence. Thereafter, the operator will typically lock each side of the room structure in an expanded position via the conventional locking devices.

To achieve this combination of results, the components of the present invention and their relative placement are preferably dimensioned such that roller 45 starts to move down inclined surface 33 before wheel 62 starts to move up ramp 56. After the initial movement of roller 45 down inclined surface 33, wheel 62 moves up ramp 56 as roller 45 continues downward, such that some longitudinal and lateral movement of room portion 40 occurs simultaneously. I However, the relative angles and length of inclined surface 33 and ramp 5(5, are preferably established such that at least some pivoting of tube 60 occurs after roller 45 moves off inclined surface 33. Thus, the lateral distance that room portion 40 nee&; to be lowered in moving to expanded positions can be minimized and the supporting mechanism streamlined for minimal size and weight within a vehicle or other confined space.

Although the present invention has been described above with respect to specific embodiments, the same is by way of illustration and example only and is not to be taken as limitation. Numerous variations of the invention are contemplated in addition to those recited herein without departing from the essential features of this invention. Accordingly, the spirit and scope of the present invention are to be limited only by the terms of the claims below.

What is claimed is:

1. An expandable room structure comprising:

first and second room portions, each room portion having a floor,

said second room portion being mounted so as to be movable with respect to said first room portion between expanded and retracted positions, the floor of the second room portion being disposed above the floor of the first room portion in the retracted positions,

a first support tube mounted under said first room portion,

a second support tube mounted under said second room portion,

said second support tube being telescopically mounted with respect to the longitudinal length of said first support tube, and

said second support tube being mounted for lateral movement with respect to said first support tube, the extent of that lateral movement being sufficient to permit the floor of said second room portion to be flush with the floor of said first room portion when the second room portion is in the expanded position.

8

2. The invention according to claim 1 wherein rack and pinion drive means are connected to said first and second support tubes for causing relative movement between those tubes.

3. The invention according to claim 2 wherein said rack and pinion drive means includes as the pinion a drive wheel mounted on one end of said first support tube and an inclined surface is mounted on said first support tube such that, at a predetermined point in telescopic extension of said second support tube from said first support tube, said second support tube pivots about said drive wheel and a portion of said second support tube moves laterally along said inclined surface.

4. The invention according to claim 1 wherein said first support tube includes a laterally inclined surface and said lateral movement of said second support tube is achieved by sliding engagement of said second support tube with said inclined surface.

5. An expandable floor structure, including a first floor and a second floor which are relatively movable between expanded and retracted positions, the second floor being disposed above said first floor in the retracted positions, and an apparatus for causing relative movement between the first and second floors such that the first floor is flush with the second floor in the expanded position, that apparatus comprising:

an outer rail connected to the first floor and extending longitudinally,

an inner rail connected to the second floor and slidably mounted along the outer rail,

a drive wheel connected to the outer rail and having a surface which engages the inner rail to cause sliding of the inner rail with respect to the outer rail,

an inclined surface on the outer rail which extends laterally outward and is dimensioned so as to receive an end portion of the inner rail and thereby permit the inner rail to pivot about the drive wheel as the inner rail slides with respect to the outer rail.

6. The apparatus according to claim 5 wherein the first floor includes an inclined ramp along one side of that floor and the second floor includes at least one roller on its underside to permit the second floor to be movably supported on the first floor when in the retracted positions and to facilitate movement of the second floor down and up the inclined ramp as the second floor moves to and from the expanded position.

7. The apparatus according to claim 6 wherein the inner rail is connected to the second floor by a cantilevered mounting at one end of the inner rail, a plurality of openings are spaced along the length of the inner rail, and the surface of the drive wheel which engages the inner rail includes a plurality of projections which can be received in those openings.

8. The apparatus according to claim 7 wherein the inner and outer rails are formed as telescoping tubular elements, a free rolling wheel is attached to the end of the inner rail mounted within the outer rail to facilitate sliding movement between those rails and the free rolling wheel is engagable with the inclined surface as the inner rail slides with respect to the outer rail.

9. The apparatus according to claim 8 wherein the expandable floor structure includes at least two sets of the inner and outer rails, each set being spaced apart and having a common cross shaft connected to the drive wheel of each set, and includes at least one drive motor connected to that cross shaft so as to cause rotation of the drive wheels of each set of inner and outer rails.

5,491,933

9            10

**10.** The apparatus according to claim **9** wherein the cross shaft includes a keyed portion for receiving a hand tool for manually rotating the drive wheels.

**11.** A vehicle having a slide out room structure therein to selectively expand the internal accommodation of that 5 vehicle, said room structure including a first portion and a second portion slidably nested within said first portion when said room structure is in retracted positions, each of said first and second portions having a roof section, side and end wall sections and a floor section, the floor section of said second 10 portion being spaced above the floor section of said first portion when said room structure is in the retracted positions, and including means for moving said second portion relative to said first portion to define an expanded position of said room structure wherein the floor section of said first 15 portion and the floor section of said second portion are disposed on the same horizontal plane, that means comprising:

at least first and second sets of telescoping tubular support members mounted beneath said room structure, each 20 set including a inner tube and an outer tube,

said first and second sets of tubular support members being spaced apart, aligned longitudinally along the line of expansion and retraction of said room structure and connected by a cross shaft element, 25

one end of each of said inner tubes being connected adjacent said side wall section of said second portion and the other end of each of those tubes having a rotatable wheel element attached thereto and being mounted for sliding movement within one of said outer 30 tubes,

rack and pinion drive means provided on each of said sets of tubular support members, including a toothed drive wheel fixedly mounted at one end of each of said outer 35 tubes and a plurality of spaced slots along each of said inner tubes for receiving the teeth of said drive wheel,

said cross shaft joining each of said drive wheels to provide rotational force thereto,

at least one drive motor connected to said cross shaft,

an inclined ramp means formed on the interior of each of said outer tubes for receiving said wheel element,

said inclined ramp means extending laterally out of said outer tube and being disposed along the length of said outer tube such that when said wheel element slides along said inclined ramp means said inner tube pivots about said drive wheel,

a sloped end region provided on the side of the floor section of said first portion toward which said second portion moves in expansion of said room structure, and

a carrier means mounted beneath the floor section of said second portion for supporting said second portion at least in part on said first portion when said room structure is in the retracted positions and for facilitating movement of the floor section of said second portion up and down said sloped end region.

**12.** The vehicle according to claim **11** wherein the length of said inner tubes, said outer tubes and the floor section of said second portion along the line of expansion and retraction of said room structure as well as the position of said inclined ramp means and the carrier means are correlated such that as the room structure is expanded said carrier means engages said sloped end region before said wheel elements engage said inclined ramp.

**13.** The vehicle according to claim **12** wherein the end wall sections of said first and second portions each include substantially vertical elements which abut the vertical elements of the end wall section of the other portion when the room structure is in the expanded position, and wherein during expansion of said room structure the abutting vertical elements first engage at one end thereof and thereafter pivot together coincident with the pivoting of said inner tubes about said drive wheels.

**14.** The vehicle according to claim **13** wherein at least one of said vertical elements includes a weather sealing surface thereon and locking means are provided on at least one of said end wall sections to selectively secure said room structure in the expanded position.

\* \* \* \* \*

# EXHIBIT
# P

08/754872



Slideout mechanism #1
Peterson Industries, Inc.
Smith Center, ks

mech. does not level or center
itself to opening

mech. does not sit in opening

mech. mounts to floor

motor moves as bed moves
restriction to how far bed can move

round rail

cross brace

screw sissor
jack

no height adjustment

Acme screw

2 12" pipe

2" pipe

roller height adjustment
engages lower surface of slideout room floor

08/754872

Slideout mechanism #2
Peterson Industries,Inc.
Smith Center,  ks

mech. does not sit in opening

mech. does not level or center
itself to opening

roller height adjustment
engages lower surface of slideout room floor

mech. mounts to floor

slide plate

restriction to how far bed can move

square tube with roller chain welded to bottom
witch is engaged by sprocket

sprocket

motor mounted to floor

no height adjustment

square tube rail



**H**Verizon Services Corp. v. Vonage Holdings Corp.
C.A.Fed. (Va.),2007.
Only the Westlaw citation is currently available.
United States Court of Appeals,Federal Circuit.
VERIZON SERVICES CORP., Verizon
Laboratories, Inc., and Verizon Communications,
Inc., Plaintiffs-Appellees,
v.
VONAGE HOLDINGS CORP., and Vonage
America, Inc., Defendants-Appellants.
**Nos. 2007-1240, 2007-1251, 2007-1274.**

Sept. 26, 2007.

**Background:** Owner of patents relating to enhanced
internet domain name server and localized wireless
gateway system allowing wireless telephones to
register with system and make calls brought patent
infringement action against provider of telephone
services using voice over internet protocol (VoIP)
technology. The United States District Court for the
Eastern District of Virginia, Claude M. Hilton, Senior
Judge, entered judgment in owner's favor, and
provider appealed.

**Holdings:** The Court of Appeals, Dyk, Circuit Judge,
held that:

(1) patents relating to enhanced internet domain name
server did not require that system directly convert
higher level protocol identifier of node to different
lower level protocol;

(2) patentees' statement during prosecution history of
related patent operated as disclaimer of claim for
extended transmission range; and

(3) district court did not abuse its discretion in
enjoining provider.

Affirmed in part, vacated in part, and remanded.

Michel, Chief Judge, dissented in part and filed
opinion.

**[1]** Patents 291 ⟢0

291 Patents

Term "translating," as used in patents relating to
enhanced internet domain name server, did not
require that system directly convert higher level
protocol identifier of node to different lower level
protocol, even though specification's examples of
translation involved change in protocol from higher
to lower level protocol, where nothing in claim
language or specification required change in protocol.

**[2]** Patents 291 ⟢0

291 Patents

Term "conditional analysis," as used in patents
relating to enhanced internet domain name server,
meant determination that generated first result based
on first condition or data, and second result based on
different condition or data, but did not require that
conditional analysis performed be based upon called
party's preferences, where nothing in specification
required such limitation.

**[3]** Patents 291 ⟢0

291 Patents

Term "system," as used in patents relating to
enhanced internet domain name server, meant
computer system, such as one or more computers
and/or devices, that provided services to other
computer systems over network, but did not require
management of enhanced name translation service,
even though claims at issue specified "receiving a
name translation request at a server," and
specification discussed "providing enhancements to
the address processing of a domain name server,"
where there was no indication that term was being
redefined in specification to include any enhanced
name translation functions.

**[4]** Patents 291 ⟢0

291 Patents

Term "destination," as used in phrase "destination
address" in patents relating to enhanced internet
domain name server, did not refer only to final
destination, but also included intermediate
destinations, despite language in specification
defining "destination address" to mean final
endpoint, where language was from portion of
patent's "Background Art" describing how internet

--- F.3d ----
--- F.3d ----, 2007 WL 2781869 (C.A.Fed. (Va.))
(Cite as: --- F.3d ----)

worked in general, and proposed construction would have excluded several examples in specification where "destination address" was telephone number only, and thus not point in internet.

**[5] Patents 291 🔑0**

291 Patents
In order for statement made by patentee during prosecution history of patent in same family as patent-in-suit to operate as disclaimer, statement in prosecution history must be clear and unambiguous, and constitute clear disavowal of scope.

**[6] Patents 291 🔑0**

291 Patents
Statement made by patentees during prosecution history of patent relating to localized wireless gateway system allowing wireless telephones to register with system and make calls restricting its operation to within several feet of base station operated as disclaimer of claim for extended transmission range in related patent, even though related patent was issued before statement was made, where prior art references were all directed to non-localized systems, and patentees specifically restricted their invention to cordless phones operating "within a few feet from a base station."

**[7] Patents 291 🔑0**

291 Patents
Term "localized wireless gateway system," as used in patent relating to localized wireless gateway system allowing wireless telephones to register with system and make calls, was required to compress, decompress, and packetize voice signals, where, in describing invention, specification stated that "gateway compresses and decompresses voice frequency communication signals and sends and receives the compressed signals in packet form via the network."

**[8] Patents 291 🔑0**

291 Patents
Term "localized wireless gateway system," as used in patent relating to localized wireless gateway system allowing wireless telephones to register with system and make calls, did not require presence of multiple base station transceivers, even though specification

stated that "inventive system includes a plurality of base station transceivers."

**[9] Patents 291 🔑0**

291 Patents
Term "wireless telephone terminal," as used in patent relating to localized wireless gateway system allowing wireless telephones to register with system and make calls, did not require that terminal roam among plurality of base stations, even though specification on occasion made reference to "roaming" telephones, where there was no language that would require roaming in every case.

**[10] Federal Courts 170B 🔑0**

170B Federal Courts
Court of Appeals reviews district court's decision to grant injunction for abuse of discretion.

**[11] Patents 291 🔑0**

291 Patents
District court did not abuse its discretion in enjoining provider of telephone services using voice over internet protocol (VoIP) technology from infringing telephone company's patents relating to enhanced internet domain name server, despite provider's contention that damages were sufficient to compensate patentee's harm, in light of evidence of price erosion, as well as lost opportunities to sell other services to lost customers.

**Patents 291 🔑328(2)**

291 Patents
    291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
        291k328 Patents Enumerated
            291k328(2) k. Original Utility. Most Cited Cases
6,104,711, 6,282,574, 6,359,880. Construed.

Appealed from United States District Court for the Eastern District of Virginia, Senior Judge Claude M. Hilton.

Richard G. Taranto, Farr & Taranto, of Washington, DC, argued for plaintiffs-appellees. With him on the brief were John Thorne, Verizon, of Arlington, VA;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 3
--- F.3d ----, 2007 WL 2781869 (C.A.Fed. (Va.))
**(Cite as: --- F.3d ----)**

Brian C. Riopelle, McGuireWoods LLP, of Richmond, VA; and Peter C. McCabe III, Winston & Strawn LLP, of Chicago, IL, and Charles B. Molster III and Geoffrey P. Eaton, of Washington, DC. Roger E. Warin, Steptoe & Johnson LLP, of Washington, DC, argued for defendants-appellants. With him on the brief were Scott W. Doyle, Richard K. Willard, Seth A. Watkins, and Daniel L. Girdwood.

Before MICHEL, Chief Judge, and GAJARSA and DYK, Circuit Judges.DYK, Circuit Judge.

INTRODUCTION

**\*1** Appellants Vonage Holdings Corp. and Vonage America, Inc. ("Vonage") appeal from the judgment of the United States District Court for the Eastern District of Virginia in favor of appellees Verizon Services Corp., Verizon Laboratories Inc., and Verizon Communications, Inc. ("Verizon"). The judgment awarded $58,000,000 in compensatory damages and a royalty of 5.5% on any future infringing sales, based on a jury verdict that Vonage infringed claims of U.S. Patent Nos. 6,282,574 (" 574 patent"), 6,104,711 (" 711 patent") and 6,359,880 (" 880 patent"), and that those patents were not invalid as obvious. Vonage also appeals from the injunction entered by the district court barring Vonage from further infringing the asserted claims, including provisions that bar the use of certain methods and devices.

We hold that the district court did not err in its construction of disputed claim terms of the 574 and 711 patents. Therefore, we affirm the judgment of infringement with respect to those claims. However, we hold that the district court improperly construed one of the disputed terms in the 880 patent, and accordingly vacate the judgment of infringement with respect to the 880 patent and remand for a new trial.

We hold that the district court did not commit prejudicial reversible error in instructing the jury on the law of obviousness with respect to the 574 and 711 patents, and therefore affirm the judgment that the asserted claims of those patents would not have been obvious. However, in light of the error in the construction of the claims of the 880 patent and the possibility of error in the jury instruction on obviousness, we remand to the district court to determine whether prejudicial error occurred with respect to the jury instructions that would affect the obviousness verdict with respect to the 880 patent.

We vacate in its entirety the award of $58,000,000 in damages and the 5.5% royalty and remand to the district court for further proceedings. We affirm the injunction as to the 574 and 711 patents. We vacate the injunction insofar as it pertains to the 880 patent.

BACKGROUND

I Vonage's system

Since 2002 Vonage has provided telephone service to its subscribers through Voice over IP ("VoIP") technology. Vonage's system allows subscribers to place and receive telephone calls to and from parties that are Vonage subscribers and to and from parties that have traditional telephones without Vonage service. The principal difference between Vonage's service and traditional telephone service is that Vonage's system uses the internet to transmit telephone signals, rather than using the traditional public switched telephone network ("PSTN"). When Vonage subscribers place calls to non-subscribers on the PSTN, Vonage's system transmits the signals through the internet, and then relays them to the PSTN. Vonage's system uses subscribers' existing internet connections to transmit telephone signals electronically.

**\*2** There are three ways for Vonage subscribers to connect to Vonage's system. First, subscribers can use a traditional telephone, which is connected using a standard telephone cord to a terminal adapter (the user agent), which then converts analog voice signals to digital signals and communicates with the Vonage system to send or receive telephone calls. Second, Vonage subscribers can also use Vonage telephones that have an integrated, built-in terminal adapter. Third, Vonage subscribers can install certain software on their computers that allows their computer to be used as a telephone. Under this option, the subscriber simply speaks into a microphone attached to the computer, and hears responses through the speakers.

II Verizon's patents

Three Verizon patents are relevant to this appeal: the 574, 711, and 880 patents. These patents do not claim the invention of the internet telephone; rather, the basic purpose of the 574 and 711 patents (which

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2007 WL 2781869 (C.A.Fed. (Va.))                                    Page 4
**(Cite as: --- F.3d ----)**

share a specification) is to provide a server for enhanced name translation, which can be useful in implementing an internet telephone but is not limited to that purpose. The specification describes how the invention enhances the existing Domain Name System ("DNS"), which translates domain names (such as "www.fedcir.gov") into Internet Protocol ("IP") addresses. The invention enhances that system by allowing for a greater number of translations, including translations to and from telephone numbers. The invention is said to be "particularly advantageous for processing of voice telephone communications through the [internet]." 711 patent col.6, ll.48-50. The specification describes how users can use their computers' speakers and microphones to conduct conversations where the voice signals are carried in digital form through the internet.

The 880 patent describes a localized wireless gateway system that allows wireless telephones to register with the system and make calls. 880 patent abstract. According to the specification, cordless or wireless telephones can be registered with base station transceivers, which are then connected to the internet and the gateway. Id. col. 4 ll. 6-17.

For simplicity we limit our description to the claims and defenses presently at issue in this appeal. Verizon asserted the following claims of the 574, 711, and 880 patents:

Claim 27 of the 574 patent depends on claim 26. Claims 26 and 27 state:
26. A method comprising:
receiving a name translation request at a server coupled to a public packet data network;
translating a name included in the request into a destination telephone number associated with a name included in the request; and
transmitting a reply containing both the destination telephone number and a packet data network address of a telephone gateway coupled between the public packet data network and a telephone network through the public packet data network to a calling device.
**\*3** 26. A method as in claim 26, wherein the address is an Internet Protocol address.

Claim 20 of the 711 patent depends on claim 15. Claims 15 and 20 state:15. A method comprising:
receiving a name translation request at a server coupled to a public packet data network;
executing a conditional analysis in response to the name translation request;

if the conditional analysis produces a first result, translating a name included in the name translation request into a first destination address;
if the conditional analysis produces a second result, translating the name included in the name translation request into a second destination address; and
transmitting a response message containing the first or the second destination address to a calling device for use in establishing communication at least partially through the public packet data network.
20. A method as in claim 15, wherein:
the first and second destination address includes a numeric Internet Protocol address; and
the second destination address further includes information relating to call routing via a public switched telephone network.

Claims 1 and 6-8 of the 880 patent, state:1. A method comprising:
registering a wireless telephone terminal in a localized wireless gateway system;
transmitting registration data identifying the gateway system from the localized wireless gateway system to a home location register database through a public packet data communication network;
receiving a request from a calling computer coupled to the public packet data communication network for a call to the wireless telephone terminal;
in response to the request, accessing the home location register database and obtaining a packet data address for the localized wireless gateway system;
using the address to set up a voice communication through the public packet data communication network and the localized wireless gateway system between the calling computer and the wireless telephone terminal.
6. A method as in claim 1, wherein the public packet data communication network is a packet switched network.
7. A method as in claim 6, wherein the packet switched network comprises a system of interlinked data networks using TCP/IP protocol.
8. A method as in claim 7, wherein the system of interlinked data networks comprises the Internet.

III Limitations at issue in this appeal

Verizon alleges that features of Vonage's system correspond to limitations described in Verizon's patents. The first relevant feature of Vonage's system relates to transmission of the telephone number dialed by a Vonage subscriber. The Vonage system transmits this telephone number in a string of text

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                Page 5
--- F.3d ----, 2007 WL 2781869 (C.A.Fed. (Va.))
**(Cite as: --- F.3d ----)**

known as a SIP Invite. The telephone number is later extracted and reformatted by Vonage's server. Verizon alleges that this extraction corresponds to the "translation" required by each of the asserted claims of Verizon's 574 and 711 patents. The asserted claims of those patents specify translation of a "name" into a telephone number or into an internet address. Vonage does not agree that the extraction of a telephone number from a SIP invite can be a translation and argues that translation within the meaning of Verizon's patents must involve a change in protocol (or language) from a higher-level protocol-apparently meaning one that is closer to everyday expression than a native computer language-to a lower-level protocol-apparently meaning the opposite. Vonage concludes that the conversion from SIP invite to telephone number performed by its system cannot infringe because it does not involve a translation from a higher-level to a lower-level protocol.

**\*4** Vonage also argues that several other terms in the asserted claims of Verizon's 574 and 711 patents should be limited based on language in the specification of those patents, and that if so limited, Vonage's system does not satisfy those limitations. Vonage argues that the "conditional analysis" of claims 15 and 20 of the 711 patent must be responsive to the called party's needs. Vonage argues that, by contrast, in its system the conditional analysis merely results in redirecting calls involving a delinquent Vonage subscriber and thus is not related to the called party's needs. Vonage also argues that the "server" of claims 26 and 27 of the 574 patent and claims 15 and 20 of the 711 patent should be restricted beyond its ordinary meaning and must manage an enhanced name translation service. Finally, Vonage argues that the "destination" address of claims 15 and 20 of the 711 patent must refer to the final destination on the network and that the address of certain intermediary points on Vonage's system called RTP relays do not qualify as destinations under the proper construction of the term.

Verizon argues that several Vonage devices infringe claims 1 and 6-8 of the 880 patent. These devices include traditional cordless telephones that interact with a base station owned by the Vonage subscriber (such as the V-Tech IP 8100 and Uniden UIP1869V cordless telephones) and wi-fi devices that can be used at wi-fi hot spots throughout a city. Vonage makes a number of arguments with respect to the 880 patent. It argues that the patented "localized wireless

gateway system" must be read as limited in several ways. First, Vonage argues that it should be limited to a system that operates with a range of only a few feet, whereas the Vonage devices operate with a range of several hundred feet. Vonage also argues that the gateway itself compresses/decompresses and packetizes/depacketizes voice signals. These functions in the conversion of analog voice signals to digital signals are required to operate a hybrid system such as Vonage's where calls are transmitted through the internet but also through normal telephone lines when the called party is not a Vonage subscriber. But Vonage contends that these functions are performed at the subscriber's terminal rather than at the gateway as required by the 880 claims. Finally Vonage argues that the patented "localized wireless gateway system" and "Wireless Telephone Terminal," requirements of the 880 patent, must provide more than one base station and allow users to roam among different base stations, whereas users do not roam on Vonage's system.

### IV Procedural History

Verizon filed suit against Vonage on June 12, 2006, asserting that Vonage's system infringed Verizon's patents. The district judge held a claim construction hearing and issued a claim construction order on February 12, 2007, construing a number of disputed terms.

After a several-week jury trial, the jury rendered its verdict. The jury found that the asserted claims of the 574, 711, and 880 patents had been infringed. The jury also found that the asserted claims of the 574, 711, and 880 patents were not invalid as obvious, and that Vonage's infringement was not willful. The jury awarded damages of $58,000,000 and set a royalty rate of 5 .5% to govern any future infringement. The district court entered judgment on the jury verdict on March 13, 2007, and denied Vonage's motion for new trial on April 12, 2007.

**\*5** On April 12, 2007, the district court issued a permanent injunction barring Vonage from further infringing the asserted claims of the 574, 711, and 880 patents. The district court simultaneously stayed the injunction pending appeal as to present or existing customers. On April 6, 2007, Vonage filed an Emergency Motion for Stay in this court, seeking to extend the district court's stay of the injunction pending appeal to new customers as well. On April 24, 2007, after oral argument, we fully stayed the

--- F.3d ----                                                                      Page 6
--- F.3d ----, 2007 WL 2781869 (C.A.Fed. (Va.))
**(Cite as: --- F.3d ----)**

injunction pending appeal, and ordered expedited briefing.

Vonage timely appealed the district court's judgment to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

### DISCUSSION

### I

On appeal, Vonage contends first that, at the *Markman* hearing, the district court misconstrued a number of pertinent claim terms in each of the three patents. The district court used the same claim constructions in the jury instructions as it had articulated in its *Markman* decision. Because we conclude that the district court did not err in its jury instructions construing the claim terms of the 574 and 711 patents, we need not reach the question of whether raising claim construction issues at the *Markman* stage excuses compliance with the Rule 51 requirement that a party object to a jury instruction at the time the district court proposes it. We consider issues of claim construction without deference. *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1456 (Fed.Cir.1998) (en banc).

Vonage challenges the district court's construction of four terms in these patents. First, Vonage complains about the district court's failure to limit the term "translation" in asserted claims 26 and 27 of the 574 patent and claims 15 and 20 of the 711 patent. The district court instructed the jury that the term "name translation request" means "a query for translation of a name into routing information for a public packet data network."J.A. at 6622. Vonage argues that the district court erred in failing to define the claim term "translating," to require that the system "directly convert a higher level protocol identifier of a node to a different lower level protocol."J.A. at 2726. In its *Markman* decision, the district court rejected Vonage's interpretation and noted that "[a]lthough several examples appear in the specification demonstrating a translation from a higher to a lower level protocol, such limitations are not properly read from the specification into the claims."*Verizon Servs. Corp. v. Vonage Holdings Corp.,* No. 06-0682 at 14 (E.D.Va. Feb. 12, 2007) ("*Markman Order* ").

[1] We see no error in the district court's construction. Vonage points to nothing, and we can

find nothing, in the claim language or the specification that would support Vonage's proposed definition. The mere fact that the specification's examples of translation may involve a change in protocol from a higher to a lower level protocol does not establish that such a limitation should be imported into the claims. *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1323 (Fed.Cir.2005) (en banc) (cautioning against importing limitations from the specification into the claims); *Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n,* 805 F.2d 1558, 1563 (Fed.Cir.1986) ("This court has cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification."). Contrary to Vonage's argument, there is also no evidence that the ordinary meaning of translation in the art means a change in protocol from a higher-level to a lower-level protocol.[FN2]

**\*6** Second, Vonage challenges the district court's construction of the term "conditional analysis" in asserted claims 15 and 20 of the 711 patent. The district court instructed the jury that the claim term "conditional analysis" means "a determination that generates a first result based on a first condition or data, and a second result based on a different condition or data."J.A. 6622. Vonage argues that the district court should have limited the "conditional analysis" performed to one that is "based upon the called party's preferences."An example of a conditional analysis based on the called party's preferences would involve routing calls to different telephones based on the time of day. The district court rejected this interpretation in its *Markman* decision. *Markman Order* at 14.

[2] Here again we see no error in the district court's construction. Nothing other than specification examples supports Vonage's interpretation. *See, e.g.,*711 patent col. 11 ll.16-19. Although Vonage argues that the specification's discussion of the "present invention" requires that the conditional analysis performed be based upon the called party's preferences, the language it cites nowhere mentions the called party's preferences. *See*711 patent col.6; ll.41-47.

Third, Vonage complains of the district court's construction of the term "server" in asserted claims 26 and 27 of the 574 patent and claims 15 and 20 of the 711 patent. The district court instructed the jury that the term means "a computer system, such as one or more computers and/or devices, that provides

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

services to other computer systems over a network."J.A. at 6622. Vonage argues that the "server" of the asserted claims of the 574 and 711 patents must "manage[ ] an enhanced name translation service ."Appellants' Br. at 49.

[3] Again the district court rejected Vonage's proposed construction in its *Markman* decision, and we see no error in that ruling. *Markman Order* at 12-13. While the claims at issue specify "receiving a name translation request at a server," 574 patent, claim 26, 711 patent, claim 15, and the specification discusses "providing enhancements to the address processing of a domain name server," 711 patent col.4 ll.27-28, there is simply no indication that the term "server" is being redefined in the specification to include these enhanced name translation functions. The fact that such functions are mentioned separately when a "server" is mentioned in the claims weighs against limiting a "server" to one that performs the functions. *See* Phillips, 415 F.3d at 1314 ("[T]he claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel."). Since the specification does not define the term "server," we look to its ordinary meaning to a person of ordinary skill in the art. Vonage's proposed definition restricts the term "server" beyond this ordinary meaning. *See* Microsoft Computer Dictionary 474 (5th ed.2002) (defining "server" as "a computer ... that responds to commands from a client"); *see also* Phillips, 415 F.3d at 1314, 1318 (noting usefulness of technical dictionaries in construing claims).

*7[4] Finally, Vonage challenges the district court's failure to construe the term "destination" in the phrase "destination address" in asserted claims 15 and 20 of the 711 patent so that it refers only to a final destination, and not an intermediate destination. The district court did not instruct the jury with respect to the meaning of this term, and did not adopt Vonage's proposed construction. Vonage proposed the following construction: "Destination address means an identifier of an endpoint in the public packet data network."[FN3]J.A. at 68, 2727. Vonage argues that, because of the district court's failure to construe the term "destination," Verizon was able to argue to the jury that intermediate points in Vonage's system (*e.g.,* RTP relays) qualify as destinations within the meaning of the 711 patent.

We see no error in the district court's decision not to adopt Vonage's proposed construction. Vonage

principally relies on a passage in the specification that it claims defines "destination address" to mean a final address, and not an intermediate destination. *See*711 patent col.2 ll.26-37. That passage is excerpted not from a description of the invention of the 711 patent, but rather from a description, in the "Background Art" section of the patent, of how the internet works in general. Moreover, the cited passage describes how a "packet [of data] bearing a destination address" is forwarded through the internet until it arrives at a "destination computer." There is no reason to think that the same packet of data cannot then be forwarded again to another destination, until it reaches its final destination. Vonage's interpretation assumes that the "destination computer" must be a final endpoint. But it could just as easily be an intermediate endpoint, and the packet of data could then be forwarded to another "destination computer." Thus the cited passage does not redefine "destination" to mean "final destination." The cited passage also does not address the meaning of "destination address" within the patented invention, but only within the context of the general operation of the internet, and is of limited utility. Further, the ordinary meaning of the term "destination" is not limited to a final destination. In fact, Webster's Dictionary defines "destination" as "a place which is set for the end of a journey *or* to which something is sent: place or point aimed at [, *e.g.,*] when buying your plane tickets always buy through to your *farthest* [destination]." Webster's Third New International Dictionary 614 (2002) (emphasis added).

Finally, Vonage's proposed construction of "destination address" fails for another reason. As Verizon points out, Vonage's proposed construction requires that the destination be part of the "public packet data network," *i.e.,* the internet.[FN4]This reading would exclude several examples in the specification where the "destination address" is a telephone number only, and thus not a point in the internet. 711 patent col. 10 l.67 to col. 11 l.3 (destination address "may be ... [a] telephone number"); col.5 ll.52-54 ("In the preferred embodiment, the domain name server transmits different destination address information (IP address and/or telephone number).") (emphasis added). We normally do not interpret claim terms in a way that excludes disclosed examples in the specification. MBO Labs., Inc. v. Becton, Dickinson & Co., 474 F.3d 1323, 1333 (Fed.Cir.2007) ("[A] claim interpretation that excludes a preferred embodiment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                              Page 8
--- F.3d ----, 2007 WL 2781869 (C.A.Fed. (Va.))
**(Cite as: --- F.3d ----)**

from the scope of the claim is rarely, if ever, correct.") (internal citation omitted). Since Vonage's proposed construction was wrong by failing to account for the possibility that telephone numbers could be destinations, Vonage has failed to show error in the district court's failure to adopt it. *See Biodex Corp. v. Loredan Biomed., Inc.,* 946 F.2d 850, 854 (Fed.Cir.1991) (holding that the party challenging jury instructions must "demonstrate ... that the requested instruction *was proper*") (emphasis added); *see also Advanced Display Sys., Inc. v. Kent State Univ.,* 212 F.3d 1272, 1281 (Fed.Cir.2000) ("A party seeking to alter a judgment based on erroneous jury instructions must establish that [the proposed instruction] ... would have remedied the error.").

**\*8** Thus we conclude that there was no error in the district court's jury instructions with respect to the terms in the 574 and 711 patents.

II

We now consider whether the district court's failure to require the "localized wireless gateway system" of asserted claims 1 and 6-8 of the 880 patent to operate with a range of a "few feet" (discussed above) was error. Again we need not decide whether raising this claim construction issue at the *Markman* stage excuses compliance with the requirements of Rule 51. This is so because the trial record establishes that it indeed would have been futile for Vonage to object at the jury charge conference to the district court's construction of the claim term "localized wireless gateway system," on the ground that the district court failed to limit the range of such a system to a "few feet."[FN5]

Vonage proposed construing the term "localized wireless gateway system" to mean "a plurality of base station transceivers *with a limited range of a few feet* and a packet service gateway that compresses/decompresses and packetizes voice signals."Appellants' Br. at 26 n. 7 (emphasis added). Vonage argues that the gateway is limited to a transmission range of only a few feet because of statements made by the patentee during prosecution of a related patent of the same family as the 880 patent that so limited the term. The district court instructed the jury to interpret the term "localized wireless gateway system" as: "a system which is fixed to a limited or local area and which provides wireless service coverage within that local area," and did not include a "few feet" limitation. J.A. at 6623.

[5] We have held that a statement made by the patentee during prosecution history of a patent in the same family as the patent-in-suit can operate as a disclaimer. *Microsoft Corp. v. Multi-tech Sys., Inc.,* 357 F.3d 1340, 1350 (Fed.Cir.2004) (statement made during prosecution of related patent operated as a disclaimer with respect to a later-issued patent).[FN6] To operate as a disclaimer, the statement in the prosecution history must be clear and unambiguous, and constitute a clear disavowal of scope. *Id., at* 1356-57.

Such a clear disavowal has occurred here. The claims of the 880 patent originated in U.S. patent application No. 08/814,291 (" 291 application"). During prosecution the examiner issued a restriction requirement on the ground that the 291 application covered two independent and distinct inventions. The applicants then filed divisional application No. 09/363,750 (" 750 application"), pursuing some of the claims of the original 291 application, which was allowed as the 880 patent. The remainder of the claims of the original 291 application in turn matured into U.S. Patent No. 6,542,497 (" 497 patent' "). The claims of both applications require a "localized wireless gateway system." During prosecution of the 291 application the applicants' claims were rejected based on prior art wireless gateway systems.

**\*9**[6] The applicants gained allowance of the claims of the 291 application after stating that the prior art systems "all appear to be directed to non-localized systems," and that the "present invention," by contrast, was "restricted to operate within a few feet from a base station (i.e. wireless handsets)." J.A. at 7191. Thus the applicants stated:
Even further, [the prior art references] all appear to be directed to non-localized systems. More specifically, Applicant respectfully submits that although the term "wireless" is used in [the prior art references], "wireless" does not mean "local wireless," as claimed by the present invention, in the sense of a cordless phone that is *restricted to operate within a few feet from a base station* (i.e. wireless handsets). The term "wireless" in [the prior art references] is directed to systems having wide-ranging networks of switching machines.

*Id.* (emphasis added). The applicants also stated:[A prior art reference] arguably appears to disclose a local cellular or local wireless system, such as, for example, a cordless phone that is *restricted to*

--- F.3d ----                                                                                                     Page 9
--- F.3d ----, 2007 WL 2781869 (C.A.Fed. (Va.))
**(Cite as: --- F.3d ----)**

*operate within a few feet from a base station.*However, [the reference] does not disclose anything related to voice-over-internet or voice-over-internet protocol.

*Id.* at 7189 (emphasis added). We think that this language clearly disclaimed coverage of systems operating with a range greater than a "few feet," and that the district court erred in failing to construe the localized system as requiring a range of a few feet.

Verizon nonetheless argues that the disclaimer in the 291 application process (leading to the 497 patent) should not apply to the 880 patent because it occurred after the 880 patent issued. We reject this argument. As we held in *Microsoft,* where we faced the same situation (disclaimer occurred after patent-in-suit had issued), "we think that it is not unsound to apply the same interpretation to th[e] patent[-in-suit],""even though [that] patent had already issued." 357 F.3d at 1350.

Showing that the district court erred in instructing the jury is not sufficient to warrant a new trial, however. Vonage also must show it was prejudiced by the district court's error.[FN7]Vonage argues that it was prejudiced by the district court's error because several of its devices operate with a range greater than "a few feet" and, therefore, had the district court adopted Vonage's proposed instruction, those devices would not have been shown to infringe. As discussed above, because of the district court's claim construction Vonage was not able to introduce evidence that its telephones did not operate beyond a range of a "few feet." The record also clearly shows that it was prepared to offer such evidence. Under such circumstances we believe that Vonage has satisfied the requirement of prejudice. The district court's error in failing to limit the localized system to one with a range of a few feet therefore requires a new trial under the correct construction.

*10[7] Since a new trial is necessary on the issue of infringement with respect to the 880 patent, we believe it appropriate to interpret other claim terms that are disputed by the parties on appeal and are likely to be at issue in the new trial. Vonage challenges the district court's construction of the term "localized wireless gateway system" of asserted claims 1 and 6-8 of the 880 patent (the same term pertinent to the "few feet" limitation) on the ground that the district court erred in failing to require that the patented gateway system "compress[

]/decompress[    ] and packetiz[e] voice signals."Appellants' Bf. at 26, n. 7. We agree. The "Disclosure of the Invention" section of the 880 patent begins with a description of the gateway system of the "present invention." 880 patent col.4 ll.1-6. In the course of describing the "present invention," the specification then states that "[t]he gateway compresses and decompresses voice frequency communication signals and sends and receives the compressed signals in packet form via the network." *Id.* ll.12-15. When a patent thus describes the features of the "present invention" as a whole, this description limits the scope of the invention. *Honeywell Int'l, Inc. v. ITT Indus.,* 452 F.3d 1312, 1318-19 (Fed.Cir.2006); *Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1343 (Fed.Cir.2001) ("[T]he characterization of the coaxial configuration as part of the 'present invention' is strong evidence that the claims should not be read to encompass the opposite structure."); *see also Andersen Corp. v. Fiber Composites, LLC,* 474 F.3d 1361, 1368 (Fed.Cir.2007) (specification's description of a "critical element" found limiting).[FN8] Thus the term "localized wireless gateway system" must be limited to one performing compression and packetization functions at the gateway.

[8] Vonage also argues that the district court erred in failing to require that the "localized wireless gateway system" have multiple base station transceivers, because the specification states that "[t]he inventive system includes a plurality of base station transceivers." 880 patent col.4 ll.7-8. However, we have held that a limitation requiring a "plurality" may be satisfied by a single object. *Interactive Gift Express, Inc. v. Compuserve Inc.,* 256 F.3d 1323, 1335 (Fed.Cir.2001) ("[T]he reference to a plurality ... can consist of one material object."). Therefore, Vonage has failed to show error in the district court's interpretation.

[9] Finally, Vonage challenges the district court's construction of the claim term "wireless telephone terminal" of asserted claims 1 and 6-8 of the 880 patent. The district court instructed the jury to construe the term as "a telephone that communicates through radio signals to provide two-way voice communication."J.A. at 6623. Vonage alleges that the district court improperly failed to require that the "Wireless Telephone Terminal" roam among a plurality of base stations. Vonage's argument is meritless. Although the specification on occasion makes reference to "roaming" telephones, Vonage

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fails to identify language that would require roaming in every case. Vonage argues that because the patent requires multiple base stations, telephones must then roam between base stations. But we have rejected the contention that there must be multiple base stations, and the claims do not require roaming.

**\*11** We conclude that the district court erred in construing the term "localized wireless gateway system" by failing to require that the system be limited to an operating range of a few feet and perform compression and packetization functions, but hold that in other respects there was no error.

We remand for a new trial on the 880 patent, and accordingly vacate the injunction with respect to 880 patent.

### III

Vonage challenges the district court's instructions to the jury on obviousness concerning the need to find a "suggestion in the prior art to combine the elements."[FN9] Vonage's contention is that the district court "instructed the jury to rigidly apply the [teaching/suggestion/motivation to combine] test rejected by the Supreme Court in *KSR[Int'l Co. v. Teleflex, Inc.,* ---U.S. ----, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007)* ]. Appellants' Br. at 53-54.

First, we note that there cannot be prejudicial error with respect to the 574 and 711 patents because Vonage does not dispute that the obviousness testimony at trial centered on a single reference (U.S. Published Application No.2003/0193933 ("Jonas")), and thus any alleged error in instructions requiring a finding of motivation to combine several references would have been harmless. With respect to the 880 patent, because the majority is revising the claim construction of several key terms, a remand to the district court is necessary to consider whether a new trial should be granted on the issue of obviousness. In light of that remand, we also think it best to allow the district court to consider in the first instance Vonage's argument concerning alleged error in the instruction under *KSR,* and to consider the issue of prejudice.[FN10]

### IV

In light of our holding that a new trial is required on the issue of infringement of the 880 patent, we also vacate the determination that Verizon is entitled to a

damages award of $58,000,000 and a royalty rate of 5.5%, since the jury's verdict gives no indication what portion of such damages were allocated to the infringement of the 880 patent. In a situation-such as this one-where the jury rendered a single verdict on damages, without breaking down the damages attributable to each patent, the normal rule would require a new trial as to damages. *See Memphis Cmty. Sch. Dist. v. Stachura,* 477 U.S. 299, 312, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) ("When damages instructions are faulty and the verdict does not reveal the means by which the jury calculated damages, the error in the charge is difficult, if not impossible, to correct without retrial, in light of the jury's general verdict.") (internal quotation marks omitted).

The parties have not briefed whether there is any reason to depart from this general rule in this case. We think it is best under these circumstances to remand this issue for consideration by the district court in the first instance.[FN11]For the same reason, the district court should consider in the first instance the validity of the award of a 5.5% royalty rate to govern any future infringement, and the proper disposition of the amounts presently in escrow pursuant to the district court's stay order.

### V

**\*12**[10] Finally, we consider the injunction issued by the district court with respect to the 574 and 711 patents. Although we have sustained the verdict of infringement with respect to the 574 and 711 patents, Vonage argues that the district court abused its discretion by issuing an unsupported injunction with respect to those patents. We review the district court's decision to grant the injunction for abuse of discretion. *Joy Techs., Inc. v. Flakt, Inc.* 6 F.3d 770, 772 (Fed.Cir.1993).

The district court in this case made findings of fact under the four prongs of the test for issuance of an injunction, which require a plaintiff seeking an injunction to demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."*eBay Inc. v. MercExchange, L.L.C.,* --- U.S. ----, ----, 126 S.Ct. 1837, 1839, 164 L.Ed.2d 641 (2006). Vonage argues that the district

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                   Page 11
--- F.3d ----, 2007 WL 2781869 (C.A.Fed. (Va.))
**(Cite as: --- F.3d ----)**

court impermissibly based its finding of irreparable harm on lost sales alone, *see Abbott Labs. v. Andrx Pharm., Inc., 452 F.3d 1331, 1348 (Fed.Cir.2006)*, but the district court found there were "several areas of [irreparable] harm," J.A. at 6700, and the record contains evidence of price erosion as well as lost opportunities to sell other services to the lost customers.

Vonage also argues that an injunction was not necessary and that the reasonable royalty decided by the jury was sufficient to compensate Verizon's harm. *See Pfizer, Inc. v. Teva Pharm. USA, Inc., 429 F.3d 1364, 1381 (Fed.Cir.2005)* (citing *Polymer Techs., Inc. v. Bridwell, 103 F.3d 970, 974 (Fed.Cir.1996)*) (under certain circumstances "it may be reasonable to expect that invasion of the patent right can be recompensed with a royalty rather than with an injunction")).

[11] Vonage has demonstrated no clear error in the district court's determination to award an injunction with respect to the 574 and 711 patents. The district court considered the detailed testimony on both sides before deciding to issue the injunction. We see no abuse of discretion and therefore affirm the district court's decision to issue an injunction with respect to the 574 and 711 patents. While Vonage argues that the injunction was overbroad as to the 880 patent, it makes no such argument with respect to the injunction as to the 574 and 711 patents.[FN12]

CONCLUSION

We remand to the district court for a new trial on infringement of the 880 patent in light of our holding that the district court erroneously instructed the jury with respect to the meaning of several contested claim terms. We also vacate paragraph 3 of the injunction issued by the district court and all other portions of the injunction that relate to the 880 patent, but affirm the injunction in other respects. We remand to the district court as well to determine whether the jury instructions on obviousness were erroneous in light of *KSR*, and whether any error was prejudicial as to the 880 patent. We vacate the award of $58,000,000 in damages and the 5.5% royalty rate, and remand to the district court for further consideration of the damages issue. In other respects, the decision of the district court is affirmed.

**\*13** For the foregoing reasons, the decision below is

*AFFIRMED-IN-PART, VACATED-IN-PART, and REMANDED*

COSTS

No costs.

Chief Judge MICHEL filed an opinion dissenting-in-part.

MICHEL, Chief Judge, dissenting-in-part.
Although I join in the majority opinion with regard to its disposition of the claim construction, invalidity, and injunction issues relating to two of the patents-in-suit, U.S. Patent Nos. 6,282,574 (" 574 patent") and 6,104,711 (" 711 patent"), I respectfully dissent as to its disposition of the issues regarding the third patent-in-suit, U.S. Patent No. 6,359,881 (" 880 patent"), as well as its vacating the damages awarded by the jury. I would hold that the district court correctly construed all of the terms at issue in this appeal. Further, I would hold that the district court's jury instructions on obviousness were consistent with the Supreme Court's decision in *KSR Int'l Co. v. Teleflex, Inc., --- U.S. ----, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007)* and the precedents of this court. Therefore, I would affirm the district court's liability judgment, its damages award, and its permanent injunction in their entirety.

I. Claim Construction

A. 880 Patent: "Few Feet"

The majority holds that the district court erred by failing to construe the 880 patent's claims to limit them to systems that operate within a range of a "few feet."[FN1] It is undisputed that the claims of the 880 patent do not include any such range limitation. But the majority imputes one from the use of the claim term "localized wireless gateway system," focusing specifically on the requirement that the gateway system be "localized." It does so based on reading out of context snippets of language used by the applicants in the prosecution of not the 880 patent, but rather a related patent not asserted in this case.

We have made clear the methods by which claims must be construed. The explicit language of the claims must be examined, and typically the ordinary meaning of the claim language will control. *Phillips v. AWH Corp., 415 F.3d 1303, 1312-13*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 12
--- F.3d ----, 2007 WL 2781869 (C.A.Fed. (Va.))
**(Cite as: --- F.3d ----)**

(Fed.Cir.2005). The specification must also be scrutinized and the claim language read in the context of the specification. *Id.* at 1315.The prosecution history may also be relevant, and can be dispositive when the applicant clearly and expressly disavowed claim scope. *Id.* at 1317;*see also Amgen Inc. v. Hoechst Marion Roussel, Inc.,* 314 F.3d 1313, 1327 (Fed.Cir.2003) (holding that "the prosecution history may not be used to infer the intentional narrowing of a claim absent the applicant's clear disavowal of claim coverage").

Here, as already mentioned, the claim language merely requires the gateway system to be "localized." As the district court properly noted, the specification clarifies what is meant by "localized." It states that "[t]he gateway system is a localized private system, as opposed to the common, public cellular telephone networks," that can "provide communication within an office or industrial complex ... [or] a geographically limited public area of interest, such as an airport, shopping center, hotel/convention center complex or the like." 880 patent col.5 ll.30-37; *see also id.* col.10 ll.30-38 (discussing an embodiment that is "a business application for a single factory or office location" where the system's service "would be limited to the area in and around the factory or office location"); *id.* col. 10 ll.42-44. Nowhere does the specification mention any restriction to a "few feet;" to the contrary, it discloses areas of operation as large as an airport, shopping center, or industrial complex. Consequently, the district court properly rejected Vonage's proposed "few feet" limitation.

***14** The majority subverts the import of the unquantified term "localized" and ignores the clear meaning of the claim language and specification by finding prosecution history disclaimer. To be limiting, such a disclaimer must be clearly and expressly stated. *Amgen,* 314 F.3d at 1327. I agree with the majority that the prosecution of a divisional application may sometimes disclaim claim scope in a co-divisional application in the same family, even if the disclaimer occurs after the co-divisional application has been filed or issued as a separate patent. But the allegedly disclaiming language in the file history of the 880 patent's co-divisional application relied on by the majority as overpowering numerous clear statements in the specification simply does not rise to the level of a clear disavowal of claim scope.

The majority seizes on two passages in the 880 patent's co-divisional application file history, both instances where the applicants are distinguishing their invention from prior art. In one, the applicants note that " 'wireless' [as used in the prior art references] does not mean 'local wireless,' as claimed by the present invention, *in the sense of* a cordless phone that is restricted to operate within a few feet from a base station."J.A. at 7191 (emphasis added). The applicants here are clear that they are merely distinguishing certain prior art where "the term 'wireless' ... is directed to systems having wide-ranging networks" that span large geographic areas. *Id.* This distinction is precisely the same made in the specification. While the applicants use the *example* of a cordless phone operating within a few feet to illustrate why their invention is different, they are not clearly disavowing everything other than such cordless phones.

The second excerpt from the prosecution history is even less clear as an alleged disavowal. The applicants merely stated, "[a prior art reference] arguably appears to disclose a local cellular or local wireless system, *such as, for example,* a cordless phone that is restricted to operate within a few feet from a base station."J.A. 7189 (emphasis added). Applicants are describing a prior art reference, not their invention, and again simply use the "example" of a cordless phone as an illustration. The applicants go on to distinguish that prior art on other grounds. *See id.*This is not the "clear disavowal" of claim scope required by our precedents. Since no clear disavowal appears in the prosecution history, and the claim language, read in the context of the specification, specifically includes numerous embodiments with ranges greatly exceeding a few feet, I must dissent from the holding that the district court erred by not limiting the term "localized wireless gateway system" to require ranges limited to a few feet.

B. 880 Patent: Compression/Packetization

The majority also finds error in the district court's decision not to limit the term "localized wireless gateway system" to require that the gateway perform data compression and packetization. I cannot agree. Once again, the claim language is silent and does not mention these functions. The district court correctly concluded that the term should not be so limited.

***15** This time, the majority relies on a passage in the specification where it states: "Thus, *in one aspect, the*

--- F.3d ----                                                                                    Page 13
--- F.3d ----, 2007 WL 2781869 (C.A.Fed. (Va.))
**(Cite as: --- F.3d ----)**

present invention relates to a localized wireless gateway system.... The gateway compresses and decompresses voice frequency communication signals and sends and receives the compressed signals in packet form via the network." 880 patent col.4 ll.6-15 (emphasis added). But the majority fails to consider that this specification was originally penned to also support claims that were ultimately prosecuted in a separate divisional application, pursuant to a restriction requirement imposed by the PTO, because they constituted a separate and distinct invention. Those claims were issued in U.S. Patent No. 6,542,497 (" 497 patent"), which was not asserted in this action. The 497 patent claims a "localized wireless gateway system" that contains certain specific features, including components to compress and packetize data. 497 patent cl.1. Thus the "one aspect" referred to in the specification actually refers to subject matter outside the scope of the 880 patent altogether. And as already discussed and as the district court noted, the claims of the 880 patent do not require any particular type of "localized wireless gateway system" or that it perform any particular functions.[FN2] In such situations, we have held that the portions of the specification relating to claims of a separate divisional application should not be limiting. See LG Elecs., Inc. v. Bizcom Elecs., Inc., 453 F.3d 1364, 1378 (Fed.Cir.2006). Thus, I would affirm the district court's decision not to limit the term "localized wireless gateway system" in the 880 patent to require performance of data compression or packetization.

## II. Obviousness

The majority remands to the district court for reconsideration of the obviousness issues relating to the 880 patent. Because I do not discern claim construction error, I also would affirm the district court's determination that the 880 patent is not invalid and also reject Vonage's argument for reversal due to alleged defects in the jury instructions under *KSR*. Vonage argues that the district court applied the "rigid and mandatory" requirement of a "teaching, suggestion, or motivation to combine known elements," which the Supreme Court rejected in *KSR*. *KSR, 127 S.Ct. at 1741*. I disagree.

The relevant instructions were:
If you find that a combination of items of the prior art showed each of the elements of the claims in suit, you must determine whether a person of ordinary skill in the art would have been motivated to combine

the prior art references.

\* \* \*

If you conclude that the prior art discloses all the elements of the claimed invention, but those elements are found in separate prior art references, you must then consider whether or not it would have been obvious to combine the elements.
To answer this question yes, you must determine that there was some suggestion in the prior art to combine the elements. The suggestion can be expressly stated in a particular reference, or it may be within the knowledge that was generally available to one of ordinary skill in the relevant art.

**\*16** J.A. at 6626. I think it plain that these instructions do not require an explicit reason to combine to be found in the prior art references themselves. Rather, the district court instructed that such a reason could be gleaned from "the knowledge that was generally available to one of ordinary skill in the relevant art." *Id.* Such an instruction is correct.

## III. Damages and Injunction

Since I would affirm the district court's judgments on infringement and validity, I would not disturb the jury's determination of damages nor the district court's permanent injunction. Further, even when this court reverses a district court's finding of infringement and/or validity as to some, but not all, of the patents-in-suit, we do not necessarily need to vacate and remand the damages award.

When, as here, the evidence shows that each of the accused products infringes *all* of the patents-in-suit, and the infringer fails to make any showing on appeal that the damages award would not be supported by only those patents for which we affirm liability, we must affirm the damages despite our reversal of part of the infringer's liability. Remanding simply to reconfirm that the damages award is indeed supported by the affirmed liability under the remaining patents-in-suit imposes unnecessary costs on litigants and wastes judicial resources. Therefore, we should affirm the jury's determination of Verizon's damages even assuming that the claims of the 880 patent were improperly construed.

## CONCLUSION

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2007 WL 2781869 (C.A.Fed. (Va.))
**(Cite as: --- F.3d ----)**

In my view, this case is yet another example of our court needlessly upsetting judgments by finding legal error in Markman rulings that, while perhaps less than perfectly explained, are correct and that follow the methods for claim construction as explained in our precedents. Requiring more is not justified. Accordingly, I dissent.

Circuit Judge GAJARSA filed an opinion concurring-in-part and dissenting-in-part.GAJARSA, Circuit Judge, concurring-in-part and dissenting-in-part.

I join the court's decisions to vacate the judgment of infringement as to the 880 patent, to affirm infringement of the 574 patent, to affirm the judgment that the 574 and 711 patents are not invalid due to obviousness, and to remand the issue of obviousness of the 880 patent. However, I believe that the district court erred in failing to construe the claim term "destination address" and that Vonage's proposed construction is substantially correct. I would therefore vacate the judgment of infringement of the 711 patent, and I dissent from the court's judgment to the contrary.

Vonage proposed a definition for the 711 patent claim term "destination address" before the district court, arguing that the destination address must identify "a called device or service endpoint."[FN1]However, the district court's *Markman* order and its resulting jury instructions lacked any reference to this term. The only instruction to the jury regarding this claim term arose from a catchall directive: terms the court had left undefined "are to be given by you [the jury] their customary and ordinary meaning to a person of ordinary skill in the art." Failing to construe this term was error, both because the district court was obligated to provide some guidance to the jury on this term and because Vonage's definition is the correct one. Vonage should be entitled to a remand for further proceedings on infringement of the 711 patent.

*17 A full understanding of the dispute between the parties on this claim term requires a brief foray into the technical details of Voice over IP ("VoIP") calls. A VoIP call is placed over a "public packet data network," in the parlance of the 711 patent's written description-in practice, the call is placed using the Internet. In a typical VoIP telephone call, the caller and callee each have an Internet Protocol ("IP") address, and the data packets comprising the telephone call are routed over the Internet between

them.[FN2] This routing is more-or-less direct: like all Internet traffic, the packets pass through a variety of network routers on their way to their destination, but they are preferably sent along the shortest or otherwise most efficient path the Internet is able to provide. In some cases, however, this form of direct connection is not possible. For instance, if one or both of the parties to the conversation has a NAT, or "network address translation," device between it and the rest of the Internet, technical limitations may prevent a direct Internet connection between the two conversants from being formed. In these cases, Vonage provides an "RTP relay" server to which both parties connect and which relays traffic from caller to callee and vice versa.

When an RTP relay is interposed into the call, the IP address provided to the calling computer is that of the relay, not that of the called computer. Verizon asserts that in such a case, the address of the relay is the "destination address" as that term is used in the asserted claims of the 711 patent. Vonage disagrees, arguing that because the RTP relay is not the final destination of the data making up the call, the RTP relay's address cannot be the destination address. The called computer is not provided with a "destination address" under Vonage's definition, so if Vonage prevails on this claim construction issue it would likely be entitled to a finding of no literal infringement of the asserted 711 patent claims.

As the above discussion should illustrate, the dispute between the parties on this term is a subtle, technical, and substantial one. The parties do not dispute that the data in an RTP-relayed call has its final destination at the callee's computer, but that the individual IP packets sent from the calling computer have as their destination the RTP relay. Whether this arrangement embodies the "destination address" limitation entirely turns on what the scope and meaning of the term is. In the face of such a claim interpretation dispute, it is the duty of the court to resolve the issue. *See Markman,* 52 F.3d at 979 ("[I]n a case tried to a jury, the court has the power *and obligation* to construe as a matter of law the meaning of language used in the patent claim."(emphasis added)). The district court here did not meet that obligation. Nowhere in its *Markman* order is the term "destination address" mentioned. The district court's "customary and ordinary meaning" instruction essentially delegated to the jury the task of construing this claim term-without guidance from the bench, the jury was directed to impose its own definition on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

unconstrued terms. Especially when parties request that the court construe a claim term-as Vonage did here-such delegation is improper.

*18 The district court's error in failing to construe the term "destination address" would have been harmless if Vonage's proposed limiting definition lacked merit. However, I would conclude that Vonage has correctly stated the definition of the term: a "destination address," as that term is used in the 711 patent, is the address of the endpoint of a call. The examples supplied in the patent's written description all speak to the "destination" or "destination address" as being that of the actual called party. For instance, the patent references "different *destinations* of roaming subscribers," 711 patent col.4 ll.15-16 (emphasis added), and "determination of the status of a destination terminal,"*Id.* col.5 ll.24-25. A concrete example notes:
In the preferred embodiment, the domain name server transmits different *destination address* information (IP address and/or telephone number) depending on which of two or more time windows covers the time of arrival of each translation request. In this manner, the customer can have the server return different address information at different times of the day, week or month. As a result, parties seeking to communicate with someone having one name on the network, actually receive instructions to communicate with two or more alternate *destinations* at different times. For example, the communications might go to the *customer's office* during office hours and to the *home* at other times.

*Id.* col.5 ll.52-63 (emphases added). This passage is consistent with a reading of "destination address" in which the "destination" must be the endpoint of the call-here, the recipient's home or office, as appropriate. This usage of "destination" in contradistinction to an intermediate position in the network is not confined to descriptions of the preferred embodiment. In a preliminary description of Internet architecture, the patent notes:When a packet bearing a *destination address* leaves the source router, the router examines the first two numbers in a matrix table to determine how many hops are the minimum to get to the destination. It then sends the packet to the next router as determined from that table, and the procedure is repeated. Each router has a database table that finds the information automatically. This continues until the packet arrives at the *destination computer.*

*Id.* col.2 ll.26-33. This passage clearly distinguishes "routers"-intermediaries which simply pass network traffic along-from "destination computer[s]" at which the traffic comes to rest.[FN3]RTP relays function as routers. I acknowledge that an RTP relay does not function only as a "router" as that term is technically defined by the Internet Protocol, since the IP packets are addressed to the relay and, from the perspective of Internet routers, terminate at the relay. However, the relay does little more than an IP router does-it simply repackages the received data in a different IP packet and forwards it along to the ultimate destination. I do not believe there is a meaningful distinction within the context of this patent between a "router" and "relay." The patent clearly distinguishes intermediary pass-through nodes on the network from the endpoints.

*19 The majority points out that the patent describes an embodiment in which the "destination address" is only a telephone number, and argues that such an embodiment would be improperly excluded because "Vonage's proposed construction requires that the destination be part of the 'public packet data network.' " Maj. Op. at 15-16. However, Vonage's claim construction arguments did not need to focus on such a restriction, because the dependent claim actually asserted by Verizon explicitly requires that "the ... destination address include[ ] a numeric Internet Protocol address," excluding phone-number-only embodiments. 711 patent claim 20. The thrust of Vonage's argument was instead that "*[w]ith respect to the asserted claims* of the 711 patent, the destination address is always the *final endpoint* in the public packet data network."J.A. 68 (emphasis added). Even if Vonage's proposed definition of "destination address" were technically flawed in some minor particulars, a court's "task is not to decide which of the adversaries is correct" but rather to "independently ... declare the meaning of the claims."*Exxon Chem. Patents, Inc. v. Lubrizol Corp., 64 F.3d 1553, 1556 (Fed.Cir.1995).* We have the power to approve those aspects of Vonage's proposed claim construction which comport with the evidence while rejecting those aspects which do not.

The evidence here indicates that Vonage's position on the endpoint versus intermediary issue-the relevant issue actually disputed by the parties-is correct. Reading the term "destination address" in the context of its usage by the specification, *see Phillips v. AWH Corp., 415 F.3d 1303, 1316 (Fed.Cir.2005)* (*en banc* ), I conclude that the patentees meant to designate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 16
--- F.3d ----, 2007 WL 2781869 (C.A.Fed. (Va.))
**(Cite as: --- F.3d ----)**

only the endpoint of the VoIP call. Verizon's theory of infringement, to the extent that it identifies the address of an RTP relay as a "destination address," is without merit under that meaning. I would vacate the judgment of infringement of the 711 patent, vacate the injunction to the extent that it references the 711 patent, and remand with instructions to conduct further proceedings under a definition of "destination address" limited to the ultimate destination of the VoIP data.[FN4]

FN1. All judges agree that the Introduction and Conclusion accurately state the holding of the case.

FN2. Vonage alternatively argues that the district court should have instructed the jury that translation requires a change in protocol, and that the extraction of a telephone number that the Vonage system performs is not a change in protocol. Vonage also argues that a mere extraction cannot be a translation. These arguments were not even raised in Vonage's claim construction briefs in connection with the *Markman* hearing. There is nothing in the specification or prosecution history that would compel Vonage's interpretation. Vonage offers no supporting dictionary definition of the term "translation." Under these circumstances one might have expected Vonage to provide expert testimony that those skilled in the art would understand the term "translation" to have the meaning that Vonage urged. But Vonage has not called our attention to any such testimony. On the other hand Verizon's expert did testify that one skilled in the art would understand extraction to constitute translation. We see no error in the district court's failure to include Vonage's interpretation in the jury charge.

FN3. The asserted claims of the 711 patent refer to a "destination address" multiple times:
15. A method comprising:
receiving a name translation request at a server coupled to a public packet data network;
executing a conditional analysis in response to the name translation request;
if the conditional analysis produces a first

result, translating a name included in the name translation request into a first *destination address;*
if the conditional analysis produces a second result, translating the name included in the name translation request into a second *destination address;* and
transmitting a response message containing the first or the second *destination address* to a calling device for use in establishing communication at least partially through the public packet data network.
20. A method as in claim 15, wherein:
the first and second *destination address* includes a numeric Internet Protocol address; and
the second *destination address* further includes information relating to call routing via a public switched telephone network.
711 patent (emphasis added).

FN4. Vonage proposed the following construction: "Destination address means an identifier of an endpoint *in the public packet data network.*" J.A. at 68, 2727 (emphasis added).

FN5. During the trial Vonage sought to present expert testimony that the claims required that the patented system was limited to a range of a "few feet" and that the Vonage system was not so limited. Verizon's counsel objected, arguing that "[t]he Court has already construed the claim and there is no need for anything with respect to the prosecution history. The Court has already looked at it and, frankly, rejected this proposed limitation which Vonage offers."J .A. at 6046 (1144:10-14). In response the district court sustained Verizon's objection. Verizon itself clearly understood the district court to have announced that the construction of this term was finally determined: later in the trial Verizon again argued that the claim construction of this term was finally determined and not open to being reargued at trial, and that Vonage testimony regarding the operating range of one of its devices should be excluded. *See* J .A. at 6061. Under these circumstances a further objection would have been futile, and the claim of error was preserved.

FN6.*See* *Alloc, Inc. v. Int'l Trade Comm'n, 342 F.3d 1361, 1371-72 (Fed.Cir.2003)* (statements made during prosecution of parent patent surrendering subject matter binding on later interpretation of claims); *Augustine Med., Inc. v. Gaymar Indus., Inc., 181 F.3d 1291, 1300 (Fed.Cir.1999)* ("[T]he prosecution history of a parent application may limit the scope of a later application using the same claim term."); *see also Phillips, 415 F.3d at 1317* ("[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."); *Chimie v. PPG Indus. Inc., 402 F.3d 1371, 1384 (Fed.Cir.2005)* ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.") (internal quotation marks omitted).

FN7.*See* *Seachange Int'l, Inc. v. C-COR Inc., 413 F.3d 1361, 1381 (Fed.Cir.2005); Ecolab Inc. v. Paraclipse, Inc., 285 F.3d 1362, 1374 (Fed.Cir.2002)* ("[T]o warrant a new trial, Ecolab must show that the erroneous jury instruction was in fact prejudicial. When the error in a jury instruction could not have changed the result, the erroneous instruction is harmless.") (internal quotation marks omitted); *Advanced Display Sys., 212 F.3d at 1281* ("A party seeking to alter a judgment based on erroneous jury instructions must establish that ... the errors had prejudicial effect."); *Biodex, 946 F.2d at 854* (holding that a party challenging jury instructions "has a twofold task [and] must both prove the jury instructions read in their entirety were incorrect or incomplete as given and then demonstrate that the suggested instruction could have cured the error"); *11 Charles A. Wright et al., Federal Practice and Procedure § 2886 (2d ed.1995).*

FN8. Verizon argues that the "present

invention" language is not significant in this case because the specification merely refers to "one aspect" of "the present invention." But that "aspect" is the "localized wireless gateway system," the very claim term that is at issue here. *See880 patent* col.4 ll.6-7 ("Thus, in one aspect, the present invention relates to a localized wireless gateway system.").

FN9. Vonage also argues that we should hold obvious as a matter of law the claims of the 880 patent. Since Vonage did not make a motion for judgment as a matter of law on this theory, Vonage's argument is not properly before us.

FN10. Vonage also argues that the district court should have given an instruction regarding the "obvious to try" standard, but Vonage made no showing there was an issue in this case that would make such a charge appropriate.

FN11.*See* *NTP, Inc. v. Research in Motion, Ltd., 418 F.3d 1282, 1326 (Fed.Cir.2005)* (remanding, reasoning that "because the jury verdict did not specify the amount of infringing sales attributed to each individual patent claim, or the specific devices and services determined by the jury to infringe each separately asserted claim, the district court will have to determine the effect of any alteration of the jury verdict on the district court's damage award").

FN12. One factor that is relevant to the balance of the hardships required by the Supreme Court's decision in *eBay* was not considered by the district court, namely whether the district court should have allowed time for Vonage to implement a workaround that would avoid continued infringement of the 574 and 711 patents before issuing its injunction. Verizon had a cognizable interest in obtaining an injunction to put an end to infringement of its patents; it did not have a cognizable interest in putting Vonage out of business. However, as Verizon points out, Vonage made no request for a workaround period to the district court, and Vonage has already had several months since the district court's

--- F.3d ----                                                                                                          Page 18
--- F.3d ----, 2007 WL 2781869 (C.A.Fed. (Va.))
**(Cite as: --- F.3d ----)**

judgment to implement a workaround.

FN1. The majority opinion remarks that it was futile for Vonage to lodge any objections under Fed.R.Civ.P. 51 as to its proposed "few feet" limitation following the district court's *Markman* hearing. I agree that the futility doctrine applies here but due to *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,* 381 F.3d 1371, 1381 (Fed.Cir.2004). The majority opinion instead relies on an exchange at trial when Vonage's expert testified that he interpreted the prosecution history of the 880 patent to indicate that the applicant intended to limit the claimed invention to operate only "within a few feet of the base station."J.A. at 6046 (1143:20-1144:8). Verizon objected and moved to strike the testimony because "[i]t is a legal conclusion" and "[t]he Court has already construed the claim ... and, frankly, rejected this proposed limitation which Vonage offers."*Id.* (1144:9-14). In response, the district court simply stated, "Objection sustained," and did not elaborate. *Id.* (1144:15). But the district court's terse evidentiary ruling here is far from a clear indication that any further objection would be futile since it provided no explanation-nor was one required-of the basis for sustaining Verizon's objection. To hold otherwise would impose an unnecessary burden on district judges to explain each such ruling to avoid unintentionally excusing parties from complying with Rule 51.

FN2. Indeed, the fact that the 497 patent explicitly adds limitations regarding compression and packetization functions to its claim over a "localized wireless gateway system" tends to show that such functions are not typically or inherently performed by such a system.

FN1. Vonage's example of a "service endpoint" presented to the district court was a voicemail server. At oral argument before this court, though, counsel for Vonage suggested that a voicemail server could not satisfy the "destination address" claim limitation. Oral Arg. at 13:14-13:53, *available at* http://www.cafc.uscourts .gov/

oralarguments/mp3/07-1240.mp3. I would hold Vonage to the position it took at the district court and find the address of a server providing voicemail functionality to be a "destination address" when that address is provided to a calling party.

FN2. Some VoIP calls have their ultimate destination at a number on the public switched telephone network ("PSTN"), the network descended from the Bell System that is used to complete the vast majority of telephone calls. Vonage serves calls to or from PSTN telephone numbers by making available "PSTN gateways" that are connected both to the Internet and the PSTN and which intermediate between VoIP packets on the Internet side and regular telephone calls on the PSTN side. Thus, a Vonage subscriber seeking to call a telephone number will contact a PSTN gateway over the Internet, request that the gateway place a call to that number, and then send VoIP packets to the gateway, which reconstructs the sound of the caller's voice and sends it over the telephone to the called number. A similar process occurs in reverse, and in this manner the Vonage subscriber is able to call or be called by a PSTN telephone number. The patent's written description expressly contemplates embodiments involving a PSTN gateway whose IP address is part of the "destination address." *See* 711 patent col.13 l.51 to col.14 l.15.

FN3. The majority dismisses this passage as "not from a description of the invention of the 711 patent, but rather from a description, in the 'Background Art' section of the patent, of how the internet works in general."Maj. Op. at 14. I do not believe that the particular location of the passage within the specification matters. A patent specification is "a fully integrated written instrument," *Phillips v. AWH Corp.,* 415 F.3d 1303, 1315 (Fed.Cir.2005) (*en banc* ) (quoting *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 978 (*en banc* )), in which words are assumed to have the same meaning throughout. *Id.* ("The words of patent claims have the meaning and scope with which they are used in the specification

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
--- F.3d ----, 2007 WL 2781869 (C.A.Fed. (Va.))
**(Cite as: --- F.3d ----)**

and the prosecution history."(quoting *Kinik Co. v. Int'l Trade Comm'n,* 362 F.3d 1359, 1365 (Fed.Cir.2004))). While the quoted language does not specifically describe the patentee's invention, it is in the patentee's own words and therefore helpful in understanding what those words mean when they appear in the claims.

FN4. As to the other disputed terms in the 574 and 711 patents, "translating," "conditional analysis," and "server," I agree with the majority's conclusions.

C.A.Fed. (Va.),2007.
Verizon Services Corp. v. Vonage Holdings Corp.
--- F.3d ----, 2007 WL 2781869 (C.A.Fed. (Va.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw

65 Fed.Appx. 724                                                                                                    Page 1
65 Fed.Appx. 724, 2003 WL 21206079 (C.A.Fed.)
**(Cite as: 65 Fed.Appx. 724)**

**H**J.G. Peta, Inc. v. Club Protector, Inc.
C.A.Fed.,2003.
This case was not selected for publication in the
Federal Reporter.NOTE: Pursuant to Fed.Cir.R. 47.6,
this order is not citable as precedent. It is public
record.Please use FIND to look at the applicable
circuit court rule before citing this opinion. Federal
Circuit Rule 47.6. (FIND CTAF Rule 47.6.)
United States Court of Appeals,Federal Circuit.
J.G. PETA, INC. (doing business as Coverall
Manufacturing), Plaintiff-Cross Appellant,
v.
CLUB PROTECTOR, INC., and William T. Held,
Defendants-Appellants.
**Nos. 02-1127, 02-1128.**

May 20, 2003.

After patent holder sent manufacturer a cease and
desist letter asserting that manufacturer's golf cart
canopy infringed the claims of the patent,
manufacturer responded by filing a declaratory
judgment action asserting that it did not infringe
patent and that the patent was invalid. Patent holder
then filed a counterclaim of infringement. The United
States District Court for the Northern District of New
York entered judgment of noninfringement, but
denied manufacturer's request for attorney fees and
dismissed patent holder's counterclaim for
infringement. Both parties appealed. The Court of
Appeals, Bryson, Circuit Judge, held that: (1) canopy
did not infringe claims of patent for similar device;
(2) belated request to amend pleadings was too late;
and (3) attorney fees would not be awarded to
prevailing party absent evidence of bad faith.

Affirmed.
West Headnotes
**[1] Patents 291 ☞235(2)**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
        291k233 Patents for Machines or
Manufactures
          291k235 Identity of Principle or Mode
of Operation
            291k235(2) k. Particular Patents or
Devices. Most Cited Cases

Golf cart canopy did not infringe claims of patent for
similar device, even though patented device and
accused device both used plastic clips and ties as
mounting means to support some of canopy's weight,
where clips and ties of accused device did not
provide movement relative to the attached frame
structure, which was a required function of the
patented device's mounting means.

**[2] United States Magistrates 394 ☞23**

394 United States Magistrates
    394k23 k. Proceedings Before Magistrate;
Report. Most Cited Cases
Holder of golf cart canopy patent had no
constitutional right to present argument to magistrate
judge in written rather than oral form.

**[3] Federal Civil Procedure 170A ☞845**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
        170Ak844 Answer
          170Ak845 k. Time for Amendment.
Most Cited Cases
Belated request to amend pleadings to add defenses
of equitable estoppel and unclean hands was too late,
even though opposing party allegedly improperly
withheld new information related to its application
for a patent only a week before the close of
discovery, which formed the basis for the proposed
defenses of unclean hands and equitable estoppel,
where request came very late in the litigation and
subject of opposing party's patent application had
arisen much earlier at preliminary injunction hearing.

**[4] Patents 291 ☞325.11(4)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
        291k325 Costs
          291k325.11 Disbursements in General
          291k325.11(2) Attorney Fees
            291k325.11(4) k. Award to
Defendant. Most Cited Cases
Attorney fees would not be awarded to prevailing
party, who had been accused of infringing on claims

of patent for golf cart canopy, absent requisite evidence of bad faith; although patent holder's case for infringement of patent was perhaps weak, the conduct did not rise to the level of bad faith. 35 U.S.C.A. § 285.

*724 Before MAYER, Chief Judge, CLEVENGER, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

**1 Club Protector, Inc., and William T. Held (collectively "Club Protector") appeal *725 from the order of the United States District Court for the Northern District of New York granting the motion of J.G. Peta, Inc., ("Peta") for summary judgment of noninfringement of U.S. Patent No. 4,830,037 ("the '037 patent"). We affirm.

I

The '037 patent relates to a canopy that attaches to the back of a golf cart and covers the compartment that holds golf club bags. The movable canopy can be lowered to protect golf clubs from inclement weather or raised to remove golf clubs from the cart. The canopy attachment includes "frame means adapted to be attached to the golf cart and canopy means movably secured to the frame means.'"'037 patent, col. 1, II. 45-47. Defendant William T. Held owns the '037 patent and has granted an exclusive license to Club Protector, Inc.

Club Protector sent Peta a cease and desist letter asserting that Peta's golf cart canopy infringed the claims of the '037 patent. Peta responded by filing a declaratory judgment action asserting that it did not infringe the '037 patent and that the patent was invalid. Club Protector then filed a counterclaim of infringement.

After Peta moved for summary judgment of noninfringement, Club Protector sought a continuance pursuant to Federal Rule of Civil Procedure 56(f). The court granted the continuance, extending discovery for 90 days.

At the conclusion of the extended discovery period, Peta renewed its motion for summary judgment. Club Protector opposed the motion for summary judgment and challenged various procedural rulings by a magistrate judge, including the denial of Club Protector's request to amend its pleadings to add the defenses of equitable estoppel and unclean hands and

to take a deposition relating to those defenses.

The district court granted Peta's motion for summary judgment of noninfringement. The court concluded that Peta's accused device lacked a "mounting means," a limitation found in the two asserted claims, claim 1 and claim 11, and that the accused device did not infringe the '037 patent, either literally or under the doctrine of equivalents. The court denied Peta's request for attorney fees under 35 U.S.C. § 285 and dismissed Peta's counterclaim for infringement. In a separate order, the district court upheld all of the magistrate judge's procedural rulings.

Club Protector appeals the grant of summary judgment of noninfringement. Peta cross-appeals the denial of attorney fees and costs.

II

As a preliminary matter, Peta contends that we do not have jurisdiction over this appeal. Peta argues that Club Protector's notice of appeal was "untimely and premature" because Club Protector filed its notice of appeal two days before the entry of judgment by the district court clerk. We have already resolved this issue in an order filed on July 19, 2002, in which we held that the appeal was timely because Federal Rule of Appellate Procedure 4(a)(2) provides that a "notice of appeal filed after the court announces a decision or order-but before the entry of the judgment or order-is treated as filed on the date of and after the entry." Peta requests that we reconsider that order, but Peta's request itself is untimely, having not been filed within 14 days of the order as required by Federal Circuit Rule 27(l ). In its brief to this court, Club Protector in turn states that Peta filed an untimely cross-appeal, but the cross-appeal was ruled timely and Club Protector's motion to dismiss the cross-appeal was denied by this court in an *726 order filed on April 17, 2002. Accordingly, neither appeal is dismissed.

III

**2[1] Claim 1 of the '037 patent provides:

In combination with a golf cart of the type having a forward seating compartment, a rear golf bag compartment, and a top assembly including a top disposed over the seating compartment, the top assembly additionally including front and rear laterally spaced apart frame members which support

65 Fed.Appx. 724                                                                                                                Page 3
65 Fed.Appx. 724, 2003 WL 21206079 (C.A.Fed.)
**(Cite as: 65 Fed.Appx. 724)**

the top, the rear frame members being disposed between the forward seating compartment and rear golf bag compartment, the improvement which comprises a protective canopy assembly which includes a protective canopy attachment and mounting means secured to an intermediate portion of the rear laterally spaced apart frame members, the canopy attachment being at least partially supported by the mounting means and being moveable between the lowered first position where it may protectively cover golf bags and clubs positioned within the rear golf bag compartment and a raised second position where the golf bags may be unloaded from the rear golf bag compartment, the canopy attachment including a frame structure attached to the mounting means for movement relative thereto, and a cover assembly supported by the frame structure and secured to an upper rear portion of the top assembly.

Claim 11 provides:
A protective canopy attachment for attachment to a golf cart having a front, a rear, a seating compartment intermediate of the front and rear of the cart and a top assembly including a top supported generally above the seating compartment and front and rear laterally spaced frame members which support the top, said cart further including a rear compartment into which golf clubs and bags are positioned during use of the cart, and mounting means adapted to be attached to the rear frame members adjacent the rear compartment thereof and in a stationary relationship therewith said canopy assembly comprising:
a pair of U-shaped brackets pivotally interconnected to the mounting means for pivotal movement between an operative condition at which said brackets are positioned generally above the rear compartment of the cart and a non-operative, out-of-the-way condition, attachment means secured to an upper rear portion of the top assembly, and
a cover section secured to said brackets and said attachment means for movement therewith as the brackets are moved between said operative and non-operative conditions so that said cover section can be selectively moved between one condition at which said cover section protectably covers the golf bags and clubs positioned within the rear compartment and another condition at which said cover section does not inhibit the removal of clubs from the golf bags.

The district court held that the "mounting means" limitation in both claims is in means-plus-function form in accordance with 35 U.S.C. § 112, paragraph 6, and that the functions of the mounting means are to

"partially support the canopy attachment and to provide movement relative to the attached frame structure." We agree, particularly in light of Club Protector's failure to propose any different function for the "mounting means" limitation.

**\*\*3** The district court identified the structure that performs the recited functions as the structure referred to in the specification as the "frame means [70]," which includes "two bar sections 72 and 74 each **\*727** having a first through-opening 76 and a second through-opening 78 defined therein. '''037 patent, col. 2, II. 61-64.[FN1] The specification explains that the "canopy means, generally indicated 80, [is] secured to the frame means 70, and movable relative thereto between operative and inoperative conditions" and that the canopy means includes a "frame structure 82" that consists of "a pair of generally U-shaped metal brackets 84 and 86 which are pivotally attached to one another and to the frame means 70."'037 patent, col. 3, II. 4-7, 10-12. The specification reveals that the bar sections are attached to member 102 having a clevis portion 104, through which a bolt passes permitting pivotal motion between the brackets and the bar sections. '037 patent, col. 3, II. 23-60. We agree with the district court that the specification makes clear that the frame means, including the bar sections, forms the structure that performs the recited functions of the claimed "mounting means." In addition, however, we conclude that the structural elements of the member 102 and the clevis portion are also components of the claimed mounting means because those elements allow for movement relative to the frame structure. With that minor alteration, we uphold the district court's construction of the "mounting means" limitation.[FN2]

FN1. The prosecution history makes clear that when amending the claims, the patentee substituted "mounting means" for "frame means."

FN2. Club Protector contends that the district court erred in denying its request to schedule a *Markman* hearing "to have the benefit of expert testimony." This court has never held that district courts must conduct evidentiary hearings as part of the claim construction process. To the contrary, district courts are not required to follow any particular procedure in conducting claim construction; while "some courts have found

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

it useful to hold hearings .... [s]uch a procedure is not always necessary." *Ballard Med. Prods. v. Allegiance Healthcare Corp., 268 F.3d 1352, 1358, 60 USPQ2d 1493, 1498 (Fed.Cir.2001)*. In this case, the district court properly concluded that a hearing was not necessary in light of the simple technology and relatively straightforward claim language at issue. Extrinsic evidence was unnecessary, and the district court did not err in declining to conduct a hearing to consider it. *SeeVitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583, 39 USPQ2d 1573, 1578 (Fed.Cir.1996)*.

Club Protector argues that the "mounting means" found in the accused device consists of a pair of plastic ties or clips. The Peta device includes (1) an awning track that connects a canopy assembly to the roof of a golf cart and (2) a canopy assembly consisting of a fabric cover supported by a framework formed from metal tubing with a stabilizer bar extending horizontally across the width of the cart and along the bottom of the assembly. The Peta canopy is sold with plastic ties or clips that can secure the stabilizer bar to the frame of the golf cart.

The district court concluded that the ties and clips function only to prevent vibration and do not perform the recited functions of the claimed "mounting means." The court stated:

Even assuming that the clips and ties used on Peta's Canopy partially support its canopy attachment, those clips and ties clearly do not provide any movement relative to the attached frame structure. Put another way, the frame structure is simply not pivotally connected to either the ties or clips and, thus, does not move relative to the ties or clips.

While Club Protector argues that the plastic clips and ties support some of the weight of the canopy in the accused device, it does not challenge the district court's conclusion that the clips and ties do not **728** provide movement relative to the attached frame structure-a required function of the mounting means. Moreover, there is no evidence that the ties and clips provide movement relative to the frame structure. Accordingly, we agree with the district court that a reasonable jury could not conclude that Peta's accused device infringes claims 1 and 11 of the '037 patent. Because the relevant structure in the accused device fails to perform at least one of the claimed functions, the accused device cannot literally

infringe.

**4** Club Protector relies heavily on its expert's opinions to support its argument that there was a question of fact with respect to infringement. The district court considered the expert's contention that Peta's ties and clips are "mounting means," but rejected it, stating that the expert's opinion "is entirely conclusory and does not compel a contrary conclusion here." We agree. Club Protector's expert does not explain how the ties or clips perform all of the recited functions and thus his expert opinion is insufficient to create a genuine issue of material fact. *SeeArthur A. Collins, Inc. v. N. Telecom Ltd., 216 F.3d 1042, 1047-48, 55 USPQ2d 1143, 1147 (Fed.Cir.2000)*.

With respect to the doctrine of equivalents, the district court concluded that prosecution history estoppel barred Club Protector from asserting equivalents to "mounting means" and accordingly granted summary judgment of noninfringement on that issue as well. After examining the prosecution history of the '037 patent, the court concluded that the "mounting means" limitation was narrowed by amendment to overcome a rejection based on prior art. Citing this court's en banc decision in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 234 F.3d 558, 56 USPQ2d 1865 (Fed.Cir.2000)*, the court applied a complete bar to equivalents. After the district court issued its decision in this case, the Supreme Court vacated this court's decision and established a new framework for analyzing prosecution history estoppel. *SeeFesto Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002)*. As Peta correctly states, the new framework establishes a rebuttable presumption that Club Protector is estopped from asserting the doctrine of equivalents. Peta further states, correctly, that Club Protector makes no attempt to rebut the presumption of estoppel and does not request a remand for purposes of making any such showing. The presumption of estoppel thus stands unrebutted, and accordingly we uphold the summary judgment of noninfringement under the doctrine of equivalents.

IV

[2] Club Protector also objects to several matters in the magistrate judge's procedural order dated April 11, 2001. First, Club Protector contends that it was a "fundamental denial of due process" for the

65 Fed.Appx. 724                                                                                    Page 5
65 Fed.Appx. 724, 2003 WL 21206079 (C.A.Fed.)
**(Cite as: 65 Fed.Appx. 724)**

magistrate judge to consider oral, rather than written, motions. There is no constitutional right to present argument in written rather than oral form, however, and nothing about the magistrate judge's procedure violated Club Protector's due process rights. Nor did the magistrate judge's procedure violate either the local rules of the district court or the Federal Rules of Civil Procedure.

[3] Second, Club Protector argues that the magistrate judge erred in denying its belated request to amend the pleadings to add the defenses of equitable estoppel and unclean hands. A trial court's decision on a motion to amend a pleading is reviewed for abuse of discretion. *See* *Grochowski v. Phoenix Constr., 318 F.3d 80, 86 (2d Cir.2003)*. The Second Circuit, whose law governs*729 this issue, recognizes that a court may permit late amendment to a pleading upon a showing of good cause, which requires a showing of diligence by the moving party. *Parker v. Columbia Pictures Indus., 204 F.3d 326, 340 (2d Cir.2000).*

**5 Club Protector contends that Peta improperly withheld new information related to Peta's application for a patent of its own until March 9, 2001, a week before the close of discovery. Club Protector also states that Peta provided Club Protector with a copy of the motion for summary judgment at the completion of the April 4 hearing that resulted in the April 11 order. It was in that motion that Peta cited the Peta patent as evidence of noninfringement under the doctrine of equivalents. Club Protector argues that Peta engaged in inequitable conduct before the Patent and Trademark Office in obtaining its patent and that it was therefore improper for Peta to rely on that patent as evidence of noninfringement of the '037 patent. Peta's assertedly improper conduct forms the basis for Club Protector's proposed defenses of unclean hands and equitable estoppel.

The magistrate judge rejected the amendment as untimely and found a lack of good cause for the delay. The district court upheld the rejection, stating that "[l]ike the magistrate judge, the court has trouble following the logic of defendants' argument regarding the need to amend, and its papers on this appeal offer little enlightenment." We hold that the court did not abuse its discretion in rejecting the amendment. The request came very late in the litigation, and the subject of Peta's patent application arose much earlier at a preliminary injunction

hearing, as the magistrate judge indicated at the April 4 hearing that led to the April 11 order. Moreover, the district court did not rely on the Peta patent in its summary judgment opinion, and Peta's use of its patent as evidence of noninfringement under the doctrine of equivalents is immaterial, as the court found that infringement by equivalents was barred by prosecution history estoppel.

Finally, Club Protector objects to the magistrate judge's ruling denying Club Protector's request to depose Ms. Tracy Emert. Club Protector contends that Ms. Emert had information relevant to the defenses of equitable estoppel and unclean hands, but those defenses are not a part of this case because the request to amend the pleadings was denied. Nothing in Club Protector's submissions indicates that Ms. Emert had information relevant to whether Peta's device infringed the '037 patent. The district court therefore did not abuse its discretion in upholding the magistrate judge's order on this issue.

V

[4] In its cross-appeal, Peta asks that we "declare this case exceptional and award attorney fees for this appeal and/or the district court case." Under 35 U.S.C. § 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." With respect to fees for the district court proceedings, we review a district court's factual finding of whether a case is exceptional for clear error. *See* *Rambus Inc. v. Infineon Techs. AG, 318 F.3d 1081, 1088, 65 USPQ2d 1705, 1709 (Fed.Cir.2003)*; *Hoffmann-La Roche Inc. v. Invamed Inc., 213 F.3d 1359, 1365, 54 USPQ2d 1846, 1850 (Fed.Cir.2000)*. The prevailing party must establish that the case is exceptional by clear and convincing evidence. *Hoffmann-LaRoche, 213 F.3d at 1365, 54 USPQ2d at 1850.* "The prevailing party may prove the existence of an exceptional case by showing: inequitable conduct before the PTO; litigation misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit or willful infringement." *730Epcon Gas Sys., Inc. v. Bauer Compressors, Inc., 279 F.3d 1022, 1034, 61 USPQ2d 1470, 1479 (Fed.Cir.2002)* (citation omitted).

**6 Before the district court, Peta argued that Club Protector had pursued "unwarranted and spurious allegations of infringement." We do not find clear error in the district court's determination that this case is not exceptional, and thus not eligible for attorney

fees for the district court proceedings. The district court stated that "[w]hile defendants' case for infringement of the '037 patent was perhaps weak, their conduct does not rise to the level of bad faith." We agree; the record does not indicate that Club Protector pursued its argument of infringement of claims 1 and 11 of the '037 without a reasonable belief in its merits. See *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.,* 15 F.3d 1573, 1584, 27 USPQ2d 1836, 1845 (Fed.Cir.1993). Accordingly, we affirm the district court's denial of attorney fees.

Peta also requests attorney fees for this appeal. Peta contends that Club Protector's "incomprehensible" brief in this appeal displays "Club Protector's negligent disregard for fact and law." Among the enumerated errors Peta identifies in Club Protector's brief is the failure to provide case law to support its claim of due process violations and the attempt to "invalidate Peta's patent by claiming inequitable conduct." We have held that 35 U.S.C. § 285"authorizes this court to award fees in cases in which the appeal itself is exceptional." *State Indus., Inc., v. Mor-Flo Indus., Inc.,* 948 F.2d 1573, 1578 n. 1, 20 USPQ2d 1738, 1741 n. 1 (Fed.Cir.1991). "Section 285 thus provides an alternative mechanism for sanctioning frivolous appeals in patent cases where ... bad faith is also shown, in addition to the more general sanctions provisions, which do not require a showing of bad faith," including Rule 38 of the Federal Rules of Appellate Procedure.[FN3]*Id.* We do not find requisite evidence of bad faith in this appeal, and we therefore decline to award attorney fees under section 285.

> FN3.Rule 38 specifies that requests for damages and costs related to a frivolous appeal must be submitted in a "separately filed motion." Peta failed to file a separate motion and did not aver to Rule 38, or frivolousness, in its brief. Thus, we decline to evaluate whether the appeal was frivolous as filed or as argued under Rule 38.

C.A.Fed.,2003.
J.G. Peta, Inc. v. Club Protector, Inc.
65 Fed.Appx. 724, 2003 WL 21206079 (C.A.Fed.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.